1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          16 Cr. 246-03 (JSR)

5   KIAN GOHARI,

6               Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        October 21, 2016
9                                       11:00 a.m.

10
    Before:
11
                       HON. JED S. RAKOFF,
12
                                        District Judge
13

14                        APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    JORDAN ESTES
17  JASON RICHMAN
         Assistant United States Attorney
18
    GREENBURG TRAURIG
19       Attorneys for Defendant
    GREGORY KEHOE
20  ILANA HARAMATI
    MICHAEL BACHNER
21

22  Also Present:  Erin Cahill, FBI

23

24

25

1              (Case called)

2              MS. ESTES:  Jordan Estes and Jason Richman for the

3     government.  Also with us at counsel table is Erin Cahill of

4     the FBI.

5              THE COURT:  Good morning.

6              MR. KEHOE:  Gregory Kehoe, Ilana Haramati, and Michael

7     Bachner on behalf of defendant, Mr. Gohari.

8              Behind me is Mr. Quintero, who is the expert in the

9     report that I think the Court would like to discuss.  He's the

10    gentleman right behind me.  The other guy in the back is a New

11    York City cop.

12             THE COURT:  Have you discussed with your client his

13    right to be here today?

14             MR. KEHOE:  Yes, your Honor.  Mr. Bahner did, and we

15    waive his appearance.

16             THE COURT:  This hearing was called because the

17    parties telephoned the Court yesterday.  The government

18    objected on several grounds to the proposed testimony of the

19    prospective defense expert, Mr. Quintero.

20             The first ground on which the government objected was

21    on timeliness.  We had a previous Daubert hearing regarding the

22    government's expert, and during the August 4th, 2016 pretrial

23    conference -- in other words, more than two months ago -- I

24    stated from the bench -- and this was directed to defense

25    counsel -- "The one thing I feel strongly about, if your expert

1    is going to testify, he will need to provide a report in

2    advance of trial similarly detailed to the one that I have

3    indicated the government should provide, and that certainly

4    would have to be provided at least -- at the absolute -- at

5    least ten business days before trial, and that I would prefer

6    much earlier, but that would be the absolutely latest, and he

7    or she will be precluded from testifying if they don't have

8    that report."

9         The government complied, and their expert produced a

10   report, and we had, as I mentioned, a Daubert hearing, which

11   occupied a fair amount of time and led to some narrowing of

12   what the government's expert could testify about and so forth.

13   But instead, the defense did not give notice of the report of

14   its expert to the government until 9:00 p.m. on October 19th,

15   two days ago.  The trial of this case has long been set for

16   October 31st.  Ten business days before trial would be

17   October 17th.  So why shouldn't I preclude the testimony?

18        MR. KEHOE:  Your Honor, I will tell you that we made

19   an error in logging this, and to the extent that I take blame

20   for that, I do.  I thought it was ten days and not ten business

21   days.  We were continuing to get records from the government

22   even just a few days prior to the disclosure.  It was not done

23   in bad faith, it was done in good faith.  And the disclosures

24   in this case have often been made by Jencks.  And obviously, we

25   got the Jencks material from counsel, I think it was 9:30 at

1   night on that date.  But nevertheless, it was in good faith.

2   We honestly thought that it was ten days prior to trial, and

3   that Wednesday was the day, and that as we were getting

4   additional records from the government and giving them to

5   Mr. Quintero to see if it needed to be incorporated into this,

6   that's what we were doing.

7           THE COURT:  So assuming that you convince me that --

8   and I want to hear from the government in a minute -- but that

9   you convince me that this inadvertent error is not of a

10  magnitude that warrants exclusion, nevertheless, it was a

11  rather blatant violation of a crystal clear ruling from the

12  Court.  So what sanction do you think I should impose on you

13  for the violation?

14          MR. KEHOE:  Your Honor, I will take any personal

15  sanction that your Honor levies.  As lead counsel in this case,

16  it's obviously my responsibility.  I will tell you, Judge, that

17  it was not done in bad faith.

18          THE COURT:  No, I accept that it was not done in bad

19  faith.

20          MR. KEHOE:  To the extent sanctions are imposed

21  against me, individually, Judge --

22          THE COURT:  The point is, it could not have been a

23  clearer ruling, and I couched it in the strongest terms.  And

24  part of the reason for it was not only to protect the parties

25  against surprise, but also because, as you must have gathered

1    already from the prior Daubert hearing in this case, this Court

2    is very intent on making sure that Rule 702 of the Federal

3    Rules of Evidence are strictly complied with, and that usually

4    requires a hearing before trial.

5           Now, you may be surprised to learn that I do have

6    other cases and other matters and other things scheduled, and

7    I'm not going to move the October 31st -- I can't move the

8    October 31st date because I have other trials following your

9    trial, so that date is set in stone.

10          I think maybe some monetary sanction is called for,

11   notwithstanding your good faith, but let me hear from the

12   government.

13          MR. KEHOE:  Again, just before the government -- it

14   was a mistake, and I know your Honor accepts that, and of

15   course we accept responsibility for that, and I do not think at

16   this point that any prejudice has enured to the government at

17   this juncture.  This witness is not going to testify for a

18   significant period of time.  It wouldn't be until the defense

19   case, and we still have the full government case to take up

20   even before Mr. Quintero would take the stand.

21          THE COURT:  All right.  Let me hear from the

22   government.

23          MS. ESTES:  I mean, your Honor, we were concerned with

24   the timeliness.  It is true that we made a disclosure on

25   Saturday.  It was a three-page disclosure of Medicaid total

1    billings for three years.  So I do apologize for that given the

2    discovery deadline here.

3         I don't believe the timing should be the dispositive

4    thing here, we think there are many problems with the report

5    substantively, and we would ask your Honor to rule on those.

6         THE COURT:  On the timing issue, being by nature a

7    very tough judge, I'm going to impose a $100 fine on defense

8    counsel to be paid before October 31st to the Clerk of the

9    Court for the violation of my ruling.

10        MR. KEHOE:  Yes, your Honor.

11        THE COURT:  Now let's turn to the merits of the

12   report.  Of course, since I also just received the report, I

13   haven't had a chance to study it in detail, but this is a

14   report of a certified public accountant, and this is what he

15   called "observations".  It's a funny terminology, but I assume

16   that is what's normally called "opinions".

17        Opinion, or observation number 1, is, "Sales by AFAM,

18   the defendant's business, to the alleged coconspirators that

19   were billed to Medicaid were not material in relation to total

20   AFAM sales during the period covered by the indictment."

21   What's the relevance of that?

22        MR. KEHOE:  The relevance here, Judge, as with all of

23   this report, is one of motive.  The government is then placing

24   in evidence, or they have a number of items in evidence, about

25   how much money was billed to Medicare, how much money was

1   billed by Mr. Gohari.  And the motive for as we go through this

2   entire report is that if, in fact, there is some financial

3   element to this that the government is advancing here, we're

4   trying to demonstrate that, with such miniscule amounts of

5   money coming to the pharmacy and coming to Mr. Gohari, that the

6   motive for him to engage in this alleged criminal activity is

7   virtually nonexistent.  So it goes directly to motive.

8          THE COURT:  But I'm not sure how -- if he were

9   testifying, "I didn't pay much attention to this because it was

10  a trivial part of my business," then I could see it might raise

11  an issue going to motive.  But there's no indication that I'm

12  aware of that he was aware of what this accountant has now,

13  after the fact, ascertained.  So for example, the specific word

14  here "material", first of all, that has nothing to do with

15  motive, that's -- the term "material" is objective, not

16  subjective.  That's about as well-established as any principle

17  of law I know of.

18         But putting that aside for the moment, you're not

19  introducing evidence, I take it, that at the time he knew,

20  because there had been a prior audit that was brought to his

21  attention or something like that, that this was a trivial

22  amount.  And, of course, if he did know, if such an audit had

23  existed and he did know of such a trivial amount, he would have

24  been focused on the fact that his sales of illegal substances

25  were a trivial amount.  There's no materiality requirement --

1    he could be knowingly distributing or contributing to the

2    wrongful distribution of 1 gram of a controlled substance and

3    he would still face criminal sanctions.

4            MR. KEHOE:  Judge, that's subject to argument.  They

5    have a --

6            THE COURT:  No, it's not.  What's not subject to

7    argument?

8            MR. KEHOE:  It is subject to argument.

9            THE COURT:  What is?

10           MR. KEHOE:  You're saying that if there's one

11   particular issue or he had one particular transgression that he

12   would be still subject to a criminal sanction.  That's true.

13   What we have here, what we have here is a sequential series of

14   facts that the government is going to put on that my client was

15   part of this intentional conspiracy to, one, violate Title 21

16   United States Code, Section 846, and 1349 as a False Claims Act

17   conspiracy.

18           THE COURT:  No.  But here's -- maybe I'm missing your

19   point.  The government, as I understand it, will be saying,

20   while he might not perhaps have picked up on one or two of

21   these, or a whole bunch, red flags flying -- the words of the

22   prior government's expert, although we're not going to be using

23   that term at trial -- and so I can see the defense saying,

24   "Here's what the defendant's business was.  He processed

25   thousands of prescriptions, and this was a trivial portion of

1    it."  That I can see.  But that's not what you're saying.

2        What you're saying is that it was not material in

3    relation -- that's an accounting term of art that has

4    absolutely no relevance to the question.  You're free to make

5    the argument, and if you just wanted to call him as a, if you

6    will, summary witness to say here's where the total number of

7    prescriptions over the relevant period and so forth, and here

8    were the ones that the -- the proportion of them that were

9    governed by the -- that the government says were wrongful, I

10   might consider that.  But you're going a lot further here just

11   on the very first opinion.

12       MR. KEHOE:  These opinions hang together because they

13   are designed to address the evidence advanced by the

14   government.  The key to this --

15       THE COURT:  Materiality of the sales is not an element

16   of the crime and it doesn't go to motive.  The amounts go to

17   motive, but materiality -- maybe you're missing my point.

18   Materiality is a term of art.  It's both a legal term of art

19   and accounting term of art, and it says something about

20   objective materiality, not the subjective, and therefore, it

21   has no relevance to motive.

22       MR. KEHOE:  Your Honor, maybe we're talking past each

23   other on the issue of just materiality and maybe --

24       THE COURT:  That's the first -- as I say, you just

25   gave me his report.

1           MR. KEHOE:  I did, Judge.  But what we're trying to

2      get at, and it's a crucial part of the defense, given the case

3      of the government, Judge, we didn't come out of this out of

4      whole cloth.  We presented this because they, the government,

5      is going to bring a financial picture together concerning what

6      was going on in this pharmacy.  That's their case.

7           THE COURT:  And factually, and through a summary

8      witness, which could be an accountant, you are more than

9      permitted -- I want to hear from the government on this, but at

10     least off the top of my head -- you're more than permitted to

11     say, "Here's what the financial records show," but that's not

12     what this guy is saying, at least not in opinion number 1.

13          MR. KEHOE:  Judge, we will obviously be guided by what

14     the Court thinks how we should phrase this.

15          THE COURT:  Let's look at number 2.

16          MR. KEHOE:  Okay.

17          THE COURT:  Same problem.  "Sales by AFAM to the

18     alleged coconspirators funded by all payer sources, including

19     Medicaid, were not material in relation to total AFAM sales

20     during the relevant timeframe."  So there's no way I'm going to

21     allow that with the use of the term "material".

22          MR. KEHOE:  Okay, Judge.

23          THE COURT:  Observation 3.  "The hypothetical economic

24     end benefit from the sales to alleged conspirators was not

25     significant."  I have no idea, we may put your expert on the

1    stand what he means by "significant", but it sounds to me like

2    it's just a synonym for "material".  He's talking about

3    objective --

4              MR. KEHOE:  He is.

5              THE COURT:  -- materiality, which I don't want to

6    repeat myself 500 times.

7              MR. KEHOE:  It's only three, Judge.

8              THE COURT:  That's not the issue.  All right.

9              Observation number 4.  "The volume of sales of

10   prescriptions funded by Medicaid that were dispensed by AFAM to

11   the alleged coconspirators during the relevant timeframe does

12   not appear to be unusual."  I have a real question about

13   whether he has the expertise to even offer that opinion.

14   Appear in what sense?

15             MR. KEHOE:  He's juxtaposing these numbers towards a

16   statistical analysis that came from an AARP journal concerning

17   records of like type people in these types of pharmacies.  If

18   you look at the footnote that he has down there, which is --

19   actually, it's Exhibit 12, but if I can just pull this out.  I

20   mean, that's between 4 and 5.  That's where this information is

21   coming from.

22             THE COURT:  I want to hear his -- we'll have to put

23   him on the stand because I have very great doubts about whether

24   that passes 702.

25             Observation number 5.  "The monthly prescription

1    expenditures of the alleged coconspirators seemed reasonable

2    for patients of a specialty pharmacy."

3         MR. KEHOE:  That's the juxtaposition with the AARP

4    article that is put forth in footnote 14.

5         THE COURT:  All right.  We'll have to see what he says

6    about that.

7         Observation number 6.  "Prescriptions were dispensed

8    to the alleged coconspirators on 557 days during the relevant

9    time period."  That seems to me admissible, subject to hearing

10   from the government.

11        MR. KEHOE:  That's their records.  That number, if you

12   look at the footnote --

13        THE COURT:  Wait.  If it's just their records then

14   it's -- once again, he will be just then, on that regard,

15   acting as a summary witness, which is fine.

16        MR. KEHOE:  It's not necessarily a summary witness,

17   Judge, because they gave us these bulk of records --

18        THE COURT:  Well, what is it that he is opining on as

19   opposed to simply summarizing in observation number 6?

20        MR. KEHOE:  In this particular case, he's taking the

21   documents that they had and calling out from the massive amount

22   of paper that they gave us to come to a specific observation

23   taken from those documents.

24        THE COURT:  That sounds like a summary witness.

25        MR. KEHOE:  You know, Judge, oftentimes when you have

1  an expert such as a --

2        THE COURT:  No.  Excuse me.  There, I have no

3  objection, subject to hearing from the government as to its

4  point of view, as to a summary witness, but a summary witness

5  is very different from an expert.  A summary witness is fine

6  and is presented to the jury as just that.  "There were

7  voluminous records, I combed through them, and here's what I

8  found."  An expert is someone who says, "Here's something that

9  you, the jurors, would not know if you had combed through all

10  these records, but I know because I've got a special body of

11  knowledge that I methodologically reliably apply to this data

12  and came up with the following opinions."  Those are two

13  totally different things.

14        Sure, sometimes a witness can serve as both, but so

15  far, all I'm seeing on observation number 6 is that in that

16  regard he's a summary witness, which is fine, but that doesn't

17  mean -- it doesn't make him an expert.

18        Observation number 7.  "Sales of Oxycodone in its

19  various formulation to the coconspirators during the relevant

20  period amounted to less than $16,000 or less than 4 percent of

21  the sales funded by Medicaid on behalf of the alleged

22  conspiracy."  Again, that might be fine as a summary witness.

23  I don't see it as involving any expertise.

24        Observation number 8.  "None of the top 15 medications

25  sold by AFAM to the alleged coconspirators were controlled

1  substance except for Oxycodone."  I'm not sure of the relevance

2  of that, but at least it's --

3          MR. KEHOE:  It's relevant because you have Count One,

4  which is an 846 conspiracy.

5          THE COURT:  Excuse me?

6          MR. KEHOE:  It's relevant because the vast majority of

7  the medications being sold to these coconspirators are not part

8  of this indictment, certainly with regard to Count One.  Count

9  One is an 846.

10          THE COURT:  So showing what?

11          MR. KEHOE:  Showing that there was a dispensing of any

12  number of items taken from these records to these

13  coconspirators, alleged coconspirators, which were fine, even

14  under the government's treatment of this.

15          THE COURT:  What does that show?  Maybe I'm missing

16  the point.  So I come to you and I say, "Please fill my

17  prescriptions for," in my hypothetical, "for the following

18  substances," and you list four innocuous substances, and then

19  you list, in my hypothetical, a huge amount of deadly arsenic,

20  which, in my hypothetical, he then uses to kill 50 people.  So

21  what does it matter that he also asked for four innocent drugs?

22          MR. KEHOE:  Well, because, Judge, this case is focused

23  on these coconspirators buying Oxycodone.  That's what this

24  case is about.

25          THE COURT:  Believe it or not, I know that.

1          MR. KEHOE:  Okay, Judge.  What we're saying is that

2     these people came in for a variety of things.  Oxycodone

3     wasn't -- they weren't just walking in the door here and said,

4     "Oh, sign me up for Oxycodone."  That's what they would have

5     you believe.  But there is a variety of things that these

6     people have for their ailments for which they had valid

7     prescriptions.  What's lost in all of this --

8          THE COURT:  And what follows from that?

9          MR. KEHOE:  What follows from this is, as a

10    pharmacist, coming in, that he is in good faith filling all of

11    these prescriptions and is not just saying, "Give me this

12    Oxycodone."  Because this is the big deal here, this is the

13    really bad stuff.  He is acting the way a pharmacist should act

14    when he's getting valid scripts.

15          And your Honor, you should know this, and I don't know

16    if this is missed in all of this, but all of these scripts that

17    came into this pharmacy were valid scripts written by doctors.

18    These weren't phoney scripts.

19          THE COURT:  Of course, you're not calling someone who

20    says, "I have knowledge of how the reasonable pharmacist should

21    act."  That would be, of course, perfectly appropriate given

22    the government's expert.  But what you're calling is someone

23    who is going to, so far as I can see so far, summarize the data

24    and then permit you to argue that it was not -- that a

25    reasonable pharmacist would not have been suspicious under

1    those circumstances.  And I think -- again, soon I'll be

2    hearing from the government -- that that may be a reasonable

3    thing for a summary witness to do, but I think that's as far as

4    I can see any of this going.

5           Let's turn to observation number 9.  I'm not sure who

6    "we" means there.  Did he use others on this audit, or does he

7    just use the royal "we"?

8           MR. KEHOE:  I think it's the royal "we".

9           THE COURT:  I'm pleased to have royalty in my

10   courtroom.

11          MR. KEHOE:  It's always a good thing.

12          THE COURT:  "We have not seen any evidence that would

13   suggest that AFAM did not fill the prescriptions dispensed to

14   the alleged coconspirators."  How does that fall within his

15   expertise?

16          MR. KEHOE:  Because it goes back to, again, the

17   records.  And to the extent that there has been production

18   of --

19          THE COURT:  No, but he's saying, "We have not seen any

20   evidence that would suggest."  That's not he's saying.  Is he

21   an expert on suggestibility?

22          MR. KEHOE:  Judge, I think what we're talking about

23   here, and it may be just a term that your Honor is not --

24          THE COURT:  If you had said to him, if he had opined,

25   "I've seen the following things from the record, I did not see

1   X, I saw 14 red roses, and I didn't see a single blue violet,"

2   that summary, from a summary witness, assuming it's otherwise

3   relevant, would be fine.  But that's not what he's saying here,

4   he's giving an opinion about suggestibility in an area that I

5   don't think fits within even his expertise.

6           MR. KEHOE:  Well, Judge, if we can go back to this one

7   moment.  There have been production of wholesaler records, and

8   what he is saying is that the wholesaler records are consistent

9   with the dispensing by the pharmacy.  Because one of what the

10  government's positions here is, and Mr. Cabrera, I was reading

11  this information since it's been produced at some volume on

12  Monday night, is that my client did not dispense many of these

13  other items and just billed Medicaid.  That is a key component

14  of the government's case.

15          THE COURT:  All right.  Let me hear from the

16  government, and then we'll come back to defense.

17          MS. ESTES:  Your Honor, our position is that most of

18  this testimony is more appropriate from a summary witness.  The

19  expert is simply taking things from the Medicaid data, maybe

20  taking things from the wholesaler records, and he's summarizing

21  them.  We plan to do something similar with using a paralegal.

22  We just don't think it's proper to have somebody under the

23  cloak of an expert presenting this testimony to the jury.  We

24  think it's likely to confuse the jury.

25          We also have real concerns about some of the

1   observations, that they don't fall within his expertise.  For

2   instance, I don't believe that reading an AARP article makes

3   you an expert in what a specialty pharmacy does.  I believe

4   that was observation number 5.

5           Observation number 4, we similarly didn't believe

6   that, based on his CV that's at the back of his report, that he

7   has any expertise relevant to that observation.

8           THE COURT:  I think all those points seem to me at

9   least colorable, but let's get the witness on the stand and

10  we'll find out.

11          MS. ESTES:  Your Honor, one more thing before the

12  witness gets on the stand.  We're also concerned that part of

13  his testimony would be based on an interview with the

14  defendant, and it seems to us --

15          THE COURT:  That's not going to be -- that raises some

16  very serious problems, I agree.  I was not aware of that.  You

17  can't get -- the defendant has the choice.  He can either

18  invoke his Fifth Amendment privilege or he can take the stand.

19  If defense counsel has already decided that he's going to take

20  the stand, then conceivably an expert could rely on things from

21  that person, although even then there are hearsay issues that

22  would have to be explored.

23          But if we don't know if he's going to take the stand,

24  which is the usual situation, then I don't see how that could

25  be used as a back doorway of getting in his testimony.

1          Now, it depends on what he was relying on the

2   defendant for.  Let's get him on the stand and then we'll

3   discuss these issues more.

4    RONALD G. QUINTERO,

5        called as a witness by the Defendant,

6        having been duly sworn, testified as follows:

7          MR. KEHOE:  Your Honor, for purpose of this hearing, I

8   trust your Honor has a copy of the report?

9          THE COURT:  Yes.  I just got it this morning, but I do

10  have a copy of the report, and I'm going to put the questions,

11  after which I'll allow counsel to put additional questions, if

12  they wish.

13         MR. KEHOE:  My only question, Judge, is do you want me

14  to put a copy of the report into the record at this point?

15         THE COURT:  Sure.  Let's call it Defendant's Exhibit 1

16  for today's proceeding.

17         MR. KEHOE:  Yes, your Honor.  And I believe

18  Mr. Quintero has got the same report in front of him.

19         THE COURT:  Very good.  You can mark it as Defendant's

20  Exhibit 1.

21         (Defendant's Exhibit 1 received in evidence)

22  BY THE COURT:

23  Q.  You're a CPA, right?

24  A.  Yes, sir, among ten licenses that I have.

25  Q.  You're not a pharmacist.

1  A.  I am not.

2  Q.  Your first observation number 1 is, "Sales by AFAM to the

3  alleged coconspirators that were billed to Medicaid were not

4  material in relation to total AFAM sales during the period

5  covered by the indictment."

6          By "material", you mean that in the accounting sense,

7  yes?

8  A.  Yes, sir.

9  Q.  Okay.

10 A.  May I expand?  In order to arrive at these opinions, I was

11 given this aggregated data from which you could not reach these

12 conclusions, and so I had to go through the information,

13 accumulate the information in order to arrive at these

14 conclusions.

15 Q.  I understand.  So the point is whether the conclusion is

16 relevant.  So to arrive at observation number 1, you looked at

17 a lot of sales data and the records reflecting that, and you

18 looked at which of the sales went to various persons, and then

19 you made a computation, right?

20 A.  Yes, sir.

21 Q.  Then they will be relevant as a summary witness.  In other

22 words, you can say, "I looked at all the sales records of the

23 total relevant period and came to X, and then I looked at how

24 many of those sales went to Mr. Jones, Morris, whatever the

25 names of the coconspirators" -- I'm not using their real names

1    -- "and that came to Y," period.

2           Defense counsel, of course, is free to argue from that

3    that that shows that this was a tiny fraction or whatever of

4    that, but the accounting materiality is not material to this

5    case as a concept.

6           So are you able to change this?  I think it's really

7    already expressed in some of the subnotes to your observation

8    of -- you can put dollar figures in all of this and say that it

9    now suggests 1.3 percent of the total sales, right?

10   A.  Yes, sir.  May I make one comment, sir?

11   Q.  Yes.

12   A.  In order to arrive at these conclusions, I had to apply the

13   skill sets that I routinely apply as a CPA --

14   Q.  I know you did.

15   A.  -- or forensic accountant.

16   Q.  I know you did, but I don't see how that's relevant.  I

17   just had this discussion with counsel, but I'll have it with

18   you.  He says that the whole point of calling you goes to

19   motive of the subject of state of his defendant, of his client.

20   He says that the government is saying that a reasonable

21   pharmacist would normally see all sorts of problems and would

22   react, and he wants to argue, no, a reasonable pharmacist would

23   not have all those problems because this was just a tiny little

24   subset of a much bigger business, and it wouldn't have caught

25   his eye for various reasons that are expressed.

1          Now, you're not an expert upon what a reasonable

2    pharmacist is, you don't hold yourself out as that, correct?

3    A.   Correct.  Only in reviewing data.

4    Q.   Okay.  So what is it that you can bring to the table?  You

5    can certainly summarize what total sales were, what the sales

6    were to the coconspirators, and we'll go through each of the

7    observations, but that's the gist of your first observation,

8    right?  Total sales were X, and the total sales to the

9    coconspirators were Y, right?

10   A.   Yes, sir.

11   Q.   But then you add something else, and this is what I'm not

12   going to permit.  You say, "and as an expert accountant, I can

13   tell you that that is not material."

14         Now, if this were a securities fraud case, that would

15   be highly relevant.  It has no relevance to this case based on

16   your first observation in the form of a summary of the 1.3

17   percent total.  Defense counsel, of course, is free to argue

18   that, ladies and gentlemen of the jury, this was a tiny

19   fraction, and no wonder my client would have no motive to focus

20   on it because it just is small beans.  That's fine.  But your

21   opinion that it's not material is an accounting concept that

22   has no relevance, so I'm not going to allow it.  Do you

23   understand?

24   A.   I understand.

25   Q.   Very good.

1          Observation 2.  Same issue.  This says, "Sales by AFAM

2    to the alleged coconspirators funded by all payer sources,

3    including Medicaid, were not material in relation to total AFAM

4    sales during relevant timeframe."  You can testify as your

5    backup that would show that, out of total AFAM sales of

6    $29,168,183, the sales by the alleged coconspirators funded by

7    all payer sources whole have amounted to $452,854, or just

8    1.5 percent of total sales.  That's fine.  That's a summary

9    witness.  But then you can't add this stuff about material.

10   Understood?

11   A.  I understand.

12   Q.  Very good.

13          Then observation number 3.  "The hypothetical economic

14   benefit from sales to the alleged coconspirators was not

15   significant."  I don't understand how that's admissible at all.

16   What do you mean by "not significant" other than "not

17   material"?

18   A.  I had to do some calculations from the sales to, as a CPA,

19   determine what was the gross profit on the sales, what were the

20   taxes on the gross profits, and what Mr. Gohari's share of the

21   company was in order to determine --

22   Q.  Right.  So you could say, "All Mr. Gohari got out of this

23   was X."  That would be -- and that might even involve a modest

24   amount of expertise to the extent you're taking account of

25   taxes and stuff like that -- and let me get to that in a

1   second -- but that's not what you're saying, you're going much

2   more.  You're saying it's not significant.  To Ebenezer

3   Scrooge, it might have been very significant, and to George

4   Soros it was probably penny ante.  You're talking about as an

5   accounting concept, and that's not what is relevant to this

6   case.

7            But let me ask you.  As to the different question,

8   which is how much he put in his pocket, in effect, other than

9   an analysis of the documents, does that rely in any way, shape,

10  or form on what he told you?

11  A.  No, sir.  None of these conclusions do, and observations

12  do.

13  Q.  Very good.

14           Observation number 4.  "The volume of sales and

15  prescriptions funded by Medicaid that were dispensed by AFAM to

16  the alleged coconspirators during the relevant timeframe does

17  not appear to be unusual."  Unusual to whom?

18  A.  All of these observations are supported by schedules, and I

19  show what the quantity is of volume and dollar amount of the

20  prescriptions.

21  Q.  What is it that you are adding -- other than the very

22  loaded term "unusual" -- what is it you're adding in

23  observation number 4 to what you've already presented in

24  observations 1, 2, and 3, as I've modified them?

25           In other words, the big sales, tiny portion; big

1  funding, tiny portion; big income, tiny portion.  Those were

2  the first three.  What is it you're saying in addition in

3  observation number 4?

4  A.  As a certified fraud examiner, from looking at this data,

5  it would not suggest to me that there was anything spectacular

6  about the pattern, frequency, or quantity or dollar amount of

7  what was being dispensed so as to draw my attention, as a fraud

8  examiner, that there was some improper conduct.

9  Q.  But the question is not what a fraud examiner would

10 conclude, the question here is, as defense counsel has stated,

11 the state of mind of the defendant.  So I don't see the

12 relevance of observation 4, and I will strike observation 4 in

13 its entirety.

14            MR. KEHOE:  May I be heard on that, Judge?

15            THE COURT:  Of course.

16            MR. KEHOE:  With regard to what the witness just said,

17 the frequency and the magnitude, that goes part and parcel with

18 our evidence on motive.  Because we're talking about

19 frequency --

20            THE COURT:  No.  Counsel, I'm really concerned that we

21 are not communicating today.  I've already agreed in

22 observations 1, 2, and 3 that he can give summary data about

23 frequency, et cetera.  Now he wants to go a step further and

24 give his opinion, now wearing his hat as a certified fraud

25 examiner -- and we may need to have a Daubert hearing as to

1   whether that is an admissible form of expertise, but I'm

2   putting that aside for a moment -- that it does not appear to

3   be unusual.  That's what we're talking about.  So I don't

4   understand your response.  What is it in opinion number 4, of

5   observation number 4, that he is adding that is admissible in

6   this case that he's adding to observations 1, 2, and 3, as

7   modified by the Court?

8           The answer, he says, is that a certified fraud

9   examiner, looking at all these records, would not think that

10  the volume of sales and prescriptions funded by Medicaid that

11  were dispensed to AFAM by the alleged coconspirators was

12  unusual.  That adds, as near as I can see, nothing, and it also

13  assumes that the opinion of a certified fraud examiner as to

14  what's usual or unusual is relevant to any issue in this case.

15          If you want to address that, I'm happy to have you

16  address that.

17          MR. KEHOE:  Your Honor, I think your Honor framed the

18  issue, and that's exactly where I was coming from.  Exactly as

19  with his expertise on volume of sales and prescriptions and

20  patterns.  To the extent that it dovetails with 1 and 3, I was

21  looking at it as part and parcel of the same issue.

22          THE COURT:  All right.  So I think observation number

23  4, to the extent it would be admissible, adds nothing to 1, 2,

24  and 3, and to the extent it goes beyond that and invokes his

25  expertise as a certified fraud examiner, it's irrelevant, so

1    observation 4 is stricken.

2            Observation number 5.  "The monthly prescription

3    expenditures of the alleged coconspirators seemed reasonable

4    for patients of a specialty pharmacy."  You've already told me

5    you're not a pharmacist or an expert in pharmacy, so how can

6    you make that observation?

7    A.   In connection with the work that I do, I routinely will

8    look at information and evaluate it in relationship to relevant

9    industry data.  I've worked in various aspects of the

10   healthcare profession, including pharmaceutical operations and

11   the pharmaceutical fraud before.  With the order of magnitude

12   of these prescriptions that were dispensed, there's nothing

13   that appears unusual.

14   Q.   Unusual to who?  To a reasonable pharmacist in this

15   defendant's situation?

16   A.   Yes, sir.

17   Q.   Your expertise on that issue comes from what?  Reading a

18   few articles?

19   A.   From 41 years' experience.

20   Q.   41 years' experience in the pharmacy industry?  No.

21   A.   Across a broad range of industries as an auditor, as a

22   forensic --

23   Q.   No.  But that's not the relevant issue.  How many cases

24   have you -- we'll start with that.  How many cases have you had

25   involving the sale of controlled substances by a pharmacist?

1   A.   I would estimate that there -- well, I worked in several

2   cases involving pharmacies and controlled substances, just like

3   this pharmacy is a subset of what they sell.

4   Q.   I don't think you've answered my question.  How many cases

5   have you had involving the allegation being the sale of illegal

6   controlled substances by a pharmacist?

7   A.   I don't recall that specific issue coming up, although it

8   may have.

9   Q.   All right.  So this may be the first such case.

10  A.   It is possible.  I don't recall.

11  Q.   How many cases have you had in which, even if that specific

12  allegation was not made, the question you were asked to opine

13  on was the reasonable behavior of a pharmacist?

14  A.   The normal cases I have are not narrowed to just

15  pharmacists.  The expertise that I apply across my entire

16  practice is being able to get objective data in order to

17  evaluate certain issues.  So that is what I routinely do, but

18  is not limited to pharmacies.

19  Q.   I haven't heard yet a basis for observation 5.  I also --

20  A.   May I comment, your Honor?

21  Q.   Yes.

22  A.   In connection with observation 5, I'm familiar with what

23  medications cost, I do this work routinely, and I refer to the

24  AARP article only because it is an objective source of

25  quantifiable information that is from a study that's published

1   on an annual basis and, in connection with the work that I do,

2   I do routinely look for independent benchmarks from credible

3   sources.  So that is what I routinely do.  Both my general

4   expertise and specific knowledge of the pharmaceutical costs

5   are what enable me to arrive at this conclusion.

6   Q.  I'm not even totally sure I understand what you're saying

7   in observation number 5.  "The monthly prescription

8   expenditures of the alleged coconspirators" -- let me stop

9   there.  What do you mean by "the monthly prescription

10  expenditures of the alleged coconspirators"?

11  A.  The range that I refer to --

12  Q.  No.  Tell me what it means.

13  A.  The expenditure of $90 --

14  Q.  Expenditures by whom?

15  A.  By the third-party payers, as well as any supplemental

16  amounts paid by the alleged coconspirators --

17  Q.  Whoa.  I'm just talking simple English here before we get

18  to the question of expertise.  "The monthly prescription

19  expenditures of the alleged coconspirators", meaning how much

20  they paid to the pharmacy?

21  A.  They and the third-party payers.

22  Q.  All right.  "Seemed reasonable for patients of a specialty

23  pharmacy."  "They seemed reasonable", I take it you mean seemed

24  reasonable to the pharmacist.

25  A.  These would be reasonable to the pharmacist, they would be

1   reasonable to anybody looking at the range of monthly

2   expenditures of $90.59 to $2,566.21 per month.

3   Q.  And the basis for this, the specific basis is the report

4   issued by the AARP in February, 2016?

5   A.  No, sir.  The specific basis is my own familiarity with the

6   cost of pharmaceutical prescriptions.  The AARP report just

7   provides an objective indication as to what specialty

8   medications can cost.  They are quite expensive, or can be.

9   Q.  We'll hold on observation number 5 for a moment.  I'm not

10  yet convinced it's an admissible.

11       Let's go to number 6.  "Prescriptions were dispensed

12  to the alleged coconspirators on 557 different days during the

13  relevant timeframe."  So that's fine.  That's really a kind of

14  summary witness, yes?  You didn't have to bring to bear any

15  particular accounting expertise, you just looked at the dates,

16  right?

17  A.  Well, the same as any CPA would do, going through data in

18  order to extract the data.

19  Q.  Yes.  But for example, the government is bringing their own

20  highly expert paralegal.  What is it you did that was different

21  from what you could have directed a paralegal to do?

22  A.  Paralegals are not routinely so proficient at being able to

23  go through massive amounts of data to find the kind of

24  information that I was able to identify.

25  Q.  So you're better able to know where to look is what you're

1   saying.  But it's not like you're bringing to bear some

2   esoteric expertise that the lay jury would need to have because

3   they wouldn't have it in their own experience.  What you're

4   saying is, I'm familiar with this kind of data, I looked at a

5   whole bunch of data, what I found was that the prescriptions

6   were dispensed on 55 different days, right?

7   A.  Yes, sir.  This was not evident from the government data

8   that was provided to me.  It became evident because I'm

9   familiar with how to manipulate, in this case, electronic

10  records so as to convert data into useful information.

11  Q.  Okay.  Well, that's commendable.  I think it sounds to me

12  like more in the nature of a summary witness, but I certainly

13  will allow it with that caution.

14          Observation number 7.  "Sales of Oxycodone and its

15  various formulation to the alleged coconspirators during the

16  relevant timeframe amounted to less than $16,000 or less than

17  4 percent of the sales funded by Medicaid on behalf of the

18  alleged coconspirators."  So again, this is very similar to the

19  modified opinions 1, 2, and 3 we talked about before, and I

20  have no problem with it, but as, in effect, a summary.  I have

21  no problem with it, but what is it adding to the earlier

22  observations?

23  A.  This observation is very specific to the medication that

24  is --

25  Q.  Oh, okay.

1    A.   -- at issue here.

2    Q.   Got it.

3           Observation 8.   "None of the top 15 medications sold

4    by AFAM to the alleged coconspirators was a controlled

5    substance except for Oxycodone."   What's the relevance of that?

6    A.   Again, I had to comb through all of the raw data in order

7    to find --

8    Q.   No.   I understand.   I'm asking a slightly different

9    question, and maybe this is a question more for counsel than

10   for you.   I understand what you're saying, but I don't

11   understand its relevance to this case.

12   A.   I would defer to legal counsel on that.

13   Q.   We'll get to him in a minute.

14           Observation number 9.   "We have not seen any evidence

15   that would suggest that AFAM did not fill a prescription

16   dispensed to the alleged coconspirators."   What you're saying,

17   in effect, is the government gave us all this data, I went

18   through all this data, and I didn't see -- as near as I can

19   tell, they filled everything.   So when the paper says

20   prescription for X, Y, or Z, I'm assuming that it was filled

21   because I didn't see any evidence to the contrary.

22   A.   I went beyond that, your Honor.   I understand the

23   government is alleging that some of these prescriptions may not

24   have even been filled, and so as an auditor, I looked at

25   several sources of information for evidence of them having been

1    filled.  I looked at patient records, I looked at records

2    furnished by Medicare, I looked at records furnished by DEA,

3    and then I also looked at such wholesale records as were

4    produced by the government to come to this conclusion.

5    Q.  I see the relevance of that.  Were you looking as to the --

6    I wasn't aware that the government was claiming that certain

7    prescriptions were not filled.  But did you then look at those

8    specific items?

9    A.  Yes, sir.  I looked for the specific medications that were

10   the top 15.

11   Q.  And you didn't see anything in the record that showed that

12   they were not filled.

13   A.  I saw no evidence of that.

14   Q.  I think that's relevant.

15           Where we are, and then I'll turn it over to counsel,

16   is -- and as I did with the government's witness, I will

17   summarize all this in a written order so that there won't be

18   any question -- the monetary and percentage conclusions of

19   observations number 1, 2, and 3 can be presented, but not the

20   opinion about materiality.

21           Observation 4, same thing.

22           Observation 5 is stricken.

23           Observation 6 is okay.

24           Observation 7 is okay.

25           Observation 8, I want to hear from the government.

1              Observation 9 is okay.

2              Before I hear from them, anything further defense

3    counsel wants to say?  I guess I asked you to respond to the

4    relevance of number 8.

5              MR. KEHOE:  Actually, Judge, on your line of this

6    being a summary witness, if he can summarize exactly going

7    through these records, "Did you calculate the medications sold

8    to these alleged coconspirators?  Yes," and then just say, "Of

9    these medications, how many were controlled substances?"  And

10   they said, "There's only one, Oxycodone."

11             THE COURT:  But that's why number 8 is a little bit

12   different from the others.  What you're saying is fine for the

13   others, but I guess what's the legal -- what's the relevance to

14   any issue in this case of number 8?

15             MR. KEHOE:  The relevance, Judge, is that this is a

16   pharmacy that is a busy pharmacy, that they were dispensing

17   many different items.  This is not just some pill mill, as one

18   might, in this courtroom from time to time, think.  That

19   they're dispensing of any number of prescriptions, many of

20   which are to these particular coconspirators, and they include

21   all of these various items.  One of them is Oxycodone.

22             So what we're showing here, Judge, is even with these

23   coconspirators, based on just a pure summary that the witness

24   has done on the records presented by the government, these are

25   all the items that are being dispensed to these coconspirators.

1    It's not just one.  Because what happens when you just talk

2    about the one, Judge, we ended up looking myopically --

3               THE COURT:  I thought that was sort of covered in the

4    earlier stuff but --

5               MR. KEHOE:  If it is, we're not going to repeat it.  I

6    can mesh that into one of the other items as far as the source.

7               THE COURT:  Let me hear from the government.

8               MS. ESTES:  Your Honor, our one concern is with

9    observation number 3.  My understanding is that is in reliance

10   on tax returns.

11              THE COURT:  I thought you were applying his tax return

12   rates, in effect, from tax returns he had provided to you.

13              THE WITNESS:  I did have that, but I was applying

14   general tax rates.

15              THE COURT:  That's what I thought he meant.  I think,

16   as long as he's just saying he's applying a 35 percent blended

17   tax rate, which presumably is -- is that the highest?

18              THE WITNESS:  Well, with city and state, it can be

19   higher, but I wasn't trying to overstate things, so I was

20   conservative.

21              THE COURT:  Well, conservative in this case would

22   be --

23              THE WITNESS:  I'm sorry, your Honor.

24              THE COURT:  -- would be to apply the higher rate

25   because that's the tax, that's money not in his pocket.

1          THE WITNESS:  Well, that would lessen the alleged

2   amount that went to his --

3          THE COURT:  That's true.  Fair point.

4          Anyway, as long as he's using, I think, what are

5   reasonably generalized tax rates as opposed to -- you can

6   certainly challenge him and say -- well, actually, no.  Let me

7   think about this for a minute.

8          But you did see his tax returns?

9          THE WITNESS:  I did, your Honor.

10         THE COURT:  And that included for all the relevant

11  years covered by indictment?

12         THE WITNESS:  I did, yes, sir.

13         THE COURT:  I don't think that precludes his

14  testimony, but I think that maybe means that you have a right

15  to see the tax returns, too, if that's what you want.

16         MS. ESTES:  We do have the tax returns, your Honor.

17  We're concerned -- we don't want any of the testimony being

18  based on these tax returns because our understanding was he was

19  not the accountant preparing them and that they would be

20  inadmissible hearsay.

21         THE COURT:  That's fine.  Of course, if you open the

22  door -- all my rulings for both sides have the exception, if

23  someone opens the door on cross examination of something that

24  otherwise would not come in.  So if you were to say to him,

25  "Now, you have no idea what rate Mr. Gohari actually paid," and

1   he would say, "Oh, yes, I do, because I looked at his tax

2   returns," so that would open the door.  But barring something

3   like that, I agree, he should not refer to the tax returns.

4           MS. ESTES:  Your Honor, we also have some concerns

5   with the discussion of the 65 percent membership interest in

6   AFAM and where that comes from.  I don't know if that's going

7   to be --

8           THE COURT:  Where does that come from?

9           THE WITNESS:  That came from the corporate membership

10  tax returns, so for AFAM.

11          MS. ESTES:  Your Honor, one of our concerns is, we've

12  seen the bank records for AFAM here, and we don't see any

13  payments to Mr. Gohari or any other members in the pharmacy.

14  So we don't know that breaking it down like this make sense

15  because, just out of the pharmacy bank account, we're not

16  seeing those payments.

17          MR. KEHOE:  That's ripe for cross examination.  They

18  can ask that question on cross.  If they don't see it, they can

19  ask.

20          THE COURT:  Maybe I'm missing the point.  If you don't

21  see any monies going from the company to Mr. Gohari, I would

22  think that supports the position being taken by the defense,

23  because they're saying how do you realize any benefit?

24          MS. ESTES:  Well, I mean, we assume there is some

25  other bank account somewhere where he must be getting paid.

1  But our concern is --

2          THE COURT:  That's a speculation, that's not evidence.

3          MS. ESTES:  Right.  But our concern is, this talks

4  about a 65 -- it's breaking it down.  It's saying that the

5  pharmacy's profits are really being divided between multiple

6  people, Mr. Gohari, Ms. Cohen, and other individuals.

7          THE COURT:  I think the point is this.  They're, of

8  course, assuming the innocence of their client, so they're

9  saying an innocent person in Mr. Gohari's position could expect

10 to realize from these questioned sales X amount of money.  That

11 seems to me a perfectly reasonable thing to do -- bereft of all

12 the buzz words like "significant", "insignificant", and so

13 forth, which I've ruled out -- but just the sheer amount of

14 money.  The more I think about it, I think, even to the extent

15 it is based on tax returns, I don't see -- it's not like the

16 government doesn't have them, so I think that is a fair thing.

17         This is the one observation that, to a limited extent,

18 does involve his expertise, but it's really expertise as a tax

19 accountant, so to speak.  But no, I will allow the figures to

20 be given and how he arrived at those figures, but I'm not going

21 to allow the words "significant", or "material", et cetera.

22         Anything else from counsel?

23         MS. ESTES:  Your Honor, just to be clear.  How much of

24 this, if any, is going to be allowed as testimony from an

25 expert witness?

1              THE COURT:  At the moment, I think number 3 is the

2     only one, seems to me so far, that really is more than just a

3     summary witness.  But I think that the way to handle this is to

4     have him identify on direct as an accountant, a CPA for

5     whatever number of years, and inform the jury that, to the

6     extent he's doing more than just summarizing, he's bringing to

7     bear his accounting expertise, and that will be either obvious

8     in the case of tax calculations, or can be brought out on cross

9     examination.  But I think it has to be clear to the jury that

10    he is primarily a summary witness, but also he is bringing some

11    expertise to bear.  That came up also in one of the other

12    observations we talked about where he talked about knowing

13    where to look, so to speak, for certain of the data.  So I

14    think he is both, but the jury will be made aware that it's

15    primarily a summary witness, but he is bringing some accounting

16    expertise to bear.  Okay?

17             MS. ESTES:  Your Honor, we would also ask that, since

18    his report does rely on an interview with the defendant, that

19    if there are any notes of that interview, that we believe we

20    should be entitled to them.  It's not entirely clear from the

21    report what is based on that, but we just received it a day and

22    a half ago, and we think it's fair to receive any notes from

23    that interview.

24             THE COURT:  Did you make any notes after that

25    interview?

1            THE WITNESS:  Yes, your Honor, I did.

2            THE COURT:  Any objection?

3            MR. KEHOE:  No objection, Judge.

4            THE COURT:  Just make sure the government, between you

5    and counsel, make sure the government gets that in the next day

6    or two.

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  Anything else?

9            MS. ESTES:  No, your Honor.

10           THE COURT:  Anything from defense?

11           MR. KEHOE:  No, your Honor.

12           THE COURT:  Thank you so much.  You may step down.

13           I'm very much looking forward to the trial.  Let me

14   remind you, under my individual rules, there are certain things

15   that are due three business days before the start of the trial,

16   such as proposed voir dire and things like that.

17           MR. KEHOE:  Yes, your Honor.

18           THE COURT:  Because if I had to impose another $100,

19   you'd be practically broke.

20           Also, when it comes to experts, just so you're aware,

21   the Second Circuit has strongly disapproved what is sort of

22   routine in state court, which is you bring out the person's

23   expertise, and then you say, "Your Honor, we proffer so and so

24   as an expert on such and such."  And in state court, the judge

25   says, "Yes."  Once in a million years he says, "No."

1          But the Second Circuit has said, in my view totally

2    correctly, that that has the effect of giving the jury the

3    opinion that the court has signed off on the witness's

4    expertise, whereas all the court is ruling on is whether

5    there's enough to go to the jury on whether or not he is a

6    reliable expert or not.

7          So the Second Circuit has said, and I follow -- of

8    course, they're my boss -- that that should not be done.

9    There's no need to have it in any event, because we've had a

10   Daubert hearing now on both experts.

11         MR. KEHOE:  Yes, your Honor.

12         THE COURT:  So you can bring out the expertise, this

13   fellow is a CPA, the other guy is an expert in pharmaceutical

14   practices, and then you put your first substantive question or

15   whatever it is.

16         MR. KEHOE:  Absolutely.

17         THE COURT:  Okay?

18         What I usually say -- and maybe this will also solve

19   the problem of summary witness or expert witness -- when we

20   have the first witness, whoever it is, sounds like it'll be the

21   government's witness, I say to the jury -- I tell them this

22   before the person is called -- "We're about to hear from a

23   witness who is, in some respects, a summary witness and in some

24   respects an expert witness.  A summary witness is someone who

25   analyzes voluminous data and then tells you what the data

1  shows.  An expert differs in that he can also offer opinions

2  about matters that would not be in your normal ken.  And an

3  expert, therefore, differs from any other witness in that he

4  can offer opinions.  However, an expert's opinions are no

5  better than what he relied on, and/or importantly, or equally

6  importantly, you must scrutinize the credibility and adequacy

7  of an expert's testimony just as you would any other witness.

8  The fact that he's an expert does not in any respect lessen

9  your obligation to assess both the weight, the meaning, the

10 credibility, and the validity of his testimony."  So words to

11 that effect.

12        I repeat that each time an expert is called, because I

13 think there's a great danger that experts are elevated in the

14 jury's mind to a degree that is not warranted by the law, so I

15 just want you both to be aware of that.

16        MR. KEHOE:  Yes, your Honor.

17        THE COURT:  Anything else?

18        MR. KEHOE:  Just with regard to some of the

19 disclosures from the government.  I think the government said,

20 this.  Obviously, we were late on ours, but they have been

21 significantly late in violation of the Court's order on several

22 disclosures.

23        THE COURT:  So you're asking, you think 50 bucks?  25?

24        MR. KEHOE:  No, Judge.  Just in the spirit of

25 symmetry, that they have --

1          THE COURT:  The only flack violation that's been

2    brought to my attention by reference to the transcript was

3    yours, but if you want to show me the transcript and show how

4    they violated it, I will consider it, because, of course,

5    that's true, there should be -- so is there such an instance?

6          MR. KEHOE:  Several.

7          THE COURT:  And what were they?

8          MR. KEHOE:  Disclosures of items after your discovery

9    deadline that you, in that same hearing, laid out in crystal

10   clear fashion that the government had to disclose by several

11   points, and there have been several disclosures since then.

12         THE COURT:  Well, I thought -- and my usual practice

13   is to say, of course, the government has a continuing

14   obligation if they discover something that was previously

15   unknown to them or could not by reasonable diligence have

16   discovered, to produce it later.

17         What you would have to be talking about is something

18   that they well knew about beforehand and then didn't produce.

19         MR. KEHOE:  Well, when we asked about that, I didn't

20   hear any response coming from the government that this was

21   something that just came up.

22         THE COURT:  Let's hear a response from the government.

23         MR. KEHOE:  Your Honor, we've made two additional

24   disclosures.  Both of these came up as we were preparing for

25   trial.  We realized we were missing some data.  On Saturday we

1    produced data relevant to all Medicaid billings of the

2    pharmacy.  These are documents their expert is relying on, so I

3    don't understand that there's any dispute that they should be

4    in evidence.

5          As we've been preparing for trial, in addition, we

6    realized we were missing certain data related to Dr. Ahmad.  He

7    is a doctor who dispensed HIV medications that were fraudulent.

8    We learned, in preparation -- we assumed that after he had been

9    shut down there had been no more prescriptions from Dr. Ahmad

10   dispensed at the pharmacy so we hadn't gotten that data.  We

11   learned during trial prep that the pharmacist directed people

12   to go get prescriptions from the doctor after he had been

13   arrested, because he had been arrested then let out.  His

14   clinic had reopened.  When we learned that, we went and got the

15   data from that, and we now see that the pharmacy dispensed on

16   273 occasions medications from the doctor after he had been

17   arrested.

18         THE COURT:  Well, it doesn't sound to me that it

19   stands on the same footing as the untimeliness of the

20   defendant, technically, because with respect to experts, I made

21   very clear not only that the 10-day limit was fixed and final,

22   but also that he really hoped responsible counsel would come up

23   with expert reports much sooner than that because of the nature

24   of having to prepare for an expert.

25         But nevertheless, since the waters have been muddied

1  somewhat, and recognizing that receiving $100 will not totally

2  cure the problem of the government's trillion dollar deficit, I

3  will withdraw the sanction imposed on defense counsel.  So you

4  can still ride the subway when you leave here tonight.

5            MR. KEHOE:  Thank you, your Honor.

6            THE COURT:  Very good.

7            (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25