UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA


            v.                            16 CR 246 (JSR)

KIAN GOHARI,
                                          Jury Trial
                 Defendant.

------------------------------x

                                          New York, N.Y.
                                          November 3, 2016
                                          9:12 a.m.


Before:

                    HON. JED S. RAKOFF,

                                          District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
JORDAN L. ESTES
JASON A. RICHMAN
EDWARD B. DISKANT
     Assistant United States Attorneys

GREGORY W. KEHOE
ILANA HARAMATI
MICHAEL BACHNER
     Attorneys for Defendant

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  So juror No. 12 called, said that he's

 3     stuck in the Midtown Tunnel and that his GPS says he won't be

 4     here until 12:30.

 5              THE DEPUTY CLERK:  9:30.

 6              THE COURT:  Excuse me, 9:30.

 7              So I have no problem waiting until 9:30.  I shouldn't

 8     say I have no problem.  I think it's unfortunate.  But were we

 9     to receive word from him that it's a worse problem, I think we

10     would have to consider replacing him with an alternate.  So I

11     just want to bring that to your attention.  So I'll go back to

12     chambers and as soon as he shows up, we'll start.

13              MR. KEHOE:  Yes, sir.

14              THE COURT:  Okay.  Very good.

15              Anything else?

16              MR. KEHOE:  Just that Linda has been vigilantly trying

17     to get the light changed.

18              THE COURT:  I just placed a call to higher authorities

19     so we'll see what happens.  Thank you.

20              (Recess)

21              THE COURT:  So we have heard nothing more from juror

22     No. 12.  It's now 9:40.  My courtroom deputy is going to go

23     down to the security line and see if he's there.  If he is not

24     there, then I expect we'll have to excuse him and seat

25     alternate No. 1.  So just remain in the courtroom, as I will,
```

 1    and she'll go down right now and see what the story is.

 2            MR. KEHOE:  Judge, may I ask a question.  Can we just

 3    call this gentleman to see where he is?

 4            THE COURT:  He I'm sure would have called us if he was

 5    able to.  If he's still in the Midtown Tunnel, I'm not sure we

 6    can call him.  In any event, my courtroom deputy is downstairs

 7    so we'll see what the story is.

 8            MR. KEHOE:  Yes, your Honor.

 9            THE COURT:  But assuming we called him, just to

10    explore, and he said he's still stuck, we're still going to

11    excuse him, right?

12            MR. KEHOE:  If he's just right around the corner I

13    would submit to the Court --

14            THE COURT:  I think he would have let us know if he

15    was right around the corner.  He let us know that he was stuck.

16            MR. KEHOE:  Yes, your Honor.

17            THE COURT:  Hopefully he's just stuck in the security

18    line, which is an ordeal onto itself.

19            MR. KEHOE:  Your Honor has the good fortune not to

20    have to go through that every morning.

21            (Discussion off the record)

22            (Pause)

23            THE COURT:  To make up a little bit of time I'm going

24    to ask my courtroom deputy to ask the jurors if they mind

25    sitting to 1:15.  That's the latest I can go.  That will give

1   us 15 minutes more than we otherwise would have had.  At 11,

2   which would have been our normal break, we will take our normal

3   break because I have a telephone conference on another matter.

4   It's a shame to have that break fairly early.

5              THE DEPUTY CLERK:  They're fine with 1:15.

6              (Pause)

7              THE COURT:  All right.  It is now several minutes

8   after ten despite juror No. 12's statement to us at 9:45 that

9   he was, quote, six minutes away.  He still is not here.  My

10  courtroom deputy went down to see if he is on line and she has

11  not returned, which suggests to me that he was not yet on line

12  and I'm sorry that we didn't excuse him earlier.  But if he is

13  not here by 10:15, I'm going to excuse him even if he's one

14  second away according to any statement he might make.

15             Any disagreement?

16             MS. ESTES:  No, your Honor.

17             MR. KEHOE:  I hate to be the recalcitrant one.  I

18  understand where your Honor is time wise and I understand your

19  Honor has expended this.  We'll just see where he is,

20  obviously.

21             THE COURT:  His credibility at the moment is zero, or

22  maybe it's his GPS.  When would you suggest we excuse him?

23             MR. KEHOE:  That's a difficult question, Judge.

24             THE COURT:  Well, I want an answer since you seem not

25  to be amenable to the Court's position.

1              MR. KEHOE:  No, Judge.  My position is if Linda comes

2      back in a few minutes and says the guy is nowhere in sight,

3      even if it's before 10:15, your Honor makes that decision

4      accordingly.

5              THE COURT:  What I'm asking, is there any objection to

6      excuse him under those circumstances?

7              MR. KEHOE:  Under the circumstances where he's not --

8              THE COURT:  He's not there?

9              THE DEPUTY CLERK:  I even went out on the sidewalk.

10     Tried to convince a stranger.

11             MR. KEHOE:  Can we make one last call to see where he

12     is?

13             THE COURT:  Sure.

14             THE DEPUTY CLERK:  Automatic voice mail, flipped over

15     immediately.

16             MR. KEHOE:  Well, Judge, then we'll go along with the

17     10:15 trigger point.

18             THE COURT:  All right.

19             THE DEPUTY CLERK:  I'll go back downstairs?

20             THE COURT:  No.  We'll see where he is at 10:15.

21             (Pause)

22             THE COURT:  Get the witness on the stand.

23             (Continued on next page)

24

25

1            (Jury present)

2            THE COURT:  So, ladies and gentlemen, thank you, most

3    of you, for your promptness.  Now, I understand that things

4    happen that are beyond the control of individual jurors.  But I

5    think it's very important that all jurors make a special effort

6    to allow extra time.  The situation here this morning where

7    we're not starting until almost a little after 10:10 and that's

8    a tremendous inconvenience for those of you who have to just

9    sit around twiddling your thumbs, but it's worse than that

10   because if that were to happen repeatedly, we would not be able

11   to achieve the schedule in this case we have made.  And counsel

12   and I have made every effort to make sure this case is

13   completed in the timetable we promised you, but the one thing

14   we can't control is things like what happened this morning.

15   So, as I say, I am sure it's no one's fault.  But I do want to

16   urge everyone to allow extra time so that if things do arise,

17   it's not such a difficulty.

18            Now, we will start now.  We're going to have to take

19   our midmorning break still at 11 because I have a conference

20   call on another matter at 11 sharp, so, but then thanks to your

21   agreement we'll sit until 1:15 rather than one so at least

22   we'll recapture a little of the lost time.  And I'm hopeful

23   counsel will take the shortened time into account as well.

24            So please call your next witness.

25            MS. ESTES:  Your Honor, the government calls William

1    Winsley.

2     WILLIAM T. WINSLEY,

3        called as a witness by the Government,

4        having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. ESTES:

7        MS. ESTES:  Your Honor, we'd first like to read a

8    stipulation into the record.

9        THE COURT:  That's exciting.  Go ahead.

10       MS. ESTES:  It is hereby stipulated and agreed that

11   Government Exhibits 101 and 102 are true and correct copies of

12   records obtained from the New York State Bureau of Narcotics

13   Enforcement reflecting the prescriptions for controlled

14   substances filled by Afam Pharmacy, doing business as Ekwunife,

15   on the dates and for the individuals, substances, and

16   quantities reflected in those exhibits; that the original

17   records were all made at or near the time by, or from

18   information transmitted by a person with knowledge of the

19   matters set forth in the records; that they were kept in the

20   ordinary course of the Bureau of Narcotics Enforcement's

21   regularly conducted business activity; and that it was the

22   regular practice of that business to make the records.

23       It is further stipulated and agreed that this

24   stipulation, which is Government Exhibit 1001, may be received

25   into evidence as a Government Exhibit at trial.

1          Your Honor, we would move that Government

2   Exhibit 1001, and also the BNE records which are Government

3   Exhibits 101 and 102, we'd offer them into evidence.

4          MR. KEHOE:  No objection, Judge.

5          THE COURT:  Received.

6          (Government's Exhibits 1001, 101, 102 received in

7   evidence)

8   BY MS. ESTES:

9   Q.  Good morning.

10  A.  Good morning.

11  Q.  Could you please describe your educational background.

12  A.  Yes.  I'm a pharmacist registered in Ohio.  I attended the

13  Ohio State University, where I got my bachelor's degree in

14  pharmacy in 1974.  I then went on and got a master's degree in

15  pharmacy in 1978.

16  Q.  Did you obtain your pharmacy license?

17  A.  Yes.  After I graduated in 1974 with my bachelor's in

18  pharmacy, I took the licensing exams and received my license in

19  August of 1974.

20  Q.  Where did you work after you became a licensed pharmacist?

21  A.  Initially I worked at Riverside Hospital in Columbus, Ohio,

22  where I was the evening shift supervisor while I was working on

23  my master's degree.

24  Q.  Where did you work after Riverside Hospital?

25  A.  After my master's degree I went to West Virginia University

1    Hospital as assistant director of pharmacy.  I worked there for

2    two years.  From there I went to Akron City Hospital in Akron,

3    Ohio, also as assistant director of pharmacy, and I worked

4    there for approximately eight years until 1998 or 1988, pardon

5    me.

6    Q.  So to be clear, how many years did you work as a practicing

7    pharmacist?

8    A.  About 14.

9    Q.  What did you do after that?

10   A.  When I left Akron City Hospital I joined the Ohio State

11   Board of Pharmacy as a compliance specialist.

12   Q.  Could you explain generally the function of the Ohio State

13   Board of Pharmacy?

14   A.  The Ohio State Board of Pharmacy has two functions.  First

15   of all, they are of course a licensing administrative agency,

16   just like all healthcare boards around the country.  The Ohio

17   State Board of Pharmacy licensed pharmacists, pharmacy interns.

18   They also licensed places where prescription drugs were stored

19   such as pharmacies, hospitals, prisons and jails, EMS squads,

20   doctors, dentist's offices, veterinarians.  So we licensed

21   facilities where prescription drugs were stored.

22        In addition, however, the Ohio State Board of Pharmacy

23   is also classified as a law enforcement agency.  Ohio does not

24   have a state police, so the state board of pharmacy was charged

25   with enforcing the criminal drug laws around the state.

1    Q.  Mr. Winsley, what were your duties and responsibilities as

2    a compliance specialist at the Ohio State Board of Pharmacy?

3    A.  As a compliance specialist I was a pharmacist stationed out

4    in the field and my job was to conduct inspections of license

5    sites and to conduct investigations involving potential

6    violations, both administrative and criminal.

7    Q.  How long were you a compliance specialist?

8    A.  Approximately two years.

9    Q.  What did you do after that?

10   A.  Then I moved into the office as assistant executive

11   director.

12   Q.  What were your duties and responsibilities as assistant

13   executive director?

14   A.  Primarily overseeing the day-to-day operations of the

15   office, which meant overseeing the activities of the people

16   doing the licensing.  I consulted with the field staff on their

17   investigations, particularly since I had worked with many of

18   them.  I was responsible for the testing process for

19   pharmacists, including the security of the testing materials

20   and in actually administering the test.

21   Q.  Let me stop you there.  What do you mean by the testing

22   process?

23   A.  Pharmacists have to take two exams in order to be licensed

24   as pharmacists.  Once we graduate from pharmacy school, we take

25   a clinical exam, which covers the use of drugs, disease states,

1    all of the things related to what you might think of as

2    pharmacy.   In addition pharmacists have to take a law exam, a

3    jurisprudence exam covering the drug laws, rules, and

4    regulations, both federal and the state in which they're

5    getting licensed.   To my knowledge pharmacists are the only

6    healthcare profession that has to take a law exam.

7    Q.   Mr. Winsley, how long were you the assistant executive

8    director at the Ohio State Board of Pharmacy?

9    A.   Approximately seven years, until December of 1998.

10   Q.   What did you do after that?

11   A.   Then I became executive director of the board of pharmacy

12   upon the retirement of my predecessor.

13   Q.   And what were your duties and responsibilities as executive

14   director generally?

15   A.   I had overall responsibility for the functioning of the

16   board.   I dealt -- I was responsible for preparing and

17   maintaining the budget for the board.   I dealt a lot with the

18   legislature on bills relating to drug laws, as well as

19   professional type laws for various health professions.   And I

20   represented the board in public, to the press and so forth.

21   Q.   Mr. Winsley, have you ever been associated with the

22   National Association of Boards of Pharmacy?

23   A.   Yes, I have.

24   Q.   What is the National Association of Boards of Pharmacy?

25   A.   The National Association of Boards of Pharmacy is an

1   association of all of the state boards of pharmacy around the

2   country, plus several from outside the United States.  It's

3   truly an association.  It's not a government agency, but it is

4   an association that allows the boards to get together to

5   discuss mutual concerns, problems.  The association has

6   developed a set of model laws and rules that states can use

7   when they go to the legislature to update their laws.  NABP

8   also is responsible for what we call the PMP interconnect.

9   Q.  And what is the PMP interconnect?

10  A.  The vast, in fact, all states but one in the United States

11  have a program called the prescription monitoring program where

12  pharmacies report the prescriptions for controlled substances,

13  primarily, that they have filled.  And each state then has that

14  database available for physicians, well, prescribers and

15  pharmacists and sometimes law enforcement to obtain data.  But

16  the interconnect then that NABP put together connects, I

17  believe we're up to 35 states, where information is shared

18  state to state.

19  Q.  And just to be clear, when you're saying that database,

20  what are you referring to?

21  A.  The database is the collection of controlled substance

22  prescriptions that were dispensed to patients within that

23  particular state.

24  Q.  So turning back to the National Association of Boards of

25  Pharmacy, what were your roles with the National Association of

1   Boards of Pharmacy?

2   A.   I served on numerous task forces and committees to discuss

3   several of those problems that are mutual amongst states.   Then

4   I served two separate terms on the executive committee,

5   analogous to a board of directors for a corporation.

6   Q.   What were your roles on the executive committee?

7   A.   The executive committee, as I said, functions as a board of

8   directors.   So the executive committee had oversight over the

9   executive director of NABP and the activities, just to make

10   sure that everything was operating properly.

11   Q.   But what are were your roles on the executive committee?

12   A.   Well, on the executive committee, I functioned in that

13   role.   At the end of the executive committee I ran for

14   treasurer of NABP and was elected treasurer, where I served for

15   a year.   At the end of that year I ran for and was elected

16   president elect of NABP.   And then I progressed -- no more

17   elections, thank you -- I progressed from president elect into

18   president of the NABP for a year.   And then I became chairman

19   of that executive committee, in other words, chairman of the

20   board of directors for a year.

21   Q.   Mr. Winsley, you referenced task forces earlier.   Were you

22   on any task forces related to controlled substances?

23   A.   Yes, I was on several.   One of them was a task force where

24   we attempted to make suggestions to rewrite the federal

25   Controlled Substances Act.   And another was a task force to

 1   deal with the problems with controlled substances throughout

 2   the country.

 3   Q.  Mr. Winsley, have you published in the field of pharmacy

 4   practice?

 5   A.  After I became executive director, I was responsible for

 6   writing a quarterly newsletter that was sent to all pharmacists

 7   that were licensed with us, plus other people that asked to be

 8   on the mailing list; and they were also published on our

 9   website.

10   Q.  And what topics would you cover in those publications?

11   A.  I covered a variety of topics.  Obviously, reminding people

12   that time to renew your license was coming up was pretty

13   standard.  But I also covered new laws and rules that

14   pharmacists needed to know about, such as when nurse

15   practitioners got prescribing privileges and physician

16   assistants, when changes to pharmacy laws took place, when we

17   made changes to our rules.  And then I also quite frequently

18   discussed general topics relating to pharmacy practice, such as

19   pharmacist corresponding responsibility with a prescriber when

20   they were filling prescriptions.

21   Q.  Mr. Winsley, we'll turn back to the corresponding

22   responsibility in a little bit.

23           Have you spoken on the field of pharmacy practice?

24   A.  Yes.  I've given well over 500 talks to pharmacists.  In

25   addition I've given numerous talks to physicians, nurses,

1    physical therapists, athletic trainers, all kinds of groups.

2    The majority of the pharmacy talks were continuing education

3    talks.  And most all of my talks dealt with drug laws, rules,

4    and regulations as they affected the parties that I was

5    speaking with.

6    Q.  Mr. Winsley, aside from the legislative bodies in Ohio that

7    you mentioned earlier, have you testified before any

8    legislative bodies on the field of pharmacy practice?

9    A.  Yes.  I testified in front of Congress on the Ryan Haight

10   Act, which was the bill that tightened up control over the

11   internet supply of controlled substances.

12   Q.  Mr. Winsley, have you testified in court proceedings as an

13   expert in pharmacy practice?

14   A.  Yes.  I testified in numerous criminal cases while I was

15   with the board.  And since I've retired in 2011, which I forgot

16   to mention, I'm sorry, I've testified twice in federal court,

17   once in Philadelphia and once here in the Southern District of

18   New York, in cases involving drugs.

19   Q.  Mr. Winsley, in what city are you based?

20   A.  City called Millfield, Ohio.

21   Q.  Who paid for your travel to New York and your

22   accommodations while you're here?

23   A.  The U.S. Attorney's Office.

24   Q.  Are you being compensated by the government in any other

25   way?

1  A.  Yes.  I'm being paid $250 an hour for work actually

2  performed.

3  Q.  Mr. Winsley, are you familiar with the term controlled

4  substance?

5  A.  Yes, I am.

6  Q.  What is a controlled substance?

7        THE COURT:  I probably should interrupt at this point

8  to say, ladies and gentlemen, there are two types of witnesses.

9  Most of the witnesses are fact witnesses.  They relay what they

10  saw, heard, and so forth.  And then there are witnesses

11  sometimes called expert witnesses, sometimes called specialized

12  witnesses, who are witnesses who have a particular learning in

13  a particular area that may be, if you find it useful, helpful

14  to you in evaluating some specialized aspect of a case.  So

15  Mr. Winsley is being offered as an expert witness of that kind.

16        However, it's like every other witness -- you need to

17  scrutinize his testimony carefully.  You need to see whether

18  you deem it worthy of belief.  And if you do deem it worthy of

19  belief, you have to determine what weight to give it.  That is

20  true of every single witness.  That's your job.  You always

21  look carefully at all witnesses and you determine whether or

22  not their testimony is testimony that you wish to accept, and

23  that applies to expert witnesses just as much as it applies to

24  other witnesses.  So I just want to make you aware of that.

25        Okay, counsel.  Go ahead.

1   Q.  Mr. Winsley, what is a controlled substance?

2   A.  A controlled substance is a drug that is subject to either

3   abuse potential and/or addiction liability.  In other words,

4   people can get addicted to those drugs if they take them

5   continually.

6   Q.  Are controlled substances classified in any way?

7   A.  Yes.  Controlled substances are divided into five

8   schedules.  Schedule I being those drugs that are the most,

9   have the highest abuse potential and/or the highest addiction

10  liability, but have no medical use.  Some examples would be

11  heroin, LSD, those kind of drugs that maybe some people refer

12  to as street drugs.

13          Schedule II substances also have an extremely high

14  addiction liability and/or abuse potential, but they have a

15  medical use.  Those examples, there are a lot of them, but they

16  would be morphine, amphetamine, oxycodone, hydrocodone, those

17  types of drugs.

18          And then the schedules go down III, IV, and V.  And

19  with each change in the number, the abuse potential and/or the

20  addiction liability gets less and less and less, although even

21  at Schedule V the drugs still do have an abuse potential or an

22  addiction liability.  An example of Schedule V, just to give

23  you the difference, would be maybe cough syrups with codeine in

24  them that in some places are sold over the counter by a

25  pharmacist.  So they range.

1    Q.  Mr. Winsley, what is an opiate?

2    A.  An opiate is a drug that basically comes from the opium

3    plant, the poppy.

4    Q.  Does Schedule I contain any opiates?

5    A.  Heroin would be one.

6    Q.  Does Schedule II contain any opiates?

7    A.  Morphine, oxycodone; there are a number of opiates in

8    Schedule II.

9    Q.  Can you describe to the jury what oxycodone is?

10   A.  Yes.  Oxycodone is an opiate.  It's a drug that's used for

11   the treatment of pain.  It is a Schedule II substance, which

12   means it is highly addictive and/or subject to significant

13   abuse potential.

14   Q.  And based on your training and experience, what risks are

15   associated with oxycodone usage?

16   A.  Well, addiction, obviously, abuse.  Overdoses can lead to

17   respiratory depression, you stop breathing, and even overdoses

18   can result in death.

19   Q.  Are there different types and dosages of oxycodone?

20   A.  Yes.  Primarily there's two different types.  One is

21   immediate release where when you take the drug, kind of like an

22   aspirin tablet, it dissolves pretty quickly and gets into the

23   system pretty quickly.  The other is a controlled substance

24   release form where when you take it, it dissolves slower.  The

25   drugs get into the body slower, but it lasts longer.  So if you

1   take the controlled release dosage form on a regular basis, you

2   develop a pretty constant level of the drug instead of having

3   to go up and down like maybe you do with thinking again of

4   aspirin with a headache, you sometimes have to take doses two

5   or three times.  So the immediate release oxycodone is taken a

6   little more frequently than the controlled release.

7   Q.  Turning to the immediate release, can you describe some of

8   the immediate release forms of oxycodone?

9   A.  Well, oxycodone is available in different strengths,

10  5 milligrams all the way up to 30 milligrams per tablet,

11  5 milligram being the most common dose used in most individuals

12  who are not used to takes opiates.  Most people if they go into

13  an ER, broken arm, for example, they're going to get the

14  5 milligram rather than the highest one, the 30.

15  Q.  So, Mr. Winsley, when is 5-milligram oxycodone an

16  appropriate course of treatment?

17  A.  It's appropriate for most individuals, particularly those

18  who are what we call opiate naive.

19  Q.  What do you mean by opiate naive?

20  A.  They're not used to taking opiates.  Most of us are opiate

21  naive.  If we have an injury, if we have surgery, we've not

22  taken opiates before very much, so you would start with the

23  lowest dose.

24  Q.  And generally speaking, when is 30-milligram oxycodone an

25  appropriate course of treatment?

1   A.   Only for those patients in severe pain who have developed a

2   tolerance, if you will, to the opiates and who can handle a

3   higher dose.

4   Q.   Can a patient get a refill for an oxycodone prescription?

5   A.   No, you can't.  Schedule II substances cannot be refilled.

6   You need a new prescription every time you need a new supply.

7   Q.   Mr. Winsley, you previously also discussed controlled

8   release forms of oxycodone.  Can you describe some of those?

9   A.   The most common one that I think most people are familiar

10  with is called Oxycontin released in the 1990s and it was a

11  drug product that was originally intended to be used for those

12  patients such as terminal cancer patients who have long term

13  pain, intense pain, but who can be developed into a steady

14  consistent dose.  Their pain is not up and down, it's

15  consistent, so they can take the controlled release dosage

16  form.

17  Q.   Was Oxycontin subject to abuse?

18  A.   Oxycontin became an immediate hit on the street because it

19  turns out that, first of all, the Oxycontin dosage forms

20  originally ranged in various quantities up to 160 milligrams

21  per dosage unit because the intention was they were released

22  slowly so the patient never got a high dose.  It was quickly

23  discovered, however, that the Oxycontin tablets that were

24  initially released could be crushed and then the people could

25  snort them, like you see cocaine.  They could dissolve them in

1    liquid and inject.  They would get the total dose of oxycodone

2    all at once which would give them a heroin-like high, but it

3    also killed quite a few people because they were not used to

4    that quantity.  The 160 milligram was quickly removed from the

5    market, so the highest one available now is 80 milligrams.

6    Q.  And currently that 80-milligram oxycodone, is that subject

7    to abuse?

8    A.  Because of the problems that the original formulation was

9    causing, the drug company redid the dosage formulation and made

10   it more tamper resistant.  The new dosage form can no longer be

11   crushed and then snorted or injected.  But it still can be

12   abused by taken orally, just like a lot of other controlled

13   substances.  So it's still abused for oral use, but it is no

14   longer able to be abused by crushing or injecting.

15          MR. KEHOE:  Excuse me, your Honor, I object.  Can I

16   have a brief side bar on this testimony?

17          THE COURT:  Sure.

18          (Continued on next page)

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. KEHOE:  First, Judge, I think preliminarily, you

3       ruled out anything about death in one of your prior rulings.  I

4       let this go for a while.  But just looking at your order and

5       also his report, none of this information that he's opining

6       about was included in this report.  And I think your Honor's

7       order itself was quite clear as to what this witness was able

8       to testify and what he's not.

9              THE COURT:  Well, my opinion, my order dealt with his

10      specific opinions, but of course he is bound by what's in his

11      report.  He can't go outside the four corners of his report.

12      So what about that?

13             MS. ESTES:  Your Honor, I believe his report

14      specifically references Oxycontin just as background, that this

15      was once the most commonly form of oxycodone that was subject

16      to abuse.  We're about to get into what is now the most common

17      one, which is 30 milligram.  It's just historical information

18      but I believe it is in the report.

19             THE COURT:  Well, I think you need to narrow it to

20      what is really fairly within the report.  For example, although

21      there was no objection and therefore I let it go, while it was

22      relevant to explain what a Schedule II controlled substance

23      was, all the stuff about Schedules III, IV, and V was

24      completely irrelevant.  And given the time concerns that the

25      Court has already expressed, I don't know why we even got into

1   that.  And similar now we're talking about something that is at

2   best of historical interest and I think we should leave that to

3   the treatise that Dr. Winsley will undoubtedly want to write

4   some day, but not on our time.

5           MS. ESTES:  We will move on.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2    BY MS. ESTES:

3    Q.  Mr. Winsley, what type of oxycodone has the most potential

4    for abuse?

5    A.  Today it's the oxycodone 30-milligram tablet.

6    Q.  Why is that?

7    A.  Because it still is in a dosage form that can be crushed

8    and then snorted, injected, abused in a variety of ways, as

9    well as orally.

10   Q.  Mr. Winsley, what is drug diversion?

11   A.  Drug diversion is a movement of a prescription drug outside

12   of the normal distribution channel, in other words, drug

13   manufacturer to wholesaler to pharmacy to patient.  Drug

14   diversion occurs when drugs are moved outside of that channel

15   in a way that allows them to be abused.

16   Q.  Mr. Winsley, let me stop you right there.  What are some

17   examples of controlled substances that are the subject of

18   diversion?

19   A.  The opiates; oxycodone, hydrocodone being the two top ones.

20   Q.  Turning to oxycodone there, can you explain generally ways

21   oxycodone can be diverted?

22   A.  Yes, by theft --

23                    MR. KEHOE:  I object, Judge.  Same as before on the

24   side bar.  I can explain at side bar if your Honor would like

25   further discussion.

 1            THE COURT:  No.  I think we need to really get to

 2    the --

 3            MS. ESTES:  We can move on, your Honor.

 4            THE COURT:  -- opinions that this witness was called

 5    to present to the jury.  All right.

 6    Q.  Mr. Winsley, let's talk about pharmacist training for a

 7    bit.  What sort of training does a pharmacist receive in

 8    school?

 9    A.  From about the 1950s on, pharmacists were required to

10    complete a five-year college program.  Recently that's been

11    increased to six years, so the newer pharmacists have had six

12    years of college training.

13    Q.  And what does that training generally cover?

14    A.  It covers primarily as you might expect drugs, their uses,

15    their indications, the disease states that they're used to

16    treat, how to dose them, the calculations necessary to handle

17    those drugs.  But pharmacists also, because I previously

18    mentioned we have to take a law exam, pharmacists, every

19    pharmacy school also has at least one course in drug laws.

20            MR. KEHOE:  Your Honor, same objection.

21            THE COURT:  Overruled.

22    Q.  Mr. Winsley, so what sort of laws do pharmacists receive

23    training on?

24    A.  Laws relating to drugs, both criminal and administrative,

25    federal and state, primarily the state where the college is

1   located, of course.

2   Q.  Do those include laws on controlled substances?

3   A.  Yes, they do.

4   Q.  Mr. Winsley, do pharmacists receive training on issues

5   relating to drug diversion?

6   A.  Yes, part of their pharmacology training, the effects of

7   the drugs, as well as, of course, during their jurisprudence

8   course.

9   Q.  Mr. Winsley, I'd like to switch topics a bit and talk about

10   pharmacy practice more generally.  According to professional

11   standards and practice, what responsibility does a pharmacist

12   have before filling a prescription?

13   A.  First thing that a pharmacist has to do is ensure that the

14   prescription is valid, that it meets all of the requirements.

15   So it has patient name, drug, strength, quantity, directions

16   for use.  It's properly authorized by the prescriber, which on

17   the paper prescription would be a signature.

18   Q.  And, Mr. Winsley, let me stop you there.  How does a

19   pharmacist verify that a prescription is valid in those ways?

20   A.  Well, based upon their education and experience, they know

21   the drugs and the usual doses and so forth.  They should know

22   the physicians that are writing the prescriptions or at least

23   then they need to make an effort to determine that the

24   physician or prescriber -- could be a dentist or veterinarian

25   or whatever -- is authorized to write that prescription if they

1    don't already know that prescriber.

2    Q.  Mr. Winsley, what other responsibilities does a pharmacist

3    have before filling a prescription?

4    A.  Once they determine that a prescription meets all of the

5    requirements, they have been required by the state to maintain

6    a patient profile.  That patient profile is a list of patient

7    specific information -- name, address, date of birth, disease

8    states that the patient has shared with the pharmacist,

9    allergies that the patient has shared with the pharmacist.  And

10   in that profile it contains a list of all of the drugs received

11   by that patient from that pharmacy over the last, depends on

12   the state, two or three years.

13            Once they have that profile, they're required to check

14   the new prescription against those drugs, do what's called a

15   prospective drug utilization review.  They're required to look

16   for potential problems.  Those potential problems may include a

17   drug/drug interaction where one drug affects how another drug

18   reacts and may cause problems.  They're required to check for

19   drug allergies.  A lot of people, for example, have allergies

20   to penicillin so, obviously, the pharmacist would need to catch

21   that and not fill a penicillin prescription for that patient.

22   They're required to look for indications of misuse or abuse.

23   Q.  Mr. Winsley, let me stop you right there.  What happens if

24   a pharmacist notices indications of misuse or abuse?

25   A.  If they notice any problems, but particularly misuse or

1   abuse, they're required to resolve their concerns before they

2   proceed with filling the prescription.

3   Q.   And what do you mean by resolve their concerns?

4   A.   It depends on what the potential problem is.  It could be

5   something as simple as talking to the patient.  It could be

6   calling the physician to discuss those concerns with the

7   physician.  It could be doing a little additional research if

8   they think there's a problem but they want to make sure.  So

9   there's a variety of steps and it depends on the severity of

10   their concern.

11   Q.   So, Mr. Winsley, let's assume the pharmacist decides the

12   prescription is fine.  What happens after that?

13   A.   Once the pharmacist determines it's acceptable to fill the

14   prescription, then it's filled and then it's delivered to the

15   patient either by the pharmacist or by one of the pharmacy

16   employees.  But in all cases the pharmacist needs to be offered

17   counseling by the -- I'm sorry, the patient needs to be offered

18   counseling by the pharmacist.

19   Q.   Mr. Winsley, when you say offered counseling, what do you

20   mean?

21   A.   There are some instances where the pharmacist will just go

22   out and talk to the patient.  But if that's not the case, then

23   whoever hands the prescription to the patient has to ask in

24   some manner if the patient wants to talk to the pharmacist.

25   Q.   What is the purpose of that counseling?

1    A.  To make sure that the patient understands what the drug is,

2    how to take it, whether to take it with food or on an empty

3    stomach, for example, what things to look out for if the

4    patient has side effects.  Many drugs can cause a rash if you

5    have an allergy, so that might be one of the things the

6    pharmacist would talk to the patient about.

7    Q.  Mr. Winsley, is it possible to counsel a patient if the

8    patient doesn't go into the pharmacy?

9    A.  Only if it's done by phone.

10   Q.  Mr. Winsley, let's turn to controlled substances.  Do

11   pharmacists have any particular responsibilities with respect

12   to controlled substances?

13   A.  Yes.  They're required to ensure that a controlled

14   substance prescription is written for a legitimate medical

15   purpose by a prescriber acting in the usual course of that

16   prescriber's practice.

17   Q.  Mr. Winsley, you mentioned a corresponding responsibility

18   earlier.  What did you mean by that?

19   A.  The requirement goes further to say that the responsibility

20   for making sure that a prescription is for a legitimate medical

21   purpose issued by a prescriber in the usual course of practice

22   obviously falls on the prescriber himself or herself, but a

23   corresponding equal responsibility rests with the pharmacist

24   who fills it.  So the pharmacist is required to use independent

25   judgment on every prescription for a controlled substance that

1    they fill to make sure it meets that legitimate medical purpose

2    requirement.

3    Q.  Mr. Winsley, what are some of the things a pharmacist might

4    do to satisfy that responsibility?

5    A.  They rely on their knowledge and experience.  They are drug

6    experts.  They know doses.  They should know the prescribers.

7    They should know their patients.  And if there are any concerns

8    that the pharmacist has that maybe this prescription was not

9    issued appropriately, then they need to follow up and resolve

10   that before they go on.

11   Q.  Mr. Winsley, is a pharmacist required to call a doctor

12   after receiving a prescription?

13   A.  They are not required to call a doctor after receiving the

14   prescription unless during that prospective utilization review

15   they come up with some concerns that they need to talk to the

16   doctor about.

17   Q.  Does calling a doctor's office to verify a prescription

18   satisfy the pharmacist corresponding responsibility?

19   A.  No, it does not.

20   Q.  Could you explain?

21   A.  Obviously, if the prescription was written by a doctor not

22   for a legitimate purpose but for some other purpose, that

23   doctor certainly is not going to admit that to the pharmacist.

24   He will say -- he or she will say I wrote that prescription.

25   So just verifying that the physician wrote that prescription

1    does not fulfill the pharmacist's corresponding responsibility

2    to make an independent judgment on whether they should fill or

3    not fill.

4    Q.  So what should a pharmacist do if he thinks a prescription

5    is illegitimate?

6    A.  Once a pharmacist makes a determination that the patient is

7    not for -- the patient -- the prescription is not for a

8    legitimate medical purpose, the pharmacist, a reasonable

9    pharmacist would refuse to fill that prescription.

10   Q.  Is it consistent with the pharmacist's obligations to

11   direct a doctor to prescribe certain medications?

12   A.  No, nobody can direct a doctor to prescribe.  The decision

13   on whether to prescribe or not prescribe is a function of the

14   physician.  Pharmacists may certainly suggest and do on a daily

15   basis once they've done their review, talked to the patient,

16   many times they will call and suggest that the doctor consider

17   something else.  But they cannot dictate to the doctor that the

18   doctor must write something.

19   Q.  Is it consistent with the pharmacist's obligations to

20   instruct the patient to obtain certain medications?

21   A.  No, and for basically the same reasons.  If the patient

22   should not be dictating to the doctor what's written either.

23   Q.  Is it consistent with the pharmacist's obligations to tell

24   a patient that the pharmacist will dispense certain medications

25   only if the patient presents other prescriptions to the

1    pharmacist?

2    A.  That's pretty unusual.  Each prescription needs to stand on

3    its own and the pharmacist needs to make the decision whether

4    to fill it or not to fill it on its own, not whether or not

5    other prescriptions have come in with it.

6    Q.  So, Mr. Winsley, when filling a controlled substance

7    prescription, are there any particular indicators that might

8    cause a pharmacist to question the validity of that

9    prescription?

10   A.  There are a number of indicators that pharmacists need to

11   be aware of.  One would be distance of the patient from the

12   pharmacy and/or the prescriber.  Most patients live or visit

13   pharmacies and physicians within a reasonable distance, which

14   obviously varies from location to location.  In Montana that

15   reasonable distance may be many miles.  In an urban setting

16   such as Philadelphia, Boston, New York, Washington, it would be

17   much shorter.

18   Q.  Mr. Winsley, let me stop you there.  If I could ask you to

19   give me some of the examples that might be indicators that

20   might cause a pharmacist to question the validity and then we

21   could go through the examples one by one.

22   A.  Certainly.  I apologize.  Another indicator would be

23   patients bringing in prescriptions for the same drug that they

24   just received shortly before, in other words, a duplicate

25   prescription; patients bringing in prescriptions for the same

1    drug from two or more different prescribers; patients who

2    frequently change doctors for pain control but still get the

3    same dose of the same drug from multiple different prescribers

4    one after another; doctors who write using a technique we refer

5    to as cookbook therapy where everybody gets the same dose or

6    similar doses of the same drugs no matter their age, height,

7    weight, sex, disease state.  A major concern is somebody who

8    brings in prescriptions for multiple patients where the

9    pharmacist rarely, if ever, sees the patients but only sees the

10   one individual.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Mr. Winsley, let me stop you there and let's start

2   discussing some of these indicators.  First, turning to

3   distance, what about distance might give a pharmacist pause?

4   A.  Most patients tend to frequent a pharmacy that's close to

5   where they live.  For their primary care physicians, they tend

6   to frequent one who is close where they live.  They don't tend

7   to travel great distances for either location.

8           Obviously, if they are seeing a specialist -- we've

9   got people that travel from Saudi Arabia to the Cleveland

10  clinic to see the specialist there.  That's different.  But

11  your primary care physician is usually relatively close to

12  where you live, as is your pharmacy.  It is unusual for

13  patients to pass multiple pharmacies on the way.

14  Q.  In Mr. Winsley, if a pharmacist notices that patients are

15  traveling a great distance to go to a doctor, what would a

16  reasonable pharmacist do in that situation?

17  A.  First of all talk to a patient and find out, if the

18  pharmacist is not familiar with the doctor, find out if that

19  doctor is a specialist, get a feeling for what the situation

20  is.  It could be that the patient is here in New York City, for

21  example, on vacation and they brought a prescription from home.

22  Those are things that can be resolved by talking to the

23  patient.

24  Q.  Mr. Winsley, if a pharmacist notices that patients are

25  traveling a great distance to get to the pharmacy, what would a

Gb3sgos2            Winsley - direct

1    reasonable pharmacist do?

2    A.   Again, talk to the patient.  There are a variety of reasons

3    why that might happen.  One could be that they are moving from

4    pharmacy to pharmacy just as I mentioned moving from doctor to

5    doctor.  There could be a lot of other reasons for that too.

6    Again, the pharmacist needs to talk to the patient and find

7    out.

8    Q.   What would a reasonable pharmacist do if he suspects a

9    patient is moving from pharmacy to pharmacy?

10   A.   If there is not a legitimate reason, then the pharmacist

11   should exercise a great deal of restraint in filling

12   prescriptions, particularly for controlled substances.

13   Q.   Mr. Winsley, earlier you discussed cookbook prescribing.

14   What did you mean by that?

15   A.   Pain is not a state that has standard treatment.  We all

16   react different to pain.  Some of us need more pain medication

17   than others.  Unlike an infection, for example, if we came down

18   with an infection and we all lived in the same town, came down

19   with pneumonia, and we went to visit our own physician, odds

20   are we would get the same antibiotic as long as we were healthy

21   adults.  Pain doesn't work that way.

22          So, when you have a physician who writes the same drug

23   in the same strength for everybody -- husband, wife, teenage

24   son, teenage daughter, grandma, grandpa, neighbors -- no matter

25   whether they have back spasms or nerve damage in their neck or

1   bad knees, and particularly when they write in the highest

2   strength available, that's certainly a problem that should

3   cause a reasonable pharmacist to have a great amount of concern

4   about the validity of those prescriptions.

5   Q.  Mr. Winsley, you also discussed earlier a customer coming

6   in with controlled substance prescriptions for other people.

7   Why could that be a problem?

8   A.  It's very rare for anybody to be a, quote, caregiver for

9   somebody other than maybe a spouse or a neighbor, very close

10  personal friend.  In my experience dealing with these issues

11  many years in pharmacy, I have never run cross anybody taking

12  care of more than one or two people.

13  Q.  What should a reasonable pharmacist do if he or she

14  observes a patient coming in with multiple controlled substance

15  prescriptions for other people?

16  A.  Pharmacists should use a great amount of discretion and

17  judgment.  Most reasonable pharmacists would not continue to

18  fill all of those prescriptions.

19  Q.  Mr. Winsley, earlier you talked about early dispensing,

20  filling a drug early.  Why could that be a problem?

21  A.  Prescriptions come in and they have the quantity and

22  directions for use.  For example, a quantity of 30, directions

23  1 per day.  That means the prescription should last for 30

24  days.  If a patient comes in halfway through, say after 2

25  weeks, and wants more of the same drug, that is an indication

 1   that there may be a problem, the patient is taking too many.

 2   Depending upon the drug involved, it could involve a potential

 3   for abuse.  It is certainly something that a pharmacist needs

 4   to look into.  A pharmacist should not dispense more than what

 5   has been prescribed by the physician.

 6   Q.  What should a reasonable pharmacist do if he notices

 7   continued early dispensing?

 8   A.  If it's continued, the pharmacist needs to do what he or

 9   she can to put a stop to it, which may include not filling the

10   prescription.  If, after talking to the physician, the

11   prescriber, it can't be resolved, the pharmacist needs to

12   recognize his or her corresponding responsibility and cease

13   that process.

14   Q.  Mr. Winsley, you mentioned earlier switching prescribers.

15   Why should that be a concern?

16   A.  There are two aspects of that.  One is if they are seeing

17   two different doctors to get the same drug at the same time.

18   That is obviously a problem.  The other is that most patients,

19   if they are a pain patient, they go to a pain physician, they

20   quite frequently sign a contract, and part of that contract is

21   they will only go to that physician.  Many times they will only

22   go to one or two pharmacies to get them filled, so that the

23   process can be monitored.  It is very unusual for legitimate

24   pain patients to be moving from doctor to doctor to doctor

25   after very short periods of time still getting the same drug.

1   Q.  What should a reasonable pharmacist do if he or she notices

2   that a patient is frequently switching doctors?

3   A.  If the pharmacist can't resolve that issue, perhaps due to

4   the patient frequently moving for some reason or some other

5   reason that I can't come up with right now, but if they can't

6   resolve that issue, again, they need to remember their

7   corresponding responsibility and stop filling some of those

8   prescriptions.

9            THE COURT:  Counsel, as I indicated, most regretfully,

10  we are going to have to take a break now because I need to take

11  that conference call in the other matter.

12           Ladies and gentlemen, we will take a 15-minute break

13  at this time.

14           (Recess)

15           THE COURT:  I neglected, ladies and gentlemen, to

16  comment on Juror No. 11's really wonderful hat.  You have

17  outdone yourself.

18           Go ahead, counsel.

19  BY MS. ESTES:

20  Q.  Mr. Winsley, is there anything about purchasing controlled

21  substances with cash that should raise a concern with a

22  pharmacist?

23  A.  Some people do not have prescription drug coverage and,

24  obviously, pay cash.  If a patient is paying cash for

25  controlled substances but they have insurance coverage for

1    their other drugs, that is something that should give pause to

2    a reasonable pharmacist.  Many insurance companies do their own

3    prospective utilization review and start notifying pharmacists,

4    prescribers, and even law enforcement if they detect problems.

5    Q.  Mr. Winsley, let me stop you there.  What should a

6    reasonable pharmacist do if he notices a patient is paying in

7    cash for controlled substances when the patient also has

8    insurance?

9    A.  The first step would be to find out why.  Make sure the

10   insurance covers the drug.  Some health insurance covers some

11   drugs and doesn't cover others.  But assuming that there is no

12   logical reason, a reasonable pharmacist could suspect that

13   there was a problem with that prescription.  Ultimately, if

14   they can't resolve that problem, they should not fill it.

15   Q.  Mr. Winsley, in preparation for your testimony today, were

16   you asked to review certain records related to Ekwunife

17   Pharmacy?

18   A.  Yes, I was.

19   Q.  What type of records did you review?

20   A.  I had the prescription monitoring program information from

21   the Bureau of Narcotics Enforcement from the state of New York.

22   I had two spreadsheets that consisted of the controlled

23   substance prescriptions that were dispensed from the pharmacy.

24   I had a spreadsheet with some medication data on it.  Then I

25   received some patient profiles that were printed from the

 1   pharmacy computer system.

 2   Q.  Mr. Winsley, were you asked to make any assumptions when

 3   reviewing these records?

 4   A.  Yes.  I was asked to assume that in a certain number of

 5   cases one individual was bringing in prescriptions for multiple

 6   patients.

 7   Q.  Mr. Winsley, I would now like to discuss certain of those

 8   records.

 9            MS. ESTES:  Your Honor, may I have permission to

10   publish what has been previously entered into evidence as

11   Government Exhibit 219?

12            THE COURT:  Yes.

13   Q.  Mr. Winsley, these are prescription records for patient

14   Gilberto Cabrera.  Did you review these in preparation for your

15   testimony today?

16   A.  Yes, I did.

17            MS. ESTES:  Ms. Bostillo could you please turn to page

18   2 of this document and zoom in to the bottom two rows as well

19   as the headings at the top.

20   Q.  Mr. Winsley, turning to these two transactions, what to

21   they show generally?

22   A.  These are two prescriptions, both of them for oxycodone 30

23   mg tablets.

24   Q.  What is the date on the first prescription?

25   A.  The first prescription was filled on October 10, 2012.

1    Q.   What is the quantity for that prescription?

2    A.   120 of the oxycodone 30 mg tablets.

3    Q.   What is the doctor's name?

4    A.   Pardon my pronunciation.   Basseau.

5    Q.   Turning to the second transaction -- excuse me.   Strike

6    that.   Turning back to the first transaction, what is the

7    amount listed there?

8    A.   The quantity is 120.

9    Q.   Sorry.   Under the amount column, directing your attention

10   to that column.

11   A.   Okay.   It's $180.

12   Q.   What is the amount listed on the insurance paid column?

13   A.   Zero.

14   Q.   What is the amount listed in the patient paid column?

15   A.   $180.

16   Q.   What are the initials listed in the last column?

17   A.   DG.

18   Q.   Turning to the second transaction below, what is the date

19   of that transaction?

20   A.   It was filled on October 15, 2012.

21   Q.   What is the quantity there?

22   A.   Again, 120 oxycodone 30 mg tablets.

23   Q.   What is the prescriber name?

24   A.   Last name is Belfar.

25   Q.   What is the amount listed?

1    A.   $180.

2    Q.   What is the amount listed in the insurance paid column?

3    A.   Zero.

4    Q.   Patient paid column?

5    A.   $180.

6    Q.   What are the initials are the right column?

7    A.   KDG.

8    Q.   Mr. Winsley, did you form any opinions when you were

9    reviewing these transactions?

10   A.   Yes, I did.  This is one of those instances that I referred

11   to when discussing what a pharmacist should check for during

12   prospective utilization review.  These are two prescriptions

13   for oxycodone 30 milligrams, the patient showing up 5 days

14   after the first one was filled with an identical prescription.

15   The first prescription was a 30-day supply, and 5 days later

16   the same patient is presenting a second prescription for

17   another 30-day supply.  In addition, they are written by 2

18   different prescribers.  So this is overlapping prescribers and

19   overlapping dosage forms.

20   Q.   What might a reasonable pharmacist do if they were

21   presented with this situation?

22   A.   There is very little that could explain this.  Certainly

23   you would talk to the 2 prescribers and you would talk to the

24   patient.  But in most cases a reasonable pharmacist would not

25   fill the second prescription.

1   Q.  Mr. Winsley, you testified earlier about reviewing certain

2   records related to this pharmacy.  Based on your review of

3   those records, did you notice any cookbook prescribing as you

4   described earlier?

5   A.  Yes, I did.  There were several doctors that appeared to

6   write large quantities of oxycodone 30 milligrams if not

7   exclusively, then predominantly.

8   Q.  Let's look at some of though records.

9        MS. ESTES:  Your Honor, may I have permission to

10  publish Government Exhibit 214?

11       THE COURT:  Yes.

12       MS. ESTES:  Ms. Bostillo could you please zoom in to

13  the first transaction here.

14  Q.  Mr. Winsley, these are records for the patient Luther

15  Perry.  What is the drug listed here?

16  A.  It's oxycodone 30 milligrams.

17  Q.  What is the quantity listed there?

18  A.  150 tablets.

19  Q.  What is the doctor's name?

20  A.  Robert White.

21       MS. ESTES:  Ms. Bostillo, could you please pull up

22  Government Exhibit 205.  These are patient records for Philip

23  Ingram.  And if you could please zoom in to the last

24  transaction on page 1.

25  Q.  Mr. Winsley, what is the drug listed there?

1   A.  Oxycodone 30 milligrams.

2   Q.  What is the quantity listed there?

3   A.  120 tablets.

4   Q.  Who is the prescriber?

5   A.  Robert White.

6           MS. ESTES:  Ms. Bostillo, could you please pull up

7   Government Exhibit 206, the prescription records for Willie

8   Johnson.  And could you zoom in to the first transaction on the

9   first page.

10  Q.  Mr. Winsley, what is the drug listed there?

11  A.  Oxycodone 30 milligrams.

12  Q.  What is the quantity listed?

13  A.  150 tablets.

14  Q.  What is the prescriber name?

15  A.  Robert White.

16          MS. ESTES:  Ms. Bostillo could you please pull up

17  Government Exhibit 218.  And could you turn to page 2 and zoom

18  in to the fourth transaction.  These are the records for Jorge

19  Tirado.

20  Q.  Mr. Winsley, what is the drug listed there?

21  A.  Oxycodone 30 milligrams.

22  Q.  What is the quantity?

23  A.  150 tablets.

24  Q.  Who is the prescriber?

25  A.  Robert White.

1            MS. ESTES:  Finally, Ms. Bostillo, could you please

2     pull up Government Exhibit 210, the prescription records for

3     Sheri Bowen, and turn to page 2.  And if you could zoom in to

4     the sixth transaction there.

5     Q.  Mr. Winsley, what is the drug listed there?

6     A.  Oxycodone 30 milligrams.

7     Q.  What is the quantity?

8     A.  150 tablets.

9     Q.  Who is the prescriber?

10    A.  Robert White.

11    Q.  Mr. Winsley, after reviewing these transactions, did you

12    come to any conclusions?

13    A.  Yes.  Dr. White in particular was of concern to me.  These

14    were just a few examples.  He actually wrote, if memory serves

15    me correctly, about 89 prescriptions for oxycodone 30

16    milligrams to 17 or 19 patients, I'm sorry, one or the other.

17    In fact, the only prescriptions in the pharmacy, with two

18    exceptions, were for oxycodone 30 milligrams from Dr. White.

19    The other two prescriptions were oxycodone with acetaminophen,

20    or Tylenol, in two instances.  So the only prescriptions from

21    Dr. White in this pharmacy controlled substance printout were

22    for oxycodone.

23    Q.  That would raise a concern with a reasonable pharmacist?

24    A.  Yes.  It's unreasonable that 17 or 19 patients would all

25    need large quantities of oxycodone 30 milligrams for a

1   legitimate medical purpose unless Dr. White would happen to be

2   a real specialist or the patients were terminal cancer

3   patients.

4   Q.  Mr. Winsley, I would like to look at some records that

5   relate to another doctor now.

6        MS. ESTES:  Ms. Bostillo, if you could please pull up

7   Government Exhibit 207, the prescription records for Stefone

8   Holliman.  And if we could turn to page 3 and zoom in to the

9   third transaction there.

10  Q.  Mr. Winsley, what is the prescription listed there?

11  A.  Oxycodone 30 milligrams.

12  Q.  What is the quantity?

13  A.  90.

14  Q.  Who is the prescriber?

15  A.  Pardon my pronunciation.  Siberceva.

16       MS. ESTES:  Ms. Bostillo, could you please turn to

17  Government Exhibit 218, the record for Jorge Tirado.  And could

18  you please turn to page 17 and zoom in to the last transaction.

19  Q.  Mr. Winsley, what is the drug listed there?

20  A.  Oxycodone 30 milligrams.

21  Q.  What is the quantity?

22  A.  Number 90.

23  Q.  Who is the prescriber?

24  A.  Same doctor, Dr. Sibirceva.

25       MS. ESTES:  Ms. Bostillo, could you please turn to

1    Government Exhibit 206, and could you turn to page 28 and zoom

2    in to the second transaction from the bottom.

3    Q.  Mr. Winsley, what is the drug listed there?

4    A.  Oxycodone 30 milligrams.

5    Q.  What is the quantity?

6    A.  Number 90.

7    Q.  Who is the prescriber?

8    A.  Sibirceva.

9           MS. ESTES:  Ms. Bostillo, could you please turn to

10   Government Exhibit 210.  And could you please turn to page 25

11   and zoom in to the second transaction from the bottom.

12   Q.  Mr. Winsley, what is the drug listed there?

13   A.  Oxycodone 30 milligrams.

14   Q.  What is the quantity?

15   A.  Number 90.

16   Q.  Who is the prescriber?

17   A.  Dr. Sibirceva.

18          MS. ESTES:  Finally, Ms. Bostillo, could you turn to

19   Government Exhibit 202, page 4, and if you could please zoom in

20   to that second transaction from the bottom.

21   Q.  Mr. Winsley, what is the drug listed there?

22   A.  Oxycodone 30 milligrams.

23   Q.  And the quantity?

24   A.  Number 90.

25   Q.  Who is the prescriber?

1    A.   Dr. Sibirceva.

2    Q.   Mr. Winsley, after reviewing these transactions, did you

3    come to any conclusions?

4    A.   Yes.  This doctor prescribed a large number of 30 mg

5    oxycodone prescriptions to multiple patients.  In fact, she

6    prescribed 44 prescriptions to 8 different patients.  The

7    overwhelming majority of them were identical: 90 tablets, one

8    tablet 3 times a day.  This is another example of what I refer

9    to as cookbook prescribing.

10   Q.   Again, what should a reasonable pharmacist have done after

11   noticing this?

12   A.   After the pharmacist discovers this type of process going

13   on, the pharmacist should do some significant amount of

14   research into the patients and the physicians.  If unable to

15   resolve the concerns, then the pharmacist should not fill those

16   prescriptions.

17   Q.   Mr. Winsley, could you turn in the exhibit binder in front

18   of you to what has been premarked for identification purposes

19   as Government Exhibit 915.  I believe it is in the second

20   binder, the bottom one?

21   A.   Government 1 of 2?

22   Q.   Government Exhibit 915.

23   A.   915, yes, ma'am.

24   Q.   Mr. Winsley, do you recognize that document?

25   A.   Yes.  These were prescriptions that were picked up at the

1     pharmacy on February 23, 2015.

2     Q.  Does this document accurately summarize data containing

3     Government Exhibits 202, 210, 207, and 206?

4     A.  I'm not familiar with the correlation; I apologize.  This

5     is data that is available on the patient profiles that I

6     reviewed.

7              MS. ESTES:  Your Honor, the government would offer

8     Government Exhibit 915 as a summary exhibit.

9              MR. KEHOE:  No objection, Judge.

10             THE COURT:  Received.

11             (Government's Exhibit 915 received in evidence)

12             MS. ESTES:  Permission to publish?

13             THE COURT:  Yes.

14    Q.  Mr. Winsley, what is reflected in this chart generally?

15    A.  These are all prescriptions that were picked up in one day

16    at the pharmacy.  There are four prescriptions for oxycodone 30

17    milligrams for 4 different patients.

18    Q.  Mr. Winsley, were you asked to make an assumption about

19    these prescriptions?

20    A.  I was.  I was asked to assume that these prescriptions were

21    all that day brought in by the same individual.

22    Q.  Taking into account that assumption, did you form any

23    opinions about these prescriptions?

24    A.  I did.  The opinion that I formed was that it was

25    exceedingly questionable to be filling 4 different

1    prescriptions for 4 different patients for oxycodone from --

2    let me count real quick on this one -- 3 different, no, 2

3    different prescribers.  This is something that a reasonable

4    pharmacist certainly should have questioned.

5              MS. ESTES:  Your Honor, may I publish Government

6    Exhibit 211, which has been previously entered into evidence?

7              THE COURT:  Yes.

8    Q.  Mr. Winsley, these are the prescription records for Eugene

9    Seaman.  I would like to first look at the first few pages

10   here.  If you want to turn in your exhibit binder as well, it's

11   Government Exhibit 211.

12   A.  Yes, ma'am.

13   Q.  Looking at these first few pages, what doctor are the

14   prescriptions coming from?

15   A.  Dr. Ahmad.

16   Q.  I would like to go through some of the relevant drugs

17   listed here.

18              MS. ESTES:  Ms. Bostillo, if you could please turn to

19   page 2.  Then if you could zoom in to the third and fourth rows

20   of this page.

21   Q.  Mr. Winsley, what is the drug listed in the top row here?

22   A.  Isentress.

23   Q.  What is that used to treat?

24   A.  HIV.

25   Q.  What is the price of the drug listed here?

 1   A.  $1,007.75.

 2   Q.  What is the drug listed below?

 3   A.  ATRIPLA.

 4   Q.  What is that used for treating?

 5   A.  HIV.

 6   Q.  What is the price listed there?

 7   A.  $1,789.43.

 8        MS. ESTES:  Ms. Bostillo, could you zoom out of these

 9   transactions and zoom into the transaction at the bottom of

10   this same page.  Thank you.

11   Q.  Mr. Winsley, what is the drug listed here?

12   A.  ABILIFY.

13   Q.  What is that used to treat?

14   A.  It's an antipsychotic.

15   Q.  What is the amount listed there?

16   A.  $565.41.

17        MS. ESTES:  Ms. Bostillo, could you please turn to the

18   next page and zoom in to the third, fourth, and fifth rows.

19   Q.  Mr. Winsley, looking at the top row here, what is the drug

20   listed?

21   A.  REYATAZ.

22   Q.  What is that used to treat?

23   A.  HIV.

24   Q.  What is the amount listed there?

25   A.  $1,002.44.

Gb3rseo2       Winsley - direct

1   Q.   Turning to the row below that, what is the drug listed?

2   A.   Prezista.

3   Q.   What is that used to treat?

4   A.   HIV.

5   Q.   What is the amount listed?

6   A.   $1,058.36.

7   Q.   Turning to the row below that, what is the drug listed?

8   A.   Epzicom.

9   Q.   What is that used to treat?

10  A.   HIV.

11  Q.   And what is the amount listed there?

12  A.   $962.72.

13  Q.   Mr. Winsley, did you form any opinion after reviewing the

14  prescription for Eugene Seaman?

15  A.   Yes.  From the very beginning of this profile I looked at

16  the prescriptions that were issued between -- let me check the

17  first page to make sure my date is correct -- from 1/6/2012

18  through 2/5/2012, a one-month time.  In that one-month time

19  there were 14 prescriptions for HIV drugs dispensed according

20  to this profile.  13 of them were unique drugs.  There was one

21  duplicate, but the others were all different drugs, all used to

22  treat HIV, which is not for any legitimate medical purpose at

23  all.

24          In reviewing the contraindications for these drugs,

25  there were four that were totally contraindicated because they

1   were duplicative therapy -- same side effects, same effects --

2   which could have meant had the patient taken all of these, it

3   could have some serious side effects.  There were 13 other

4   interactions between these drugs.  Remember I mentioned that

5   they had to look for drug-drug interactions where one drug

6   diminished or increased the effect of another drug or changed

7   the way it was metabolized.

8            So there were multiple problems with this collection

9   of drugs all being given within a one-month period of time.

10  Q.  Mr. Winsley, what should a reasonable pharmacist have done

11  after seeing all these prescriptions?

12  A.  After the first problems and then as these prescriptions

13  continued to come in, they should not have been filled.

14            MS. ESTES:  Your Honor, may I have one moment?

15            THE COURT:  Yes.

16  Q.  Mr. Winsley, turning back to those transactions, who was

17  the prescribing doctor for those drugs?

18  A.  Dr. Ahmad.

19            MS. ESTES:  No further questions.

20            THE COURT:  Cross-examination.

21  CROSS-EXAMINATION

22  BY MR. KEHOE:

23  Q.  I guess it is still morning.  Good morning, Mr. Winsley.

24  Before I go into something else, let me go back to that exhibit

25  quickly, the Mr. Seaman exhibit.  I believe that is

1   Exhibit 211.  Pardon me if I'm a little laborious here.  Page 2

2   Ms. Bostillo.  This is again what the government was just

3   talking to with regard to Mr. Seaman and 211.  Correct me if

4   I'm wrong, but I think the first item that you pointed to was

5   January 23rd of 2012.  Would that have been the third

6   transaction?

7           MR. KEHOE:  Ms. Bostillo, I believe that is what we

8   were just talking about, if I'm not mistaken.  I think it is

9   page 2, the third transaction for Mr. Seaman.  I'm sorry.

10  Let's start at page 1, January 13, the third one down.  I

11  believe that's where we started.

12  Q.  This is one of the transactions that counsel just asked you

13  about, Mr. Winsley?

14  A.  Yes.

15  Q.  This is the Isentress.  I think you said it's an HIV

16  medication?

17  A.  Yes.

18  Q.  The amount I think you said was, I can read it for myself,

19  $1,007.75?

20  A.  Yes.

21  Q.  Can you look over to the far side and look to see what the

22  initials are.

23  A.  NG.

24  Q.  Now let's go down to the next one you talked about.  I

25  think you were talking about ATRIPLA.  Same page, same date.  I

1   believe again that was $1789.43?

2   A.   Yes.

3   Q.   Can you look over to the far initials.

4   A.   Yes.

5   Q.   What were they?

6   A.   NG.

7   Q.   Stay on this page if we can, 117.  Pardon my pronunciation.

8   Is that Singulair?  Is that how you pronounce that?

9   A.   Yes.

10   Q.   If you go across on Singulair, that's $163, right?

11   A.   Correct.

12   Q.   The initials there are KDG?

13   A.   That is correct.

14   Q.   The one below that, Advair, is $297, and that's DG?

15   A.   Yes.

16   Q.   There appear to be at least two sets of initials there,

17   correct?

18   A.   They are different on this list, yes.

19   Q.   Yes.  I believe we are on page 3.  These are 117, is that

20   right?  I think these are the ones that counsel was just

21   talking about with you.  It's 1/23/2012, and I believe it is

22   page 3.

23          MR. KEHOE:  Do you see that Ms. Bostillo, the ones we

24   were just talking about?  It's three transactions down.  These

25   are the ones that counsel was discussing.  Those are the ones.

1    Thank you.

2    Q.   This is one I believe that you were just talking about,

3    REYATAZ.   The next one below there is Prezista, and the one

4    below that is Epzicom.   With all due respect, I don't hold

5    myself out as a pronunciation expert certainly when it comes to

6    pharmacological terms.   Were those all three HIV medications?

7    A.   Yes, sir.

8    Q.   Going to the amount column, they were respectively

9    $1,002.44, $1,058.36, and the last one is $962.72.   Did I read

10   that correctly?

11   A.   You did.

12   Q.   The initials in the right-hand column on each one of those

13   is MC, isn't it?

14   A.   Correct.

15   Q.   Mr. Winsley, to backtrack a little bit, to go back to some

16   of your initial issues that you talked about and that counsel

17   took you through concerning your experience, correct me if I'm

18   wrong, but I believe that from '88 to 2011 you were working in

19   various capacities for the Ohio board of pharmacy?

20   A.   That's correct.

21   Q.   For the most part, I think you told us that was

22   investigative work?

23   A.   And inspections.

24   Q.   And policy work, inspections, investigations?

25   A.   Right.

 1   Q.  It didn't involve dispensing of prescriptions, did it?

 2   A.  Not during those years.

 3   Q.  Then you testified that before you were at the Ohio board

 4   of pharmacy, I think you said you first worked at the Akron

 5   city hospital for four years?

 6   A.  That was the last hospital.

 7   Q.  That was the last hospital.  My apologies.  How long did

 8   you work?  You were there eight years, from when to when?

 9   A.  About 1980 till '88.

10   Q.  Akron, Ohio, has a population of about 200,000 people?

11   A.  Probably.  I don't know for a fact.

12   Q.  Maybe, since the tire industry has moved away, it's dropped

13   down to 150,000?

14   A.  Who knows.

15   Q.  It's a city of relatively modest population, right?

16   A.  Relatively speaking, yes.

17   Q.  I think you also said you worked for a period of time at

18   the college of pharmacy at West Virginia University Medical

19   Center in Morgantown, is that right?

20   A.  I was an adjunct professor at the college of pharmacy.  I

21   was assistant director of the medical center hospital pharmacy.

22   Q.  At Morgantown?

23   A.  Morgantown.

24   Q.  Morgantown, Virginia?

25   A.  West Virginia.

```
 1   Q.  West Virginia, excuse me, where the university is.  You

 2   were there for two years?

 3   A.  Yes.

 4   Q.  You can correct me on this.  Morgantown, just passing

 5   through, that's about 30, 35,000 people in Morgantown?

 6   A.  I would think more, but not many.  It's not New York City.

 7   Q.  I understand, of course.  Then you were back in Columbus at

 8   the Riverside Methodist Hospital in Columbus?

 9   A.  Correct.

10   Q.  When were you there?

11   A.  From '74 until about '78.

12   Q.  I know the Buckeye university.  Columbus is a little bigger

13   than the other places.  What is that, about 7, 800,000 people?

14   A.  The metro area is over a million.

15   Q.  But in the city itself, what would you say?

16   A.  You could be right.  I don't know.

17   Q.  I'm not trying to pin you down to it, honestly.

18             MS. ESTES:  Objection.  Relevance.

19             THE COURT:  I don't see the relevance.  But if counsel

20   wants to come to the side bar, I'll hear it.

21             MR. KEHOE:  Sure.

22             (Continued on next page)

23

24

25
```

1              (At the side bar)

2              MR. KEHOE:  I'm just laying a foundation of the basis

3    upon which he is making and rendering an opinion.  This man,

4    not young man, probably our age, Judge, this gentleman has

5    experience that is quite limited, in smaller towns and

6    hospitals, and it doesn't translate into an examination of a

7    neighborhood hospital.

8              THE COURT:  I don't understand how any reasonable

9    argument along those lines could be made on the basis of

10   population.

11             MR. KEHOE:  Just giving an idea of size, Judge.

12             THE COURT:  No, excuse me.  You could look at New York

13   as a large city or you could look at New York, as many people

14   do, as a collection of small neighborhoods, each having their

15   own distinctive qualities.  In fact, my recollection was that

16   you made arguments along that line by way of cross-examination

17   with earlier witnesses, describing or attempting to elicit

18   things about the economic level of the particular community and

19   other things that were special to that particular part of New

20   York.

21             So I do not understand how there would be a basis for

22   any juror to infer that because this witness had only been in

23   communities that had a measly 1 million people, for example,

24   from the last question put, that that somehow disqualified or

25   limited him in any way about opinions what pharmacists do under

 1   standards applicable to pharmacists everywhere, unless you have

 2   a better argument than I have heard so far.

 3           MR. KEHOE:  Judge, if I may be heard.  This is stuff

 4   that was brought out on direct examination where this guy went

 5   through where he practiced and what he did.  They did that in

 6   order to make them think that this guy knows exactly what he is

 7   talking about everywhere.  That's the reason why we had him put

 8   in.  That's the reason why the government wants to put him in.

 9   When you go back and challenge --

10           THE COURT:  First of all, counsel, if you point your

11   finger at me again, I will hold you in contempt.

12           MR. KEHOE:  My apologies, Judge.  I didn't mean to do

13   that.  Please take my apologies.  I didn't mean it in that

14   regard.

15           They put that stuff in, Judge, for that specific

16   reason.  It doesn't translate.  The experience doesn't

17   translate.

18           THE COURT:  If you want to say, Mr. Witness, what were

19   your experiences here, what were your experiences there, have

20   you ever been in a community that has what you are asserting in

21   your other questions, the particular areas of your client's

22   community, that I can understand.  What you have been eliciting

23   so far is simply population data.  That has no rational

24   relationship to the point you're trying to make.

25           MR. KEHOE:  Judge, I will be guided by your Honor's

1    wisdom.  If I was connecting the dots there in my own mind,

2    that was where I was leading into the next portion of it, which

3    goes to exactly what your Honor has alluded to.

4                THE COURT:  Let's go on to the next portion.

5                I also want to caution counsel -- I'm sure this is

6    unnecessary, but just so that we don't have a problem -- any

7    appeal to the notion that someone outside New York City should

8    be disregarded because they are outside New York or any sort

9    of, if you will, geographicism of that kind would be totally

10   uncalled for.

11               MR. KEHOE:  I understand.  With regard to the

12   geography, I understand, and I will just limit it to the

13   experience.

14               THE COURT:  Okay.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                MR. KEHOE:  May I proceed, Judge?

3                THE COURT:  Yes.

4    BY MR. KEHOE:

5    Q.  Mr. Winsley, going back to a little bit more on your

6    background, I thought I read in your report that when you were

7    in pharmacy school, you interned at the family pharmacy.

8    A.  In my family's pharmacy, yes, I did.

9    Q.  Where was that, sir?

10   A.  Zanesville, Ohio.

11   Q.  Basically, is that what you call a community pharmacy in a

12   town?

13   A.  My parents owned it, yes.

14   Q.  In listening to your career upon questioning of counsel,

15   that was really your last experience in a community pharmacy,

16   wasn't it?

17   A.  Yes.

18   Q.  At that time even at that community pharmacy you weren't

19   listed yet, is that right?

20   A.  I worked there occasionally to spell my mother and father

21   after I got licensed, but not very often.  So for the most part

22   I was not, but yes, I was licensed while I worked there.

23   Q.  I understand.  What you gave us with regard to working in a

24   hospital -- I'm sorry.  Most of your work as a pharmacist, as a

25   pure pharmacist, was in hospitals, isn't that right?

 1   A.   That's right.

 2   Q.   The hospital situation is much different than a community

 3   pharmacy, isn't it?

 4   A.   Except for the out-patient prescriptions that we filled,

 5   yes, it is.

 6   Q.   But for the most part, in-patient prescriptions are being

 7   dropped off by doctors or doctors' offices or nurses directly

 8   within the facility?

 9   A.   Right, for the most part.  They are orders from within the

10   facility.  They are not dropped off by doctors' offices.  But

11   you're right.

12   Q.   You just cut through a lot of questions.  These are

13   prescriptions from within the hospital facility that are sent

14   directly down to you within the hospitals at the hospital's

15   pharmacy, right?

16   A.   For the most part, yes.

17   Q.   That is a pretty closed environment, isn't it?

18   A.   It is.

19   Q.   Part of your work when you were with the board, and I'm

20   talking about the higher board of pharmacies, was going out to

21   community pharmacies, wasn't it?

22   A.   Yes.

23   Q.   Community pharmacies are, depending on the community

24   pharmacy, generally a lot busier than hospital pharmacies,

25   aren't they?

1   A.   Absolutely not.

2   Q.   No?

3   A.   No.

4   Q.   Many community pharmacies are extremely busy locations

5   where you have hundreds and hundreds of people coming in every

6   day, aren't they?

7   A.   Yes.

8   Q.   In a hospital situation you don't have doctors and nurses

9   coming downstairs and giving you scripts, as you would in a

10  hospital setting, do you?

11  A.   You don't have that in a hospital setting either.

12  Q.   How does the script get from the doctor down there?

13  A.   The doctor writes it on the chart or writes it in the

14  computer, and then it makes it from the nursing station down to

15  the pharmacy; in the old days via pneumatic vacuum system,

16  nowadays mostly computer-to-computer.

17  Q.   I actually remember the pneumatic tube systems.

18  A.   So do I.

19  Q.   At department stores.  Staying with that, it was actually a

20  direct contact between the doctor's office, being a pneumatic

21  tube system or computer, to you in the pharmacy to fill it?

22  A.   Yes.

23  Q.   You weren't really dealing with patients all that much,

24  were you, in the sense of when you were filling the

25  prescription?

1    A.  For the in-patient not as often, but we did fill out-

2    patient prescriptions, yes, we were.

3    Q.  You didn't have individual citizens walking in with scripts

4    that necessarily were sick or feeble?  Let me rephrase that.

5    When you were getting scripts basically coming from the doctor

6    to you, you weren't really dealing with -- not out-patient,

7    in-patient -- individuals coming into your pharmacy that were

8    injured and hurt and sick, were you?

9            MS. ESTES:  Objection.  Compound.

10           THE COURT:  It is compound, but I think this witness

11   can sort through it.  I'll allow it.  Do you want to answer the

12   question.

13   A.  If you limit it to they didn't come into the pharmacy,

14   correct.  They certainly were injured, hurt, sick, because that

15   is why they were in the hospital.  But they did not come into

16   my pharmacy.

17   Q.  To move off this topic, there is a lot more human

18   interaction in a community pharmacy than there is in a hospital

19   pharmacy, isn't there?

20   A.  Patient interaction?

21   Q.  Yes.

22   A.  Yes.

23   Q.  I think you were talking about both as a pharmacist and

24   working for the board in your investigative policy, policy

25   capacity.  The vast majority of your career is in Ohio, isn't

1    it?

2    A.  Yes.

3    Q.  You never worked in a pharmacy in New York?

4    A.  No.

5    Q.  You never worked in a hospital pharmacy in New York?

6    A.  No.

7    Q.  Or community pharmacy in New York?

8    A.  I never worked in New York.

9    Q.  We can leave that, at the risk of not repeating the

10   question.  Of course that leads me to the last question.  Have

11   you ever worked in a community pharmacy in Brooklyn as well?

12   A.  Of course not.

13   Q.  You as a pharmacy investigator often had a different

14   perspective than the pharmacist that's working day-to-day

15   because you are looking at maybe charts over a significant

16   period of time, right?

17   A.  Yes.

18   Q.  You go in there as an investigator and say give me all of

19   your charts from the 12-month period A to Z, correct?

20   A.  That's a little broad, but ahead go in and ask for

21   information, yes.

22   Q.  I stand corrected.  I have never been a pharmacy

23   investigator, so I asked that question.  You may have that more

24   narrow --

25            THE COURT:  Counsel, ask a question.

1            MR. KEHOE:  Yes, sir.

2   Q.  Your perspective is to look over charts and see if there

3   are patterns in those charts over time, don't you?

4   A.  That is what the investigators do.

5   Q.  That's very different from the job of a community

6   pharmacist on a day-to-day basis who is looking and getting

7   information from patients and filling those prescriptions over

8   the course of an 8-hour day, isn't that right?

9   A.  Not completely.  They are required to do utilization

10  review, which means review that last year's data for that

11  patient.

12  Q.  I understand.  There is a utilization review, and I

13  understand that that is part of what a pharmacist --

14            THE COURT:  Counsel, you just have to put questions.

15  That is your job.

16            MR. KEHOE:  Yes, your Honor.

17  Q.  But the perspective of the two you would agree with me is

18  quite different?

19  A.  Yes.

20  Q.  I think we established this.  If we didn't, I want to ask

21  you.  You have no medical training, right?

22  A.  No.  Or yes, that's correct: no, I don't.

23  Q.  The decision on whether or not a particular prescription

24  medication is the right medication for a particular patient is

25  a determination that is made by the treating physician, isn't

1   it?

2   A.   Initially.

3   Q.   I think you talked about this PMP system.  I think you

4   could talked about it on direct examination.

5   A.   Yes.

6   Q.   The PMP system has to deal with the dispensing, for

7   instance, of controlled substances?

8   A.   Reporting.

9   Q.   The only party required by law to check the PMP is the

10  treating physician before he gives out a prescription or he

11  writes a prescription, isn't that right?

12  A.   That law in New York has changed during the course of this

13  investigation.  There was no requirement that they check it.

14  Q.   So there is no requirement that a pharmacist check?

15  A.   There was no requirement that anybody check it during this

16  course.  You have a new law now that does require checking, but

17  that took place after this case.

18  Q.   For the pharmacist.  But when this was ongoing --

19  A.   Nobody was required to check.

20  Q.   Do you not now that under New York law doctors were

21  required to check?

22  A.   Not back then.

23  Q.   When the law was enacted in 2013 was it not requiring

24  doctors to check the PMP?

25  A.   Yes, in 2013 it was.

1   Q.  That was when the law was enacted, correct, in New York?

2   A.  As far as I know, the electronic prescribing stuff.

3   Q.  Let's go back.  When the law was enacted in 2013 in the

4   state of New York, the only party required to check the PMP was

5   the doctor?

6   A.  I can't agree or disagree.  I don't recall whether

7   pharmacists were required or not.

8   Q.  Fair enough, sir.  I think you said in response to a

9   question by counsel that pharmacists can only fill legitimate

10  prescriptions written for a legitimate medical purpose.

11  A.  That's right.

12  Q.  The particular legitimate prescription I think you said has

13  to include the patient's name, is that correct?

14  A.  Yes.

15  Q.  And the drug name, right?

16  A.  Yes.

17  Q.  I think you mentioned the drug strength, the quantity, and

18  the directions for use.

19  A.  Yes.

20  Q.  I think you also said that after the physician sees all

21  that, he has to also ensure that if he has any issues, whether

22  or not this prescription is otherwise legitimate, right?

23  A.  You said physician.  I assume you meant pharmacist.

24  Q.  I meant pharmacist.  I apologize.

25  A.  That is correct.

1   Q.   If I ever make a mistake like that again, please correct

2   me.

3   A.   Okay.

4   Q.   With regard to that, the pharmacist has to ensure whether

5   or not it is otherwise legitimate even if he has all that

6   information?

7   A.   That is correct.

8   Q.   One of the ways that he does that is to see whether or not

9   it's written, for I think you talked about, legitimate medical

10  purpose?

11  A.   That is correct.

12  Q.   I think you also said in response to counsel whether or not

13  it's in the course of the practitioner's professional practice.

14  Did I get that right?

15  A.   Yes.

16  Q.   Those have to be satisfied in the judgment of the

17  pharmacist before he dispenses?

18  A.   Yes.

19  Q.   Looking at this criteria on legitimate medical purpose,

20  federal law doesn't define legitimate medical purpose, does it?

21  A.   No.

22  Q.   New York law doesn't either, does it?

23  A.   Not that I know of.

24  Q.   This other provision that you have concerning the course of

25  the professional practice, neither federal law nor New York

 1   State law defines that either?

 2   A.  Yes.  Each state defines the professional practice of an

 3   individual health care practitioner.

 4   Q.  Where is that --

 5   A.  The definition of the practice of medicine and the

 6   definition of the practice of pharmacy is included in your

 7   laws, as it is in every state.

 8   Q.  Maybe you could help me out here.  When something is

 9   written in the course of a practitioner's professional

10   practice, that concept that you used during your direct

11   examination, there is no state or federal law codifying what

12   that means, is there?

13            MS. ESTES:  Objection.

14            THE COURT:  Sustained.

15            MR. KEHOE:  May I ask a question at side bar, Judge?

16            THE COURT:  Yes.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1             (At the side bar)

2             THE COURT:  What's your question?

3             MR. KEHOE:  My question was what the basis of the

4    objection was.

5             THE COURT:  I'm glad you asked.  First, there was no

6    objection made, with I think one little exception, to the

7    witness's describing the legal regime on his direct, and

8    therefore it is perfectly appropriate for counsel to get into

9    that subject on cross.

10            But the ultimate determiner of what the law says or

11   doesn't say is neither for this witness nor for counsel but is

12   for the Court.  So where, as there now appears to be, there is

13   a disagreement about what the law provides or not, we are not

14   going to waste the jury's time with things like can you show me

15   where that is or slight changes in the wording of a question so

16   the response about what the law provides or doesn't provide may

17   be slightly different.  Those are all questions of law for the

18   Court.

19            If either side wishes the Court to instruct the jury

20   as to what the law is or is not regarding any aspect of the law

21   pertaining to pharmacists, I will be glad to do so.  No one has

22   provided me with any request to do so, but if such request is

23   made, I will do so.

24            But I'm not going to have a debate between counsel and

25   the witness on what the law does or does not provide other than

1    when they are in total agreement, as they have been until this

2    point we have just gotten to.  Frankly, I still think the whole

3    thing is irrelevant, but the government got into it without

4    objection from counsel, and therefore I think the defense has a

5    right to respond.

6            MR. KEHOE:  My only clarification, if you will, was

7    that I took your Honor's guidance that he would be limited to

8    his report on the particular issues -- I had objected at one

9    point, and your Honor overruled the objection -- and him

10   talking about some of those issues in his report.  I will give

11   you an example.  For instance, he says that the pharmacist must

12   prepare a patient profile.  In the state of New York that is

13   not true.

14           THE COURT:  The only person who can determine whether

15   that is true or not is me, not the witness.

16           MR. KEHOE:  I understand that.

17           THE COURT:  It is not a good use of the jury's time

18   because they don't know whether you're right or he's right and

19   they have no basis for determining it.  If you say you're right

20   or if he says he's right, neither means beans in this

21   particular context.  The only person who can determine what the

22   New York law provides is me.

23           There was in his report, and it was another reason I

24   allowed a certain amount of -- again, there was only one

25   objection made during his entire direct on this subject.  Most

1    of it was done totally without objection.

2          There is an interplay to some extent of laws,

3    regulations, and customary practices, so it was not

4    unreasonable for the government to try to elicit that without

5    getting into too much of a fine-spun sort.  If you have a

6    statute to put in front of him --

7          MR. KEHOE:  I do.

8          THE COURT:  Let me see it.

9          MR. KEHOE:  Judge, as far as not objecting, I would

10   have objected.  I did object in the beginning, and I'm not sure

11   what the objection was, frankly.  It was overruled.  I thought

12   on these particular issues that your Honor was giving counsel

13   permission.

14         THE COURT:  There is no such thing as a continuing

15   objection unless you ask for a continuing objection.  And you

16   haven't been shy about having side bars.  I ruled on one, only

17   one, objection on this issue, and no other objections were made

18   during direct.

19         MR. KEHOE:  I understand, Judge.

20         THE COURT:  Let me see what you want to put in front

21   of me.

22         MR. KEHOE:  This is in fact the regulation that the

23   witness cited in his brief.  It is the regulations from the

24   office of pharmacy professionals part 63.

25         THE COURT:  I remember that.

 1          MR. KEHOE:  The pertinent section is 63.6, I believe.

 2          THE COURT:  Let me see it.

 3          MR. KEHOE:  This is the section here.

 4          THE COURT:  For the record, this reads --

 5          MR. KEHOE:  You have to go a few pages back, Judge.

 6          THE COURT:  That's all right.  This is part of the

 7    overall part 63 regulations of the office of the professions of

 8    New York State.  It provides in this particular subsubpara-

 9    graph --

10          MR. KEHOE:  Many subparagraphs.

11          THE COURT:  "In the event a patient refuses to supply

12    information necessary for maintenance of a medication profile

13    or to accept counseling as prescribed in clause (a) of this

14    subparagraph, a pharmacist or pharmacy intern may fill a

15    prescription as presented without having violated the

16    requirements of this subparagraph, provided that the refusal to

17    provide such information or accept counseling is documented in

18    the records of the pharmacy."

19          Just so I'm clear, what is it that you want to elicit

20    from him in this regard?

21          MR. KEHOE:  He said in his report that you must, must,

22    put together a patient profile.  He just reiterated it again.

23    That's not true.  Yes, you have to do it, but only in instances

24    where even if the patient refuses --

25          THE COURT:  The way I read this is it doesn't say you

1     don't have to do a patient profile.  It says if the patient

2     refuses to supply the information necessary to do that, you

3     have to document the refusal.

4          MR. KEHOE:  It then allows you to still dispense.

5          THE COURT:  After you document the refusal.

6          MR. KEHOE:  Correct.

7          THE COURT:  If that is the point you want to elicit, I

8     will allow you to elicit it.  But I think it is different from

9     what you just put to him, which was that you don't have to have

10    a profile.  What this says is you have to have a profile, but

11    if the patient refuses to give the information necessary to

12    complete the profile, then you have to document that refusal.

13         MR. KEHOE:  And then you can still dispense.

14         THE COURT:  Yes.

15         MR. KEHOE:  There is one other point, Judge, while we

16    are here.  In the spirit of getting through this quickly, if I

17    can show your Honor another section?

18         THE COURT:  Sure.

19         MS. ESTES:  Your Honor, one issue.  I would note that

20    this provision focuses exclusively on counseling.  It doesn't

21    mean that if this happens, they have satisfied the

22    requirements.

23         THE COURT:  This is why I think it should have all

24    been presented before.  But let me see what you mean.

25         MS. ESTES:  This provision focuses exclusively on

1    counseling.  It doesn't mean that if this happens, they can

2    still dispense.  It means they haven't violated the provision

3    on counseling specifically.

4         MR. KEHOE:  Counsel can ask that on redirect

5    examination.  What it says here is -- this is what we just

6    talked about with regard to the refusal -- a pharmacist may

7    fill a prescription as presented without having violated.

8    That's what the law says.  As presented without having violated

9    as long as they document it.  What this witness said is they

10   must fill out a profile.  There are exceptions to everything,

11   and this is it.

12        MS. ESTES:  Mr. Kehoe, respectively, you are saying

13   without having violated but leaving out this subparagraph that

14   is very critical.  Without having violated this specific

15   provision.

16        THE COURT:  This is really a classic case of why this

17   is a debate that needs to be resolved by the Court.  I see some

18   ambiguity in the wording of this subsubsection.

19        What is the other one?

20        MR. KEHOE:  The other one is just these regulations

21   contemplate that a third party can pick up for a patient.

22        THE COURT:  Did he say contrary to that?

23        MR. KEHOE:  I want to ask him that.  One of his

24   cautionary signs was --

25        THE COURT:  You don't need to show him any regulation

 1    or law there unless he disagrees with it.

 2              MR. KEHOE:  Correct.

 3              THE COURT:  On this one --

 4              MR. KEHOE:  That's the other one.

 5              THE COURT:  I'm going to allow you to present that to

 6    him, but I think ultimately I'm going to instruct the jury that

 7    there are legal questions here that have to be resolved by the

 8    Court, which I will do if they become pertinent to this case.

 9    I think the statute, now that I see how it is worded, is

10    ambiguous; therefore, I will need to know a little bit of the

11    legislative history.  Unless both of you have brought the

12    legislative history with you, there is no way I can determine

13    this on the spot.

14              I will allow the cross-examination, I will allow the

15    redirect, but I'm going to instruct the jury that in the end

16    it's something I have to determine.

17              MR. KEHOE:  Yes, your Honor.

18              (Continued on next page)

19

20

21

22

23

24

25

```
 1              (In open court)

 2              MR. KEHOE:  May I proceed, Judge?

 3              THE COURT:  Yes.

 4    BY MR. KEHOE:

 5    Q.  Now, moving on, Mr. Winsley, we were talking -- we'll kind

 6    of shift gears here a little bit and we're just talking about

 7    the prescriptions themselves and you raised some issues

 8    concerning some prescriptions as to what people have to watch

 9    out for.

10              Do you recall that during your testimony?

11    A.  Yes.

12    Q.  Well, with all of those cautions that you explained to us,

13    none of those prevent a dispensing pharmacist from filling a

14    prescription, do they?

15    A.  No.

16    Q.  So you're saying that if he takes the necessary steps to

17    resolve his questions and exercises his professional judgment

18    that he can fill that prescription?

19    A.  And accept responsibility and liability for that decision,

20    yes.

21    Q.  And he accepts that responsibility for that decision based

22    on his professional judgment, right?

23    A.  Yes.

24    Q.  And that judgment can differ, can't it?

25    A.  It can differ.
```

1   Q.  Now, when that pharmacist is looking at a particular

2   prescription and one of the things he wants to look at -- and

3   correct me if I'm wrong -- is the validity of the prescription,

4   right?

5   A.  Okay.

6   Q.  Is that true?

7   A.  Yes.

8   Q.  And I think you talked about whether or not -- trying the

9   best he can whether or not it's -- verify that it's issued for

10  a legitimate medical purpose?

11  A.  Correct.

12  Q.  And I think you talked in direct examination about whether

13  or not the particular doctor involved was a licensed doctor

14  that should be dispensing this type of medication, right?

15  A.  Prescribing this medication, yes.

16  Q.  So maybe if, for instance, cancer medication, you might

17  want to see whether or not this is an oncologist doing it,

18  right?

19  A.  That would help in the judgment process.

20  Q.  So in a case of pain medication, you might want to see

21  whether or not this is a doctor who is out there treating pain

22  in its various capacities?

23  A.  I'd want to see if they were qualified to treat pain, yes.

24  Q.  You'd want to see whether or not they're qualified and

25  whether in fact they're actually doing that, right?

1    A.  Both.

2    Q.  You'd wanted to inspect the prescription itself to see

3    whether or not it had been tampered with it any way?

4    A.  Yes.

5    Q.  And sometimes, Doctor, is it not true that if you have a

6    doctor who has scripts coming into your office, and take you

7    back to prehistoric days before computers or when scripts were

8    all sent by computers, that sometimes doctors just wrote out

9    the script?

10   A.  Yes.

11   Q.  And put his initials on it?

12   A.  Well, his signature.

13   Q.  And one of the ways that you verify that script with his

14   signature and his initials is you recognize the handwriting?

15   A.  Yes.

16   Q.  And one of the things that they also do is, you know,

17   dosage for a particular issue, you could look at it to see this

18   is the dosage this person has been getting over a significant

19   period of time?

20   A.  Well, that's one thing you'd look at, yes.

21   Q.  And likewise you have to go into, you know, whether or not

22   there are directions for administering it given by the

23   physician and is the person -- right, I don't want to give you

24   a multiple question here -- what directions did the doctor give

25   for administering?

1    A.   That's correct.

2    Q.   And whether or not the person that is the name on the

3    prescription is the person to whom it's going?

4    A.   Yes.

5    Q.   And sometimes, sometimes I think you said on direct

6    examination that there are in fact calls to the doctor's

7    office?

8    A.   Correct.

9    Q.   Now, all of these are individual steps that a pharmacist

10   can make and it is up to the pharmacist's professional judgment

11   which one he uses; isn't that right?

12   A.   Yes.

13   Q.   There's no requirement under, there's no requirement at all

14   that says you have to do this or you have to do that.  You have

15   to do A and you have to do B.  It's all based on the

16   professional judgment of the pharmacist?

17   A.   And the problem that the pharmacist discovers.

18   Q.   Excuse me?

19   A.   And the problem that the pharmacist discovers, yes.

20   Q.   And in the exercise of his professional judgment how he

21   resolves any of those issues?

22   A.   That's step one, yes.

23   Q.   And that's true, is it not, for both -- and let me back up.

24   We've been talking here this morning about controlled

25   substances for the most part, right?

 1   A.  Yes.

 2   Q.  And but this exercise is true for controlled substances as

 3   well as non-controlled substances, right?

 4   A.  Yes.

 5   Q.  So ultimately, the ultimate decision on whether to fill

 6   that prescription is left to the professional judgment of the

 7   pharmacist, isn't it?

 8   A.  Subject to further review, yes.

 9   Q.  Anybody can review down the line?

10   A.  Yes.

11   Q.  But that's ultimately his decision using his professional

12   judgment, right?

13   A.  Yes.  At that moment in time it's that's pharmacist

14   decision whether to dispense or not dispense.

15   Q.  And that judgment is a very -- is a subjective standard,

16   isn't it?

17   A.  Yes, it is.

18   Q.  Now, for instance, just to use an example, before we get

19   into the example, a pharmacist can disagree on whether or not,

20   for instance, a given geographical distance is too far or not

21   too far?

22   A.  Sure.

23   Q.  Someone traveling from I think Ohio to Florida is a lot

24   different than someone traveling two zip codes in Brooklyn,

25   isn't it?

1    A.  Probably, not being familiar with Brooklyn that much.

2    Q.  You do --

3    A.  I'll give you the mileage is a whole lot shorter.

4    Q.  Take my word for it, there are a lot of zip codes in

5    Brooklyn.

6    A.  Okay.

7    Q.  So you get my point, sir, that whether or not that travel

8    is -- the distance issue that you were talking about with

9    counsel is too far is really a subjective analysis that the

10   pharmacist has to look at on a case-by-case basis?

11   A.  It is.

12   Q.  And there could be a lot of factors that go into that,

13   aren't there?

14   A.  Yes.

15   Q.  For instance, a patient is dealing with a doctor that's

16   next-door to the pharmacy and he or she gets his or her

17   prescriptions filled by that pharmacy for a long period of time

18   and then the doctor moves across town, moves from, you know,

19   Brooklyn to the estates in Pennsylvania -- I'm kidding -- moves

20   a few neighborhoods over and the patient continues to go back

21   to that pharmacy because he or she may be more comfortable in

22   that pharmacy?

23   A.  Once the pharmacist determines that's the situation, of

24   course, that would be a reasonable solution.

25   Q.  A reasonable solution.  And based on something like that,

1    the subjective decision by the pharmacist validly could be to

2    fill this prescription?

3    A.  It could.

4    Q.  Now, once he goes through -- once he goes through this

5    exercise and based on your experience, Doctor, based on your

6    experience, you have, have you not, seen pharmacists go through

7    this analysis and review of various factors that they might

8    consider and come to completely different decisions using their

9    professional judgment?

10   A.  Yes.

11   Q.  Now, one of the issues that you looked at or talked about

12   during the course of your testimony this morning was a patient

13   profile, and what is that again, if you can?

14   A.  That's a document that's required to be kept by the

15   pharmacy that lists the name, address, date of birth or age,

16   disease states, but primarily its purpose is to contain all of

17   the prescriptions obtained by that patient from that pharmacy

18   within a certain period of time.

19   Q.  Now, Doctor, you noted in your report, if I may, that the

20   patient -- that the pharmacist must review the patient profile?

21   A.  Yes.

22   Q.  And he must review the patient profile before he dispenses

23   any prescriptions, right?

24   A.  Yes.

25   Q.  Isn't it a fact, Mr. Winsley, well, let me withdraw that

1    question and shave it down a little bit.

2         What do you do in a situation where a patient refuses

3    to give the information necessary for a patient profile?

4    A.  Well, they can't refuse to give the list of drugs they've

5    gotten because that's generated by the pharmacy when they fill

6    the scripts.  So the information the patient would refuse to

7    give might be disease state, might be outside drugs that

8    they're taking; and the pharmacist certainly is not held

9    accountable if they ask and cannot obtain it.  But they're held

10   responsible for what they know or should have known, and that

11   list of drugs under that patient name at that address are

12   things that they know.

13   Q.  So even without a patient profile, the pharmacist can still

14   dispense or fill the prescription?

15   A.  No.  They have a patient profile.  They may not have all of

16   the information like disease state and so forth that we talked

17   about, but they have to have a patient profile with a patient

18   name and the list of drugs that they've obtained, that that

19   patient has obtained from that pharmacy.  There is no may about

20   it.  They must have that.

21   Q.  Let me maybe narrow the question a little bit more, Doctor.

22   In the State of New York, in the event a patient refuses to

23   supply information necessary for the maintenance of a

24   medication profile, they refuse, can the pharmacist still

25   dispense, assuming he documents the --

1   A.   Okay, we're not on the same wavelength.  The patient can't

2   refuse the pharmacy the access to the information about the

3   prescriptions that the pharmacy has filled for that patient.

4   It's on that profile generated by the pharmacy.  The patient

5   has no say.  If I go into a pharmacy and say I want my drugs

6   but you can't keep a list of them, that's not a valid thing

7   that the patient can do away with.  So if the patient has been

8   in there more than once and gotten prescriptions filled, there

9   is at least a profile, at minimum patient name, address --

10  because that's required for the prescription -- and the drugs.

11  Q.   We're talking about medication profile here and if the

12  patient, in the State of New York, if the patient refuses to

13  supply information necessary for the maintenance of a

14  medication profile, what can the pharmacist do?

15          MS. ESTES:  Objection, asked and answered.

16          THE COURT:  So let me see if I can move this along.

17          So the profile contains information both supplied by

18  the patient and supplied by third parties in the normal course?

19          THE WITNESS:  Third parties being like the doctor that

20  writes the prescription and so forth, yes.

21          THE COURT:  So supposing you have all the information

22  from the doctor who provides the prescription and so forth, but

23  when you ask the patient, if you're a pharmacy, you ask the

24  patient because you have some concern about a particular

25  prescription and you ask for information you want to include in

1    the profile and the patient says I don't care to tell you that,

2    does that mean you can't prescribe or can you still prescribe?

3    Is it a judgment call?  Where does that all stand?

4            THE WITNESS:  At that point it becomes a judgment call

5    on the part of the pharmacist.  It depends again on the

6    problem.

7            THE COURT:  Go ahead, counsel.

8            MR. KEHOE:  Thank you, your Honor.

9    Q.  So given the scenario that Judge Rakoff just gave you,

10   using his professional judgment under the circumstances when

11   that information is not forthcoming from the patient, the

12   pharmacist can still fill that prescription, can't he?

13   A.  Under that scenario where it's a concern, yes.

14   Q.  Now, I think you talked a little bit about this about a

15   third party picking up scripts and some cautions there, but it

16   is completely valid for a third party to pick up scripts, be

17   they controlled or not controlled, for another individual,

18   can't they?

19   A.  Yes.

20   Q.  And there's no limit on the number of individuals that

21   person can pick up for?

22   A.  Other than the good judgment of the pharmacist.

23   Q.  Again, we go back to the good judgment of the pharmacist?

24   A.  Correct.

25   Q.  But there's no baseline to say, okay, Kehoe, you can only

1    pick up three or five, is there?

2    A.   For a reasonable pharmacist that would be excessive.

3    Q.   That's not my question for you.  There is --

4    A.   There is nothing in law or rule that I know of.

5    Q.   Again, we're talking about the judgment of the pharmacist?

6    A.   Yes.

7    Q.   Now, we talked a little bit about oxycodone, I believe,

8    during the course of your -- a lot about oxycodone since this

9    morning?

10   A.   Yes.

11   Q.   Under your questioning by counsel, and the oxycodone is a

12   controlled substance, a Schedule II controlled substance, that

13   is prescribed I think you testified to alleviate pain or assist

14   with pain?

15   A.   Alleviate pain, yes.

16   Q.   And that can be prescribed for a very long period of time,

17   can't it?

18   A.   Depending upon the condition of the patient, the disease

19   state.

20   Q.   If depending on a particular patient and the physician

21   looks at this patient -- let me withdraw that question.

22        The disease state obviously is based on a

23   physician/patient relationship between the patient and the

24   doctor?

25   A.   Yes.

1   Q.  And the doctor assesses that there is a need for this

2   long-term use of oxycodone, right, he can do that?

3   A.  He can make that decision on his own and he is held

4   accountable for that decision.

5   Q.  And he's accountable for his decision that this particular

6   patient over this particular time needs oxycodone for years,

7   right?

8   A.  Peer review would say no.

9   Q.  Peer review would say no.  Is there anything, does the FDA

10  limit the period of time in which oxycodone can be either

11  prescribed or dispensed to a patient?

12  A.  No.  It's a package insert which is FDA approved is

13  indicated for the short-term relief of pain.  Centers for

14  Disease Control, CDC, has come out with recommendations that

15  opiates are not the primary drug for treatment of chronic pain

16  and should not be given for prolonged period of time.  So there

17  are government agencies saying that that is inappropriate

18  therapy.

19  Q.  Mr. Winsley, in the FDA insert that you are talking about,

20  there is no time limit put in that FDA insert that limits the

21  time frame in which oxycodone can be either prescribed or

22  dispensed, does it?

23  A.  Not specific time, you are correct.

24  Q.  And if a particular doctor feels that the use of an opiate,

25  in this instance oxycodone, is necessary for a patient over a

1    long period of time to enable that patient to lead a -- lead a

2    normal life, that is a completely appropriate decision by the

3    doctor and dispensing by the pharmacist, right?

4    A.   Subject to the peer review we've talked about before.

5    Q.   Subject -- everything we're talking about, everything we're

6    talking about is subject to peer review, isn't it?

7    A.   Yes.

8    Q.   That's why you had a job at the Board of Pharmacy all those

9    years, right?

10   A.   That's why we're here today.

11   Q.   That's why we're here today.

12          Now, in addition to chronic pain, oxycodone is also

13   available to deal with, you talked about this morning, moderate

14   pain?

15   A.   Yes.

16   Q.   So that has to do with the gradations of how many

17   milligrams you got.  I think you talked about the dose from

18   five to 80?

19   A.   For the controlled release.

20   Q.   And for the controlled release.  And that, where you go

21   between five to 80 is, again, up to the sound discretion of the

22   treating physician and then the sound judgment of the

23   pharmacist, right?

24   A.   Correct.

25   Q.   Now, you also talked a little bit about, a little bit about

1    mail order forms.  What are these mail order forms?

2    A.  Those are pharmacies that dispense drugs via U.S. mail or

3    UPS, FedEx, whatever.  Usually they have contracts with

4    insurance companies to deal with the clients of the insurance

5    companies.

6    Q.  And when you deal with that, the prescription verification

7    process for mail order pharmacies like Walgreen's, do you know

8    what they are?

9              MS. ESTES:  Objection, relevance.

10             MR. KEHOE:  We talked about mail order pharmacies on

11   direct.  He brought up a mail order pharmacy issue.

12             THE COURT:  I'll allow it.

13   A.  Would you repeat that again?

14   Q.  Are you familiar with the prescription verification

15   procedures at mail order pharmacies such as Walgreen's or CVS?

16   A.  Yes, I am.  I've been in them.

17   Q.  What are their verification procedures?

18   A.  Pretty much the same thing that a community pharmacist is

19   required to do.  They verify, first of all, the legitimacy of

20   the script.  Actually, most of the mail -- I'm sorry, I used

21   script instead of prescription.  If I slip, that's what I mean.

22   Q.  I understand.

23   A.  They -- most mail order pharmacies have access to the total

24   patient profile as opposed, at least everything that the

25   insurance has paid for, as opposed to the individual patient

1   profile if patients don't go to the same pharmacy.  So they

2   actually have more information available in terms of doing drug

3   utilization review.  They're still required to look, if they

4   get a prescription from a doctor in Florida for a patient in

5   New York, they're certainly required to look into that before

6   they go fill it.  So they're held to basically the same

7   constraints or the same requirements as a community pharmacy.

8   Q.  Well, except the pharmacist in a mail order pharmacy never

9   sees the patient or never sees the person that could pick up

10  for that patient as they would in a community pharmacy, right?

11  A.  No, they don't.

12  Q.  Okay.  And as far as offering counseling, which is what you

13  talked about this morning, the only -- there's no need in a

14  mail order pharmacy to provide professional counseling other

15  than to put a circular into the prescription for the patient to

16  read, right?

17  A.  No.  The written is not appropriate.  They do that and it's

18  good, but they're required to provide a phone number for mail

19  orders.  It has to be a toll free number that the patient can

20  call to talk to the pharmacist, or in cases, just as in a

21  community pharmacy, if the pharmacist has a concern, they can

22  call the patient directly.

23  Q.  Let me rephrase the question.  In the State of New York it

24  is permitted for mail order pharmacies to put a circular in

25  there with counseling instructions or an offer for counseling

1    without ever seeing the patient or anybody picking up the

2    prescription, correct?

3    A.  As long as it contains a phone number.

4    Q.  Now, you talked a little bit this morning about drug

5    interaction?

6    A.  Yes.

7    Q.  And drug interaction making sure that -- pardon my -- the

8    prescriptions that you get react with each other properly; is

9    that right?

10   A.  That's correct.

11   Q.  Are you familiar with the term of a synergistic effect?

12   A.  I am.

13   Q.  What is that?

14   A.  Basically when you give two drugs, if they have a

15   synergistic effect, one plus one equals three.  They improve

16   the activities of each other.  And so synergism is sometimes

17   used, particularly in infections where they'll give two

18   different types of antibiotics that attack in different ways.

19   Q.  Let me take you one step further on this synergistic, not

20   exactly on that term, but are you also with the term of

21   polypharmacy?

22   A.  Oh, yes.

23   Q.  What is that?

24   A.  Polypharmacy is giving a lot of drugs.

25   Q.  Is it not a fact, Mr. Winsley, that as an inspector or your

1  role in the Ohio Board of Pharmacy, a pharmacy dealing with the

2  patient wants all of the prescriptions for that patient to go

3  to one location, don't they?

4  A.  That would be ideal so that the pharmacist can do

5  prospective drug utilization review effectively.

6  Q.  And that's also ideal to ensure that this person is not

7  pharmacy shopping, if you will?

8  A.  It would help to diminish that.

9  Q.  Again, these are all just steps that a pharmacist

10  exercising his judgment would take to ensure that you're not

11  going to have problems with the patient not only getting

12  prescriptions from different places, but taking prescriptions

13  from different pharmacies that might not work together?

14  A.  Yes.  Pharmacists should always encourage, they can't

15  force, but they can encourage that all the scripts come to --

16  prescriptions come to their pharmacy so that they can do their

17  job adequately.

18          THE COURT:  Counsel, about how much more do you have?

19          MR. KEHOE:  Very little, Judge.

20          THE COURT:  Okay.

21          MR. KEHOE:  Very little.  I mean very little.  I know

22  you like to hear that and the jury likes to hear that too and

23  so does Mr. Winsley, so it's a popular term.

24  Q.  As a good pharmacist, Mr. Winsley, you would, as an

25  inspector, you would instruct your pharmacist, to be a good

1   pharmacist try to encourage your patients to bring all their

2   scripts to one pharmacy, wouldn't you?

3   A.   We always encourage that all the way through pharmacy

4   school all the way up.

5             MR. KEHOE:  May I have one moment, Judge?

6             THE COURT:  Yes.

7             MR. KEHOE:  I just want to talk to the brain trust.

8   They're smarter than I am, Judge.

9             True to my word, Judge, I have no further questions.

10  Thank you.

11            THE WITNESS:  Thank you.

12            THE COURT:  Redirect?

13            MS. ESTES:  We don't have any redirect, your Honor.

14            THE COURT:  All right.  Thank you very much.  You may

15  step down.

16            THE WITNESS:  Thank you.

17            (Witness excused)

18            THE COURT:  Call your next witness.

19            MR. RICHMAN:  The government calls Caran Thomas, your

20  Honor.

21   CARAN THOMAS,

22       called as a witness by the Government,

23       having been duly sworn, testified as follows:

24            THE COURT:  Counsel.

25            MR. RICHMAN:  Thank you, your Honor.

1    DIRECT EXAMINATION

2    BY MR. RICHMAN:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  Where do you currently work?

6    A.  New York State Education Department, Office of Professional

7    Discipline.

8    Q.  How long have you been with the New York State Education

9    Department's Office of Professional Discipline?

10   A.  Ten years.

11   Q.  What is your current role at that office?

12   A.  Supervisor professional conduct investigator.

13   Q.  What are your responsibilities as supervisor?

14   A.  I supervise a unit of investigators.

15   Q.  Prior to being a supervisor what was your role?

16   A.  I was a senior professional conduct investigator.

17   Q.  What were your responsibilities in that role?

18   A.  Investigating professional misconduct.

19   Q.  Where are you from originally?

20   A.  The island of Grenada.

21   Q.  Where did you grow up?

22   A.  Primarily in Brooklyn, New York.

23   Q.  How long have you lived in Brooklyn?

24   A.  Thirty-seven years.

25   Q.  You mentioned that you're assigned to the Office of

1    Professional Discipline.  What is the role of that office?

2    A.  We investigate allegations of professional misconduct

3    against licensed professionals.

4    Q.  As part of that role what are some of the things you do,

5    what are some of the professions that you oversee?

6    A.  We oversee every profession except for medical doctors and

7    lawyers.  We do dentists, pharmacists, nurses, acupuncturists,

8    massage therapists, chiropractors.  We have about 54 to 55

9    professions that we oversee.  Those are just a few.

10   Q.  Focusing on pharmacists, what does your office do in regard

11   to overseeing pharmacies?

12   A.  Okay.  We license the pharmacists themselves.  As far as

13   the pharmacy is concerned, we conduct inspections of

14   pharmacies.

15   Q.  When are inspections conducted?

16   A.  When someone is seeking to open a pharmacy, we conduct what

17   are called new registration inspections to ensure they are

18   properly ready to open.  And once that pharmacy is operational,

19   we conduct routine inspections to make sure that they're

20   practicing accordingly.

21   Q.  Are there any other kinds of inspections that you do?

22   A.  Yes.  We can do complaint related inspections, or, if

23   another agency requests that we go out and do an inspection, we

24   do those as well.

25   Q.  How often are routine inspections of pharmacies conducted?

1    A.   We try to do them every two years.

2    Q.   What does an inspection entail?

3    A.   Going in, ensuring that a licensed pharmacist is on duty,

4    checking to make sure his or her license and registration is

5    displayed, checking the stock, meaning the drugs that are in

6    the pharmacy, checking that they are current, checking that

7    they are properly branded, which means that they -- the

8    information that is supposed to be on the pharmacy bottle is on

9    the bottle, making sure that the information that is on the

10   bottle, excuse me, what's in the bottle matches what's on the

11   label as well, making sure the drugs aren't outdated.  There's

12   a huge amount of things that we check.  Those are just a few.

13   Q.   If a pharmacy is not in compliance what can happen?

14   A.   We -- there's an inspection report that we complete.  If we

15   find something is incorrect or not proper, we mark it as

16   unsatisfactory, which would be a violation against the

17   education rule.

18   Q.   Are there any penalties associated with such violations?

19   A.   Depending on the seriousness of the violation, yes.  It

20   varies though depending on the history with the pharmacy, the

21   severity of the violation found.

22   Q.   Are you familiar with Afam Pharmacy Associates?

23   A.   I am.

24   Q.   Do you know it by any other name?

25   A.   Yes, Ekwunife Pharmacy.

1    Q.   How did you become familiar with Afam Pharmacy Associates?

2    A.   Well, I conducted the new registration inspection when they

3    initially opened several years ago.

4    Q.   And did you recently re-familiarize yourself with the

5    pharmacy?

6    A.   Yes.

7    Q.   And why did that happen?

8    A.   The FBI contacted my office and asked that we go in and

9    obtain some prescriptions and I accompanied one of my

10   investigators to do so.

11   Q.   When was that request made?

12   A.   That request was made on October 26, 2015, if I'm not

13   mistaken.

14   Q.   Between the initial investigation before the pharmacy

15   opened and October 26, 2015, do you know if the pharmacy was

16   inspected?

17   A.   There weren't any other inspections other than the one that

18   I initially stated that I did when they first opened.

19   Q.   Do you know of any complaints that were filed against the

20   pharmacy in that time?

21   A.   There were no complaints filed against the pharmacy.

22   Q.   Did you conduct the investigation that the FBI asked you to

23   do?

24   A.   I accompanied one of my investigators to conduct that

25   inspection, yes.

560

1    Q.  What date did that inspection take place?

2    A.  October 27, 2015.

3    Q.  How long did that inspection last?

4    A.  Approximately an hour and a half to two hours.

5    Q.  Was there anyone from the pharmacy present when you

6    conducted the investigation?

7    A.  Yes.

8    Q.  Who was present?

9    A.  The supervisor pharmacist as well as the owner, Mr. Kian

10   Gohari, and there was another pharmacist there but I do not

11   recall his name.

12   Q.  Were there any patients at the pharmacy when you conducted

13   your inspection?

14   A.  When we entered, no.

15   Q.  During the course of the inspection?

16   A.  Yes.  Maybe two or three patients came in to attempt to

17   hand in prescriptions to be filled.

18   Q.  During the course of the inspection were any violations

19   uncovered?

20   A.  Yes.

21   Q.  Were any violations uncovered by you?

22   A.  By me, no.  I didn't do the routine inspection.

23   Q.  Were you present when any violations were revealed?

24   A.  Yes, I was.

25   Q.  What were those?

A.   The one that I remember off the top of my head was the

biennial controlled substance inventory report, which is a

report that the pharmacy is required to maintain in the

pharmacy, was not present in the pharmacy.

Q.   What is a biennial controlled substance inventory report?

A.   The pharmacy has to prepare a report for the DEA and it's

due May 1 depending on -- every two years, depending on which

year they were registered.  So if the pharmacy was initially

registered in 2011, that report would be first due May 1 of

2013.  So, again, it's something that has to be completed.  It

lists all of the controlled substances in the pharmacy

separated by class -- C2s are by themselves; threes, fours, and

fives can be counted together.

Q.   When you say C2s, threes, fours, and fives, what are you

referring to?

A.   The controlled substances.  I'm not a pharmacist so I don't

want to say the wrong thing, but it's the class of drug.

Q.   During the course of your employment have you inspected

other pharmacies?

A.   Yes.

Q.   Generally speaking is this something that is present --

          MR. KEHOE:  Objection, Judge.  It's irrelevant.

          THE COURT:  Sustained.

Q.   Focusing on this pharmacy and focusing on the report, what

are the requirements with regard to the report?

1    A.    The pharmacist must complete the report, as I previously

2    stated, and it has to be separated by class and it must be

3    maintained in the store to be furnished upon request.

4    Q.    And was it at Afam Pharmacy Associates when you inspected?

5    A.    It was not.

6    Q.    Did you ask anyone at the pharmacy about the report?

7    A.    My investigator, Mr. Williams, asked Mr. Gohari for the

8    report; and I remember him telling him he did not have it

9    because it was in storage in New Jersey.

10   Q.    Did Mr. Gohari say anything else about the report?

11   A.    Not that I recall.

12   Q.    Was the pharmacy assessed any penalty in connection with

13   this?

14   A.    Yes.

15   Q.    What penalty?

16   A.    Well, for all of the violations found, the Education

17   Department issued -- we referred the case to what we call our

18   violations committee and the pharmacy and the supervising

19   pharmacist was fined $750.

20          MR. RICHMAN:  Permission to approach, your Honor?

21          THE COURT:  Yes.

22   Q.    I'm now showing you what has been marked for identification

23   as Government Exhibit 800.  If you could please take a look at

24   Government Exhibit 800.  Do you recognize this exhibit?

25   A.    I do.

1    Q.   And how do you recognize it?

2    A.   I obtained these prescriptions from the pharmacy owner on

3    the date in question.

4    Q.   Is this a fair and accurate depiction or does this fairly

5    and accurately reflect the prescriptions that you took from the

6    pharmacy?

7    A.   Yes.

8            MR. RICHMAN:   The government would offer Government

9    Exhibit 800, your Honor.

10           MR. KEHOE:   No objection, Judge.

11           THE COURT:   Received.

12           (Government's Exhibit 800 received in evidence)

13   Q.   Have you reviewed some of these prescriptions in connection

14   with your investigation?

15   A.   Yes.

16   Q.   And if I could please ask you to turn to, I think it's the

17   third or fourth paper clip bundle, Jorge Tirado would be the

18   name.

19   A.   I have it.

20   Q.   Is there an address listed for Mr. Tirado on that

21   prescription?

22   A.   There is.

23   Q.   And what is that address?

24   A.   863 Hancock Street, Brooklyn, New York 11221.

25   Q.   And who is the doctor that is listed on that prescription?

1    A.   Dr. Robert E. White.

2    Q.   Is there an address listed for Dr. Robert E. White?

3    A.   There is.

4    Q.   What is that address?

5    A.   11905 80th Road, Kew Gardens, New York 11415.

6    Q.   Generally speaking are you familiar with that location?

7    A.   Yes.

8    Q.   Where is that located?

9    A.   Queens, New York.

10   Q.   And turning to the address you first read, Mr. Tirado, are

11   you familiar with that location?

12   A.   Yes.

13   Q.   Where is that located?

14   A.   Bedford-Stuyvesant, Brooklyn, New York.

15   Q.   Approximately how far are those two locations from Afam

16   Pharmacy?

17   A.   Individually or?

18   Q.   Taking one at a time.

19   A.   Kew Gardens would be approximately a 30-minute drive.  And

20   Bedford-Stuyvesant, maybe a 15-minute drive.

21             MR. RICHMAN:  Just one moment, your Honor.

22             No further questions at this time.

23             THE COURT:  Cross-examination.

24             MR. KEHOE:  May I approach, Judge, the witness?

25             Ma'am, can I just take those exhibits.  Thank you.

1   CROSS-EXAMINATION

2   BY MR. KEHOE:

3   Q.  Good afternoon, Ms. Thomas.  I don't think we've had the

4   pleasure.  My name is Greg Kehoe.  I represent Mr. Gohari.

5   A.  Hi, how are you.

6   Q.  Thanks.  Let me just ask you a few questions about your

7   testimony and about this inspection.  If I have it correct

8   that, obviously -- I'll try to move through this quickly -- you

9   investigate or look into allegations of professional misconduct

10  in a wide array of areas; is that right?

11  A.  Correct.

12  Q.  And you answer complaints from people?

13  A.  Correct.

14  Q.  And you do routine inspections?

15  A.  Correct.

16  Q.  And it's fair to say when you inspected the Afam Pharmacy

17  on October 27, excuse me, 2015, you hadn't received any

18  complaints and this was not a routine inspection?

19  A.  Well, we did conduct a routine inspection.  No complaints

20  were received, but we did conduct a routine inspection.

21  Q.  You did a routine inspection at the behest of the FBI?

22  A.  Yes and no.  One was due, so we went in and we did a

23  routine inspection; and then we also obtained what was

24  requested from the FBI.

25  Q.  But the issue, the entity that triggered you going in there

1    to inspect was a phone call from the FBI to please go in and

2    inspect Afam Pharmacy, right?

3    A.  Correct.

4    Q.  Now, during I think your inspection you said you had

5    some -- there were some fairly technical violations, weren't

6    they?

7    A.  Correct.

8    Q.  His refrigerator didn't have a thermometer?

9        You have to say yes or no.

10   A.  Yes.

11   Q.  The refrigerator had food and medicine in it?

12   A.  Correct.

13   Q.  That's not something that generally you want to see?

14   A.  Correct.

15   Q.  That's a common violation, isn't it?

16   A.  Yes.

17   Q.  And I think there was some improper branding in the stock?

18   A.  I did not conduct the routine inspection.  I reviewed it as

19   a supervisor, but I don't remember exactly which violations

20   were found.  Those that you initially said I do recall, but I

21   don't remember if there was misbranding.

22   Q.  If I showed you something to refresh your recollection?

23   A.  Sure.

24   Q.  And it would be 3505-2.

25            MR. KEHOE:  May I approach, Judge?

 1              THE COURT:  Yes.

 2   Q.  Ms. Thomas, can you take a look at this?

 3   A.  Yes.

 4   Q.  And just read it and then I'll ask you whether or not that

 5   refreshes your recollection on the individual violations.

 6   A.  Okay.

 7   Q.  Does that refresh your recollection?

 8   A.  It does.

 9   Q.  And tell me what those violations were.

10   A.  First I just want to point out I'm reading a report that

11   was created by one of my investigators which is what we -- the

12   summary, the case summary --

13              MR. RICHMAN:  Objection, your Honor.

14              THE COURT:  The question was whether -- this exhibit

15   is not in evidence, so you can't read from it.

16              THE WITNESS:  Okay.

17              THE COURT:  Why don't you hand it to me.  Thank you.

18              The question only is whether that refreshes your

19   recollection with respect to that aspect that counsel asked you

20   about.

21              THE WITNESS:  Somewhat.

22              THE COURT:  Okay.  So tell us what you now remember.

23              THE WITNESS:  Based on what I just read, it is

24   documented that there was misbranded drugs found in the

25   pharmacy.

1    BY MR. KEHOE:

2    Q.   Okay.  Anything else?

3    A.   Anything else such as?

4    Q.   Anything else that refreshes your recollection that was a

5    problem?

6    A.   No.

7    Q.   I think we focused on, counsel focused on this biennial

8    controlled substance inventory?

9    A.   Yes.

10   Q.   And you said that it wasn't at the pharmacy?

11   A.   Correct.

12   Q.   And the State of New York has a requirement that says what

13   you have to do and not have do at the pharmacy, right?

14   A.   Correct.

15   Q.   But New York State regulation does not require the pharmacy

16   to have the controlled substances log at the pharmacy, do they?

17   A.   I cannot answer that question.

18   Q.   You don't know whether or not the State of New York

19   requires it to be at the pharmacy or not?

20   A.   I believe it does, but I cannot say for sure because it is

21   a requirement that when we go out and do our inspections, they

22   are supposed to have it.  It's supposed to be maintained in the

23   pharmacy.

24   Q.   And my question for you is you don't know if -- do you know

25   that it's not a requirement in the State of New York to have

1  that log at the pharmacy?

2  A.  I cannot answer that question.

3  Q.  Now, when we go through the actual -- by the way, can you

4  tell us what this biennial inventory control item does?

5  A.  It just documents what is in the pharmacy at the time of

6  the inspection.  I'm sorry, at the time the inventory is taken.

7  Excuse me.

8  Q.  There is a completely separate control of the dispensing of

9  controlled substances by the New York State Bureau of Narcotics

10 Enforcement on a daily basis, isn't there?

11 A.  Okay, that is not part of my job description, so I'm not

12 familiar with that.

13 Q.  You're not familiar with the daily reporting to the New

14 York State Bureau of Narcotics --

15         MR. RICHMAN:  Objection, Judge.  Asked and answered.

16         THE COURT:  Sustained.

17 Q.  So other than your going in there and checking, you don't

18 know any other law that requires daily referral of

19 information --

20         MR. RICHMAN:  Objection, your Honor.

21         MR. KEHOE:  Said she doesn't know.

22         THE COURT:  Sustained.

23 Q.  Now, when you went through there, when you went through

24 Mr. Gohari's review, you issued what, these weren't severe

25 violations, were they?

1   A.  No, they weren't.

2   Q.  I mean none of them were, all together, were not severe?

3   A.  No, they were not egregious is the word I would use.

4   Q.  Even including not having a log, that wasn't severe?

5   A.  No.

6   Q.  So, in fact, there was a fine of $750?

7   A.  Correct.

8   Q.  A civil fine of $750, right?

9   A.  Correct.

10  Q.  Now, these items in all these scripts, and I think they're

11  for George Tirado -- I'm reading the scripts.

12          THE COURT:  I just, because we're getting close to the

13  time where we'll need to break for the day, how much longer do

14  you have?

15          MR. KEHOE:  Two minutes, Judge.

16          THE COURT:  I think we can accommodate that.

17  Q.  Ma'am, I'm just looking at these scripts.  They're George

18  Tirado, Duane Harrison, Willie Johnson, Gilberto Cabrera, Sheri

19  Bowen -- may I approach, Judge -- Exhibit 800.  And those were

20  the scripts that the FBI told you to pick up, right?

21  A.  Those were the names of the individuals.

22  Q.  And they involved the dispensing of oxycodone, right?

23  A.  Correct.

24  Q.  Did the FBI ever tell you to tell Gohari not to fill any

25  scripts for these people anymore?

```
 1              MR. RICHMAN:  Objection.

 2              THE COURT:  Ground?

 3              MR. RICHMAN:  Hearsay.

 4              MR. KEHOE:  For what has been said.

 5              THE COURT:  Overruled.

 6   Q.  Did the FBI tell you to tell Gohari not to fill oxycodone

 7   for any of these people anymore?

 8   A.  No.

 9   Q.  Did they tell you that?

10   A.  No.

11              MR. KEHOE:  Thank you, ma'am.  I have no further

12   questions.

13              THE COURT:  Redirect?

14              MR. RICHMAN:  No, thank you, your Honor.

15              THE COURT:  Thank you so much.  You may step down.

16              (Witness excused)

17              THE COURT:  Ladies and gentlemen, that's all for

18   today.  Now, you may have heard that the Chicago Cubs won the

19   World Series for the first time in 108 years, so anything is

20   possible, including starting at 9 a.m. tomorrow.  So we'll see

21   you at 9 a.m. tomorrow.  Have a good evening.

22              (Continued on next page)

23

24

25
```

```
 1                   (Jury not present)

 2              THE COURT:  Please be seated.

 3              Now, do I understand it correctly that because

 4    Mr. Gohari is a Sabbath observer, the latest we can go tomorrow

 5    would be two?

 6              MR. KEHOE:  Yes, your Honor.

 7              THE COURT:  So we'll at least go to one and maybe a

 8    little bit later, but we certainly won't go past two.  Okay.

 9    Very good.

10              MR. RICHMAN:  Your Honor, if I may, we'd just like to

11    inform the Court, at this point I've consulted with defense

12    counsel about length of cross-examination.  We anticipate

13    likely resting on Monday, potentially tomorrow, unlikely

14    tomorrow, potentially Monday.  Defense counsel has provided a

15    lengthy witness list.

16              MR. KEHOE:  And that's a point well taken, Judge.  I

17    gave you my word we will cull it down quite significantly.

18    Honestly, Judge, I have no -- and I will give it to you as soon

19    as I possibly can in the spirit of good will.  It's not going

20    to be that level, Judge, and we will do that expeditiously.

21              THE COURT:  That's helpful.  Now, but why don't we see

22    where things stand at the close of business tomorrow.

23              MR. KEHOE:  Judge, I know your Honor is a stickler for

24    having the next witness, but I think given fact that the

25    government is not sure if they're going to rest.
```

1            THE COURT:  You don't have to have anyone here

2    tomorrow.

3            MR. KEHOE:  That was my question.

4            THE COURT:  Now, one thing you will need to do is

5    inform, once the government rests, you will need to inform the

6    government then and there, if not earlier, whether the

7    defendant is going to take the stand or not.

8            MR. KEHOE:  I will do that as well, Judge.

9            THE COURT:  Very good.  Okay.  We'll see you tomorrow.

10           (Adjourned to November 4, 2016, at 9 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examinationof:                    Page

WILLIAM T. WINSLEY

      Direct By Ms. Estes . . . . . . . . . . 466
      Cross By Mr. Kehoe  . . . . . . . . . . 512

CARAN THOMAS

      Direct By Mr. Richman . . . . . . . . . 556
      Cross By Mr. Kehoe  . . . . . . . . . . 565


                         GOVERNMENT EXHIBITS

Exhibit No.                        Received

1001, 101, 102  . . . . . . . . . . . . . . 467

800   . . . . . . . . . . . . . . . . . . 563

915   . . . . . . . . . . . . . . . . . . 508