```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4                v.                        16 CR 246 (JSR)

 5   KIAN GOHARI,
                                            Jury Trial
 6                    Defendant.

 7   ------------------------------x

 8                                          New York, N.Y.
                                            November 4, 2016
 9                                          9:00 a.m.

10   Before:

11            HON. JED S. RAKOFF

12                                          District Judge

13

14

15

16

17            APPEARANCES

18
     PREET BHARARA
19        United States Attorney for the
          Southern District of New York
20   JORDAN L. ESTES
     JASON A. RICHMAN
21   EDWARD B. DISKANT
          Assistant United States Attorney
22

23   GREGORY W. KEHOE
     ILANA HARAMATI
24   MICHAEL BACHNER
          Attorneys for Defendant
25
```

```
 1              (Trial resumed; jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.  I

 3    just heard something ridiculous.  I heard my courtroom deputy

 4    say "Surprise."  I'm not surprised.  I knew you could do it.

 5              Please call your next witness.

 6              MR. RICHMAN:  The government calls Sheri Bowen, your

 7    Honor.

 8     SHERI BOWEN,

 9         called as a witness by the government,

10         having been duly sworn, testified as follows:

11              THE CLERK:  State your name and spell it slowly for

12    the record.

13              THE WITNESS:  My name is Sheri Bowen.  S-H-E-R-I

14    B-O-W-E-N.

15    DIRECT EXAMINATION

16    BY MR. RICHMAN:

17    Q.  Good morning.  How old are you?

18    A.  52.

19    Q.  Where did you grow up?

20    A.  Bronx, New York.

21    Q.  Are you currently married?

22    A.  Yes.

23    Q.  Do you have any children?

24    A.  Yes.

25    Q.  Where do you currently live?
```

1   A.   Brooklyn, New York.

2   Q.   Were you arrested earlier this year?

3   A.   Yes.

4   Q.   What were you arrested for?

5   A.   Conspiracy with oxycodone.

6   Q.   How did you come to be involved in this oxycodone

7   conspiracy?

8   A.   I was working, volunteering at Bread & Life and I met a

9   gentleman named Alberto Nazario, who was also working there.  I

10  was telling him about my prescriptions and he was telling me

11  about his cousin G that would buy them from me, and he

12  introduced me to G.

13  Q.   Generally, what was your role in the oxycodone conspiracy?

14  A.   My role was to go to the doctor's office and obtain an

15  oxycodone prescription.

16  Q.   What would happen after you got those oxycodone

17  prescriptions?

18  A.   I would give the prescriptions to Gilberto, who I called G,

19  and he would fill them and then sell them.

20  Q.   Do you know where Cabrera was selling the prescriptions?

21  A.   I know he was filling them at Danny's pharmacy on 52nd and

22  Church.

23  Q.   52nd and Church, where is that located?

24  A.   Flatbush.

25  Q.   How do you know that?

Gb4zegb1                    Bowen - direct

1    A.  Because Cabrera had taken me with him.

2    Q.  Taken you with him to the pharmacy?

3    A.  Yes, sir.

4    Q.  Have you ever been inside the pharmacy?

5    A.  No, sir.

6    Q.  Why have you never been inside the pharmacy?

7    A.  Because Cabrera said that Danny didn't want any of us to

8    come to the pharmacy.

9    Q.  Have you ever seen Danny before?

10   A.  Yes, sir.

11   Q.  If you could look around the courtroom today, do you see

12   Danny today?

13   A.  He's right over there.

14            MR. KEHOE:  Conceded, Judge.

15            THE COURT:  The identification is stipulated.

16            MR. RICHMAN:  Thank you, your Honor.

17   Q.  Did you and Cabrera ever have a conversation about his

18   relationship with Danny?

19   A.  Yes.  Cabrera said that he would pay Danny to fill the

20   prescriptions and we also had to get other prescriptions to

21   give to Danny.

22   Q.  Taking a step back, how did you first become involved in

23   this conspiracy?

24   A.  A guy named Willie that also worked with Cabrera told me

25   about it.

1   Q.  What did he say to you and what did you say to him?

2   A.  He said to me did Cabrera, which I called G, tell you about

3   the new thing we doing?  I was like no.  Then he explained that

4   we would go get oxycodone prescriptions and Cabrera would pay

5   us.

6   Q.  Before you obtained any oxycodone prescriptions, did you

7   ever sell any other prescriptions to G?

8   A.  Yes.  When I first met him, I sold him my Seroquel.  And

9   then afterwards we got involved in going to a doctor's office,

10  obtaining HIV medications to sell.

11  Q.  When you say sold him Seroquel, what is Seroquel?

12  A.  Seroquel is sleeping medication that my psychiatrist give

13  me.

14  Q.  Did Cabrera tell you why he purchased your Seroquel?

15  A.  Yes.  He purchased it to sell.

16          MR. RICHMAN:  Permission to approach, your Honor?

17          THE COURT:  Yes.

18  Q.  I am now showing you what's been marked for identification

19  as Government Exhibit 617.  Do you recognize the individual in

20  that photograph?

21  A.  Yes.  It's Dr. Naveed.

22  Q.  How do you recognize Dr. Naveed?

23  A.  Because he's the doctor that was giving us HIV

24  prescriptions.

25  Q.  Is that a fair and accurate depiction of Dr. Naveed?

1    A.   Yes, it is.

2               MR. RICHMAN:   Your Honor, the government offers

3    Government Exhibit 617.

4               MR. KEHOE:   Excuse me, your Honor.  May I come to the

5    side bar, please?

6               THE COURT:   All right.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

581

Gb4reqb1                              Bowen - direct

1                    (At the side bar)

2            MS. ESTES:  Maybe I misunderstood.  I thought Mr.

3    Richman yesterday said this witness was not going to mention

4    Dr. Naveed.

5            MR. RICHMAN:  I just said she has been instructed not

6    to testify about his arrest.

7            MR. KEHOE:  I misunderstood.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  Any objection to the exhibit?

 3              MR. KEHOE:  No, your Honor.

 4              THE COURT:  Received.

 5              (Government's Exhibit 617 received in evidence)

 6   Q.  Have you met Dr. Naveed?

 7   A.  Yes, I have.

 8   Q.  How did you meet him?

 9   A.  I was going to his office to obtain prescriptions for HIV

10   medication.

11   Q.  Who told you to go to his office?

12   A.  Cabrera.

13   Q.  What did Cabrera tell you with about him before you went to

14   his office?

15   A.  He said that Dr. Naveed would give us any type of

16   prescription we asked for.

17   Q.  Did you then go to Dr. Naveed's office?

18   A.  Yes, I did.

19   Q.  Can you describe your experience when you went to Dr.

20   Naveed's office.

21   A.  We had to be there 5 o'clock in the morning.  The purpose

22   of going at 5 o'clock in the morning is because you wanted to

23   be first on line because Dr. Naveed only took five new patients

24   a day.  And when you got there, the guy will be tearing off a

25   piece of paper bag, writing a number on it, giving you your
```

1   number where you is at in line.  Then about 9 o'clock it would

2   open, you would go in and sit down and wait, and at about 2:00

3   or 3:00 Dr. Naveed would come.

4   Q.  When Dr. Naveed would come at about 2:00 or 3:00, what

5   would he do?

6   A.  He would come in, he would go in his office, and then the

7   receptionist would start calling people to see him.

8   Q.  Did Dr. Naveed write prescriptions for you?

9   A.  Yes, he did.

10  Q.  What prescriptions did he write?

11  A.  I only know the names of a couple of them: Vyread, Atripla,

12  and Prezista.  I can't really pronounce them.

13  Q.  What disease were these medications intended to treat?

14  A.  HIV.

15  Q.  Did you have HIV?

16  A.  No.

17  Q.  What did you do with these prescriptions after Dr. Naveed

18  wrote them for you?

19  A.  I would either give them to G or someone that he sent to go

20  with me, and then G would take them to a pharmacy, fill them,

21  and sell them.  No, excuse me.  He'd take them to the pharmacy

22  and fill them.  The pharmacies give us money.

23  Q.  Did you ever receive these HIV medications?

24  A.  No.

25  Q.  What would G give you in return for the prescriptions?

1   A.  He would give me money.

2   Q.  How long did you go to Dr. Naveed for?

3   A.  Anywhere from six months to a year.  I'm not exactly sure.

4   Q.  At any point did you lie to Dr. Naveed?

5   A.  Yes.  I told him I had HIV.

6   Q.  Did you feel like you were fooling him when you told him

7   that?

8   A.  No.

9   Q.  Why not?

10  A.  Because there was no proof when I first went that I had

11  HIV.  I just told him.  I just tell him what I want, and he

12  just give me the script.

13  Q.  When you say that, what do you mean?

14  A.  I mean I go in there with the piece of paper that Cabrera

15  had given me and I just tell him the medicine that's on the

16  piece of paper, and he would write me a script for it.

17          MR. RICHMAN:  Your Honor, permission to publish what

18  is in evidence as Government Exhibit 210.

19          THE COURT:  Yes.

20  Q.  Ms. Bowen, we are going to focus in on the first row of

21  this document.

22          MR. KEHOE:  If I may, Judge, with regard to this

23  testimony, if I could request an instruction from the Court.  I

24  do believe that I should discuss with you at side bar an

25  instruction that the defense is going to ask you to give the

1  jury.

2       THE COURT:  You had better come to the side bar.  I

3  don't understand.

4       (At the side bar)

5  MR. BACHNER:  Judge, I'll carry the ball on this one.

6  Your Honor, we have a concern that this background evidence

7  that goes to Dr. Ahmad, who is not a co-conspirator of the

8  defendant, we are concerned that from this background evidence

9  which is coming in to establish relationships the jury may

10 conclude that the defendant had something to do with some

11 wrongdoing with Dr. Ahmad when he is not a conspirator.

12      We would ask a limiting instruction that this is come

13 in purely as background information, the defendant has not been

14 charged in any conspiracy with Dr. Ahmad.  In fact, we would

15 like to go further and indicate that there is no proof that the

16 defendant committed any wrongdoing in connection with Dr.

17 Ahmad.  We are concerned that they are going to introduce

18 evidence that the defendant had a lot of dealings with Dr.

19 Ahmad.

20      THE COURT:  First of all, this is the first time you

21 have asked for that instruction.  You knew this witness was

22 going to come.  Having said that, let me ask the government,

23 what is the relevance of any of this?

24      MR. RICHMAN:  Your Honor, the relevance is, as it has

25 been from the beginning -- first, I think we would view Dr.

1    Ahmad as an unindicted co-conspirator.  There has been

2    testimony that this defendant --

3              THE COURT:  Wait a minute.  He is not an unindicted

4    co-conspirator, is he?

5              MR. RICHMAN:  May I have one moment, your Honor?

6              THE COURT:  Yes.

7              MS. ESTES:  Your Honor, our position is that Ahmad

8    himself is not an unindicted co-conspirator but as part of the

9    conspiracy the defendant was asking people in this conspiracy,

10   Cabrera, to send patients to Dr. Ahmad because he knew what was

11   going on over there.  He knew what was going on over there

12   because he was there handing out business cards, which we

13   established the other day.  We will also establish that 77

14   percent of his Medicaid pills were for HIV prescriptions of Dr.

15   Ahmad.

16             THE COURT:  I have a very simple question, two simple

17   questions.  The first one is:  Is he or is he not a

18   co-conspirator, Dr. Ahmad?

19             MS. ESTES:  We think he is a co-conspirator.

20             THE COURT:  My second question is:  Did you so

21   indicate that to the defense?

22             MS. ESTES:  We didn't put it on the list of the

23   co-conspirators because we understood that to be the

24   transactions that they wanted listed.

25             THE COURT:  What is he a co-conspirator in?

1          MS. ESTES:  A conspiracy involving HIV medications.

2          THE COURT:  To be frank, I think the government may

3    have misled the defense and we may have to deal with that, but

4    I don't see any reason to give an instruction at this time,

5    which would just complicate matters.  The evidence is relevant,

6    which is all that the jury needs to know.  We'll sort out later

7    what will or will not follow.

8          MR. BACHNER:  Judge, we'll make further argument when

9    your Honor deems it appropriate, but to the extent that this

10   really isn't relevant to the conspiracy charged -- perhaps we

11   should have objected a bit earlier -- we move to strike it.

12         THE COURT:  The law is clear that the government

13   doesn't have to charge someone in an indictment as a

14   co-conspirator in order to prove that they are co-conspirators.

15   The government also can establish agency or co-conspirator

16   relations that may not be the conspiracy charged in the

17   indictment but still may be a conspiratorial relationship that

18   is relevant to the case.

19         The thing that bothers me is whether they misled the

20   defense.  That is what we will take up at the next break.  But

21   I don't think an instruction on this point would be called for

22   because the whole situation is unclear as to how it will come

23   out.  We'll sort it out.

24         MR. BACHNER:  Okay.

25         THE COURT:  Certainly if I find the defense has been

588

1   misled, we'll take action.

2            MR. BACHNER:  Thank you, Judge.

3            (Continued on next page)

589

Bowen - direct

```
 1                   (In open court)
 2    BY MR. RICHMAN:
 3    Q.  Ms. Bowen turning back to where we were, is there a
 4    prescriber name listed on this?
 5              MR. KEHOE:  If I may, Judge, with regard to this
 6    exhibit, we would object based on the same.
 7              THE COURT:  Yes.  For this one occasion I will give
 8    you a continuing objection to all that we discussed, all the
 9    testimony that was implicated by what was discussed at the side
10    bar.
11              MR. KEHOE:  Yes.  I raise that, Judge, because your
12    Honor said previously that you don't have standing objections.
13              THE COURT:  Exactly.  Congratulations on getting an
14    exception.
15    Q.  Ms. Bowen, do you see the prescriber name listed there?
16    A.  Ahmad Naveed.
17    Q.  Is that the doctor you were just telling us about?
18    A.  Yes, it is.
19    Q.  Do you see a drug name listed there?
20    A.  Prezista.
21    Q.  Do you know what Prezista is prescribed for?
22    A.  HIV.
23    Q.  Do you see an amount listed there?
24    A.  Yes.
25    Q.  What is the amount listed there?
```

1    A.  $1,058.36.

2              MR. RICHMAN:  Ms. Bostillo, if you could please blow

3    up the last row on this page.

4    Q.  Ms. Bowen, for this row do you see a doctor's name listed

5    there?

6    A.  Dr. White.

7    Q.  Are you familiar with the name Dr. White?

8    A.  Yes, it is.

9    Q.  How did you first learn of Dr. White?

10   A.  That's the doctor that Willie was telling me about when he

11   was telling me there was something else going on.  He told me

12   to talk to G about it, and I spoke to G about it.  And he had a

13   gentleman named Wilfredo take me to the doctor.  I mean

14   Alberto.

15   Q.  Take you to the doctor?

16   A.  Yes, sir.

17   Q.  When you said to the doctor, to which doctor?

18   A.  To Dr. White's office.

19   Q.  Did you obtain prescriptions from Dr. White?

20   A.  Yes.  I obtained oxycodones.

21   Q.  During your visits with Dr. White, did you indicate that

22   you had a medical problem?

23   A.  Yes.  I told him I fell and hurt my shoulder.

24   Q.  Did he do any kind of testing when you told him that?

25   A.  No.

1   Q.   What would you do with the prescriptions from Dr. White

2   after he wrote them for you?

3   A.   I would give them to either Cabrera or to someone he sent

4   with me, and then they would give them to Cabrera, and he would

5   take them to a pharmacy, fill them, and sell them.

6   Q.   Would Cabrera give you anything in return?

7   A.   Yes.  He would pay me for going to the doctor.

8   Q.   How much would he pay you?

9   A.   Different times.  Sometimes a hundred, sometimes 2,

10  sometimes 3.  It's just different prices.

11  Q.   For how long did you go to Dr. White?

12  A.   Probably about 3 or 4 months.

13  Q.   We'll come back to this later.  Do you know what Cabrera

14  did with the prescriptions that you gave to him?

15  A.   He would fill them and sell them.

16  Q.   Do you know where he would fill them?

17  A.   At Dr. White's office.  No, I don't.

18  Q.   Did you have Medicaid at this time?

19  A.   Yes, I did.

20        MR. RICHMAN:  Ms. Bostillo, if we could please move on

21  to page 2 of this document and blow up rows 4 and 5, please.

22  Q.   Ms. Bowen, do you see a doctor's name listed here?

23  A.   Dr. Masavia.

24  Q.   Do you know Dr. Masavia?

25  A.   Yes.  He is my psychiatrist.

1    Q.  Do you presently go to Dr. Masavia?

2    A.  Yes, I do.

3    Q.  Do you see what drugs are listed here?

4    A.  Yes.

5    Q.  What are they?

6    A.  Ibuprofen and Citalopram.  I don't know how to say it.

7    Q.  Would you also give these prescriptions to Cabrera to fill?

8    A.  Yes, I would.

9    Q.  Why would you do that?

10   A.  Because Cabrera said that Danny told him that he is not

11   going to just fill just oxy prescriptions, we has to have more

12   than oxy prescriptions or it don't look right.

13   Q.  Moving back to the oxy prescriptions, after you stopped

14   with Dr. White, did you go to any other doctors to receive

15   oxycodone?

16   A.  Yes.  I went to Dr. Belafonte.

17   Q.  How did you first learn about Dr. Belafonte?

18   A.  Cabrera.

19   Q.  What would happen when you would visit Dr. Belafonte?

20   A.  We would go in, we would give the receptionist $250, and a

21   bunch of us would go in back and watch films on drugs, homeless

22   or we would have a discussion on whatever topic somebody came

23   up with.  Then, after we did that for 15 minutes, we would go

24   back in the reception area and someone would call us, and we

25   would go into the doctor's office and receive a prescription

1    for oxycodone.

2    Q.  Did Dr. Belafonte ever examine you?

3    A.  No.

4    Q.  What, if any, prescriptions did Dr. Belafonte give you?

5    A.  Oxycodone.

6    Q.  What would you do with these prescriptions?

7    A.  I would give them to Cabrera.

8    Q.  Would you receive anything in exchange?

9    A.  Yes.  He would pay me.

10   Q.  Do you know what Cabrera would do with the prescriptions

11   after he bought them from you?

12   A.  He would fill them and sell them.

13   Q.  Do you know where he was filling them?

14   A.  No.

15           MR. RICHMAN:  Ms. Bostillo, if we could please move to

16   page 11 of Government Exhibit 210.  And if we could zoom in on

17   the first row.

18   Q.  Ms. Bowen, do you see the doctor's name listed on this row?

19   A.  Yes.

20   Q.  Do you recognize that doctor's name?

21   A.  Yes.

22   Q.  Who is that doctor?

23   A.  It was a doctor that was in Dr. Feygin's office.

24   Q.  Who is Dr. Feygin?

25   A.  Dr. Feygin is a doctor that has different doctors' offices

594

1    but there's other doctors you see.

2    Q.   Did you yourself visit Dr. Feygin?

3    A.   Yes, I did.

4    Q.   How did first learn of Dr. Feygin?

5              MR. BACHNER:   Your Honor, could we have a same

6    objection as to all of the testimony related to these doctors

7    as we lodged at side bar for the same reason as interposed last

8    time?

9              THE COURT:   I'm not sure it is the same situation, but

10   I will note your objection, and we'll take it up at the next

11   break.

12             MR. BACHNER:   Thank you.

13   Q.   How did you first learn about Dr. Feygin?

14   A.   Cabrera.

15   Q.   What would happen when you visited Dr. Feygin?

16   A.   You would go to Dr. Feygin's office, see a receptionist,

17   you would give urine, and you would see the doctor.   Then, when

18   you come out, the doctor prescribed oxycodones for you.

19   Q.   Was it your urine that you would give to Dr. Feygin?

20   A.   No.

21   Q.   Who gave you the urine?

22   A.   Cabrera.

23   Q.   Do you have an understanding of why you had to use

24   Cabrera's urine?

25   A.   Yes.   I couldn't use my own because I have other

1   medications in my system.

2   Q.  Did you receive any prescriptions from Dr. Feygin?

3   A.  Yes, I did: oxycodone.

4   Q.  Any others?

5   A.  Muscle relaxants, blood pressure medicine, vitamin D, foot

6   medicine.  They just give everything.

7   Q.  How were you able to obtain these medications?

8   A.  For Dr. Feygin, I just had to bring him a prior

9   prescription, a printout from the pharmacy showing that I had

10  taken these medicines prior.

11  Q.  Why did you take the prescriptions?

12  A.  So I could give them to Cabrera so he could sell them.

13  Q.  Did Cabrera tell you why he wanted these particular

14  prescriptions?

15  A.  At this particular doctor we had to get like Vytorin and

16  some other medication that he told us that Danny had told him

17  to tell us to get.

18          MR. KEHOE:  Your Honor, objection hearsay.  You are

19  talking about a third party.

20          THE COURT:  Actually, I think we need to have another

21  side bar.  I'm sorry, ladies and gentlemen.

22          (Continued on next page)

23

24

25

```
1                    (At the side bar)

2          THE COURT:  I'll ask the reporter first to read the

3    last question and answer.

4                    (Record read)

5          THE COURT:  That sounds to me like a classic statement

6    in furtherance of a conspiracy.

7          MR. KEHOE:  I agree, Judge.  My objection is there

8    were conversations coming back on -- I thought she was talking

9    about one of these doctors.

10         THE COURT:  No.  That was a statement of Cabrera

11   relating what he had been told by Danny, the defendant.  It

12   clearly comes in under the co-conspirator exception.

13         MR. KEHOE:  I think what he is talking about is not

14   from Danny, from the doctor.

15         MR. RICHMAN:  It was from Danny.

16         MR. BACHNER:  The "he" was like this dangling pronoun

17   out there.  You couldn't tell if the he referred to Feygin or

18   the defendant.

19         THE COURT:  I didn't find any ambiguity.  The

20   objection is overruled.

21         MR. BACHNER:  Judge, the basis of the other objection

22   was --

23         THE COURT:  I'm not hearing anything yet that remotely

24   raises the issues that we discussed before.  Just so you are

25   clear, all this evidence is clearly relevant.  All of this
```

Cb4aophi                Bower - line 25

1    evidence there could be no objection to unless the defense had

2    been misled.

3           With Dr. Naveed there was a specific discussion,

4    including a discussion with the Court, as to whether Dr.

5    Naveed -- now I'm falling into my own trap -- Dr. Ahmad was a

6    co-conspirator.  Whether or not there are implications of that

7    from what was offered in the first part of her testimony we

8    will take up at the next break.

9           With respect to anyone else, the evidence just offered

10   was not offered on the grounds that this other doctor was a

11   co-conspirator.  It was offered to show that the defendant had

12   a role in referring through Mr. Cabrera these people to get

13   their phony oxycodone -- whether it is phony or not, their

14   oxycodone prescriptions.  What could be more relevant to this

15   case?  Overruled.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              MR. RICHMAN:  May I proceed, your Honor?

 3              THE COURT:  Please.

 4              MR. RICHMAN:  Thank you.

 5   BY MR. RICHMAN:

 6   Q.  Did there come a time when you stopped going to Dr. Feygin?

 7   A.  Yes.

 8   Q.  After stopping with Dr. Feygin, did you then go to any

 9   other doctors to receive oxycodone?

10   A.  Yes, Dr. Una.

11              MR. RICHMAN:  Ms. Bostillo, if you could please turn

12   to page 23 and please pull up the second-to-last row.

13   Q.  Ms. Bowen, do you see a prescriber name listed here?

14   A.  Yes.

15   Q.  What is that name?

16   A.  Dr. Una.

17   Q.  What drug is being prescribed here?

18   A.  Oxycodone.

19   Q.  How did you first learn of Dr. Una?

20   A.  Cabrera.

21   Q.  What would happen when you visited Dr. Una?

22   A.  When you go to Dr. Una's office, you have to give up urine.

23   You go in the back, she would test you, she would check out

24   what you say was hurting.  If your MRI is old, she makes know

25   go get a new MRI.
```

1    Q.  Did you have an MRI at that point?

2    A.  At that point, yes, I did.

3    Q.  How did you obtain that MRI?

4    A.  I was in a car accident.

5    Q.  What strength oxycodone did Dr. Una prescribe to you?

6    A.  30 milligrams.

7    Q.  Was the strength of the drug important to you?

8    A.  Yes, it is.

9    Q.  Why is that?

10   A.  Because if it is not 30 milligrams, no one will buy them.

11   Q.  What would you do with the prescriptions you obtained from

12   Dr. Una?

13   A.  I would give them to either Cabrera or whoever he had sent

14   with me, which Cabrera would take them to the pharmacy and fill

15   them and sell them.

16   Q.  Would Cabrera give you anything in return?

17   A.  He would pay me for going to the doctor.

18   Q.  How long did you go to Dr. Una for?

19   A.  I went to Dr. Una for about a year.  For a year.

20   Q.  Why did you stop?

21   A.  When I stopped getting the oxycodones from her.  But I

22   still have pain in my shoulders sometimes, and I go get a shot.

23   Q.  Aside from your work for Cabrera as part of this oxycodone

24   scheme, did you and he have any other dealings?

25   A.  Yes.  He had offered me money for sex, and I did.

Cb4scoba1                        Bowen - direct

 1   Q.  When did this occur?

 2   A.  I don't remember exactly.

 3           MR. RICHMAN:  Your Honor, one moment, please?

 4           THE COURT:  Yes.

 5           MR. RICHMAN:  Your Honor, permission to publish

 6   Government Exhibit 613, which is in evidence?

 7           THE COURT:  Yes.

 8           MR. RICHMAN:  Thank you, your Honor.

 9   Q.  Ms. Bowen, do you recognize this individual?

10   A.  Yes.  It's Tonya Freeman.

11   Q.  How did you first meet Tonya Freeman?

12   A.  She was a friend of mine.  We met in a halfway house.

13   Q.  Was she involved in the oxycodone conspiracy you have been

14   testifying about?

15   A.  Yes, she was.

16   Q.  How do you know that?

17   A.  Because I'm the one that introduced her to Cabrera.

18   Q.  Why did you introduce her to Cabrera?

19   A.  Because she was already getting oxycodones and the

20   gentleman that was filling them for her was no longer around.

21           MR. RICHMAN:  Your Honor, permission to publish

22   Government Exhibit 14, which is in evidence?

23           THE COURT:  Yes.

24           MR. RICHMAN:  Thank you.

25   Q.  Ms. Bowen, do you recognize this individual?

1    A.   Stefone Holliman, Tonya Freeman's boyfriend.

2    Q.   Was Mr. Holliman involved with the oxycodone conspiracy?

3    A.   Yes, he was.

4    Q.   How do you know that?

5    A.   Because I introduced him to Cabrera.

6             MR. RICHMAN:   Your Honor, permission to publish

7    Government Exhibit 602, which is in evidence?

8             THE COURT:   Yes.

9    Q.   Ms. Bowen, do you recognize the individual on Government

10   Exhibit 602?

11   A.   Yes, I do.

12   Q.   How do you recognize him?

13   A.   Robert Hespeth.

14   Q.   Was he a participant in the oxycodone conspiracy?

15   A.   Yes, he was.

16   Q.   What was his role?

17   A.   His role was to take individuals to the doctors to make

18   sure they gave him a prescription and didn't run off with them.

19   And he would also take the prescriptions to Danny's pharmacy.

20   Q.   How do you know he would take them to Danny's pharmacy?

21   A.   Because I went with him.

22   Q.   You testified earlier that Cabrera was filling

23   prescriptions with the defendant.   How do you know that?

24   A.   Because I went with him.

25   Q.   Did he ever tell you anything about that?

1    A.  Yes.  He told me that he pays Danny to fill the

2    prescriptions.  He also calls Danny and lets him know when we

3    have prescriptions to be filled.  And if Danny's going to go

4    out of town or be on vacation, he'll call Cabrera, and Cabrera

5    will call us to make sure that we go to the doctor around

6    Danny's schedule.

7    Q.  Breaking that down a bit, what did Cabrera tell you about

8    what he would give to the defendant?

9    A.  When we would complain to Cabrera about how much money he

10   would give us, he told us the only reason he gave us only a

11   little bit of money was because he had to pay the pharmacist,

12   which was Danny.

13   Q.  Did he tell you he was giving the pharmacist anything else?

14   A.  He also would call us and let us know different

15   prescriptions that Danny would want us to get.

16   Q.  What kind of prescriptions would Danny want you to get?

17   A.  I know one time it was some Motrin that you take for your

18   muscles for pain.  And one time he asked for foot medicine.

19   Q.  Were any of your other medications filled with him?

20   A.  Yes, my psych medication was also filled with Danny.

21   Q.  Were you yourself ever at the defendant's pharmacy?

22   A.  I never went in, but I went with Cabrera and I sat in the

23   truck and watched him talk to Danny.

24   Q.  Why did you stay in the truck?

25   A.  Because Danny didn't want nobody to come to the pharmacist

 1   other than Cabrera.  And Danny said Robert can come.

 2   Q.  While you were sitting in the truck, were you able to

 3   observe the defendant and Cabrera?

 4   A.  Yes.  They were standing outside talking because of the

 5   fact that there was a young lady working in Danny's office and

 6   Danny didn't want her to hear what him and Cabrera was talking

 7   about.

 8          MR. KEHOE:  Objection, your Honor.  There is no

 9   identification of who is speaking at this point.

10          MR. RICHMAN:  I can lay a foundation, your Honor.

11          THE COURT:  All right.

12   Q.  Did Cabrera tell you anything about his conversation with

13   the defendant?

14   A.  Yes.  Cabrera was talking to Danny in reference to the fact

15   that we wanted the prescriptions that he had to be filled.

16   Q.  Did Cabrera tell you anything about why they were talking

17   outside the pharmacy?

18   A.  Yes.  Cabrera said that there was a young lady, that there

19   was a female in the pharmacy that Danny didn't want to see

20   talking to him.

21   Q.  Did he tell you why he didn't want the female to see them

22   talking?

23   A.  Excuse my language.  He said he can't stand it when that

24   bitch is there because then Danny can't be seen doing what he

25   needs to do for us.

1   Q.   Did you ever speak to Danny on the phone?

2   A.   Yes.

3   Q.   How many times?

4   A.   Once.  I called Danny because when I was at Dr. Feygin's

5   office I had needed a printout, and I called Danny and asked

6   him would he send the printout to Dr. Feygin's office.

7   Q.   Did anyone from the pharmacy ever call you?

8   A.   Yes.  A young lady called me once and told me that my -- I

9   received a phonecall, and it was a young lady, a female,

10  telling me that my prescriptions was ready.  And I was like,

11  what's your address?  Then she gave me the address.  So then I

12  knew it was Danny's pharmacy, and I said okay and I hung up.  I

13  later on told Cabrera that Danny called me.

14  Q.   Did the defendant ever ask you about your pain?

15  A.   No.

16  Q.   Did the defendant ever ask you if you had HIV?

17  A.   No.

18  Q.   Did the defendant ask you about any ailments related to any

19  of the medications that you filled at his pharmacy?

20  A.   No.

21  Q.   Do you know whether Cabrera ever called the defendant?

22  A.   Yes.

23  Q.   How do you know that?

24  A.   Because I was with him at one time when he had called

25  Danny.

Bowen - direct

1    Q.  How often would they speak?

2    A.  Any time that any of us that was going to the doctor's,

3    Cabrera would call Danny and let him know who was going to the

4    doctor's.  Any time Danny was going to be out of town on

5    vacation, he would call Cabrera and make him aware that he

6    wasn't going to be in the pharmacy.

7    Q.  Did you ever overhear any conversations between Cabrera and

8    the defendant?

9    A.  Yes.  Them I've heard him tell them that it was Sheri

10   Bowen's turn.  I've heard him call and ask him where he's at,

11   how long before he would be there.

12   Q.  Ms. Bowen, are you familiar with the term "home health

13   aide"?

14   A.  Yes, I am.

15   Q.  How are you familiar with that term?

16   A.  I wanted to be one.

17   Q.  Do you know if Mr. Cabrera was a home health aide?

18   A.  No.

19   Q.  Did you ever hear Mr. Cabrera tell anyone he was a home

20   health aide?

21   A.  No.

22   Q.  Do you believe Mr. Cabrera was presenting himself as a home

23   health aide?

24   A.  No.

25   Q.  Are you familiar with the requirements to be a home health

1    aide?

2    A.   Yes.   I know you cannot have a felony, you can't be on

3    drugs.

4    Q.   How do you know that?

5    A.   Because I wanted to be one, so I had to find out the

6    qualifications.

7    Q.   Do you know if Mr. Cabrera could have qualified as a home

8    health aide?

9          MR. KEHOE:   Objection, Judge.   Competency to give a

10   conclusion as to that.

11         THE COURT:   Sustained.

12   Q.   Have you ever talked to Mr. Cabrera about his prior

13   criminal history?

14   A.   Yes.

15   Q.   Do you know if Mr. Cabrera has prior felony convictions?

16   A.   Yes.

17   Q.   Do you know if Mr. Cabrera therefore could have qualified

18   as a home health aide?

19         MR. KEHOE:   Objection.

20         THE COURT:   Sustained.   You can save that for

21   summation if you wish.

22         It wasn't any better on the second try than on the

23   first.

24         MR. RICHMAN:   Thank you, your Honor.

25   Q.   Based on your interactions with Mr. Cabrera, did you ever

1    think he was a home health aide?

2    A.   No.

3    Q.   Why not?

4    A.   For one, he wore shorts and flip-flops every day.  He had a

5    look of being dirty, not someone that you would hire to take

6    care of anyone in your family.

7    Q.   Any other reason?

8    A.   No.

9    Q.   Did you ever see Mr. Cabrera give the defendant money?

10   A.   No.

11   Q.   If you yourself needed to pick up an everyday medication,

12   would you go to the defendant's pharmacy?

13   A.   No.

14             MR. KEHOE:   Objection, your Honor.  Pure speculation.

15             THE COURT:   No, overruled.  The answer "no" will

16   stand.

17   Q.   Where would you go?

18   A.   I would go to the pharmacist closest to me.

19   Q.   Why wouldn't you go to the defendant?

20   A.   Because when Cabrera would get your prescriptions, the

21   extra ones, he would save them to have when he would take other

22   people's oxycodones.  So that means it takes a minute before

23   you get your medication.

24   Q.   Was there a time when Mr. Cabrera stopped going to the

25   defendant?

608

0b4scph1                    Bowen - direct

 1   A.   Yes.

 2   Q.   How do you know that?

 3   A.   Because Cabrera had a meeting with everybody, and he told

 4   us that Danny said he would no longer take our prescriptions

 5   because Robert Hespeth was red flagged.

 6   Q.   What was your understanding of what he meant by "red

 7   flagged"?

 8   A.   That Robert Hespeth was being investigated.

 9   Q.   Ms. Bowen, do you presently take any medications?

10   A.   Yes, I do.

11   Q.   What medications?

12   A.   Zoloft, Abilify, and Seroquel.

13   Q.   Why do you take those medications?

14   A.   Because I'm depressed, manic depressive.

15   Q.   How do these medications affect you?

16   A.   Seroquel makes me sleep, and Abilify and Zoloft is for my

17   depression.

18   Q.   Do they have any effect on your ability to think?

19   A.   No.

20   Q.   How about on your memory?

21   A.   No.

22   Q.   Are you currently taking your medications?

23   A.   Yes.

24   Q.   What happens when you don't take your medications?

25   A.   I don't think anything happens; but my family members point

O4sophi                              Bower - direct

 1    out to me that my behavior changes.

 2    Q.  You said that you were arrested in 2016 for the oxycodone

 3    conspiracy.  Was that the first time you were involved with

 4    drugs?

 5    A.  No.

 6    Q.  When did you first become involved with drugs?

 7    A.  In my 20s.

 8    Q.  Approximately when was that?

 9    A.  30 years ago.

10    Q.  Where were you living at the time?

11    A.  North Carolina.

12    Q.  During that period of time did you commit any other crimes?

13    A.  Yes, I did.

14    Q.  What kinds of crimes?

15    A.  Shoplifting, prostitution, possession of drugs.

16    Q.  Had you been arrested for some of these crimes?

17    A.  Yes.

18    Q.  Have you been incarcerated for some of these crimes?

19    A.  Yes.

20    Q.  At some point during this time period were you involved in

21    a romantic relationship?

22    A.  Yes.

23    Q.  Did there come a time when you had an incident with the

24    individual that you were involved with?

25    A.  Yes.  My son's father used to beat me half to death.

```
 1   Q.  What happened in response?
 2   A.  One time I was cooking, and the rat poison was there and I
 3   had put some in his food.  And one time I had put some in his
 4   pills, but when he went to take them, I took them out of his
 5   hands and flushed them in the toilet.
 6   Q.  Did anything happen to you when you did this?
 7   A.  No.
 8   Q.  Did there come a time when you moved out of North Carolina?
 9   A.  Yes.
10   Q.  When was that?
11   A.  I'd say about 25 years ago.  25 years ago, I was about 25.
12   Q.  After leaving North Carolina, where did you live.
13   A.  New York.
14   Q.  After returning to New York, did you continue to deal in
15   drugs?
16   A.  Yes, I did.
17   Q.  How did you deal in drugs?
18   A.  I used to take them.  I used to get high, so possession
19   with distribution.  And I used to get my drugs and I also would
20   traffic them.
21   Q.  Were you arrested in connection with this trafficking?
22   A.  Yes, I was.
23   Q.  What happened?
24   A.  I got sentenced to 5 years.
25   Q.  Where were you arrested?
```

1    A.  St. Thomas.

2    Q.  What were you doing in St. Thomas when you got arrested?

3    A.  I was bringing drugs back to New York.

4    Q.  After being sentenced to those 5 years, were you eventually

5    released from prison?

6    A.  Yes, I was.

7    Q.  Where did you go?

8    A.  Back to New York.

9    Q.  Were you still using drugs at this time?

10   A.  Yes, I was.

11   Q.  Were you caught using drugs?

12   A.  Yes, I was.

13   Q.  What happened when you were caught using drugs?

14   A.  I went to jail.

15   Q.  How long did you go to jail for?

16   A.  I believe 3 years.  I'm not exactly sure.  I believe 3

17   years.

18   Q.  After serving that time in jail, were you released?

19   A.  Yes, I was.

20   Q.  When you were released, did you continue to use drugs?

21   A.  The last time I was released, no.

22   Q.  Prior to that, did you serve time in Rikers Island?

23   A.  Yes, I did.

24   Q.  While you were in Rikers Island, did you engage in any

25   criminal behavior?

1  A.  Yes.  I sold crack and heroin.

2  Q.  Once you were released from Rikers, were you still using

3  drugs?

4  A.  Yes.

5  Q.  Were you arrested during this time?

6  A.  Yes.

7  Q.  Did you serve jail time?

8  A.  Yes.

9  Q.  Did you undergo a competency evaluation?

10  A.  Yes.  The judge sent me to Mid-Hudson for an evaluation for

11  my mental.

12  Q.  Did the evaluation determine that you were competent?

13  A.  Yes.

14  Q.  When was this that you were released from that stint?

15  A.  The last one was 2009.

16  Q.  Since then, have you continued to use or deal drugs?

17  A.  No.  I relapsed one time, but other than this case, no.

18  Q.  When was the one time that you relapsed?

19  A.  When my daughter's father died.

20  Q.  Since being arrested, have you pled guilty to your

21  involvement in the oxycodone conspiracy that you described

22  today?

23  A.  Yes, I did.

24  Q.  At the time of your plea, did you have an agreement with

25  the government?

Cb4soph1                                                Bowen - direct

1    A.  Yes, I did.

2    Q.  Was it an oral agreement or a written agreement?

3    A.  A written agreement.

4            MR. RICHMAN:  Permission to approach, your Honor?

5            THE COURT:  Yes.

6            MR. RICHMAN:  Thank you.

7    Q.  Ms. Bowen, I'm showing you what's been marked for

8    identification as Government Exhibit 1100.  Do you recognize

9    that document?

10   A.  Yes, I do.

11   Q.  How do you recognize that document?

12   A.  It's my plea agreement.

13           MR. RICHMAN:  Your Honor, the government offers

14   Government Exhibit 1100.

15           MR. KEHOE:  No objection, Judge.

16           THE COURT:  Received.

17           (Government's Exhibit 1100 received in evidence)

18   Q.  Directing your attention to the last page of that document,

19   is that your signature?

20   A.  Yes, it is.

21   Q.  Before you signed this document, did you review it with

22   your attorney?

23   A.  Yes, I did.

24   Q.  As part of this agreement, did you plead guilty to crimes?

25   A.  Yes, I did.

G64ascb1                              Bower - direct

1   Q.   What crimes did you plead guilty to?

2   A.   Conspiracy with oxycodone and filling out -- falsifying a

3   document.

4   Q.   In connection with the conspiracy to distribute oxycodone,

5   how many crimes did you plead guilty to?

6   A.   Also Medicaid fraud.

7   Q.   Briefly, can you tell us what made you guilty of I think

8   you termed it lying on documents.

9   A.   I didn't fill out the document correctly.

10  Q.   What was that in connection with?

11  A.   Food stamps.

12  Q.   Why did you plead guilty to these crimes?

13  A.   Because I'm guilty.

14  Q.   Have you been sentenced for these crimes?

15  A.   No, I haven't.

16  Q.   What is your understanding of the maximum sentence you face

17  as a result of your guilty plea?

18  A.   35 years.

19  Q.   When you were first arrested by federal agents in

20  connection with this case, what crime were you charged with?

21  A.   Conspiracy with oxycodone.

22  Q.   To your knowledge, how did the government learn about the

23  other crimes that you pled guilty to?

24  A.   I told them.

25  Q.   What is your understanding of your obligations under this

```
 1   cooperation agreement?

 2   A.  I sit down and meet with the agents, I testify, and I tell

 3   the truth.

 4   Q.  What is your understanding of what the government will do

 5   if you do all of the things required by you in this agreement?

 6   A.  They will give me a 5K letter.

 7   Q.  What is your understanding of the type of information that

 8   goes into a 5K letter?

 9   A.  All the negative and positive things I've done.

10   Q.  What is your understanding of who receives that letter?

11   A.  The judge.

12   Q.  What sentence do you hope to receive?

13   A.  I pray every night for probation.

14   Q.  If the government writes this letter, what is the maximum

15   sentence you can receive?

16   A.  35 years.

17   Q.  Do you know what you will be sentenced to?

18   A.  No, sir.

19   Q.  Were you promised any particular sentence?

20   A.  No, sir.

21   Q.  What is your understanding of what happens if you lie

22   today.

23   A.  They tear up my letter.

24   Q.  Is your cooperation agreement ripped up?

25   A.  Yes, it is.
```

 1    Q.  Can you write your guilty plea?

 2    A.  No, I can't.

 3    Q.  What is your understanding of what happens if your

 4    cooperation agreement gets ripped up?

 5    A.  Then I can't go under the guidelines.

 6    Q.  What is your understanding of whether the outcome of this

 7    trial has any effect on whether you receive that letter?

 8    A.  I has no effect.

 9              MR. RICHMAN:  One moment, your Honor?

10              THE COURT:  Yes.

11    Q.  Ms. Bowen, other than the people you talked about during

12    your testimony, do you know any other individuals that Mr.

13    Cabrera was using during the course of this oxycodone

14    distribution?

15    A.  Yes, I do.

16    Q.  Who are some those other individuals?

17    A.  John O'Foy, Jorge Perez, Will, and there are some that I

18    have seen but I don't know their names.

19              MR. RICHMAN:  No further questions, your Honor.

20              THE COURT:  Cross-examination.

21              MR. KEHOE:  Yes, your Honor.  If I might have just one

22    moment?

23              THE COURT:  Yes.

24    CROSS-EXAMINATION

25    BY MR. KEHOE:

1    Q.  Good morning, Ms. Bowen.  My name is Greg Kehoe.  I

2    represent Mr. Gohari.

3    A.  Good morning.

4             MR. KEHOE:  Judge, may I proceed?

5             THE COURT:  Yes.

6    Q.  Ms. Bowen, based on your testimony this morning, you have

7    been abused by quite a few men in your life emotionally and

8    physically.

9             MR. RICHMAN:  Objection, your Honor.

10            THE COURT:  Ground?

11            MR. RICHMAN:  Characterization.

12            THE COURT:  Overruled.

13   Q.  Is that right, Ms. Bowen?

14   A.  Just one.

15   Q.  Just one.  Did any of these men abuse you emotionally?

16            THE COURT:  Excuse me.  The answer was just one.  Then

17   you said did any of these men, which by its very wording means

18   more than one.

19   Q.  The person you're talking about, is that physical abuse?

20   A.  Yes, it is.

21   Q.  Did any of these men abuse you emotionally?

22            MR. RICHMAN:  Objection.

23            THE COURT:  You're doing it again.  It's one.

24            MR. KEHOE:  That was physically, Judge.

25            THE COURT:  Excuse me?

```
 1              MR. KEHOE:  If I can, I was talking about abuse
 2    physically.
 3              THE COURT:  I'm sorry.  Forgive me.  Let's start again
 4    on that last question.
 5    Q.  If at any point my question isn't clear, I apologize.  We
 6    talked this morning about some physical, physical, abuse you
 7    received, and it came from one man, is that right?
 8    A.  Yes.
 9    Q.  That was your former husband?
10    A.  My baby daddy.
11    Q.  Emotionally, did any of the men in your life abuse you
12    emotionally?
13    A.  I don't know.  What's your definition of emotionally?
14    Q.  We'll get into that a little bit later and maybe clarify it
15    with some questions down the line.  You yourself, ma'am, to
16    clarify a little bit, I think you told us you were getting some
17    psychiatric medicines.  Did you need those psychiatric
18    medicines?
19    A.  Yes, I do.
20    Q.  What to you suffer from?
21    A.  Bipolar.
22    Q.  Do you also have schizophrenia?
23    A.  Not that I know of.  I'm not sure.
24    Q.  With all due respect, did you tell the government that you
25    were suffering from a bipolar disorder?  Do you recall telling
```

1   the government that you suffer from a bipolar disorder and

2   schizophrenia?

3   A.  That's part of the bipolar.  That's part of, what you say,

4   bipolar disorder.  Manic depressive.

5   Q.  I'm sorry.  Schizophrenia is part of the bipolar disorder?

6   A.  What is the definition of schizophrenia?

7   Q.  Let me back up here if I can.  Do you recall telling the

8   government on June 1st of 2016, several months ago, that you

9   suffer from a bipolar disorder and schizophrenia?  Do you

10  recall telling them that?

11  A.  I recall saying bipolar disorder.

12  Q.  You don't recall schizophrenia?

13  A.  I really don't recall.

14          THE COURT:  Sustained.

15  Q.  The medications I think you were taking for this were

16  Abilify and Seroquel and Zoloft, is that right?

17  A.  Yes.

18  Q.  You continue to take those now?

19  A.  Yes.

20  Q.  Ma'am, because of some of these unfortunate psychiatric

21  conditions -- you are considered to be poor, right?  You get

22  paid in assistance from Social Security?

23  A.  Yes.

24  Q.  I think also in addition to aid from Social Security --

25  that includes food stamps, doesn't it?

1   A.   Yes.

2   Q.   That includes Medicaid?

3   A.   Yes.

4   Q.   I think there was a period of time when you were on welfare

5   as well?

6   A.   Yes.

7   Q.   You were considered to be disabled, were you not?

8   A.   On welfare?

9   Q.   Were you considered to be disability to enable you to get

10   welfare?

11   A.   No.

12   Q.   With regard to your drug use, were you in fact, with all

13   due respect, a former addict?

14   A.   Yes.

15   Q.   So you had that issue as well?

16   A.   Yes.

17   Q.   That included, I think, smoking crack cocaine?

18   A.   Yes, it did.

19   Q.   Now let us turn to some of the issues in this case, Ms.

20   Bowen, if we could, directly.  I think you told us that you met

21   Mr. Cabrera through the Bread & Life?

22   A.   Yes.

23   Q.   Mr. Cabrera wasn't working there, was he?

24   A.   No.

25   Q.   Bread & Life is a soup kitchen, isn't it?

1    A.  Food pantry.

2    Q.  I'm sorry?

3    A.  Food pantry.

4    Q.  It's a place for a the homeless and the poor to come in and

5    get a meal?

6    A.  Get a meal, learn how to work computers, get aid, have

7    classes, spiritual growth.

8    Q.  Just to help people out, right?

9    A.  Yes.

10   Q.  Usually the people that are there are unemployed and have

11   physical and mental problems, many of them?

12   A.  I can't say.  I don't know their deepest background.

13   Q.  It is through this that you met Cabrera, who first started

14   talking to you about his oxycodone scheme, is that right?

15   A.  Excuse me?  Rephrase that.

16   Q.  It was as a result of your meeting at the Bread & Life with

17   Cabrera that you were introduced into this oxycodone scheme,

18   right?

19   A.  No.  When I met him, there was no oxycodone scheme at the

20   time.

21   Q.  Did he come up with it thereafter, after that?

22   A.  A few years after, yes.

23   Q.  A few years after that?

24   A.  About a year and a half after, yes.

25   Q.  Was he dealing with Alberto Nazario at that point?

1   A.  Yes.

2   Q.  By the way, when did you meet Cabrera?

3   A.  I don't know the exact date.

4   Q.  But it was two years prior to getting involved in this

5   oxycodone scheme?

6   A.  I'm not sure.  I think so.  Not sure.

7   Q.  He offered you this participation where he paid you for

8   going to doctors, right?

9   A.  Yes.

10  Q.  Your role was to go to the doctor and get an oxycodone

11  prescription and give that oxycodone prescription to Cabrera?

12  A.  Correct, or anybody that he sent with me.

13  Q.  Who did he send with you?  Did he come with you sometimes?

14  A.  Yes, he dropped me off, yes.

15  Q.  Who else came with you?

16  A.  Will came with me, Alberto came with me, Robert came with

17  me.

18  Q.  That would be Alberto Nazario, is that right?

19  A.  Correct.

20  Q.  The Robert is Robert Hespeth?

21  A.  Correct.

22  Q.  That's Mr. Cabrera's nephew?

23  A.  Correct.

24  Q.  I think you told us that he would pay you, Cabrera, when

25  you gave him the prescription, he would pay you a hundred

1  dollars, $200, $300?

2  A.  Yes.

3  Q.  This was, what, for 90 30 mg pills for a month?

4  A.  It was different amounts.  Sometimes 60.

5  Q.  When you got the 90, you sold those to him too?

6  A.  Yes.

7  Q.  Did he tell you for the 90 30 mg pills he was sometimes

8  making $2700 on that?

9  A.  No.

10  Q.  Did he tell you that he sometimes made up to several

11  thousand dollars based on that?

12  A.  No.

13  Q.  At the time this was going on, he was in fact giving you

14  somewhere between 100 and $200, but you don't know how much he

15  was selling it for, is that accurate?

16  A.  That's accurate.

17  Q.  And he never told you?

18  A.  He never told me the exact amount, no.

19  Q.  You noted in your direct examination that Cabrera told you

20  that he wasn't giving you more money because he was paying

21  Danny, is that right?

22  A.  Yes.

23  Q.  When did he tell you that?

24  A.  Will had came to me and was telling me about how his cousin

25  said that we was getting ripped off, we could get more money.

1    And I asked Cabrera about it.

2    Q.   Let me get this.  Stop me if I'm wrong.  Will said to you

3    that Cabrera was ripping you off and that you could get more

4    money?

5    A.   Ripping us off and we could get more money.

6    Q.   Ripping us off and you could get more money.  You asked

7    Cabrera about it?

8    A.   Right.

9    Q.   He told you that he had to pay off Danny Gohari?

10   A.   Yes, he did.

11   Q.   But he didn't tell you how much he was paying Danny Gohari?

12   A.   No.

13   Q.   Did he tell you how often he was paying Danny Gohari?

14   A.   No.  Let me rephrase that.  He did say every time he went

15   to the pharmacy he had to pay Danny.

16   Q.   So every time he went to the pharmacy, he had to pay off

17   Danny Gohari?

18   A.   Yes.

19   Q.   That came from Cabrera?

20   A.   Yes.

21   Q.   You sold other medications to Cabrera, like your HIV

22   medication, right?

23   A.   Yes.

24   Q.   I think you noted for us that during this period of time

25   you might have had other drugs in your system, is that right?

1   A.  Back then?

2   Q.  When you were doing all this --

3   A.  No, I didn't.  Other than my psych meds, no.

4   Q.  But it is a fact with regard to some of the HIV

5   prescriptions that you got someone else with HIV to give you

6   their blood to take to a doctor, didn't they?

7   A.  Not in the beginning.

8   Q.  It did happen, did it not?

9   A.  At the end.

10  Q.  Who gave you this HIV blood?

11  A.  The name was Karen.

12  Q.  You took her HIV blood into the doctor to get an HIV

13  script?

14  A.  No, that's not how it went.

15  Q.  Let's back up a second.  When you were going in to get an

16  HIV prescription from a doctor, you went in there with blood

17  from a person who had HIV, did you not?

18  A.  Yes.  It was Karen's blood.

19  Q.  With Karen's blood, the doctor wrote you a script for HIV?

20  A.  He was already writing me the scripts.

21  Q.  After you had the blood, he wrote you a script, did he not?

22  A.  Yes.

23  Q.  Going back to Mr. Cabrera, I think you talked to us a bit

24  about Tonya Freeman and Stefone Holliman.

25          MR. KEHOE:  May I have one moment, Judge?

1   Q.  You talked to Stefone Holliman about getting oxycodone and

2   getting scripts that you could sell thereafter, didn't you?

3   A.  No.

4   Q.  Tell me about that.

5   A.  Stefone Holliman was already getting oxycodones.

6   Q.  Did you say that you could get him money for those

7   oxycodone pills?

8   A.  He was already getting money for them.

9   Q.  Was he getting it from Cabrera?

10  A.  No.  He was already working with a different gentleman.

11  Q.  Who was that different gentleman?

12  A.  I don't know him.

13  Q.  Was that also true of his girlfriend Tonya Freeman?

14  A.  Yes.

15  Q.  You introduced Tonya Freeman and Stefone Holliman to

16  Cabrera to get them involved in his oxycodone scheme, right?

17  A.  They had asked me did I know somebody that could fill their

18  scripts, and I introduced them to Cabrera.

19  Q.  Then for a period of time you were getting paid by Cabrera

20  for having brought Stefone Holliman and Tonya Freeman to him,

21  did you not?

22  A.  No.  Cabrera was giving me the money to give them, and I

23  was taking some of it.

24  Q.  You were just keeping it as payment, in your mind, as

25  payment for bringing them together?

 1    A.   No.   That was for running around.

 2    Q.   How much was Cabrera paying to Tonya Freeman and Stefone

 3    Holliman?

 4    A.   I think he was giving them like 2 or $300.   I don't

 5    remember.

 6    Q.   Total or each?

 7    A.   Each.

 8    Q.   These were for 90 30 mg tablets?

 9    A.   I really never looked.   I'm not sure.

10    Q.   During this period of time you considered Mr. Cabrera to be

11    a friend, didn't you?

12    A.   Yes.

13    Q.   He ultimately cut you out of direct transactions with

14    Holliman and Tonya Freeman, didn't he?

15    A.   Not that I know of.

16    Q.   You introduced Holliman and Freeman to Cabrera.   You were

17    getting the money from Cabrera to pay Holliman and Freeman,

18    right?

19    A.   Yes.

20    Q.   Shortly thereafter Cabrera began to pay them directly,

21    didn't he?

22    A.   I didn't know that.

23    Q.   Do you recall telling the government on April 14, 2016,

24    that a few months after introducing Cabrera, Holliman, and

25    Freeman, he cut you out?

1    A.  No, I don't remember saying that.

2    Q.  You don't recall saying that?

3    A.  He didn't cut me out.  They stopped giving me the scripts.

4    Q.  I'm looking at 3503-1.

5         MR. KEHOE:  May I approach, Judge?

6         THE COURT:  Yes.

7    Q.  Will you take a look at this document.  Just read that

8    bottom paragraph, please.  Don't tell us what it says.  I'm

9    going to ask you if that refreshes your recollection as to what

10   you told the FBI.

11   A.  It says Bowen was cut out.  It didn't say by whom.

12   Q.  Who cut you out?

13   A.  Tonya and Stefone.

14   Q.  Staying with Mr. Cabrera, is it not a fact that Mr.

15   Cabrera, I think you told us you were taking Abilify and

16   Seroquel, is that right?  And those are psychiatric

17   medications?

18   A.  They was given to me by my psychiatrist, yes.

19   Q.  Did Mr. Cabrera sell those?  Did he sell your Abilify?

20   A.  Not when I first met him.

21   Q.  He took your Abilify, which you needed, and he sold them?

22   A.  When I first met him, yes.

23   Q.  Did he tell you that he did that?

24   A.  Excuse me?

25   Q.  Did he tell you that he was selling your Abilify that you

1    needed?

2    A.   Yes.   That's how I met him.

3    Q.   No, no.   When he took your Abilify and sold it, did he tell

4    you that he was doing it?

5    A.   When I first met him, he didn't take them.   I gave it to

6    him.   That's how I met him.

7    Q.   Thereafter, did he take them if you and sell them?

8    A.   After that, no, sir.

9    Q.   He paid you, what, $50 for those?

10   A.   When I first met him.

11   Q.   Staying with Mr. Cabrera, I believe you testified you

12   thought he was a friend at this point?

13   A.   Yes.

14   Q.   Do you recall telling the FBI that Mr. Cabrera preys on

15   people?

16   A.   Yes.

17   Q.   When you say he prays on people, he takes advantage of

18   people, doesn't he?

19   A.   That's not what I mean when I say he preys on people.

20   Q.   When you say he preys on people, what do you mean?

21   A.   Basically, the ones that he deals with is on drugs, so he

22   trades them drugs for their prescriptions.   So he uses drugs to

23   pay them instead of money.

24                (Continued on next page)

25

1   BY MR. KEHOE:

2   Q.  So, when Mr. Cabrera knows that somebody, for instance, is

3   smoking crack cocaine, he will take their prescriptions and pay

4   them in crack cocaine?

5   A.  Well, basically what happens is they will come to him and

6   ask him for some drugs and tell him take the money from the

7   prescriptions.

8   Q.  Were these people who were asking him for drugs, were they

9   addicts?

10  A.  Yes.

11  Q.  And who were these people?

12  A.  I really don't know their names.  I really don't know their

13  names.  I can't really say.  I don't know their names.

14  Q.  You mentioned I think about knowing their names.  If we get

15  the scenario correct, when you say he preyed on people, he was

16  doing business with drug addicts, was he not, and then taking

17  their scripts and paying drug addicts with crack or heroin or

18  whatever; is that right?

19  A.  Say that again.

20  Q.  Mr. Cabrera, when you said that he preys on people, he has

21  a dealing with, for instance, a crack user, and he gets the

22  crack user to sell the prescriptions to him in return for crack

23  cocaine.

24  A.  No.

25          MR. RICHMAN:  Objection, your Honor.  Form.

```
 1              THE COURT:  Sustained.
 2   Q.  Well, do you recall any -- do you recall telling the -- let
 3   me withdraw that question.
 4              Did you ever observe or know of Mr. Cabrera
 5   threatening any of these patients that were part of the ring?
 6   A.  I've heard about it, yeah.
 7   Q.  And did you hear that from -- tell us what victims were
 8   threatened.
 9              MR. RICHMAN:  Objection, your Honor.  It calls for
10   hearsay.
11              THE COURT:  Sustained.
12   Q.  Well, do you know of a situation -- do you recall telling
13   the F.B.I. --
14              THE COURT:  No, no, no, no.  Whether or not it was
15   stated in some other forum does not allow in hearsay.
16              MR. KEHOE:  I understand, Judge.
17   Q.  Now, you talked about some of the patients that were part
18   of this ring.  I believe counsel asked you about a series of
19   them, and I think one of them you included was George Nazario?
20   A.  Yes.
21   Q.  And I think another one was Mr. George or Jorge Tirado?
22   A.  I didn't say that.
23   Q.  But do you know Jorge Tirado?
24   A.  No.
25   Q.  Well, Mr. Nazario, do you know -- just staying with
```

1    Mr. Tirado --

2    A.  I don't know him, Tirado.

3    Q.  That's fine.  And if I can just ask, you were asked some

4    questions about a home health aide, whether or not Cabrera was

5    a home health aide person.  Do you recall that?

6    A.  Yes.

7    Q.  And you said no.

8    A.  Yes.

9    Q.  But you also told us that you overheard some conversations

10   on the telephone between Danny Gohari and Mr. Cabrera, did you

11   not?

12   A.  Yes.

13   Q.  Did you ever hear Cabrera talking on the phone to a doctor

14   or a medical facility that he was taking care of George Tirado

15   at a psych facility?

16   A.  No.

17   Q.  Did you ever hear Mr. Cabrera telling Mr. Gohari that he

18   was in fact at a psych evaluation for George Tirado?

19            MR. RICHMAN:  Objection.

20   A.  I'm not even sure who George Tirado is.

21            THE COURT:  Are you withdrawing the objection?

22            MR. RICHMAN:  Yes, I will withdraw the objection.

23   Thank you.

24   Q.  Did you ever hear Mr. Cabrera ever telling Mr. Gohari that

25   he was at a doctor's appointment -- any doctor's appointment --

     1    with anyone?

     2    A.  No.

     3    Q.  Now, did you know Ben Darin?

     4    A.  No.

     5    Q.  And you didn't know Mr. Tirado.

     6    A.  No.

     7    Q.  So, you were never part of any conversations or overheard

     8    any conversations about those individuals between Mr. Gohari

     9    and Mr. Cabrera.

    10    A.  No.

    11    Q.  Now, this entire scheme, the person that was in control or

    12    was running the scheme was Mr. Cabrera, wasn't it?

    13    A.  Correct.

    14    Q.  And I think you just -- correct me if I'm wrong, but I

    15    think you told us in response to some questions by counsel that

    16    you had a car accident in 2014.

    17    A.  Yes.

    18    Q.  And then you began to get oxycodone from another doctor as

    19    a result of that.

    20    A.  Yes.

    21    Q.  And who was that doctor?

    22    A.  Dr. Una.

    23    Q.  By the way, you also talked about Dr. White at one point.

    24    Do you recall that?

    25    A.  Yes.

1  Q.  And did Dr. White ultimately throw you out of the office or

2  throw other people from Cabrera's scheme out of the office

3  because he suspected what you were doing?

4  A.  No, not that I know of.  That's not why he threw me out.

5  That's not why he discontinued me.

6  Q.  Well, Dr. White discontinued you, didn't he?

7  A.  Yes.

8  Q.  Now, the whole idea of bringing the urine in with oxycodone

9  remnants in there, that was Mr. Cabrera's idea, wasn't it?

10  A.  Yes.

11  Q.  And that initially started by shaving the oxycodone pills

12  into the urine?

13  A.  Yes.

14  Q.  And that again was Mr. Cabrera's idea?

15  A.  Yes.

16  Q.  And a doctor was suspicious of that when it had happened,

17  because the oxycodone level was too high; is that right?

18  A.  No.

19        THE COURT:  I'm sorry.  I heard a sound, but I

20  didn't --

21        MR. RICHMAN:  She answered.  I was going to object

22  because it calls for hearsay, but the answer came in.

23        THE COURT:  All right.  When there is an objection,

24  you need to wait a minute so I can rule on the objection.  OK?

25        THE WITNESS:  OK.

GR47GOH2                    Bowen - cross

 1   Q.  Ms. Bowen, let's just step back.  The urine that was being

 2   used with the oxycodone to take into the doctor's office was

 3   Mr. Cabrera's urine, wasn't it?

 4   A.  Yes, it was.

 5   Q.  And he was the one who gave it to you, either himself or

 6   through Mr. Hespeth; is that correct?

 7   A.  That's correct.

 8   Q.  And you had nothing to do with that part of the scheme, did

 9   you?

10   A.  The urine, no.

11   Q.  Now, at one point I think you noted in response to some

12   questions by counsel concerning pain gels, and you said that

13   Cabrera told you that Danny wanted you to get pain gels?

14   A.  Yes.

15   Q.  And this was after your car accident, right?

16   A.  No, beforehand.

17   Q.  Well, you in fact got pain gels on several occasions,

18   didn't you?

19   A.  Before the car accident.

20   Q.  And in fact the pain gels that you had, that you used for

21   your back, do you remember you were using the pain gel for your

22   back?

23   A.  When I first got them, no.

24   Q.  Do you recall using a pain gel for your back?

25   A.  Yes.

1    Q.   OK.  And it worked, didn't it?

2    A.   Yes.

3    Q.   So, the suggestion was if you had pain in the back, to get

4    pain gel to alleviate that pain, it was a good suggestion,

5    wasn't it?

6    A.   In the beginning my back wasn't hurting.

7    Q.   You got pain gel, right?  You had pain.  You put it on your

8    back, right?

9    A.   When I first got the pain gel, I had no pain.

10   Q.   When you got the pain gel, you put it on your back; it

11   alleviated the pain, didn't it?

12   A.   Yes.

13   Q.   Now, I think you noted again in response to questions by

14   cocounsel -- by counsel for the government -- that you

15   understood that Mr. Gohari wanted some other medications

16   besides oxycodone; is that right?

17   A.   Yes.

18   Q.   You didn't speak to Mr. Gohari about that, did you?

19   A.   Cabrera told me.

20   Q.   Cabrera was the person that told you, right?

21   A.   Cabrera told me that that's what Danny wanted, yes.

22   Q.   And this is Cabrera who set up the doctor appointments,

23   right?

24   A.   Yes.

25   Q.   Who gave you the urine, right?

1   A.  Yes.

2   Q.  Took you to the doctors appointments; is that right?

3   A.  Yes, sometimes.

4   Q.  Or Mr. Hespeth or Mr. Nazario, right?

5   A.  Yes.

6   Q.  And he is also the person that told you that Mr. Gohari

7   wanted these other prescriptions.

8   A.  Yes.

9   Q.  Now, he also told you that -- did he also tell you that

10  Mr. Gohari would tell you what prescriptions to get?

11  A.  He said he told him to tell us what prescriptions he

12  wanted.

13  Q.  Now, again, with regard to what prescriptions there were to

14  get, you didn't talk to Mr. Gohari about that, did you?

15  A.  No, I didn't.

16  Q.  And Mr. Gohari never told you to get certain prescriptions,

17  did he?

18  A.  No, he didn't.

19  Q.  And, in fact, putting Mr. Cabrera aside, you don't know of

20  Mr. Gohari telling any of these patients in this scheme what

21  prescriptions to get, do you?

22  A.  That's correct.

23  Q.  Now, I think you also said that Mr. -- let me just shift

24  gears a little bit about going into the pharmacy now, if we

25  can.  And you recall a few questions by counsel for the

1    government concerning going to the pharmacy, into the pharmacy?

2    Do you recall those questions?

3    A.   I recall him asking me some questions, yes.

4    Q.   That's all right.  It's just a topic area; I just want to

5    make that change.

6    A.   OK.

7    Q.   Now, I think you said in response to questions by counsel,

8    that Mr. Cabrera said you weren't allowed to go into the

9    pharmacy.

10   A.   Yes.

11   Q.   And I think it was that you weren't supposed to know things

12   about Gohari and the pharmacy?

13   A.   That's correct.

14   Q.   Well, that's again information that you got from Cabrera,

15   isn't it?

16   A.   Yes.

17   Q.   And you never got that information from Mr. Gohari.

18   A.   No.

19   Q.   Now, did you not go into the pharmacy on a couple of

20   occasions?

21   A.   Danny's pharmacy?

22   Q.   Yes.

23   A.   Never.

24   Q.   Well, you did in fact see Mr. Gohari.

25   A.   Yes, I did.

 1   Q.   And again Mr. Gohari never in fact said to you don't come

 2   to the pharmacy, don't do this or don't do that, did he?

 3   A.   He didn't see me.

 4   Q.   Excuse me?

 5   A.   He didn't see me.

 6   Q.   Now, Cabrera, did he also tell you that the only person

 7   Gohari wants to communicate is with Cabrera?

 8   A.   Robert was allowed to drop it off if Cabrera called Danny

 9   first.

10   Q.   So Cabrera told you that he had to call Danny first.

11   A.   Robert told me.

12   Q.   OK.   So, Robert told you that he had to call Danny first.

13   A.   Yes, Robert was waiting on Cabrera to call Danny so he

14   could drop off the prescriptions.

15   Q.   Again, this information about whether or not this

16   communications with Mr. Cabrera, it is either Cabrera or

17   Hespeth who told you that Gohari, Danny Gohari, only wanted to

18   communicate with either of those two, right?

19   A.   Correct.

20   Q.   And, again, that didn't come from Danny Gohari, did it?

21   A.   Cabrera said it did.

22   Q.   Right.   Just to take this one step further, I think you

23   noted for us in response to questions by counsel, that the

24   pharmacy called you on one occasion?

25   A.   Yes.   A lady called me and told me that I had prescriptions

1   that was ready.  And I asked her for the address, and she told

2   me, and I said thank you.

3   Q.  Well, and that was under Sheri Bowen.

4   A.  Yes.

5   Q.  And there was no problem talking or communicating with this

6   person in the pharmacy, was there?

7   A.  I don't understand.

8   Q.  Well, you said this lady called you from Mr. Gohari's

9   pharmacy to tell you that you had a script waiting.

10  A.  That I had --

11  Q.  That you had a prescription waiting.

12  A.  Prescriptions ready.

13  Q.  And she never told you, for instance, this is the last

14  phone call you're going to get from this pharmacy, did she?

15  A.  No.

16  Q.  This was a normal conversation between a pharmacist filling

17  one of your prescriptions and calling you as a patient,

18  correct?

19          MR. RICHMAN:  Objection, your Honor.

20          THE COURT:  Sustained.

21  Q.  Well, sir -- ma'am -- excuse me.  When you communicated

22  with this woman, did she tell you that Cabrera should call the

23  pharmacy?

24  A.  No.

25  Q.  Did she tell you that Hespeth should call the pharmacy?

 1    A.   No.

 2    Q.   And in fact you told Cabrera about this conversation,

 3    didn't you?

 4    A.   I told her -- I told Cabrera that Danny called.

 5    Q.   And was it Danny calling?

 6    A.   It was his pharmacist; it was his pharmacy that called.

 7    Q.   But you in fact told Cabrera about it, didn't you?

 8    A.   Yes.

 9    Q.   And you wanted to make sure that the person that was in

10    charge of this scheme knew that the pharmacy called you, right?

11    A.   No.  The reason why I told him about it is because my psych

12    medication has a refill, and that mean he did not pick up my

13    refill.  And since I couldn't go to the pharmacy, he had to go

14    get it.

15    Q.   Now, did you ever talk to Mr. Gohari on the phone?

16    A.   Yes, I called him and told him that I needed my

17    prescription printout sent to the doctor's office.

18    Q.   And when you talked to him, Ms. Bowen, did Mr. Gohari --

19    and that's Danny Gohari, the gentleman that's at the table

20    there, right --

21    A.   Yes.

22    Q.   -- did he tell you not to call the pharmacy?

23    A.   Well, from what my understanding is, Cabrera called him

24    first.

25    Q.   Did he tell you not to call the pharmacy?

 1  A.  No.

 2  Q.  Did he tell you that the only person he dealt with was

 3  Cabrera?

 4  A.  No.

 5  Q.  Did he tell you that the only person he wanted to deal with

 6  was Cabrera?

 7  A.  No.

 8  Q.  So, in fact when you called him to ask for this

 9  information, he got the information and sent it to the doctor's

10  office, didn't he?

11  A.  Yes.

12  Q.  Now, I think you were talking about coming to the pharmacy,

13  and Cabrera brought you to the pharmacy.

14  A.  Correct.

15  Q.  And he brought you to the pharmacy and you sat in the car,

16  didn't you?

17  A.  Correct.

18  Q.  And he brought you to the pharmacy because if the

19  pharmacist had some questions, you would have to come in.

20  A.  No, I was riding with him because we was going to have sex

21  afterwards.

22  Q.  Oh, you were riding with him just because you were going to

23  have sex afterwards.

24  A.  Yes, we were going somewhere to do something afterwards.

25  Q.  Now, when Cabrera was picking up your medication from

 1   Mr. Gohari's pharmacy, the psychiatric medication, etc., he was

 2   in fact delivering it to you, wasn't he?

 3   A.  Hespeth was.

 4   Q.  Excuse me?

 5   A.  Robert would give it to me.

 6   Q.  I stand corrected.  When it was picked up by either Hespeth

 7   or by Cabrera, they would in fact deliver it to you.

 8   A.  Yes, they would.

 9   Q.  And this was in fact medication that you needed.

10   A.  Yes, it was.

11   Q.  And these were the prescriptions that were filled at

12   Mr. Gohari's pharmacy, right?

13   A.  Yes.

14   Q.  And those are the medications that you still get?

15   A.  Yes.

16   Q.  I mean I think you mentioned that you get Seroquel was one

17   of the medications you still get?

18   A.  Yes.

19   Q.  And you continue to get it?

20   A.  From a different pharmacist.

21   Q.  I understand, but that you were getting it from

22   Mr. Gohari's pharmacy, and after this meeting that Cabrera had

23   with all of you, you got it from another pharmacy, right?

24   A.  Yes.

25   Q.  And did there come a time when that Seroquel went generic?

1   A.  Years ago.

2   Q.  OK.  But you continued to receive -- even after it went

3   generic, you continued to receive it from Mr. Gohari's

4   pharmacy, right?

5   A.  Yes.

6   Q.  Now, after this meeting -- by the way, who was at this

7   meeting that Cabrera had where he told you that the Hespeth

8   situation had come up and that Danny wasn't going to be able to

9   deal with you anymore?

10  A.  It was Robert, Will, Cabrera and myself was in the truck.

11  Well, they was in the truck and I was leaning on it.

12  Q.  And this was a meeting that was set up by Cabrera?

13  A.  Robert had called me and told me that Cabrera wanted to

14  talk to me.

15  Q.  OK.  But the meeting -- based on that you concluded that

16  this was a meeting that was set up by Cabrera.

17  A.  Yes, a meeting between me and Cabrera, yes.

18  Q.  And after that meeting, Cabrera just moved his oxycodone

19  ring to another pharmacy, didn't he?

20  A.  Actually before the meeting.  I'm not sure.  I can't answer

21  that.  I'm not sure.

22  Q.  Well, after Mr. Gohari said -- after this meeting, you and

23  Cabrera and Hespeth continued doing the oxycodone trading in

24  another pharmacy, didn't you?

25  A.  I'm not sure, because Cabrera dealt with it.  I think he

1    did.  Yes, I think so.

2    Q.  And that was a Duane Reade pharmacy, wasn't it?

3    A.  No.

4    Q.  Well, what pharmacy was it?

5    A.  I don't know.

6    Q.  And who was the pharmacist that was part of this

7    transaction in the second pharmacy?

8    A.  I don't know.

9    Q.  Well, did you go to that pharmacy?

10            MR. RICHMAN:  Objection, your Honor.

11            THE COURT:  Sustained.

12   Q.  Well, you in fact pleaded guilty, ma'am, to an oxycodone

13   transaction going into 2016, and Mr. Gohari stopped dealing

14   with you.  Who was it that you were doing this oxycodone

15   transaction into 2016?

16            MR. RICHMAN:  Objection, your Honor.

17            THE COURT:  Someone remind me.  I thought it was a

18   conspiracy count.

19            MR. RICHMAN:  It is.

20            THE COURT:  That's not the same as a transaction,

21   unless there is a specific transaction referred to.

22   Q.  Well, a conspiracy continued into 2016, did it not?

23   A.  Yes.

24   Q.  OK.  And you and Cabrera and Hespeth and others were

25   dealing with another pharmacy to get your oxycodone.

1          MR. RICHMAN:  Objection, your Honor.

2          MR. KEHOE:  Your Honor, this is part of the conspiracy

3   charged by the government.

4          THE COURT:  No, I'm not sure it is.  I'm not sure it

5   matters whether it is or not.  I think it is fair game to

6   inquire about other dealings she may have had at that time, so

7   you may inquire about that, regardless of whether it fits

8   within the charge or not.

9          MR. KEHOE:  Yes, your Honor.

10  Q.  Ma'am, we are talking about the other pharmacy that you in

11  fact began to deal with with Mr. Cabrera after you stopped

12  dealing or getting any prescriptions filled at Mr. Gohari's

13  pharmacy.  What was that other pharmacy?

14  A.  I don't know.  The only pharmacist that I ever really heard

15  about was Danny's.

16  Q.  Well, after you stopped with Danny, you continued to get

17  oxycodone, and Cabrera was taking it to another pharmacy to get

18  filled, wasn't he?

19  A.  Towards the end I wasn't really close to Cabrera as for

20  knowing what he was doing.

21  Q.  Ma'am, it's accurate to say -- well, it's true, is it not,

22  that all the information that you have about transactions with

23  Mr. Gohari, discussions with Mr. Gohari, what Mr. Gohari wanted

24  to do, what he didn't want, that all came from Mr. Cabrera,

25  didn't it?

```
 1    A.  That's correct.

 2              MR. KEHOE:  May I have one moment, Judge?

 3              THE COURT:  Yes.

 4              MR. KEHOE:  Thank you very much, Ms. Bowen.  Thank you

 5    very much.  I have no further questions.

 6              THE COURT:  Any redirect?

 7              MR. RICHMAN:  Just one moment, please, your Honor.

 8              No redirect, your Honor.  Thank you.

 9              THE COURT:  Thank you very much.  You may step down.

10    Please call your next witness.

11              MS. ESTES:  The next witness we will call is Maura

12    Hayes-Chaffe.

13              MR. KEHOE:  May I just discuss this witness at side

14    bar, your Honor?

15              THE COURT:  Yes.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25
```

1          (At the side bar)

2          MR. KEHOE:  If I may, Judge, this might be an

3     appropriate time for the issue concerning Dr. Naveed and not

4     naming him as a coconspirator and not telling us that he was a

5     coconspirator and not giving 404(b) notice.

6          This witness is going to talk about transactions that

7     took place in Dr. Naveed's office involving HIV and other

8     issues that have nothing to do with this conspiracy.  And they

9     also have a witness that's getting on the stand that has no

10    personal knowledge concerning the validity or invalidity of any

11    of the prescriptions written by Dr. Naveed.

12         THE COURT:  Well, all right, let me find out.  What's

13    this witness basically going to say?

14         MS. ESTES:  The witness will summarize transactions

15    from Dr. Naveed's office that were dispensed at the defendant's

16    pharmacy.  From 2010 to 2012 there were millions of dollars of

17    HIV transactions.

18         THE COURT:  This is the summary witness that we went

19    through before.

20         MS. ESTES:  The summary witness.

21         THE COURT:  And I already ruled on what could and

22    could not be presented by this witness and essentially that she

23    was a summary witness of voluminous documents, so I don't

24    understand the objection.

25         MR. KEHOE:  The objection is that this involves

1  transactions that have nothing to do with this case.  We have

2  thousands of transactions that the government wants to put in

3  involving hundreds and hundreds of patients.  Five of those

4  patients were patients that are in this oxycodone conspiracy.

5          What the government is seeking to do is to put these

6  prescriptions in concerning Dr. Naveed without one shred of

7  evidence that these prescriptions were improper.

8          THE COURT:  All right.  So, remind me more

9  particularly what is this witness going to summarize?

10          MS. ESTES:  So, from 2010 to 2012 we have a list of

11  all the transactions, Dr. Ahmad prescriptions that were

12  dispensed at the defendant's pharmacy.  In 2011, over 75

13  percent of the defendant's Medicaid billings were from

14  Dr. Ahmad.

15          Now, the defendant's entire defense in this case is

16  that he was acting in good faith.  We believe we have shown

17  that he knows that Dr. Ahmad was a dirty doctor, because we

18  have had evidence of the Eugene Seaman transactions yesterday,

19  where the expert testified that these were duplicative, that

20  there were all of these problems with the transactions.  We

21  have presented evidence the defendant was handing out business

22  cards at the doctor's office, which has been described as a

23  place where people were handing out scripts left and right.

24  And we have also presented evidence that the defendant directly

25  told Cabrera to send his patients to Dr. Ahmad.

1            THE COURT:  So, I think defense counsel is right, this

2    raises the issue that I flagged.  So, what I will do is give

3    the jury an early break, and we will take that up before we

4    call the next witness.

5            MR. KEHOE:  Thank you, your Honor.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Ladies and gentleman, anticipating, with

3    the great foresight that I have that Juror 11 wanted a break,

4    we are going to give you your midmorning break now for about 20

5    minutes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court; jury not present)

 2          THE COURT:  Please be seated.  So, here is my

 3     recollection of the situation, and then I will hear from

 4     counsel.

 5          The government was directed to list all the

 6     coconspirators, and at some point they did so, and Dr. Ahmad

 7     was not listed as a coconspirator.  Do I have that right?

 8          MR. KEHOE:  Yes, your Honor.  Your Honor, you did

 9     direct us to list the coconspirators.  We sent a letter on July

10     8 disclosing the names of the people who we presented at trial

11     that were working directly with Cabrera.

12          In our opposition to the motion for a bill of

13     particulars, we also hereby disclose that at trial the

14     government will offer evidence regarding fraudulently obtained

15     HIV drugs which were prescribed by Dr. Naveed Ahmad and

16     dispensed at Afam.

17          THE COURT:  That's very interesting.  Let me see that.

18          This, however, was in your opposition to their request

19     for a bill of particulars.

20          MS. ESTES:  Yes, your Honor.

21          THE COURT:  All right.  So, then I ordered the bill of

22     particulars in respect to the names of the coconspirators.  And

23     who were listed as the coconspirators?

24          MS. ESTES:  I'm not sure your Honor actually ordered

25     it.  We have never prepared an actual bill of particulars.
```

```
 1              THE COURT:  Is that right?  Well, now my recollection

 2    needs to be refreshed.  Normally -- maybe I just did it orally.

 3    I mean my normal practice is to require the disclosure of the

 4    names of coconspirators.  And I recall that in the motion in

 5    limine there was an assertion by the defense that Dr. Ahmad had

 6    not been listed as a coconspirator, so ...

 7              MS. ESTES:  The disclosures we made are those listed

 8    in the document.  We sent that letter --

 9              THE COURT:  Well, you better tell me right now who are

10    the coconspirators.

11              MR. KEHOE:  I can give you a list, Judge, what they

12    gave us.

13              THE COURT:  Well, let me see.  Was this in writing?

14              MR. KEHOE:  It was actually two transactions -- two

15    e-mails.

16              THE COURT:  Two transactions constituting a

17    conspiracy?  Go ahead.

18              MR. KEHOE:  Your Honor, Ms. Hamarati is looking for

19    the actual documents.  We cited them in our motion papers, but

20    I can tell you the name --

21              THE COURT:  But I want to see them.

22              MR. KEHOE:  OK.

23              MS. ESTES:  Your Honor, I would just note that I think

24    our position -- we wavered a little -- but that he is not

25    necessarily a coconspirator but it's still relevant.
```

 1               THE COURT:  No, no, relevance is undisputed.  I have

 2      already concluded that even at the side bar.  If you are saying

 3      he is a coconspirator, then the question was whether you misled

 4      the counsel into believing he was not, and then what follows

 5      from that, if anything.

 6               If you are saying he is a coconspirator, then the

 7      question is whether you have changed your position.  And I want

 8      to find out what the state of play was previously, but the

 9      first question I have -- which you need to answer

10      definitively -- is are you claiming now he is a coconspirator,

11      yes or no?

12               MS. ESTES:  Your Honor, we are not going to argue in

13      closing that he is a coconspirator.

14               THE COURT:  OK.  So, who are you going to say?  Well,

15      let me put you on notice that when I charge the jury, I'm going

16      to want a list of who you say are the coconspirators.  And I

17      also think, since he will not be listed, some of the fears that

18      defense counsel expressed at side bar earlier are totally

19      immaterial, because there will be no claim that he is a

20      coconspirator.

21               Now, that doesn't mean that transactions involving him

22      are not relevant.  But before we get to that, the key question

23      is -- the government says they're not going to say he's a

24      coconspirator.  Therefore, if the defense assertion is that

25      they were led to believe he's not a coconspirator, they weren't

1    misled, because they are still saying he is not a

2    coconspirator.

3          So, now the question becomes if he is not a

4    coconspirator, what transactions involving him, if any, are

5    relevant to this case.

6          So, the ones that were referred to when this came up

7    earlier this morning at side bar were of the form I was

8    directed by Cabrera -- and I can't remember in that case or

9    only in the case of the other doctor did she say it -- that

10   Cabrera said Danny told me to do it -- but, in any event, that

11   would be a reasonable inference either way -- to go to this

12   particular doctor.  The clear implication being that this is a

13   doctor who we are confident we can get to sign off on these

14   prescriptions.  That doesn't make the doctor a coconspirator,

15   but it makes the fact that they went to him relevant, because

16   the suggestion is this is not someone who the ultimate

17   customers are voluntarily or of their own medical reasons going

18   to this particular doctor; it's someone they are, if you will,

19   artificially directed to because the conspirators want them to

20   go to that particular person.  And that seems to me highly

21   relevant.  The jury, of course, may disagree with any of those

22   inferences, and defense counsel is free to argue against those

23   inferences, but that seems to me highly relevant.

24          So, before we get to the witness who is about to come

25   up, let me stop there and hear anything defense counsel wants

```
 1    to say about what I've said so far.

 2            MR. KEHOE:  Yes, your Honor, several issues.  The

 3    primary issue -- well, the first issue, not the primary,

 4    because they are all extremely important -- in the August 4

 5    hearing counsel for government said We believe that the only

 6    relevant Ahmad patient files are going to be the ones related

 7    to the 20 coconspirators, the members of this crew that were

 8    going to the pharmacy and getting their prescriptions filled

 9    there.

10            Now, we have this witness coming up with literally

11    hundreds and hundreds of patients, with thousands of scripts,

12    and of those --

13            THE COURT:  OK.  So, you are addressing what I want

14    you to address next, but I just want to make sure before we get

15    to this the relevance vel non of this coming witness, anything

16    you wanted to say about what I said about the previous witness

17    or the fact that Ahmad is not a coconspirator, etc?

18            MR. KEHOE:  No.

19            THE COURT:  OK.  So then let's turn to this witness.

20            MR. KEHOE:  So then with regard to what the government

21    said --

22            THE COURT:  So, just to make the record clear, so the

23    objection that was made at the side bar with respect to the

24    previous witness's testimony regarding Dr. Ahmad is overruled

25    for the reasons I just stated.
```

```
 1              MR. BACHNER:  I'm sorry.  I haven't had a chance to
 2      speak.  Can I have a chance to address?
 3              THE COURT:  You want to disagree with your cocounsel?
 4              MR. KEHOE:  He wants to help me out.
 5              MR. BACHNER:  I want to clarify my position on that,
 6      because I haven't had a chance to speak to Mr. Kehoe about it.
 7              Judge, our position is that the testimony that came in
 8      regarding Dr. Ahmad, that we are concerned that the jury can
 9      draw the conclusion -- that I think the government wants them
10      to draw, which I this is erroneous based on the fact that he is
11      not a coconspirator -- that Mr. Gohari somehow was implicated
12      and aware that Mr. Ahmad was giving out phony HIV scripts.  He
13      is not a conspirator in the case.
14              THE COURT:  No, I think they do want to draw that
15      inference.  Why is that not a reasonable inference that they
16      can argue?  That doesn't make the doctor a coconspirator; it
17      just means he is someone that it's easy to get prescriptions
18      from.
19              MR. BACHNER:  Well, I think the government's theory of
20      the ease to get the scripts is that Dr. Ahmad is writing
21      scripts, based upon the testimony we've heard, without doing
22      any testing, without doing any of the necessary information.
23              THE COURT:  Yes, yes.  That doesn't mean he entered
24      into an agreement with your client to distribute oxycodone.
25      They might have wanted to make that assertion, but they've
```

1    chosen not to. The main effect of this is twofold: First, the

2    jury will be instructed if they find that there is a

3    conspiracy, they must find that there was an agreement that

4    meets the various requirements between your client and X, Y and

5    Z, who will be specified. And Dr. Ahmad will not be specified.

6    So, they know that he is not someone who they have to consider

7    as a coconspirator. And I will consider whether even saying

8    specifically to them at the time that means that everyone else

9    you have heard about is not part -- you cannot convict on the

10   basis of any supposed agreement between the defendant and

11   anyone else.

12         Second, it means if there were hearsay statements

13   offered from Dr. Ahmad -- which I don't think there have

14   been -- but anyway, if there were, they would not be admissible

15   on a coconspirator exception. Those are the two things that

16   follow.

17         I mean all the time, just to take the most obvious

18   example, people get together in conspiracies, and maybe they

19   need an illegal gun, so they go off to a guy who they know will

20   sell them an illegal gun, but it doesn't make the guy who they

21   get the illegal gun from a member of the overall conspiracy,

22   but it certainly is relevant that they went off and got an

23   illegal gun rather than a legal one. And that's the sort of

24   argument they're making with respect to Dr. Ahmad.

25         MR. BACHNER: But they're also arguing that Mr. Gohari

 1   was -- I'm concerned they're going to argue that Mr. Gohari was

 2   aware.

 3          THE COURT:  Yes.  So what?  Of course he was aware

 4   under their theory; I understand that's their argument.

 5          MR. BACHNER:  But he's not --

 6          THE COURT:  That doesn't make Dr. Ahmad a

 7   coconspirator.

 8          MR. BACHNER:  Well, our position, your Honor, most

 9   respectfully, is that the jury should be instructed that Dr.

10   Ahmad is affirmatively not considered a conspirator in this

11   case and Mr. Gohari is not charged with engaging in any

12   conspiratorial conduct with Mr. Ahmad.

13          THE COURT:  That will be a meaningless instruction at

14   this time, but I will consider --

15          MR. BACHNER:  I don't need it now, your Honor.

16          THE COURT:  -- I will consider making that instruction

17   at the time of the charge.  I think that is certainly a very

18   plausible possibility.  Yes?

19          MR. BACHNER:  Your Honor, if I can just follow up on

20   one other thing, because what we have had during the course of

21   the case is several instances in which the government is trying

22   to argue that the doctors were in fact part of what was going

23   on here, the conspiracy.

24          For example, they elicited evidence of these doctors

25   doing cooked prescriptions, look how many scripts are being

1    filled all at one time, arguing that Mr. Gohari should have

2    been on notice that these doctors were doing bad things, and

3    other instances of these doctors engaging in conduct --

4           THE COURT:  I mean we have to take each case

5    individually, but as a general proposition, assuming they can

6    provide the evidentiary basis for that inference, that is fine.

7    That does not make the doctors coconspirators, it makes them --

8           I come back to my analogy of a minute ago.  If you are

9    about to have a great big drug conspiracy, and you need weapons

10   because it may very well involve violence, so you and your

11   coconspirators say, oh, well, I know we can get an unlicensed

12   weapon illegally from Joe, and someone says, oh, and, you know,

13   we can also get an unlicensed weapon illegally from Sam, and so

14   they go off and they get weapons from Joe and Sam, neither Joe

15   nor Sam are members of a conspiracy, the drug conspiracy.  But

16   the knowledge of the defendants to the coconspirators that

17   these were people from whom they could get illegal guns is

18   highly relevant to assessing the mental state of the

19   coconspirators and their conspiracy, and that's I think -- the

20   government will correct me if I'm wrong -- that's essentially

21   the argument that's about been made here.  Yes?

22          MR. BACHNER:  Judge, they are not going to be arguing

23   that the doctors were aware that they were filling bad scripts,

24   in other words, that they're giving the gun with knowledge

25   there is a conspiracy.

 1              THE COURT:  OK, that is a fair point.  Let me find

 2     out, what is the government's position on that?

 3              MS. ESTES:  Your Honor, we have to prove that the

 4     defendant lacked good faith when he filled these prescriptions.

 5     Their entire defense is that the doctors were being duped, that

 6     the defendant was being duped by somebody else.  Showing that

 7     he sent patients to a doctor that he knew was writing

 8     fraudulent prescriptions is highly relevant.

 9              THE COURT:  Thank you, you are repeating my analogy.

10     My question to you is:  Is there anything else you are going to

11     be arguing beyond what you've just said?

12              MS. ESTES:  I don't believe so, your Honor.

13              THE COURT:  OK.  The specific concern that defense

14     counsel just raised is are you going to be arguing that the

15     doctors knew that they were supplying phony prescriptions to

16     Mr. Cabrera and/or Mr. Gohari?

17              MS. ESTES:  Your Honor, we will only repeat what, for

18     instance, Ms. Bowen said, she obtained an HIV prescription.

19              THE COURT:  No, no, no, answer my question, counsel.

20              MS. ESTES:  OK.

21              THE COURT:  Are you going to be arguing that the

22     doctors or any of them knew that they were supplying phony

23     prescriptions to the conspirators here, the alleged

24     conspirators?

25              MS. ESTES:  No, your Honor.

1           THE COURT:  OK, so there is your answer.

2           MR. BACHNER:  Fine, Judge.  Then all of this testimony

3   about the scripts being written by these doctors --

4           THE COURT:  No, no, no.  The doctors may well have

5   known that they were supplying false prescriptions.  It's

6   neither here nor there.  The question is whether they knew they

7   were supplying it as part of this conspiracy.

8           Again, I come back to my gun analogy:  Does the gun

9   dealer in my analogy know he is supplying an illegal gun?  Of

10  course he does; that's the whole point.  But does he know

11  anything about the drug conspiracy that he is supplying the

12  guns for?  No.

13          But they just told me they're not going to be arguing

14  anything about the doctor's knowledge, in any event.

15          MR. BACHNER:  I am going to make one more point and

16  sit down and accept your Honor's ruling with whatever

17  exceptions we have made.

18          Our position, your Honor, is if there is a conspiracy

19  between the doctor and the person with whom he is writing the

20  script to, and the doctor is unaware that there is another

21  conspiracy with -- he knows it's being filled by a pharmacist

22  and perhaps he doesn't know if the pharmacist is aware or not

23  aware -- once the conspiracy is proven, I don't think every

24  conspirator has to know exactly what the other conspirators are

25  doing.  So, if the guy supplying the gun knows it's a bank

1    robbery being done by someone --

2             THE COURT:  Well, you obviously are a more aggressive

3    prosecutor than the ones here, and if you were bringing the

4    charge, you would charge the doctors as coconspirators, but

5    they have chosen not to do that.

6             MR. BACHNER:  Very good.

7             MR. KEHOE:  With regard to this particular witness,

8    Judge.

9             THE COURT:  Yes.

10            MR. KEHOE:  And just as a taking-off point from my

11   learned friend, if we look at what the government said, as I

12   noted at the April 4 hearing, "The only relevant Ahmed patient

13   files that were going to be filled at Gohari's pharmacy, the

14   only relevant ones are the ones involving the 20

15   coconspirators."  They said we believe the only relevant

16   patient files -- talking about Ahmad's office -- are going to

17   be the ones related to 20 coconspirators, the 20 members of

18   this crew that were going to the pharmacy and getting their

19   prescriptions filled.

20            THE COURT:  OK.  So that seems to me to be a separate

21   point, and so let me ask the government about that.

22            MS. ESTES:  Your Honor, this was relating to the 80 or

23   so boxes that we produced from the Brooklyn District Attorney's

24   office.  As to Ms. Hayes-Chaffe, she is not going to be going

25   through and talking about like transactions of people we

1    haven't identified here and saying they're fraudulent in any

2    way.  She is summarizing the volume of transactions and the

3    sort of drugs that are coming up.  And they have had this data

4    since June.

5        THE COURT:  Well, no, no, I'm more concerned about the

6    representation.  The relevancy -- if the pharmacist knows that

7    75 percent of his prescriptions are coming from one doctor,

8    that is relevant to his knowledge of suspicious circumstances.

9    It's not by any means conclusive obviously; it's just one fact,

10   so I have no problem with the relevancy of that.  But what I

11   have a problem with is the representation that counsel just

12   quoted you as having made, because you used the word relevant,

13   and you said -- and maybe you can repeat it again, counsel.

14       MR. KEHOE:  Yes, your Honor.  This is August 4, 2016

15   hearing, page 16, lines 2 to 10:  "We believe the only relevant

16   patient files are going to be the ones related to the 20

17   coconspirators, the 20 members of this crew that were going to

18   the pharmacy and getting their prescriptions filled."

19       THE COURT:  OK.  But the government says that was in

20   reference -- the key word there in their view is "files,"

21   because what they're saying is that this was with relevance to

22   these huge boxes, and the question of how much you had to look

23   at or didn't have to look at.

24       MR. KEHOE:  This had to do with the broadening of this

25   issue which had not been timely disclosed, and counsel came in

```
 1    to say, look, the only ones that we're interested in are the
 2    people that are involved in the stated conspiracy, the 20 or
 3    people.
 4              THE COURT:  No, I understand that, but my point is
 5    this:  They're not introducing anything here from the other
 6    files.  What they're introducing here is simply the overall
 7    statistic of the percentage of prescriptions coming from Dr.
 8    Ahmad.
 9              MR. KEHOE:  Not true.  And if I could just show you
10    Government Exhibit 318.
11              THE COURT:  Yes.
12              MR. KEHOE:  I should say not accurate.
13              THE COURT:  I understood what you meant.  You said it
14    without even pointing your finger.
15              MR. KEHOE:  Now, Judge, for the record is clear, I
16    wasn't pointing the finger at you.  It was just a gesture, and
17    I was pointing over in your direction, but it was not meant to
18    be at you.  I have been around long enough to know not to do
19    that.  And my apologies if it came across that way.
20              THE COURT:  Duly accepted.
21              MR. KEHOE:  Thank you, Judge.
22              THE COURT:  So, what this again shows is the -- let me
23    make sure -- I see what GX318 is, but let me just make sure I
24    understand what this witness is going to be saying about Dr.
25    Ahmad.
```

1          MS. ESTES:  Yes, your Honor.  So, this witness will

2     testify -- this document is what forms the basis of the volume

3     of sales for Dr. Ahmad.  She will testify -- we have a summary

4     chart where she will say that in 2011 over 75 percent of the

5     Medicaid sales to the business were from Dr. Ahmad.  This is

6     the underlying document that documents the summary chart.

7          We also have her prepared to offer testimony just

8     about the top prescriptions that came from Dr. Ahmad, Atripla,

9     things like that.  But if your Honor thinks that's

10    inappropriate, we can only do the summary chart with the 77

11    percent.

12         THE COURT:  I think the rest of it would have been

13    something that would have been in those files that you said

14    were not relevant, yes?

15         MS. ESTES:  Well, your Honor, the rest of it is merely

16    from that same document.  This document is the one --

17         THE COURT:  Right.  But the specifics relating to what

18    was involved in those prescriptions would have been in those

19    other files, right?

20         MS. ESTES:  I mean, your Honor, we would only be --

21    she would be summarizing that.

22         THE COURT:  Now, what is it that you are asking the

23    jury to infer from the fact that 75 percent of the

24    prescriptions in that period of time that were Medicaid

25    reimbursed were from Dr. Ahmad?

```
1          MS. ESTES:  We believe we have evidence that the
2     defendant was aware that something was going on at Dr. Ahmad's
3     office from the testimony of Mr. Cabrera, from the testimony of
4     the expert witness yesterday about those transactions, and we
5     believe this document supports that because it shows that 75
6     percent of his billings were coming from Dr. Ahmad.  He was
7     very attuned to prescriptions coming from this doctor because
8     it's such a high volume, a very unusual volume for one
9     pharmacy.
10         THE COURT:  But I'm still not quite sure.  So,
11    assuming -- by the way, I'm not sure how you connect up the
12    fact that 75 percent was coming from Dr. Ahmad with the fact
13    that he knew that there was such a high percentage.  But let's
14    say you can show that.  So, he is aware of the high volume
15    coming from one doctor, and what inference then do you ask the
16    jury to draw from that?
17         MS. ESTES:  And based on the other evidence relating
18    to Dr. Ahmad, that he is not acting in good faith when he is
19    asking Cabrera to send patients to Dr. Ahmad.
20         THE COURT:  Because?
21         MS. ESTES:  Because he knows from going to Dr. Ahmad's
22    office and handing out business cards that this is an office
23    where people are handing out scripts left and right; he knows
24    from the transactions from Eugene Seaman, that the expert
25    talked about yesterday, that there are extreme irregularities
```

1   in these transactions, which is something a pharmacist should

2   notice.

3            THE COURT:  OK.  So, let me hear from defense counsel.

4            MR. KEHOE:  Your Honor, this of course is not a good

5   faith case, it's an intent case.  That's number one.

6            THE COURT:  Well, no, no, no, but you've raised a good

7   faith defense.

8            MR. KEHOE:  Well, in his offering, yes.

9            THE COURT:  And the government is required to disprove

10  that beyond a reasonable doubt.

11           MR. KEHOE:  And, Judge, if we address what counsel had

12  to say.  They are taking these scripts, that large volume of

13  scripts, and they're going to put a witness on the stand that

14  is not competent to testify on the validity or invalidity of

15  any of those scripts.

16           THE COURT:  That's right.  The witness is being put on

17  the stand, as I understand it, to testify to the fact that it

18  was a suspicious circumstance -- she won't use those terms;

19  that's the inference -- when 75 percent of all the

20  prescriptions are coming from this one doctor, and that,

21  coupled with all the other circumstances that she just alluded

22  to, is, first, evidence that he had reason to believe that

23  these were not legitimate prescriptions because there were too

24  many suspicious circumstances and, second of all, it's

25  corroboration of the conspiracy more directly stated by

 1   Cabrera.  So, that seems to me doubly relevant.

 2          MR. KEHOE:  If I may, Judge, in following up.  And

 3   your Honor I know doesn't know this, but first and foremost Dr.

 4   Ahmad's office is around the corner from the pharmacy, number

 5   one.  Number two --

 6          THE COURT:  Well, that's good argument to the

 7   contrary.

 8          MR. KEHOE:  No, I understand, Judge.  And, number two,

 9   obviously their expert had plenty of time to sift through any

10   of this stuff, and they only talked about the five

11   coconspirators or five transactions with Dr. Naveed, no more.

12          Number three, the only relevance to this document by

13   their admission -- if it comes in at all -- is records coming

14   in concerning the coconspirators, not every patient that went

15   into the doctor's office.

16          They narrowed the relevancy of any of Ahmad's records

17   to the coconspirators.  And I will tell your Honor that only

18   five of these 20 coconspirators went to Ahmad's office.  And

19   what they have elected to do is put all of these patients in

20   with all of these transactions, which have nothing to do with

21   this whatsoever.

22          THE COURT:  I'm inclined to adopt the government's

23   position that all they're going to put in is the 75 percent,

24   because that's the only relevance that they are asserting.

25          MR. KEHOE:  No, but that's exactly the point.  We have

1    the same point there.

2              THE COURT:  No, no, no.  You are free to argue that

3    you haven't heard, ladies and gentlemen, any direct evidence

4    that the vast bulk of what he prescribed was illegal in any

5    respect; the only ones you have heard that were questionable

6    are the five, or whatever it is.  That's a fair argument.

7              But the government is not putting it in for saying

8    that the other ones are illegal.  They're putting it in to say

9    this is one of innumerable circumstances relating to this

10   doctor that should have alerted your client to a problem.

11             MR. KEHOE:  And rhetorically speaking, Judge, which

12   ones?  That's the problem.

13             THE COURT:  No, they're saying it's not which ones.

14   That's the very point.  They're saying -- and that's why I'm

15   only allowing in the 75 percent -- they're saying it's the

16   volume that should have alerted him, not necessarily any given

17   one.

18             MR. KEHOE:  And the volume should have alerted him to

19   question all of these transactions?

20             THE COURT:  No.  The volume, when coupled with those

21   other circumstances that are already in evidence regarding him,

22   should have made him more suspicious about the particular

23   transactions that they say have additional indicia of

24   suspiciousness.

25             MR. KEHOE:  And that then comes to the next point,

1   which is, OK, with regard to these transactions of the 75

2   percent, which ones are invalid?  Which ones are valid?  Which

3   ones were properly written?

4          They had the time -- and I know your Honor has seen

5   these before in FCA cases, where the government has a record

6   such as this, they have a statistical sampling of those

7   records, they take it to a physician or an expert who renders

8   an opinion, and they extrapolate that out to say based on this

9   statistical sampling, we believe these are improper because

10  these weren't medically necessary, etc.

11         They have not done that.  They elected not to do that,

12  and maybe because they came up with this idea at the eleventh

13  hour.  Suffice it to say, what they are attempting to do is

14  say, Mr. Gohari, 75 percent of his income is coming from Ahmad

15  and it's a bad thing, it's a bad thing.  They want the jury to

16  draw the inference it's a bad thing without going --

17         THE COURT:  No, no, that's unfair.  They are saying

18  it's a suspicious service -- and then we are going to bring

19  this to a close, but I do have one question to the government.

20         The one point that in effect defense counsel raised --

21  but I will raise it more directly -- implicit in the argument

22  you are making is that 75 percent of prescriptions coming from

23  a single doctor to a neighborhood pharmacy is suspicious on its

24  face.  Dr. Winsley didn't say that, I don't believe -- what is

25  the evidence of that?  I mean, for all I know, that might be

 1   routine.  It sounds unlikely, but the government has not put

 2   forth any evidence that the normal situation is 10 percent and

 3   this is 75 percent, or the normal situation is whatever.  So,

 4   how is the jury going to assess that?

 5            MS. ESTES:  Your Honor, Maura Hayes-Chaffe is with New

 6   York City's HRA; she overseas an investigation department

 7   there.  She will testify that they began this investigation

 8   because they saw this and they thought it was atypical.

 9            THE COURT:  They thought it was atypical?

10            MS. ESTES:  Atypical.

11            THE COURT:  I see.  And she can testify to that.

12            MS. ESTES:  Yes.

13            MR. KEHOE:  The investigation, counsel leaves a big

14   part of this out.  The investigation came because of Dr. Ahmad.

15   That's how this investigation started, because of Dr. Ahmad.

16            THE COURT:  So what?

17            MR. KEHOE:  They then went back and investigated

18   Mr. Gohari.  They went to the Kings County's DA's office.  They

19   declined.  They declined.

20            THE COURT:  I think that's irrelevant to the

21   admissibility question.  But let me get -- bring in the

22   witness.  I want to question her.

23            DEPUTY COURT CLERK:  Please be seated.  State your

24   name and spell it slowly for the record.

25            THE WITNESS:  My name is Maura Hayes-Chaffe.  First

1    name is spelled M-A-U-R-A, and the last name is spelled

2    H-A-Y-E-S hyphen C-H-A-F-F-E.

3            THE COURT:  So, my understanding is that you will be

4    testifying that from your review of Mr. Gohari's pharmacy's

5    records, and more particularly the records of Medicaid

6    reimbursement, that 75 percent or so of the reimbursement

7    sought during a particular period of time were for

8    prescriptions coming from a Dr. Ahmad.  Do I have that right?

9            THE WITNESS:  Yes, that's correct.

10           THE COURT:  And was that percentage typical or

11   untypical of neighborhood pharmacies of this kind?

12           THE WITNESS:  That was atypical.

13           THE COURT:  And what's your basis for saying that?

14           THE WITNESS:  We did a review of all pharmacies who

15   had filled prescriptions from Dr. Ahmad.

16           THE COURT:  No, no, no, that's not my question.  If

17   you know, for pharmacies as a whole -- and then we will break

18   it down -- but for pharmacies as a whole, what's the normal

19   percentage or percentage range of prescriptions coming from a

20   single doctor?

21           THE WITNESS:  Well, the basis of my experience is many

22   years in Medicaid fraud and abuse and waste investigation.  I

23   would say I couldn't nail it down to a particular percentage,

24   but it is very unusual for a pharmacy to have a particular tie

25   to a particular prescriber.

1        THE COURT:  Well, I understand, but is that, even

2   though you don't know an exact figure, the normal is like of

3   the range of five or 10 percent?  Or less?  What is the basis

4   for your saying that it's very abnormal?

5        THE WITNESS:  Typically a pharmacy will have a spread

6   of claims from a spread of prescribers.

7        THE COURT:  And is that true even, if you will, as

8   opposed to CVS type pharmacies, is that true of local sort of

9   mom and pop type pharmacies?

10       THE WITNESS:  So far as I know, yes.

11       THE COURT:  And when you say so far as you know, have

12   you ever broken it down in that respect?

13       THE WITNESS:  No, we haven't done a full comparison,

14   but when we reviewed the records of this pharmacy, one of the

15   things that we considered a clear red flag was the very heavy

16   reliance on claims from a particular doctor.

17       THE COURT:  All right.  Thank you very much.  You can

18   go back to the witness room.  We will call you back in a few

19   minutes.

20       THE WITNESS:  Thank you.

21       (Witness not present)

22       THE COURT:  So, I think it comes down to -- and I

23   really am going to not spend more than five more minutes on

24   this matter, because the jury has been waiting now for 45

25   minutes while we had a "15 minute break" and we are only

1    sitting to one o'clock today because of the defendant's

2    religious observances.

3            I don't know that this witness is in a position to

4    really testify more than in sort of a gut way, sort of her

5    feeling that this is abnormal from an expert standpoint.  I

6    think she may be able to testify that it's abnormal from a kind

7    of Coho Tire standpoint, but even there I have some doubts.

8            But I think, when coupled with all the other

9    information about this pharmacy and the defendant's knowledge

10   with respect to this pharmacy, it is nevertheless

11   corroborative, when coupled with the rest, of circumstances

12   that would have put a reasonable pharmacist on notice that

13   there was something fishy going on.

14           I also think the jury from just ordinary lay

15   experience can infer that this was at a minimum something that

16   would catch the eye of the defendant.

17           So, subject to letting defense counsel have one last

18   crack at it, I will allow the testimony about the 75 percent,

19   but that's as far as it goes, and the rest will be left to

20   argument on summation.  Let me hear whatever else defense

21   counsel wants to say.

22           MR. KEHOE:  So I take it that she is not going to be

23   able to argue that it is suspicious.

24           THE COURT:  Correct.

25           MR. KEHOE:  The other issue on this document, with

 1    regard to her competency to testify, she did not do the

 2    investigation; she did not actually conduct this investigation.

 3    This investigation was conducted by third parties.

 4          THE COURT:  Yeah.  So that's a classic summary witness

 5    situation.  All she is going to be able to say is that at her

 6    direction any relevant Medicaid records were reviewed and what

 7    they showed for the relevant period is that 75 percent of the

 8    prescriptions came from Dr. Ahmad, full stop.

 9          MR. KEHOE:  And I know your Honor has ruled on this,

10    and my only footnote to that is that given the fact that a

11    representation by counsel concerning the only relevance in this

12    was for the 20 patients, that we limit it to the

13    coconspirator's name.  And I will tell you as an officer of the

14    court that only five of the coconspirators named by the

15    government are on that list.

16          THE COURT:  And there is no question that you have

17    made that and numerous other objections, all of which are

18    clearly preserved for the record with respect to this

19    testimony.

20          MR. KEHOE:  Yes, your Honor.

21          THE COURT:  All right.  I hope none of you need a

22    break, because I want to bring in the jury.

23          MR. KEHOE:  Judge, with all due respect.

24          THE COURT:  Yes, all right, five minutes.

25          (Recess)

1                (Jury not present)

2                MR. KEHOE:  Your Honor, may I put something on the

3     record?  It will take ten seconds.  The issue I have is as I

4     look at it, the chart is going back to 2011, the conspiracy we

5     have in the indictment is 2012.

6                THE COURT:  This is not claimed to be an act in

7     furtherance of the conspiracy.  It is just supposed to be a

8     suspicious circumstance.  If he had been prescribing 75 percent

9     of the prescriptions from 1897, that would still be relevant.

10               Let's bring in the jury.

11               MR. KEHOE:  Note our objection.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, we're sorry that

3     that break took so long.  Counsel had to raise, did raise, some

4     important legal issues that I had to consider.  Being by nature

5     a very slow thinker, it took a long time.  But here we are.

6          Please call your next witness.

7          MS. ESTES:  Your Honor, the government calls Maura

8     Hayes-Chaffe.

9      MAURA HAYES-CHAFFE,

10        called as a witness by the government,

11        having been duly sworn, testified as follows:

12         MS. ESTES:  Your Honor, the government would first

13    propose reading a stipulation into the record.

14         THE COURT:  Go ahead.

15         MS. ESTES:  It is hereby stipulated and agreed by and

16    between United States of America --

17         THE COURT:  You can skip the prologue.

18         MS. ESTES:  Yes, your Honor.

19         If called as a witness at trial, a custodian of

20    records from the New York State Department of Health would

21    testify that Government Exhibits 300 through 325 are true and

22    accurate copies of records obtained from DOH; that the original

23    records were all made at or near the time by or from

24    information transmitted by a person with knowledge of the

25    matters set forth in the records; that they were kept in the

1    ordinary course of DOH's regularly conducted business activity,

2    and that it was the regular practice of that business activity

3    to make the records.

4            The DOH custodian of records would further testify

5    that the information contained in Government Exhibits 300

6    through 325 comes from pharmacies who submit the information

7    electronically to get paid by Medicaid.  DOH collects the

8    information for every prescription billed to Medicaid, and it

9    is capable of generating reports indicating information

10   relevant only to a particular pharmacy or patient.

11           It is further stipulated and agreed that this

12   stipulation, which is Government Exhibit 1003, may be received

13   into evidence as a government exhibit at trial.

14           Your Honor, at this time the government would offer

15   Government Exhibit 1003, the stipulation, as well as Government

16   Exhibits 300 through 325.

17           THE COURT:  Received.

18           (Government's Exhibits 300 through 325 and 1003

19   received in evidence)

20   DIRECT EXAMINATION

21   BY MS. ESTES:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Where are you currently employed?

25   A.  I work for New York City's Human Resources Administration.

1   Q.   What is the Human Resources Administration?

2   A.   HRA, as it is commonly, known administers functions of

3   Department of Social Services and is responsible for

4   administering welfare benefits, housing benefits, and Medicaid

5   benefits, various other forms of welfare for the needy in New

6   York City.

7   Q.   What is your title?

8   A.   My title is assistant deputy commissioner of Medicaid

9   provider investigations and audit.

10  Q.   How long have you been assistant deputy commissioner in

11  that department?

12  A.   For about three and a half years.  I started in July of

13  2013.

14  Q.   What sort of work does that department do generally?

15  A.   We generally conduct audits and investigations of Medicaid

16  providers.

17  Q.   What are your duties and responsibilities as the assistant

18  deputy commissioner?

19  A.   I basically oversee about 50 staff and three units of

20  investigators and auditors.

21  Q.   What are those units?

22  A.   I have an audit unit which conducts audits and I have a

23  civil and also criminal investigations unit.

24  Q.   During the course of your work with the Human Resources

25  Administration, did you become familiar with Afam Pharmacy

1   doing business as Ekwunife?

2   A.  Yes, I did.

3   Q.  How?

4   A.  It was the target of an internal investigation.

5   Q.  What was your role in that investigation?

6   A.  I directed the investigation.

7   Q.  In connection with that investigation, did you review

8   Medicaid data related to the pharmacy?

9   A.  Yes, we did.

10  Q.  What sort of Medicaid data?

11  A.  We looked at the Medicaid data which was submitted by Afam

12  Pharmacy for payment, particularly between 2010 and 2012.

13  Q.  Ms. Hayes-Chaffe, could I ask you to turn in your exhibit

14  binder to Government Exhibit 318.

15          MR. KEHOE:  Excuse me.  With all due respect, Judge,

16  may I retrieve my exhibit?

17          THE COURT:  Yes.

18          MR. KEHOE:  I think I gave it to you.

19          THE COURT:  I'm sorry.  Parting is such sweet sorrow.

20          MR. KEHOE:  I knew you were going to say that.  Thank

21  you.

22  A.  Okay.

23  Q.  Do you recognize this document?

24  A.  Yes, I do.

25  Q.  What does this document show?

1   A.  This document is the Medicaid record for Afam Pharmacy from

2   2010 to 2012, particularly for recipients who received HIV

3   medication at this pharmacy.

4   Q.  Is it related to a particular doctor?

5   A.  Yes, it is.

6   Q.  What doctor?

7   A.  It's related to Dr. Naveed Ahmad.

8   Q.  Ms. Hayes-Chaffe, could you turn in your exhibit binder to

9   Government Exhibits 320 through 325.

10  A.  All right.

11  Q.  Do you recognize those documents?

12  A.  Yes, I do.

13  Q.  What are they generally?

14  A.  These are generally Medicaid claim summaries for various

15  years.

16  Q.  For which pharmacy?

17  A.  For Afam Pharmacy.

18  Q.  Ms. Hayes-Chaffe, could you now turn in your exhibit binder

19  to what has been premarked for identification purposes as

20  Government Exhibit 500.

21  A.  Okay.

22  Q.  Do you recognize this document?

23  A.  Yes, I do.

24  Q.  How do you recognize it?

25  A.  It was generated under my direction.

1   Q.  Does this document fairly and accurately summarize the

2   records contained in Government Exhibits 318 through 325, which

3   you just reviewed?

4   A.  Yes, it does.

5          MS. ESTES:  Your Honor, the government offers

6   Government Exhibit 500.

7          MR. KEHOE:  Subject to the objections articulated,

8   your Honor.

9          THE COURT:  Right.  There are no additional

10  objections, but those objections stand.

11         MR. KEHOE:  Yes, your Honor.

12         THE COURT:  Very good.  Received.

13         (Government's Exhibit 500 received in evidence)

14         MS. ESTES:  Permission to publish?

15         THE COURT:  Yes.

16  Q.  Ms. Hayes-Chaffe, I would like to walk through this chart.

17  What does this chart cover generally?

18  A.  It covers the Afam Medicaid billings by prescriber for 2011

19  and 2012.

20  Q.  Let's turn to the blue bar on the left.  What does that bar

21  represent?

22  A.  That represents the total value of claims submitted to

23  Medicaid by Afam Pharmacy for prescriptions generated by, or

24  written by Dr. Naveed Ahmad.

25  Q.  What is the number listed there?

 1   A.   $2,626,293.

 2   Q.   What does the red bar next to that blue bar represent?

 3   A.   The red bar represents the Medicaid claims submitted by

 4   Afam Pharmacy for prescriptions from all other prescribers

 5   during 2011.

 6   Q.   What is the number listed there?

 7   A.   $926,540.

 8   Q.   To be clear, roughly 75 percent of Afam's billing --

 9             MR. KEHOE:   No leading, Judge, please.

10             THE COURT:   Sustained.

11   Q.   Ms. Hayes-Chaffe, what percentage of Afam's billings in

12   2011 were from Dr. Naveed Ahmad?

13   A.   Approximately 75 percent.

14   Q.   Let's turn to the next two bars.   What does the third blue

15   bar on this document represent?   My apologies.   The third bar,

16   the second blue bar on this document, what does it represent?

17   A.   This represents the Medicaid claims submitted by Afam

18   Pharmacy for prescriptions written by Dr. Naveed Ahmad in 2012.

19   Q.   What is the number listed at the top?

20   A.   $1,653,946.

21   Q.   What does the red bar on the far right represent?

22   A.   That represents the value of claims submitted to Medicaid

23   by Afam Pharmacy for all other prescribers in 2012.

24   Q.   What is the number listed at the top?

25   A.   $879,196.

1    Q.  About what percentage to Dr. Naveed Ahmad's billings

2    reflect for that year?

3    A.  Approximately 69 percent.

4            MS. ESTES:  One moment, your Honor.

5    Q.  Ms. Hayes-Chaffe, how many years have you been an

6    investigator with HRA?

7    A.  I've been with HRA in a managerial capacity since July

8    2015.

9    Q.  What did you do before that?

10   A.  I worked as a senior attorney for the New York State office

11   of the Medicaid inspector general.

12   Q.  What did that job entail?

13   A.  I represented New York State --

14           THE COURT:  What is the relevance?

15           MS. ESTES:  Your Honor I was going to --

16           THE COURT:  This witness is essentially a summary

17   witness summarizing the results of voluminous documents.

18   Unless you are going into some other area, I don't see the

19   relevance.

20           MS. ESTES:  Understood, your Honor.  No further

21   questions.

22           THE COURT:  Cross-examination.

23   CROSS-EXAMINATION

24   BY MR. KEHOE:

25   Q.  Good morning, Ms. Hayes-Chaffe.  I think it is still

Gb4sgqh3                    Hayes - Chaffetz - cross

1   morning.  My name is Greg Kehoe.  I don't think we have had the

2   pleasure.  I represent Mr. Gohari.  If you could ask you a

3   couple of preliminary questions.  You're a lawyer, is that

4   right?

5   A.  Yes, I am.

6   Q.  Not a doctor, not a physician; a lawyer?

7   A.  Yes, that's correct.

8   Q.  The document that we looked at, Government Exhibit 318, is

9   that in the documents that you have before you?  I think

10  counsel was just showing that to you.

11  A.  I think she was just talking to me about 500.

12  Q.  The one prior to that.

13  A.  318?  That's a while back, but yes.

14          MR. KEHOE:  That's what I'm talking about, Judge, the

15  one a while back.

16          THE COURT:  I understand.  Maybe my notes are wrong.

17  Was that offered?

18          MS. ESTES:  Yes, your Honor.  That was part of the

19  stipulation.

20          THE COURT:  Very good.  Go ahead, counsel.

21  Q.  We were talking about 318.

22          MR. KEHOE:  May I approach one moment, Judge?

23          THE COURT:  Yes.

24  Q.  I just want to make sure we are on the same page here.

25  A.  Yes.

1  Q.  With regard to Exhibit 318, these are prescriptions between

2  2010 and 2012 prescribed by Dr. Naveed's office that were

3  filled at Afam Pharmacy, is that right?

4  A.  Yes.  I'm not sure that it's 100 percent of the claims.  We

5  were concentrating on HIV medications that were prescribed and

6  filled.

7  Q.  My question to you is a little bit easier.  Afam is a

8  neighborhood pharmacy, isn't that right?

9  A.  Yes, it is.

10  Q.  Isn't it also true that Dr. Naveed Ahmad's office was

11  literally around the corner from Afam Pharmacy?  Wasn't it?

12  A.  Yes, I believe it was.

13  Q.  Looking at these particular items in 318, as a lawyer you

14  didn't go in and check whether or not these were legitimate

15  scripts or necessary scripts or proper medically, did you?

16           MS. ESTES:  Objection.

17           THE COURT:  Sustained.

18  Q.  As a lawyer, you didn't perform any medical tasks --

19           THE COURT:  No, no.  This witness is simply a summary

20  witness, counsel.

21           MR. KEHOE:  I understand, Judge.

22           THE COURT:  That reflects rulings that were made

23  partly at your request both today and at the prior hearing.

24           MR. KEHOE:  I understand.  I stand instructed, your

25  Honor, and I will move on.

1           THE COURT:  Okay.

2    Q.  If you will look the summary chart which is Exhibit 500.

3           MR. KEHOE:  Could you put that back up, Ms. Bostillo.

4    A.  Yes.

5    Q.  These are Medicaid billings by Afam Pharmacy during the

6    entire time when Dr. Naveed Ahmad's office was around the

7    corner from Afam, right?

8    A.  So far as I know, yes.

9           MR. KEHOE:  If I might have a moment, your Honor?

10          THE COURT:  Yes.

11   Q.  Looking at this document again, can you flip a few pages

12   in.  Let's go to page 10?

13          THE COURT:  You're talking about 318?

14          MR. KEHOE:  Exhibit 318, Judge.

15          THE COURT:  That's what we have up now?

16          MR. KEHOE:  The one we have up is 500.  I stand

17   corrected.  If we can move back to 318.

18   A.  So I understand, you want me to go to page 10?

19   Q.  I don't know if they are numbered.  If you can count in

20   about ten pages on Exhibit 318.  I know that it is a chart and

21   it is not necessarily paginated.  I believe the date on the top

22   of page 10 is February 29, 2012.

23          MR. KEHOE:  Ms. Bostillo could you pull that up on the

24   screen, 318, March 29, 2012.  If we could take a look at the

25   whole page.

1          MS. ESTES:  Your Honor, objection.

2          THE COURT:  I haven't heard the question.  But I think

3     counsel is at a minimum opening doors that were closed before.

4          MR. KEHOE:  Your Honor, I'll withdraw it and make the

5     argument.  Thank you.

6          THE COURT:  Very good.

7          Anything more from the government?

8          MS. ESTES:  Not for this witness, your Honor.

9          THE COURT:  You may step down.  Thank you very much.

10         (Witness excused)

11         THE COURT:  Call your next witness.

12         MS. ESTES:  Your Honor, the government calls Ambar

13    Aranaga.

14     AMBAR ARANAGA,

15         called as a witness by the government,

16         having been duly sworn, testified as follows:

17         THE CLERK:  State your name and spell it slowly for

18    the record.

19         THE WITNESS:  Ambar Aranaga.

20         THE COURT:  How do you spell your last name?

21         THE WITNESS:  A-R-A-N, as in Nancy, A-G-A.

22         THE COURT:  Counsel.

23         MS. ESTES:  Your Honor, before we begin, the

24    government would like to offer the defendant's tax returns into

25    evidence.  I understand defense counsel is willing to

```
 1   stipulate.

 2              MR. KEHOE:  No objection, Judge.  We stipulated to

 3   that and I believe we talked about it last night and agreed.

 4              THE COURT:  Yes.  By contrast with some public

 5   figures, we will receive the income tax returns in evidence.

 6              MS. ESTES:  The tax returns are Government Exhibits

 7   1200 through 1209.

 8              THE COURT:  Received.

 9              (Government's Exhibits 1200 through 1209 received in

10   evidence)

11              MS. ESTES:  Your Honor, may I approach the witness and

12   bring them to her?

13              THE COURT:  Yes.

14   DIRECT EXAMINATION

15   BY MS. ESTES:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Where are you currently employed?

19   A.  I work for the Federal Bureau of Investigation.

20   Q.  What is your title?

21   A.  Staff operations specialist.

22   Q.  How long have you been with the Federal Bureau of

23   Investigation?

24   A.  Just over 13 years.

25   Q.  How long have you been a staff operations specialist?
```

```
 1   A.   Just under 3.

 2   Q.   Do you work in a particular unit?

 3   A.   I do.

 4   Q.   What unit?

 5   A.   I support the health care fraud unit.

 6   Q.   How long have you supported the health care fraud unit?

 7   A.   That unit about 4 months.

 8   Q.   During the course of your work in that unit, have you

 9   become familiar with Afam Pharmacy?

10   A.   Yes.

11   Q.   How?

12   A.   It's a case that I'm engaged with.

13   Q.   Have you reviewed documents and records related to

14   prescriptions filled at Afam Pharmacy?

15   A.   Yes.

16   Q.   Have you also reviewed tax returns related to Afam

17   Pharmacy?

18   A.   Yes.

19            MS. ESTES:   Your Honor, could I have permission to

20   publish what has been entered into evidence as Government

21   Exhibit 1200?

22            THE COURT:   Yes.

23   Q.   Ms. Aranaga, have you reviewed this document?

24   A.   Yes.

25   Q.   What is this document generally?
```

1   A.  This is the return of partnership income for Afam Pharmacy

2   for 2011.

3           MS. ESTES:  Ms. Bostillo, if I could ask you to zoom

4   into row 1, 2, 3.  Perfect.  Thank you.

5   Q.  Ms. Aranaga, directing your attention to the portion of the

6   tax return that is highlighted here, what is reflected in the

7   row for gross receipts or sales not reported on line 1a?

8   A.  That's $4,046,436.

9   Q.  Turning your attention to the row number 2, what was

10  reflected there for goods of cost sold?

11  A.  $3,700,388.

12  Q.  Turning your attention to line 3, gross profit, what is

13  listed there?

14  A.  $346,048.

15  Q.  To be clear, what year is that tax return for?

16  A.  2011.

17          MS. ESTES:  Your Honor, permission to publish

18  Government Exhibit 1202?

19          THE COURT:  Yes.

20          MS. ESTES:  Ms. Bostillo, could you please zoom into

21  the same portion.

22  Q.  Ms. Aranaga, what is this document generally?

23  A.  This is the return of partnership income for Afam Pharmacy

24  for 2013.

25  Q.  Turning your attention to the first line 1a for gross

1   receipts or sales, what is listed there?

2   A.  It's $1,815,217.

3   Q.  Turning your attention to the second line for cost of goods

4   sold, what is listed there?

5   A.  That is $1,358,125.

6   Q.  Turning your attention to the third line for gross profit,

7   what is listed there?

8   A.  $457,092.

9        MS. ESTES:  Your Honor, permission to publish

10   Government Exhibit 1203?

11        THE COURT:  Yes.

12   Q.  Ms. Aranaga, what is this document generally?

13   A.  This is the return of partnership income for Afam Pharmacy

14   for 2014.

15   Q.  Turning your attention to the first line here, what is

16   listed for gross receipts or sales?

17   A.  $5,116,253.

18   Q.  Turning your attention to the second line, what is listed

19   for cost of goods sold?

20   A.  $4,703,383.

21   Q.  And turning your attention to the third line for gross

22   profit, what is listed there?

23   A.  $412,870.

24        MS. ESTES:  Your Honor, permission to publish

25   Government Exhibit 1204?

 1              THE COURT:  Yes.

 2   Q.  Ms. Aranaga, what does this document reflect generally?

 3   A.  This is the return of partnership income for Afam Pharmacy

 4   for 2015.

 5   Q.  Turning your attention to the first line, what is listed

 6   there?

 7   A.  $18,925,912.

 8   Q.  Turning your attention to that second line for cost of

 9   goods sold, what is listed there?

10   A.  $17,991,516.

11   Q.  Turning your attention to the line for gross profit, what

12   is listed there?

13   A.  $934,396.

14   Q.  Ms. Aranaga, could I ask you to turn in the exhibit binder

15   in front of you to what has been premarked for identification

16   purposes as Government Exhibit 900.  Are you there?

17   A.  I am.

18   Q.  Do you recognize this document?

19   A.  Yes, I do.

20   Q.  How do you recognize it?

21   A.  This is a chart that I created showing prescriptions filled

22   at Afam Pharmacy for the date range of September 2012 through

23   October 2015 and this one in particular is for Sheri and the

24   last name has been redacted.

25   Q.  Does it fairly and accurately summarize government records

1   containing Government Exhibits 101 and 102?

2   A.  Yes.

3        MS. ESTES:  Your Honor, the government offers

4   Government Exhibit 900.

5        THE COURT:  Any objection?

6        MR. KEHOE:  Subject to prior objections.

7        THE COURT:  Yes, exactly right.  Received.

8        (Government's Exhibit 900 received in evidence)

9        MR. KEHOE:  As these go through, Judge, as I suspect

10  counsel is going through, can I just have a standing objection

11  based on our prior discussion?

12       THE COURT:  Yes.  But if there are any other

13  objections, you need to raise them.

14       MR. KEHOE:  Yes.

15       MS. ESTES:  Permission to publish?

16       THE COURT:  Yes.

17       MS. ESTES:  Ms. Bostillo, if you could please zoom in

18  to the first few lines of the chart.

19  Q.  Ms. Aranaga, what patient does this cover?

20  A.  Sheri and -- I know the last name.  I don't know if I'm

21  supposed to say it or not.

22  Q.  That's fine.  What is the drug contained in this chart?

23  A.  In this particular highlighted portion it's oxycodone.

24  There are a total of 4 drugs that the chart highlights.

25  Q.  What other drugs are listed?

 1   A.   Oxycodone, sulfadin, tramadol, and carisoprodol.

 2   Q.   As to the oxycodone, what strength oxycodone was this

 3   patient receiving?

 4   A.   30 milligrams.

 5   Q.   Approximately how many doctors wrote the prescription for

 6   oxycodone?

 7   A.   9 different doctors.

 8   Q.   How many oxycodone prescriptions did this patient receive?

 9   A.   49 total, 37 of which were oxycodone.

10   Q.   In total, approximately how many oxycodone pills did this

11   patient receive?

12   A.   3,845.

13   Q.   Ms. Aranaga, I would ask you to turn in your exhibit binder

14   to what has been premarked for identification as Government

15   Exhibit 901.  Do you recognize this document?

16   A.   Yes, I do.

17   Q.   How do you recognize it?

18   A.   This is a chart I created to show the prescriptions filled

19   at Afam between September 2012 and October of 2015 for patient

20   first name Gilberto.

21   Q.   Does this fairly and accurately summarize government

22   records contained in Government Exhibits 102 and 102?

23   A.   Yes.

24        MS. ESTES:  Your Honor, the government offers

25   Government Exhibit 901.

 1              MR. KEHOE:  Same objection, Judge.

 2              THE COURT:  Received.

 3              (Government's Exhibit 901 received in evidence)

 4              MS. ESTES:  Permission to publish?

 5              THE COURT:  Yes.

 6    Q.  Ms. Aranaga, what patient is covered by this chart?

 7    A.  The first name is Gilberto.

 8    Q.  What drugs are covered by this chart?

 9    A.  There is only one drug.  It's oxycodone.

10    Q.  What strength oxycodone was Gilberto receiving?

11              MR. KEHOE:  Your Honor, it speaks for itself.  This is

12    not an expert on that score.

13              THE COURT:  I'll let her, in effect, read the chart.

14    Overruled.

15    A.  Generally, it was 30 milligrams.  There were a few at 20

16    milligrams.

17    Q.  Approximately how many doctors wrote the prescriptions for

18    oxycodone?

19    A.  5 separate doctors.

20    Q.  How many oxycodone prescriptions did this patient receive?

21    A.  39.

22    Q.  In total, approximately how many oxycodone pills did this

23    patient receive?

24    A.  3,990.

25    Q.  Ms. Aranaga, could you please turn in your exhibit binder

1    to what has been premarked for identification purposes as

2    Government Exhibit 902.

3    A.  Yes.

4    Q.  Do you recognize this document?

5    A.  I do.

6    Q.  How do you recognize it?

7    A.  This is a chart that I created showing prescriptions filled

8    at Afam Pharmacy between September of 2012 to October of 2015

9    for the patient Darnell.

10   Q.  Does this chart fairly and accurately summarize government

11   profits contained Government Exhibits 101 and 102?

12   A.  Yes.

13            MS. ESTES:  Your Honor, the government offers

14   Government Exhibit 902.

15            MR. KEHOE:  Same objection.

16            (Received

17            (Government's Exhibit 902 received in evidence)

18            MS. ESTES:  Permission to publish?

19            THE COURT:  Yes.

20   Q.  Ms. Aranaga, what drugs are covered by this chart?

21   A.  There is only one drug.  It's oxycodone.

22   Q.  What is the strength?

23   A.  30 milligrams.

24   Q.  Approximately how many doctors wrote the prescription for

25   oxycodone?

1  A.   5 separate doctors.

2  Q.   How many oxycodone prescriptions did this patient receive?

3  A.   11.

4  Q.   In total, approximately how many oxycodone pills did this

5  patient receive?

6  A.   909.

7  Q.   Ms. Aranaga, could I ask you to turn in your exhibit binder

8  to what has been premarked for identification as Government

9  Exhibit 903.

10  A.   Yes.

11  Q.   Do you recognize this document?

12  A.   I do.

13  Q.   How do you recognize it?

14  A.   This is a chart I created showing prescriptions filled at

15  Afam from September 2012 to October 2015 for a patient first

16  name Tonya.

17  Q.   Does this chart fairly and accurately summarize government

18  records containing Government Exhibits 101 and 102?

19  A.   Yes.

20        MS. ESTES:   Your Honor, the government offers

21  Government Exhibit 903.

22        THE COURT:   Same objection, same ruling.  Received.

23        (Government's Exhibit 903 received in evidence)

24        MS. ESTES:   Permission to publish?

25        THE COURT:   Yes.

 1            MR. KEHOE:  Judge, the reason I didn't stand up is
 2   because it is the same objection.  I will every time if you
 3   want.
 4            THE COURT:  No need to, but much appreciated anyway.
 5            MR. KEHOE:  Thank you.
 6   Q.  Ms. Aranaga, what drugs are covered in this chart?
 7   A.  There are 5 drugs.  They are oxycodone, methadone,
 8   amphetamine, alderall, and zolpidem.
 9   Q.  Turning to the oxycodone, what strength oxycodone was the
10   patient receiving?
11   A.  30 milligrams.
12   Q.  Approximately how many doctors wrote the prescriptions for
13   oxycodone?
14   A.  4.  I'm sorry.  Yes, 4 different doctors authored
15   prescriptions.
16   Q.  How many oxycodone prescriptions did the patient receive?
17   A.  16.
18   Q.  In total, approximately how many oxycodone pills did the
19   patient receive?
20   A.  1,755.
21   Q.  Ms. Aranaga, could I ask you to turn in your exhibit binder
22   to what has been premarked for identification purposes as
23   Government Exhibit 904.
24   A.  Yes.
25   Q.  Do you recognize this document?

1    A.  I do.

2    Q.  How do you recognize it?

3    A.  This is a chart I created showing prescriptions filled at

4    Afam from September 2012 to October 2015 for patient first name

5    Michael.

6    Q.  Does this chart fairly and accurately summarize government

7    records contained in Government's Exhibits 101 and 102?

8    A.  Yes.

9          MS. ESTES:  Your Honor, the government offers

10   Government Exhibit 904.

11         THE COURT:  Same objection, same ruling.  Received.

12         (Government's Exhibit 904 received in evidence)

13         MS. ESTES:  Permission to publish?

14         THE COURT:  Yes.

15   Q.  Ms. Aranaga, what drugs are covered by this chart?

16   A.  There is only one drug.  It's oxycodone.

17   Q.  What is the strength?

18   A.  30 milligrams.

19   Q.  Approximately how many doctors wrote the prescriptions?

20   A.  2.

21   Q.  How many oxycodone prescriptions did the patient receive?

22   A.  14.

23   Q.  In total, approximately how many oxycodone pills did the

24   patient receive?

25   A.  1,075.

1   Q.  Ms. Aranaga, could you please turn in your exhibit binder

2   to what has been premarked for identification purposes as

3   Government Exhibit 905.

4   A.  Yes.

5   Q.  Do you recognize this document?

6   A.  I do.

7   Q.  How do you recognize it?

8   A.  This is a chart I created showing prescriptions filled at

9   Afam Pharmacy from September of 2012 to October 2015 for

10  patient first name Duane.

11  Q.  Does it fairly and accurately summarize information

12  contained in Government Exhibits 101 and 102?

13  A.  Yes.

14          MS. ESTES:  Your Honor, the government offers

15  Government Exhibit 905.

16          THE COURT:  Same objection, same ruling.  Received.

17          (Government's Exhibit 905 received in evidence)

18          MS. ESTES:  Permission to publish?

19          THE COURT:  Yes.

20  Q.  Ms. Aranaga, what drugs are covered by this chart?

21  A.  Oxycodone and morphine.

22  Q.  Approximately how many doctors wrote the prescription for

23  oxycodone?

24  A.  6 different doctors.

25  Q.  What is the strength of oxycodone?

 1    A.   30 milligrams.

 2    Q.   How many oxycodone prescriptions did this patient receive?

 3    A.   36.

 4    Q.   In total, approximately how many oxycodone pills did this

 5    patient receive?

 6    A.   3,030.

 7    Q.   Ms. Aranaga, would you please turn in your exhibit binder

 8    to what has been premarked for identification as Government

 9    Exhibit 906.

10    A.   Yes.

11    Q.   Do you recognize this document?

12    A.   Yes, I do.

13    Q.   How do you recognize it?

14    A.   This is a chart I created showing prescriptions filled at

15    Afam Pharmacy from September 2012 to October 2015 for patient

16    first name Robert.

17    Q.   Does it fairly and accurately summarize government records

18    contained in Government Exhibits 101 and 102?

19    A.   Yes.

20              MS. ESTES:  Your Honor, the government offers 906.

21              THE COURT:  Ditto, ditto, and received.

22              (Government's Exhibit 906 received in evidence)

23              MS. ESTES:  Permission to publish?

24              THE COURT:  Yes.

25    Q.   What name is covered by this chart?

704

1    A.  First name Robert.

2    Q.  What strength oxycodone was the patient receiving?

3    A.  30 milligrams.

4    Q.  Approximately how many doctors wrote the oxycodone?

5    A.  9 different doctors.

6    Q.  How many oxycodone prescriptions did the patient receive?

7    A.  22.

8    Q.  In total, approximately how many oxycodone pills did the

9    patient receive?

10   A.  2,570.

11   Q.  Ms. Aranaga could you please turn to what has been

12   premarked for identification as Government Exhibit 907.

13   A.  Yes.

14   Q.  Do you recognize this document?

15   A.  Yes, I do.

16   Q.  How do you recognize it?

17   A.  This is a chart I created showing prescriptions filled at

18   Afam from September 2012 to October 2015.

19   Q.  Does it fairly and accurately summarize information in

20   Government Exhibits 101 and 102?

21   A.  Yes.

22           MS. ESTES:  Your Honor, the government offers

23   Government Exhibit 907.

24           THE COURT:  After carefully considering the previously

25   stated objection, I will overrule it and receive the document.

1          (Government's Exhibit 907 received in evidence)

2          MS. ESTES:  Permission to publish?

3          THE COURT:  Yes.

4   Q.  Ms. Aranaga, what patient is covered by this chart?

5   A.  First name is Stefone.

6   Q.  What drugs are covered by this chart?

7   A.  Oxycodone, methadone, and sulfadin.

8   Q.  What strength oxycodone was the patient receiving?

9   A.  30 milligrams.

10  Q.  Approximately how many doctors wrote the prescriptions for

11  oxycodone?

12  A.  7.

13  Q.  How many oxycodone prescriptions did the patient receive?

14  A.  17.

15  Q.  In total, approximately how many pills did the patient

16  receive?

17  A.  1,800.

18  Q.  Ms. Aranaga, could you please turn in your exhibit binder

19  to what has been premarked as Government Exhibit 908.

20  A.  Yes.

21  Q.  Do you recognize this document?

22  A.  Yes, I do.

23  Q.  How do you recognize it?

24  A.  This is a chart I created showing prescriptions filled at

25  Afam from September 2012 to October 2015.

Q.  Does it fairly and accurately summarize information in
Government Exhibits 101 and 102?

A.  Yes.

        MS. ESTES:  Your Honor, the government offers
Government Exhibit 908.

        THE COURT:  You are really offering this
notwithstanding the previous ruling?  Received.

        (Government's Exhibit 908 received in evidence)

        MS. ESTES:  Permission to publish?

        THE COURT:  Yes.

Q.  Ms. Aranaga, what patient is covered by this chart?

A.  First name Willie.

Q.  What strength oxycodone is the patient receiving?

A.  Mainly 30 milligrams.

Q.  Approximately how many doctors wrote the prescription for
oxycodone?

A.  12.

Q.  How many oxycodone prescriptions did the patient receive?

A.  36.

Q.  In total, approximately how many oxycodone pills did the
patient receive?

A.  3,380.

Q.  Ms. Aranaga, could you please turn in your exhibit binder
to what has been premarked for identification purposes as
Government Exhibit 909.

1    A.   Yes.

2    Q.   Do you recognize this document?

3    A.   Yes, I do.

4    Q.   How do you recognize it?

5    A.   This is a chart I created showing prescriptions filled at

6    Afam Pharmacy from September 2012 to October 2015.

7    Q.   Does it fairly and accurately summarize government records

8    contained in Government Exhibits 101 and 102?

9    A.   Yes, it does.

10         MS. ESTES:  Your Honor, the government offers

11   Government Exhibit 909.

12         THE COURT:  Based on past precedent, I will receive

13   the document.

14         (Government's Exhibit 909 received in evidence)

15         MS. ESTES:  Permission to publish?

16         THE COURT:  Yes.

17   Q.   Ms. Aranaga, what patient does this chart cover?

18   A.   First name is Alberto.

19   Q.   What strength oxycodone was the patient receiving?

20   A.   30 milligrams.

21   Q.   Approximately how many doctors wrote the prescription for

22   oxycodone?

23   A.   8 different doctors.

24   Q.   How many oxycodone prescriptions did the patient receive?

25   A.   30.

1  Q.  In total, approximately how many oxycodone pills did the

2  patient receive?

3  A.  2,970.

4  Q.  Could you please turn in your exhibit binder to what has

5  been premarked for identification purposes as Government

6  Exhibit 910.

7  A.  Yes.

8  Q.  Do you recognize this?

9  A.  I do.

10 Q.  How do you recognize it?

11 A.  This is a chart I created showing prescriptions filled at

12 Afam from September 2012 to October 2015.

13 Q.  Does it fairly and accurately summarize information in

14 Government Exhibits 101 and 102?

15 A.  Yes, it does.

16         MS. ESTES:  Your Honor, the government offers

17 Government Exhibit 910.

18         THE COURT:  I assume you want a bad joke from me at

19 this point, but I've run out.  Received.

20         (Government's Exhibit 910 received in evidence)

21         MS. ESTES:  Permission to publish?

22         THE COURT:  Yes.

23 Q.  Ms. Aranaga, what patient does this chart cover?

24 A.  Patient's first name is Luther.

25 Q.  What strength oxycodone was the patient receiving?

```
 1   A.   30 milligrams.
 2   Q.   Approximately how many doctors wrote the prescriptions for
 3   oxycodone?
 4   A.   7.
 5   Q.   How many oxycodone prescriptions did the patient receive?
 6   A.   21 prescriptions.
 7   Q.   In total, approximately how many oxycodone pills did the
 8   patient receive?
 9   A.   2,131.
10   Q.   Ms. Aranaga, could you please turn to what has been
11   premarked for identification as Government Exhibit 911.
12   A.   Yes.
13   Q.   Do you recognize this document?
14   A.   I do.
15   Q.   How do you recognize it?
16   A.   This is a chart I created showing prescriptions filled at
17   Afam Pharmacy from September 2012 to October 2015.
18   Q.   Does it fairly and accurately summarize government records
19   contained in Government Exhibits 101 and 102?
20   A.   Yes.
21        MS. ESTES:  Your Honor, the government offers
22   Government Exhibit 911.
23        THE COURT:  Received.
24        (Government's Exhibit 911 received in evidence)
25        MS. ESTES:  Permission to publish?
```

 1                THE COURT:  Yes.

 2   Q.  Ms. Aranaga, what patient is covered by this chart?

 3   A.  Patient's first name is Eugene.

 4   Q.  What strength oxycodone was the patient receiving?

 5   A.  30 milligrams.

 6   Q.  Approximately how many doctors wrote the prescriptions?

 7   A.  2.

 8   Q.  How many oxycodone prescriptions did the patient receive?

 9   A.  He received 17.

10   Q.  In total, approximately how many oxycodone pills did the

11   patient receive?

12   A.  1,140.

13   Q.  Ms. Aranaga, could you please turn to what has been

14   premarked as Government Exhibit 912.

15   A.  Yes.

16   Q.  Do you recognize this document?

17   A.  Yes, I do.

18   Q.  How do you recognize it?

19   A.  It's a chart I created showing prescriptions filled at Afam

20   Pharmacy from September 2012 to October 2015.

21   Q.  Does it fairly and accurately summarize information

22   contained in Government Exhibits 101 and 102?

23   A.  Yes, it does.

24                MS. ESTES:  Your Honor, the government offers

25   Government Exhibit 912.

```
 1              THE COURT:  Received.

 2              (Government's Exhibit 912 received in evidence)

 3              MS. ESTES:  Permission to publish?

 4              THE COURT:  Yes.

 5   Q.  Ms. Aranaga, what patient does this chart cover?

 6   A.  First name is Leslie.

 7   Q.  What is the strength of oxycodone the patient is receiving?

 8   A.  30 milligrams.

 9   Q.  Approximately how many doctors wrote the oxycodone

10   prescriptions?

11   A.  3.

12   Q.  How many oxycodone prescriptions did the patient receive?

13   A.  12.

14   Q.  In total, approximately how many oxycodone pills did the

15   patient receive?

16   A.  1,950.

17   Q.  Finally, Ms. Aranaga, could you please turn in your exhibit

18   binder to what has been premarked for identification as

19   Government Exhibit 913.

20   A.  Yes.

21   Q.  Do you recognize this document?

22   A.  Yes, I do.

23   Q.  How do you recognize it?

24   A.  This is a chart I created showing prescriptions filled at

25   Afam Pharmacy from September 2012 to October 2015.
```

Ch4rag03                    Aranaga - direct

1   Q.  Does it fairly and accurately summarize information in

2   Government Exhibits 101 and 102?

3   A.  Yes, it does.

4           MS. ESTES:  Your Honor, the government offers

5   Government Exhibit 913.

6           THE COURT:  Received.

7           (Government's Exhibit 913 received in evidence)

8           MS. ESTES:  Permission to publish?

9           THE COURT:  Yes.

10  Q.  Ms. Aranaga, what patient is covered by this charge?

11  A.  First name is Jorge.

12  Q.  What strength oxycodone was the patient receiving?

13  A.  30 milligrams.

14  Q.  Approximately how many doctors wrote the prescriptions for

15  oxycodone?

16  A.  At least 10 different doctors.

17  Q.  How many oxycodone prescriptions did the patient receive?

18  A.  30.

19  Q.  In total, approximately how many pills did the patient

20  receive?

21  A.  3,070.

22  Q.  Ms. Aranaga, could you now turn in your exhibit binder to

23  what has been marked for identification as Government Exhibit

24  917.

25  A.  Yes.

 1   Q.  Do you recognize this document?

 2   A.  Yes, I do.

 3   Q.  How do you recognize it?

 4   A.  This is a chart I created showing prescriptions filled at

 5   Afam Pharmacy for September 2015 based on Medicaid data.

 6   Q.  Does it fairly and accurately summarize government records

 7   contained in Government Exhibits 300 through 317?

 8   A.  Yes, it does.

 9          MS. ESTES:  Your Honor, the government offers

10   Government Exhibit 917.

11          THE COURT:  Received.

12          (Government's Exhibit 917 received in evidence)

13          MS. ESTES:  Permission to publish?

14          THE COURT:  Yes.

15   Q.  Ms. Aranaga, I would like to walk through this document

16   now.

17          MS. ESTES:  Ms. Bostillo, could you please zoom in to

18   the top portion of the document.

19   Q.  Ms. Aranaga, what does this document show, generally?

20   A.  It shows prescriptions filled.  It's organized by date.  It

21   will show the quantity of pills dispensed, the total moneys

22   paid, the approximate price per quantity, so the price per

23   pill, and the doctor who authored the prescription.

24   Q.  Does it refer to a specific time frame?

25   A.  September of 2015.

1   Q.  How many patients are represented on this chart?

2   A.  10 individual patients.

3   Q.  How many total prescriptions are represented?

4   A.  We have 90 different prescriptions.

5   Q.  How many of these were oxycodone prescriptions?

6   A.  8 prescriptions were for oxycodone.

7   Q.  If you could walk through which patients are covered by

8   this chart.

9   A.  First name Darin, first name Wilfredo, first name Darnell,

10  first name Sheri, first name Jorge, first name Tonya, first

11  name Robert, first name Stefone, first name Wilfredo, first

12  name Duane.

13  Q.  Are these many of the same patients that were covered in

14  the summary charts we just discussed?

15  A.  Yes.

16  Q.  Ms. Aranaga, does this chart reflect a total amount billed

17  to Medicaid this month for these patients?

18  A.  Yes.

19  Q.  What is that total?

20  A.  $14,321.07.

21          MS. ESTES:  Your Honor, may I approach the witness?

22          THE COURT:  Yes.

23          MS. ESTES:  Your Honor, may we have a side bar?

24          (Continued on next page)

25

```
1                    (At the side bar)
2            MR. KEHOE:  The document was presented to us this
3    morning.  I just need a little time to take a look at it,
4    Judge.  I don't anticipate there is going to be any problem.
5            THE COURT:  What is this document?
6            MR. KEHOE:  It's a document containing a map of where
7    these individuals are located and addresses.  I just want to
8    check it out.  This particular witness --
9            THE COURT:  This witness doesn't have any expertise,
10   does she?
11           MS. ESTES:  Your Honor it was turned over to us a
12   couple of days ago.  It's summarizing the addresses.
13           THE COURT:  I think we need to move forward with this
14   witness.  If you want to take a look at it over lunch and if
15   there is a problem, we can, I suppose, recall the witness on
16   Monday.
17           MR. KEHOE:  Judge, to be honest with you, I don't
18   anticipate a problem.  It's just in furtherance of representing
19   my client.
20           THE COURT:  Right.  If there is no problem, then this
21   can be put in by stipulation.
22           MR. KEHOE:  That's right.
23           THE COURT:  Very good.
24           MS. ESTES:  Should we address it with the witness or
25   no?
```

1          THE COURT:  No.

2          (In open court)

3    Q.  Ms. Aranaga, would you please turn in your exhibit binder

4    to what has been premarked for identification as Government

5    Exhibit 918.

6    A.  Yes.

7    Q.  Do you recognize this document?

8    A.  Yes, I do.

9    Q.  How do you recognize it?

10   A.  This is a chart I created depicting the top 15 medications

11   sold by Afam to a certain number of patients, and it's sorted

12   by prescriptions filled.

13   Q.  Does this document fairly and accurately summarize

14   government records contained in Government Exhibits 201 through

15   219?

16   A.  Yes.

17          MS. ESTES:  Your Honor, the government offers

18   Government Exhibit 918.

19          THE COURT:  Received.

20          (Government's Exhibit 918 received in evidence)

21          MS. ESTES:  Permission to publish?

22          THE COURT:  Yes.

23          MS. ESTES:  Ms. Bostillo, could you please zoom in to

24   the chart here.

25   Q.  Ms. Aranaga, let's walk through this document.  Turning to

1    this bar chart, what does the bar on the far left represent?

2    A.  Oxycodone in 30 milligrams tablets.

3    Q.  What does this chart reflect generally?

4    A.  It shows the number of oxycodone prescriptions was almost 2

5    times -- was sold more than 2 times than the next highest drug.

6    Q.  What is the total amount of oxycodone prescriptions?

7    A.  272.

8    Q.  What is the next drug?

9    A.  Ventolin.

10   Q.  What is the total number there?

11   A.  104.

12   Q.  What patients does this chart cover?

13   A.  The patient list is, I'll read it off:  First name Darin,

14   first name Sheri, first name Gilberto, first name Darnell,

15   first name Tonya, first name Michael, first name Duane, first

16   name Robert, first name Stefone, first name Philip, first name

17   Willie, first name Danny, first name Michelle, first name

18   Luther, first name Eugene, first name Leslie, first name

19   Wilfredo, and first name Jorge.

20            MS. ESTES:  Your Honor, may we have a brief side bar?

21            THE COURT:  Yes.

22            (Continued on next page)

23

24

25

1              (At the side bar)

2              MS. ESTES:  Your Honor, we are prepared to rest, but

3    we have these two documents that they are not prepared to

4    stipulate to right now.

5              THE COURT:  We have to have cross-examination first in

6    any event.

7              MS. ESTES:  Right.

8              THE COURT:  After this witness is over, I will tell

9    the jury that the government is prepared to rest subject to a

10   few items that we'll deal with first thing Monday and excuse

11   them.  That preserves your right to get into those things on

12   Monday.

13             MS. ESTES:  Thank you, your Honor.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
1              (In open court)

2              MS. ESTES:  No further questions.

3              THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. KEHOE:

6    Q.  Good afternoon, Ms. Aranaga.  I Greg Kehoe.  I represent

7    Danny Gohari.  Let me go through a couple of documents that you

8    were called upon to testify about by counsel.

9              MR. KEHOE:  These tax returns, if we could put

10   Government Exhibit 1200 on the screen.  If we could blow up the

11   first top of that document a little bit, Ms. Bostillo.

12   Q.  Ma'am, you were called upon to testify.  With all due

13   respect, do you know what a form 1065 is?

14   A.  I know what's in front of me.  I knew once I started

15   reviewing the records what a form 1065 was.

16   Q.  A 1065 is a partnership return?

17   A.  Correct.

18   Q.  A 1065 brings with it a partnership.  In that there are

19   several partners, aren't there?

20   A.  Yes.

21             MS. ESTES:  Objection, your Honor.  Outside the scope.

22             THE COURT:  Overruled.

23   Q.  There are several partners, aren't there?

24   A.  That's the indication, right.

25   Q.  How many partners are there?
```

 1   A.  I would have to go through the documents.  When I was

 2   reviewing them, there were at least two.

 3   Q.  In addition to Mr. Gohari?

 4   A.  Yes.

 5   Q.  So there are three partners?

 6   A.  Right.

 7   Q.  Let's move down and talk a little bit about what the

 8   government showed you.  If we could go down to the income

 9   category.  This has gross receipts of $4,046 and change, does

10   it not?

11   A.  Yes.

12   Q.  Then it has cost of goods sold 3 million 700?

13   A.  Yes.

14   Q.  Based on your experience, Ms. Aranaga, that means that you

15   get money coming in but the pharmacy has to pay for the goods

16   going out, doesn't it?

17           MS. ESTES:  Objection, your Honor.

18           MR. KEHOE:  Your Honor, they put this in and talked to

19   her about it.

20           MS. ESTES:  Your Honor, we didn't proffer this witness

21   as an expert.

22           MR. KEHOE:  They discussed this exhibit, Judge.

23           THE COURT:  I've allowed it so far because it is

24   essentially just a variation on reading from the exhibit.  I

25   will allow that but not if it goes beyond that.  The pending

1   question can stand.

2   Q.  We go to the gross profit after cost of goods sold,

3   $346,048, right?

4   A.  Yes.

5   Q.  If we can move down, I want to show you some part of this

6   that was not discussed on direct.  If we can blow up that

7   portion below the 346 that begins with 23,000.  That reads

8   salaries -- your Honor, I'll try to get through this quickly

9   just reading the documents -- salaries, payments to partners,

10  repairs, rent, depreciation.  If we go all the way down to line

11  22, it reads that the ordinary business income for the

12  partnership is $83,591, right?  Is that what it reads?

13  A.  Yes.

14  Q.  Subject to percentages, that is split with three partners,

15  isn't it?

16  A.  That's my --

17          THE COURT:  Sustained.

18  Q.  If we go to what the government showed you as Exhibit 1201

19  excuse me 1202.  My apologies.  I think the government

20  discussed 1201 and then went to 1202 if my memory serves me

21  correctly.  My apologies.  Do you have it, Ms. Aranaga?

22  A.  Yes.

23  Q.  That's a partnership return again that was discussed with

24  you on direct examination?

25  A.  Correct.

1    Q.  It has an ordinary business income at line 22 that reads

2    104,000, doesn't it?

3    A.  Yes.

4    Q.  If we go to Government Exhibit 1203, what counsel talked to

5    you about, I want to go to the lines that counsel didn't ask

6    you about, which is the bottom line again.  This is a tax

7    return for 2014.  Line 22 says for the partnership there is an

8    ordinary business income of $117,000 for the partnership,

9    right?

10   A.  Yes.

11   Q.  When you were reading through this, you understood that

12   this was not a tax return for Mr. Gohari individually, right?

13   A.  Right.

14   Q.  Counsel took you through a series of documents and records.

15   No, I'm not going to go through all those documents again.  But

16   I would like to talk to you a little bit about how this was

17   structured.  You did this pursuant to instructions coming from

18   the government, right?

19   A.  Yes.

20   Q.  For instance, let's pick one, 901.  I have a few of them

21   here.  I think there are about 14 of them.  901.  It has the

22   columns with the date, prescription, what the drug is,

23   quantity, strength, supply, and the providers?

24   A.  Yes.

25   Q.  There is no line for who actually was the pharmacist who

 1   dispensed it, is there?

 2   A.  No.

 3   Q.  Did the government not ask you to put the dispensing

 4   pharmacist on this chart?

 5   A.  I don't remember that being discussed.

 6   Q.  Let's look.  Let's look at some from the beginning.  Look

 7   at your line on this particular chart 1/9/23, January 9, 2013.

 8   A.  I'm sorry.  What exhibit are we looking at?

 9   Q.  We're looking at Exhibit 901?

10   A.  Right.

11   Q.  If we look at the date January 9, 2013.

12   A.  The date written or the date filled?

13   Q.  That's a good question.  It is the date written.  It should

14   be line, getting help from my colleague here, line 35.

15   A.  It's the same date for both.

16   Q.  Can you take a look at across that line 35.  It's

17   prescribed by Dr. William Scott Belfar.

18   A.  Yes.

19   Q.  If we could turn our attention to Exhibit 219, Government

20   Exhibit 219.  This is prescription records for Mr. Cabrera.

21   And if we go -- pardon my fumbling here -- to page 4, four

22   down, if you look over at the right-hand side it notes the

23   prescribing pharmacist as SA, does it not?

24   A.  Yes.

25   Q.  Do you know who that is?

1   A.  I do not.

2   Q.  You do know that it is not the initials KDG or DG, right?

3   A.  Yes.

4   Q.  Let's look at the next one.  Please put back 901.  Look at

5   like 34, right above it.  It's February 6, 2013.

6   A.  Yes.

7   Q.  You have it in your chart as to Gilberto Cabrera by Sheri

8   Potter.  Let's turn our attention back to 12/19, page 4,

9   Government Exhibit 1219 page 4.  Government Exhibit 219.  We're

10  going five from the top.

11  A.  Yes.

12  Q.  Five from the top, that is the same prescription, is it

13  not?  Can you blow that up, five from the top, the February 6,

14  2013 transaction.  That's the prescription that was on a you

15  are summary chart, right?

16  A.  Yes.

17  Q.  Again we have the initials of SA?

18  A.  Yes.

19  Q.  That's not, clearly, KDG or DG, is it?

20  A.  No.

21         MR. KEHOE:  Why don't you stay on this page so we

22  don't have to flip back and forth.  Can we stay on 219.  Go to

23  the bottom prescription for Mr. Cabrera, 2/25/2013.  Yes that

24  one Ms. Bostillo.

25  Q.  This is 2/25/13, oxycodone going to Mr. Cabrera.  If we

 1    look over at the initials on the right, those initials are SAY,

 2    aren't they?

 3    A.  Yes.

 4    Q.  They are not, of course, KDG or DG?

 5    A.  No.

 6    Q.  If you look back at Exhibit 901 and we look at line 33 of

 7    901, line 33, that's the prescription that we were looking at,

 8    isn't it?

 9    A.  Yes.

10    Q.  It doesn't reflect that the pharmacist who filled it was

11    SAY, does it?

12    A.  No.

13    Q.  There are any number of examples here.  Let's take another

14    one.  You have in your chart right above that at line 31 --

15    keep it there Ms. Bostillo -- line 31, 3/22/13 filled 3/23/13.

16    Do you see that?

17    A.  Yes.

18    Q.  Let's go back to Exhibit 219 on page 6.  Top entry.

19              MS. ESTES:  Your Honor, objection.  Can we approach?

20              THE COURT:  Yes.

21              (Continued on next page)

22

23

24

25

1                  (At the side bar)

2          MS. ESTES:  Your Honor, this is outside the scope of

3    what she testified about.  She testified that she made these

4    charts based on the records.  This is a waste of jury's time

5    because we will have to go back and go over it on redirect.  It

6    will take a long time.  If he keeps this up, we are going to

7    feel compelled to do it.  This is wasting everybody's time.

8          MR. KEHOE:  Your Honor, the fact that the government

9    neglected to put in the fact that any number of these

10   prescriptions that they have in their summary charts that they

11   have introduced into evidence here were not written by my

12   client is something that the jury should know.  They have

13   introduced this summary chart --

14         THE COURT:  No, no.  I agree that it is fair comment

15   on what the documents show.  The question is whether it's

16   appropriate to be questioning this witness about this as

17   opposed to just pointing it out.  Nothing prevents you on

18   summation from pointing out what is in evidence or anything

19   about what is in evidence.

20         However, since the documents are now in evidence, if

21   there are things that you want to point out, I think this is as

22   good a time as any, as long as it doesn't become like a mini

23   summation going on for hours at a time.

24         MR. KEHOE:  I thought you would be inspired by my

25   Friday afternoon mini summation, Judge.

1          THE COURT:  Everything you say is always an

2    inspiration to me.  How long are you going to go with this?

3          MR. KEHOE:  Can I caucus with my folks?  What I was

4    planning on doing was leaving everything out, going through

5    what they left out, just taking a sampling of these.

6          THE COURT:  Caucus with your friends right here and

7    then tell me how long you want to do this.

8          MR. KEHOE:  Okay, Judge.  Thank you.

9          (Pause)

10          MR. KEHOE:  Your Honor, the brain trust has convinced

11    me that we will limit it to probably five more minutes.

12          THE COURT:  That's fine.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2   Q.  Ms. Aranaga, I think you testified that you put these

3   charts together from the instructions from the government,

4   right?  From the attorneys, right?

5   A.  Yes.

6   Q.  Suffice it to say you included in this chart every

7   prescription for oxycodone for these patients that went through

8   Afam Pharmacy, whether Mr. Gohari filled that prescription as a

9   pharmacist or not?

10  A.  Yes.

11  Q.  When we look at these documents, if the jury were to look

12  at these documents, they would have to go through line by line

13  to decide which of these were filled by Mr. Gohari and which

14  were filled by another pharmacist, wouldn't they?

15  A.  I would assume so.

16  Q.  If we are looking to these summary charts as items that are

17  filled just by Mr. Gohari, these summary chart don't do that,

18  do they?

19  A.  No, no.  They summarize what was filled by the pharmacy,

20  not necessarily by Mr. Gohari.

21          MR. KEHOE:  Thank you very much.  You have been very

22  helpful.  Thank you, your Honor.

23          THE COURT:  Any redirect?

24          MS. ESTES:  Very briefly, your Honor.

25  REDIRECT EXAMINATION

1    BY MS. ESTES:

2    Q.  Ms. Aranaga, what is your understanding of who owns the

3    pharmacy?

4    A.  Mr. Gohari.

5            MS. ESTES:  No further questions.

6    RECROSS-EXAMINATION

7    BY MR. KEHOE:

8    Q.  Didn't you tell us on cross-examination that this is a

9    partnership?

10   A.  Indeed.  The tax records, when I perused them, show that he

11   owns approximately 65 percent.

12   Q.  There are two other partners in that, aren't there?

13   A.  Yes.

14   Q.  So when you say that Mr. Gohari owns the partnership, there

15   are in fact three owners, aren't there?

16   A.  There are.  He owns the majority.

17   Q.  My question is, there are three owners?

18   A.  Yes.

19           MR. KEHOE:  Thank you, your Honor.

20           THE COURT:  Anything else, counsel for the government?

21           MS. ESTES:  Your Honor, may we approach?

22           (Continued on next page)

23

24

25

 1                (At the side bar)

 2                MS. ESTES:  Your Honor, we are done with the witness

 3   for now other than those two charts.

 4                THE COURT:  You don't need to approach for that.  I

 5   knew that.  I just meant did you have any other questions for

 6   the witness.

 7                MS. ESTES:  Not today.

 8                THE COURT:  Just so we are clear, with the proper

 9   stipulation you won't need to recall this witness?

10                MR. KEHOE:  I'll tell them later today or tomorrow,

11   Judge.  Just the maps.

12                MS. ESTES:  That's right, your Honor.

13                THE COURT:  If you don't get the proper stipulation,

14   then you will recall the witness.  Very good.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court)

 2                (Witness excused)

 3           THE COURT:  Ladies and gentlemen, the government has

 4   informed me that subject to one or two items that will come in

 5   of a documentary nature on Monday, they have completed their

 6   case.  That is where I thought we ought to be by Friday.  We

 7   are going to excuse you for the entire weekend.  I know your

 8   hearts are all aflutter at this point.

 9           By the way, I have taken note today both of still

10   another hat from juror 11 and I see that some of the other

11   persons here, for example, Juror No. 7, is wearing really quite

12   a lovely sweater there.  I know the competition is intense.

13           Don't think about this case over the weekend.  As I

14   have told you before, don't talk about it with anyone.  We are

15   right on schedule.  We will reconvene on Monday at 9 o'clock.

16   It will probably go a full day, until about 4 o'clock, maybe

17   3:30.  3:30 or 4:00 on Monday.  Have a great weekend, and I

18   will see you next week.

19                (Jury present jury not present)

20           THE COURT:  Where do we stand on the defense case?

21           MR. KEHOE:  We are ready to go Monday morning, Judge.

22           THE COURT:  I understand that.  Have you told the

23   government which witnesses you are going to call?

24           MR. KEHOE:  I will tell them.  I have a meeting set up

25   with Mr. Bachner this afternoon, and we will cull this witness
```

1  list out.  We actually have been talking about it, talked about

2  it this morning.

3            THE COURT:  Till 5 o'clock today?

4            MR. KEHOE:  If you can give me until 6:00, Judge?

5            THE COURT:  You drive a tough bargain.  All right, 6

6  clock.

7            MR. KEHOE:  We will cull this down.  It could be

8  before that.

9            THE COURT:  Also send the Court a list of who the

10  witnesses are that you intend to call.

11            MR. KEHOE:  We will do so.

12            THE COURT:  You need to include in that the defendant

13  if you propose to call him.

14            MR. KEHOE:  Yes.

15            THE COURT:  Very good.  See you all Monday.

16            (Adjourned to 9:00 a.m., November 7, 2016)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examinationof:                    Page

SHERI BOWEN

     Direct By Mr. Richman . . . . . . . . . . 576
     Cross By Mr. Kehoe  . . . . . . . . . . . 616


MAURA HAYES-CHAFFE

     Direct By Ms. Estes . . . . . . . . . . . 679
     Cross By Mr. Kehoe  . . . . . . . . . . . 685


AMBAR ARANAGA

     Direct By Ms. Estes . . . . . . . . . . . 690
     Cross By Mr. Kehoe  . . . . . . . . . . . 719
     Redirect By Ms. Estes . . . . . . . . . . 729
     Recross By Mr. Kehoe  . . . . . . . . . . 729

1                          GOVERNMENT EXHIBITS

2       Exhibit No.                                  Received

3       300 through 325 and 1003   . . . . . . . . . 679

4       500   . . . . . . . . . . . . . . . . . . . . 683

5       617   . . . . . . . . . . . . . . . . . . . . 582

6       900   . . . . . . . . . . . . . . . . . . . . 695

7       901   . . . . . . . . . . . . . . . . . . . . 697

8       902   . . . . . . . . . . . . . . . . . . . . 698

9       903   . . . . . . . . . . . . . . . . . . . . 699

10      904   . . . . . . . . . . . . . . . . . . . . 701

11      905   . . . . . . . . . . . . . . . . . . . . 702

12      906   . . . . . . . . . . . . . . . . . . . . 703

13      907   . . . . . . . . . . . . . . . . . . . . 705

14      908   . . . . . . . . . . . . . . . . . . . . 706

15      909   . . . . . . . . . . . . . . . . . . . . 707

16      910   . . . . . . . . . . . . . . . . . . . . 708

17      911   . . . . . . . . . . . . . . . . . . . . 709

18      912   . . . . . . . . . . . . . . . . . . . . 711

19      913   . . . . . . . . . . . . . . . . . . . . 712

20      917   . . . . . . . . . . . . . . . . . . . . 713

21      918   . . . . . . . . . . . . . . . . . . . . 716

22      1100   . . . . . . . . . . . . . . . . . . . 613

23      1200 through 1209   . . . . . . . . . . . . 690

24

25