GB7LGOH1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA

       v.                           16 CR 246 (JSR)

KIAN GOHARI,

                                Jury Trial

          Defendant.

------------------------------x

                               New York, N.Y.
                               November 7, 2016
                               9:29 a.m.

Before:

                  HON. JED S. RAKOFF,

                               District Judge

                      APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JORDAN L. ESTES
JASON A. RICHMAN
EDWARD B. DISKANT
    Assistant United States Attorneys

GREGORY W. KEHOE
ILANA HARAMATI
MICHAEL BACHNER
    Attorneys for Defendant

GB7LGOH1

1           (Trial resumed; jury not present)

2           THE COURT:  All right.  We received a note from juror

3    No. 7.  A copy has been given to all counsel and it is marked

4    as jury note No. 1.  It says on Friday, November 3, you showed

5    us a picture of Dr. Ahmad.  I think that he used to work at

6    Cerebral Palsy Associations of New York State, Inc., at a

7    clinic as a medical doctor where I work as a dental assistant.

8    We never worked together at the same exam room.  We did not

9    communicate with each other because of our specialties.

10   Sincerely yours, Zinaida Zlotnik.

11           I don't see any reason to take any action, but does

12   any counsel disagree?

13           MR. KEHOE:  No, your Honor, other than maybe the

14   calendar references the wrong date.  It's either Thursday, the

15   3rd, or Friday, the 4th.  It doesn't make any difference.

16           THE COURT:  I think it was the picture, if I recall,

17   was Friday the 4th.

18           MR. KEHOE:  I think it was.  And we have no.

19           MS. ESTES:  We don't think we need.

20           THE COURT:  Okay.  Very good.

21           Have you worked out the stipulations?

22           MR. KEHOE:  Yes, your Honor.

23           THE COURT:  Okay.  So let's take now any motions that

24   anyone wants to make at the close of the government's case.

25           MS. ESTES:  Your Honor, if I may, we did want to

GB7LGOH1

1   actually put on these two exhibits through the witness again,

2   the summary witness.  They will be very short, like ten

3   minutes.

4           THE COURT:  Okay.  Then let's forget about the motions

5   for now.  We'll take them up at the side bar.  Let's get the

6   jury in.  Get the witness on the stand.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB7LGOH1

1          (Jury present)

2          THE COURT:  So, ladies and gentlemen, I see the

3     competition is heating up.  Well, juror No. 11 has her usual

4     superb finery.  Juror No. 4 is wearing a very nice color dress.

5     And juror No. 5 has this really quite stunning scarf.  And

6     alternate No. 3, not about to be outdone, has a multicolored

7     shirt.  So I don't know.  It's beyond my ability to make a

8     judicial decision here.

9          So, by the way, juror No. 7, thank you very much for

10    bringing the matter you brought to our attention.  Neither

11    counsel nor I see any problem, but we appreciate your bringing

12    it to our attention.

13         All right.  We have a short bit more of the

14    government's case which we'll take right now.

15         MS. ESTES:  Your Honor, the government would first

16    like to read a stipulation into the record regarding the tax

17    return exhibits that were submitted on Friday.

18         It is hereby stipulated and agreed that Government

19    Exhibits 1200, 1201, 1202, and 1203, including all parts and

20    subdivisions thereof, are true and correct copies of documents

21    submitted to the IRS by or on behalf of the partnership Afam

22    Pharmacy Associates LLC for the tax years 2011, 2012, 2013, and

23    2014, respectively.

24         Government Exhibit 1204, including all parts and

25    subdivisions thereof, is a true and correct copy of a draft tax

GB7LGOH1                    Aranaga - direct

1    return in the name of the partnership Afam Pharmacy Associates

2    LLC for the tax year 2015.

3            Government Exhibits 1205, 1206, 1207, and 1208,

4    including all parts and subdivisions thereof, are true and

5    correct copies of documents submitted to the IRS by or on

6    behalf of Kian D. Gohari, the defendant, for the tax years

7    2011, 2012, 2013, and 2014, respectively.

8            Finally, Government Exhibit 1209, including all parts

9    and subdivisions thereof, is a true and correct copy of a draft

10   tax return in the name of Kian D. Gohari, the defendant, for

11   the tax year 2015.

12           Your Honor, permission to approach the witness?

13           THE COURT:  Yes.

14    AMBAR ARANAGA, recalled,

15        called as a witness by the Government,

16        having previously been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. ESTES:

19   Q.  Good morning, Ms. Aranaga.  I've handed you what's been

20   marked for identification purposes as Government Exhibit 919.

21   Do you recognize this document?

22   A.  Yes, I do.

23   Q.  How do you recognize this?

24   A.  This is geospatial plotting map that I created plotting

25   patient addresses for a certain number of patients.

1   Q.  Does it fairly and accurately summarize information

2   contained in Government Exhibits 101 and 102?

3   A.  Yes.

4           MS. ESTES:  Your Honor, the government offers

5   Government Exhibit 919.

6           THE COURT:  Any objection?

7           MR. KEHOE:  No objection, your Honor.

8           THE COURT:  Received.

9           (Government's Exhibit 919 received in evidence)

10          MS. ESTES:  Permission to publish?

11          THE COURT:  Yes.

12  Q.  Ms. Aranaga, I'd like to walk through this document

13  briefly.  Turning to the blue marker on the document, what does

14  that represent?

15  A.  That is the plot for Afam Pharmacy at 5207 Church Avenue in

16  Brooklyn, New York.

17  Q.  And what do the yellow markers represent?

18  A.  Those are points that correspond to addresses for patients

19  that were reported.

20  Q.  And so turning to the yellow markers, which patient lives

21  farthest from the pharmacy?

22  A.  Robert Hespeth, who used three different addresses, but one

23  in particular -- it was out in Queens even though it was

24  reported Brooklyn.

25  Q.  As to the next farthest, who was that patient?

GB7LGOH1                          Aranaga - direct

 1   A.  Ben Darin.

 2   Q.  And where was his address approximately?

 3   A.  In Jamaica.

 4   Q.  Which patient lived closest to the pharmacy?

 5   A.  Eugene Seaman.

 6   Q.  Approximately how close did he live?

 7   A.  Within a 1-mile radius.

 8   Q.  How many patients lived within a 1-mile radius of the

 9   pharmacy?

10   A.  Just one.

11   Q.  And who was that?

12   A.  Eugene Seaman.

13          MS. ESTES:  Your Honor, permission to approach?

14          THE COURT:  Yes.

15   Q.  Ms. Aranaga, I handed you what's been premarked for

16   identification purposes as Government Exhibit 921.  Do you

17   recognize this document?

18   A.  Yes, I do.

19   Q.  How do you recognize it?

20   A.  This is a chart that was created showing the patient

21   prescription totals, the amounts paid by Medicaid.

22   Q.  Does it fairly and accurately summarize information

23   contained in Government Exhibits 201 through 219?

24   A.  Yes, it does.

25          MS. ESTES:  Your Honor, the government offers

 1    Government Exhibit 921.

 2                MR. KEHOE:  No objection, Judge.

 3                THE COURT:  Received.

 4                (Government's Exhibit 921 received in evidence)

 5                MS. ESTES:  Permission to publish?

 6                THE COURT:  Yes.

 7    Q.  Ms. Aranaga, you said this contained prescription totals.

 8    Relating to what pharmacy?

 9    A.  Afam Pharmacy.

10    Q.  Let's just walk through a few of these very briefly.

11                What's the total for Alberto Nazario?

12    A.  $47,999.52.

13    Q.  And for Tonya Freeman?

14    A.  $5,356.44.

15    Q.  And for Darin Ben or Ben Darin?

16    A.  $87,251.25.

17    Q.  And let's just skip down a little to Willie Johnson.

18    A.  $54,920.69.

19    Q.  For Sheri Bowen what's the total?

20    A.  $31,838.55.

21    Q.  Let's look at two more.  For Wilfredo Stretz what's the

22    total?

23    A.  $32,982.34.

24    Q.  And for Gilberto Cabrera what's the total?

25    A.  $17,341.70.

GB7LGOH1                    Aranaga - cross

1   Q.  What's the total amount of these prescriptions for all of
2   these patients listed here?
3   A.  $451,360.27.
4            MS. ESTES:  No further questions.
5            MR. KEHOE:  Thank you, your Honor.
6            Ms. Bustillo, could we put 920.
7   CROSS-EXAMINATION
8   BY MR. KEHOE:
9   Q.  920, the chart that you just had, ma'am, 921, I apologize.
10  This 451,000 plus, what does that percentage, what was the
11  percentage of total sales in Afam Pharmacy during that three
12  plus year period?
13  A.  I didn't calculate that.
14  Q.  So you don't know if that is a minuscule amount or a large
15  amount, do you?
16  A.  Comparatively, no.
17  Q.  And if we -- you gave us a chart of various patients in
18  919.  Can we go back to 919.  Now, did you plot other patients
19  besides these individuals as to how far they were away from the
20  Afam Pharmacy?
21  A.  No.  The list of patients was provided by the U.S.
22  Attorney's Office.
23  Q.  So the U.S. Attorney's Office didn't ask you to look at
24  other patients in the pharmacy to see if they were yet further
25  away from these individuals, did they?

GB7LGOH1

1    A.  No.

2    Q.  And as a consequence you just didn't do that?

3    A.  Actually, I plotted quite a few, but they were interested

     in this particular set.

5    Q.  So the government wanted you to just do these?

6           MS. ESTES:  Objection.

7           THE COURT:  Sustained.

8           MR. KEHOE:  Thank you very much.  No further

9    questions.

10          THE COURT:  Anything else?

11          MS. ESTES:  No, your Honor.

12          THE COURT:  You may step down.  Thank you very much.

13          THE WITNESS:  Thank you, sir.

14          (Witness excused)

15          THE COURT:  Anything else from the government?

16          MS. ESTES:  No, your Honor.

17          THE COURT:  Does the government rest?

18          MS. ESTES:  Yes, your Honor.

19          THE COURT:  All right.  Counsel, come to the side bar.

20          (Continued on next page)

21

22

23

24

25

GB7LGOH1

1              (At the side bar)

2              THE COURT:  Any motions from the defense?

3              MR. KEHOE:  Yes, your Honor, make a Rule 29 motion.

4    The evidence is insufficient to sustain a conviction, Judge.

5              Central to this entire conspiracy both in Count One

6    and Count Two is the testimony of Gilberto Cabrera.  Gilberto

7    Cabrera testified that Danny Gohari told him to bring all of

8    the scripts, prescriptions, pardon me, to his pharmacy and then

9    as a consequence he would fill his oxycodone scripts.  So that

10   was the central feature of this conspiracy.  In fact, as

11   Mr. Winsley, the government's witness, noted, that telling an

12   individual to bring his or her scripts, all of his or her

13   scripts to the pharmacy is something that they are instructed

14   to do and taught to do in the pharmacy.  It completely

15   undercuts this idea coming from Cabrera that the reason why

16   Gohari asked to bring all these scripts was for some illegal,

17   nefarious reason.  The reason it was done was that is the way

18   pharmacists are trained, as Mr. Winsley said, and it completely

19   vitiates this conspiracy outlined by the government.

20             THE COURT:  So my recollection is that Mr. Cabrera,

21   among much else, testified that he had an agreement with the

22   defendant whereby he would -- the defendant would fill

23   questionable oxycodone prescriptions in return for Mr. Cabrera

24   bringing him lucrative high-end prescriptions.  Wasn't there

25   testimony to that effect?

GB7LGOH1

1          MR. KEHOE:  If we stay with that one point where he

2     said that the quid pro quo in his mind was that Danny said to

3     him bring me these prescriptions, bring me all of your

4     prescriptions.

5          THE COURT:  I don't think that's my recollection.

6          In any event, what does the government have to say

7     about this?

8          MS. ESTES:  Your Honor, there's ample evidence that

9     there was a conspiracy to distribute medically unnecessary

10    oxycodone.  Mr. Cabrera testified about this agreement where he

11    dispensed oxycodone in exchange for getting the high-end

12    medications.  He also testified that the defendant remarked on

13    occasions about he must be making good money off the oxycodone,

14    which suggests he knew that it was medically unnecessary.

15         There's also testimony that the defendant never asked

16    about these patients' pain, that he wasn't inquiring about why

17    they needed these oxycodone pills; and there was expert

18    testimony that a reasonable pharmacist would know these are

19    medically unnecessary.

20         THE COURT:  Yes, I think there is enough to go to the

21    jury.  The motion is denied.

22              (Continued on next page)

23

24

25

1              (In open court)

2              THE COURT:  All right.  Ladies and gentlemen, the

3      defendant does not have to put on any case because the burden

4      is always on the government to prove its case beyond a

5      reasonable doubt.  However, the defendant in this case has

6      decided to call a number of witnesses.

7              So please call your first witness.

8              MR. KEHOE:  Yes, your Honor.  The defense calls Ronald

9      Quintero.

10             THE DEPUTY CLERK:  Is someone getting this person?

11             THE COURT:  It's the defense counsel's job to get the

12     witness.

13             MR. KEHOE:  Ms. Haramati is going to get him.

14      RONALD GARY QUINTERO,

15          called as a witness by the Defendant,

16          having been duly sworn, testified as follows:

17             MR. KEHOE:  Thank you, your Honor.

18     DIRECT EXAMINATION

19     BY MR. KEHOE:

20     Q.  Mr. Quintero, what do you do for a living?

21     A.  I'm a certified public accountant.  I get involved in

22     various other financially oriented matters, operationally

23     oriented matters, and forensic accounting.

24     Q.  What does that mean when you say you get involved in them,

25     what in fact do you do?

1    A.  As an independent professional advisor, I will investigate

2    a variety of different matters on behalf of my clients, put

3    together analyses, render advice on behalf of my clients.  And

4    my clients are very wide ranging.  I have served on over a

5    thousand engagements during my 41-year professional career.

6    Q.  And your clients, do they include anybody in working -- any

7    entity within the United States government?

8    A.  Yes, sir, several entities.

9    Q.  And what would those entities be?

10   A.  Includes the United States Department of Justice, the

11   Federal Deposit Insurance Corporation, the United States

12   Department of Agriculture, as well as others.

13   Q.  And, sir, how long have you been doing this work?

14   A.  Since 1975.

15   Q.  And, by the way, I know your name is Ronald Quintero.  Do

16   you work for a particular entity or company?

17   A.  Yes, sir, I have two firms -- Chartered Capital Advisors,

18   which provides financial advisory services; and RG Quintero and

19   Company is a CPA firm, not that we're doing anybody's audits or

20   tax returns, but rather for certain types of projects, such as

21   ones that I've done for the Department of Justice, I'm

22   technically hired as a CPA.

23   Q.  And can you give us an idea of your educational background,

24   Mr. Quintero?

25   A.  Yes, sir.  I have an undergraduate degree in economics and

1   Spanish literature from Lafayette College.  I have a master's

2   degree in accountancy from the New York Stern School of

3   business.  I have an advanced professional certificate, which

4   is an intermediate degree between a master's degree and a PhD.

5   My field of study was investment management.  I also earned

6   that from NYU.

7           I have ten professional licenses.  I'm a certified

8   public accountant, certified management accountant, certified

9   fraud examiner.  I'm AICPA certified in financial forensics.  I

10  am a chartered financial analyst, certified financial planner.

11  I am AICPA accredited in business valuation.  I am a certified

12  insolvency and restructuring advisor and certified turnaround

13  professional.

14          In connection with all these designations I have

15  annual professional continuing education requirements of up to

16  40 hours per year.  I've always vastly exceeded the annual

17  requirements since I earned my first professional designation

18  as CPA in 1977.

19  Q.  Now, sir, you were hired in fact to work on this particular

20  case, and just by way of background, have you and I worked

21  together before?

22  A.  Yes.

23          THE COURT:  Sustained.

24          MR. RICHMAN:  Thank you, your Honor.

25  Q.  Sir, are you being compensated for your work at an hourly

GB7LGOH1                      Quintero - direct

1   rate?

2   A.  I am.

3   Q.  What is that rate?

4   A.  $510.

5   Q.  Now, you noted that you are working for the defense in this

6   case and you've also worked for the government?

7   A.  Yes, sir, I have.

8   Q.  And are you planning to testify for the government at any

9   time in the near future?

10   A.  Yes, sir, on Wednesday.

11   Q.  Now, sir, you noted a variety of enterprises that you have

12   examined.  Do any of those enterprises that you've examined in

13   the past involve the medical field or the pharmacy field?

14   A.  More than 70 of them.

15   Q.  And in what capacity have you looked at those?

16   A.  For applying the functional skills that I have ranging from

17   advisory service to fraud investigations to working in valuing

18   the businesses, preparing financial forecasts.  So the basic

19   functional skills I deliver have been applied across a wide

20   range of entities within various aspects of the -- either the

21   pharmacy business or pharmaceutical products or insurance and

22   managed care.

23   Q.  Now, Mr. Quintero, let's turn our attention to this case

24   particularly and you've worked with Afam Pharmacy.  What were

25   you asked to do?

1    A.  I reviewed the complaint and the indictment.  I was

2    provided a variety of information, most of which was produced

3    by the U.S. government in this matter.  And after having

4    reviewed it, I was asked to provide relevant financial analyses

5    that would pertain to this case.

6    Q.  And, sir, again, you examined all of that item and you came

7    up looking at the numbers.  Did those items include the tax

8    returns of Afam and individually Mr. Gohari?

9    A.  Yes, that was included.

10   Q.  Now, based on your work, sir, did you develop a series of

11   charts and -- summary charts that you presented?

12   A.  I did.

13   Q.  And let's just go through those and let me go through the

14   basis of those and then we'll talk about them one by one.  If

15   we could put on the screen Defendant's Exhibit 81.

16             MR. RICHMAN:  On whose screen?

17             Your Honor.

18             MR. KEHOE:  Just on the screen here.

19             May I approach, Judge?

20             THE COURT:  Yes.

21   Q.  Taking a look at, Mr. Quintero, Defendant's Exhibit 81, and

22   putting that -- did you put that particular demonstrative

23   exhibit together?

24             MS. ESTES:  Objection, your Honor, leading.

25             THE COURT:  Overruled.

1    A.  Yes, sir, I created this exhibit.

2    Q.  And looking at that exhibit, did you examine the Government

3    Exhibits, the Medicare billings, Government Exhibit 322 to 325?

4              MS. ESTES:  Objection, your Honor.

5              THE COURT:  Ground?

6              MR. RICHMAN:  Leading.

7              THE COURT:  It is leading, but it's leading for a

8    totally foundational purpose.  Overruled.

9              MR. RICHMAN:  Thank you.

10   A.  Yes, sir.  I developed this from the sources that are so

11   indicated, that being the Medicaid database that was provided.

12             THE COURT:  I think the answer to the question is yes.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Let's move along.

15             MR. KEHOE:  Yes, your Honor.  I'm just trying to get

16   through these quickly.

17   Q.  You also looked at the pharmacy tax return Government

18   Exhibit 202 to 204?

19   A.  I did.

20   Q.  Now let's turn, we can put Defendant's Exhibit 82 on the

21   screen.

22             MR. KEHOE:  If I may, Judge, to expedite this, can I

23   just give this stack of documents to Mr. Quintero?  It just

24   will expedite matters.

25             THE COURT:  Yes.

1   Q.  Now, just looking at Government Exhibit 82, sir, did you,

2   putting that chart together, did you use the pharmacy tax

3   returns, again, Government Exhibits 1202 to 1203, 1200 to 1203?

4   A.  I'm unsure as to the exhibit numbers of the tax returns,

5   but I prepared this exhibit based on the tax returns of Afam

6   for the periods 2011 through 2015.

7   Q.  Okay.  Let's turn our attention to Defendant's Exhibit 83.

8   Do you have that before you?

9   A.  I do.

10  Q.  Is Defendant's Exhibit 83, that chart, is that based on the

11  pharmacy tax returns you just alluded to?

12  A.  Yes, sir.

13  Q.  How about Defendant's Exhibit 84?

14  A.  I prepared this document as well.

15  Q.  Did you base that on the Medicare billings, Government

16  Exhibit 322 to 325, as well as the Medicaid database

17  Government, Exhibit 300 to 317?

18  A.  I prepared this based on the Medicaid database.  Again, I'm

19  uncertain as to the exhibit numbers for the documents that you

20  just referred to.

21  Q.  Let's turn our attention to Defendant's Exhibit 85.

22  Defendant's Exhibit 85, is that likewise based on the pharmacy

23  tax returns and the Medicaid database?

24  A.  Yes, sir, it is, and I prepared this document.

25  Q.  And Government Exhibit 86, Government Exhibit 86, excuse

1    me, Defendant's Exhibit 86, is that likewise based on the

2    Medicaid database and the patient profiles that you examined?

3    A.  Yes, sir, it is.

4    Q.  Let's turn our attention to Defendant's Exhibit 87.  Is

5    that likewise based on the Medicaid database, the patient

6    profiles, and the pharmacy tax returns?

7    A.  Yes, sir.

8    Q.  And Defendant's Exhibit 88, is that likewise based on the

9    Medicaid database in evidence?

10   A.  Yes, sir.

11   Q.  89?

12   A.  This one is as well.

13   Q.  That's likewise based on the Medicaid database in evidence.

14   Excuse me, 91?

15   A.  Excuse me, sir.  On 89, that is based on the patient

16   profiles and the crystal database.

17   Q.  Thank you.  And 91, is that likewise based on the Medicaid

18   database?

19   A.  Yes, sir, it is.

20   Q.  And Defendant's Exhibit 92?

21   A.  Yes, sir, it is.

22          MR. KEHOE:  Your Honor, at this time, as a

23   demonstrative aid to the jury, before we go through the

24   testimony on this the defense would like to exhibit Defendant's

25   Exhibit 81, 82, 83, 84, 85, 86, 87, 88, 89, 91, and 92.

1        MR. RICHMAN:  No objection, your Honor.  Thank you.

2        THE COURT:  Received.

3        (Defendant's Exhibits 81, 82, 83, 84, 85, 86, 87, 88,

4   89, 91, and 92 received in evidence)

5        THE COURT:  Ladies and gentlemen, you should

6   understand with respect to these charts -- I think as I recall

7   there were some similar charts from the government -- these are

8   summaries of data from exhibits, underlying exhibits that are

9   already in evidence.  So they may be a useful summary for you,

10  but if you have any question about them, you'll have to look at

11  the underlying evidence that's also part of what you will be

12  receiving.

13        Go ahead, counsel.

14        MR. KEHOE:  Thank you, your Honor.

15  Q.  Mr. Quintero, I'd first like to, if we can turn our

16  attention first to Exhibit 81, and if we could put Exhibit 81

17  on the screen.  Now, explain to the jurors exactly what 81 is.

18  A.  Exhibit 81 reveals the total sales of Afam between 2012 and

19  2015, breaking it down into two payer sources.  The blue boxes

20  are the revenues that were funded or the sales that were funded

21  by Medicaid.  The red boxes contain the sales that were funded

22  by other payer sources such as Medicare, third party insurance

23  companies, or individuals paying out of their own pockets.

24  Q.  Now, sir, just before we get into this, in this Afam

25  Pharmacy, did you take a look at in your examination of the tax

1    returns information concerning this pharmacy as to whether or

2    not it was a limited liability company, a partnership, etc.?

3    A.  Yes, sir, I did.

4    Q.  And what did you conclude based on that?

5    A.  It is a limited liability corporation --

6               MR. RICHMAN:  I apologize, your Honor.  We would

7    object subject to the Court's prior.

8               THE COURT:  Which of my prior rulings are you

9    referring to?

10              MR. RICHMAN:  Your Honor, if we could briefly.

11              THE COURT:  I have my prior rulings.  Which one are

12   you referring to?

13              MR. RICHMAN:  Nothing from the order, your Honor, but

14   from the appearance that predicated the order.

15              THE COURT:  From the?

16              MR. RICHMAN:  The hearing concerning this testimony

17   that came before.

18              THE COURT:  You have something from the transcript?

19              MR. RICHMAN:  I think I could show you something

20   specific, your Honor.

21              Your Honor, our understanding was that the witness

22   would be testifying as a summary witness concerning some of the

23   numbers underlying his analysis.  This testimony seems to veer

24   away from that cabined testimony.

25              THE COURT:  Well, first, I think the rulings of the

GB7LGOH1                          Quintero - direct

1  Court were quite clear as to what he could or could not testify

2  to, and I don't think it addressed that issue.  Second, this

3  was opened in prior testimony, concededly by defense

4  cross-examination, but without objection.  So I will within

5  narrow limits allow this.  Overruled.

6          MR. RICHMAN:  Thank you, your Honor.

7          MR. KEHOE:  Thank you, your Honor.

8  Q.  Could you proceed on that score?

9  A.  Yes, sir.  Afam is a limited liability corporation which is

10  taxed not directly, but rather the taxable income of the

11  limited liability corporation, or LLC, is paid personally by

12  the members or partners in the limited liability corporation.

13  Q.  So based on that, sir, when you say -- what about with the

14  individual partners, are they taxed thereafter?

15  A.  Yes.  For all intents and purposes, all of the taxable

16  income of the limited liability corporation is untaxed at the

17  corporate level.  It's rather taxed at the partnership level.

18  So they personally pay the taxes based on any income realized

19  by the corporation.

20  Q.  And was this information that you culled from the tax

21  returns for the partnership and for Mr. Gohari personally?

22  A.  Yes, sir.

23  Q.  Now, from those same tax returns, did you also understand

24  when Afam Pharmacy opened, the year?

25  A.  Yes, sir.

1    Q.  And what year was that?

2    A.  2010 September.

3    Q.  Now going back --

4    A.  Excuse me.  More precisely, it was incorporated on that

5    day.  The tax return doesn't say when the first day of

6    operations was.

7    Q.  I stand corrected.  Thank you.

8            Going back to Defendant's Exhibit 81, if we can.

9    These are Medicaid, non-Medicaid sales for the pharmacy for the

10   operative time frame?

11   A.  Yes, 2012 through 2015.

12   Q.  So if we take a look at this, for instance, in 2013, there

13   is non-Medicaid sales of 779; is that right?

14   A.  That is correct.

15   Q.  And Medicaid of a million?

16   A.  Approximately, yes, sir.

17   Q.  If we turn to 2014, it's 3,432,335 for non-Medicaid, and

18   $1,683,918 for Medicaid; is that accurate?

19   A.  Yes, sir, that is correct.

20   Q.  Let us turn our attention, if we may, to Exhibit 81.

21           Excuse me, 82, my apologies, Defendant's Exhibit 82.

22   Now, what is this, sir?  You prepared this chart.  Can you

23   explain this for the jurors?

24   A.  Yes, sir.  This summarizes information from the company's

25   income tax returns.  It shows that over the five-year period

1   sales grew from $4,046,000 in 2011 to eventually 18,925,000,

2   rounded, in 2015.  However, what's significant is a specialty

3   pharmacy --

4            MR. RICHMAN:  Objection, your Honor.

5            THE COURT:  Sustained.

6            MR. RICHMAN:  Thank you, your Honor.

7   Q.  Well, keep that blown up.  If you could go through the

8   costs of goods sold, can you explain that next line, sir?

9   A.  Yes, sir.  The costs of goods sold is the cost of the

10  medications that are actually dispensed by the pharmacy, as

11  well as other products dispensed by the pharmacy.

12           MR. RICHMAN:  Objection, your Honor, to this line of

13  questioning.  This is going beyond the tax returns.

14           MR. KEHOE:  Your Honor, if I may, I can show you the

15  tax return.

16           THE COURT:  That's not the issue.  Tell me where in

17  his report this appears.

18           MR. KEHOE:  It would be observation three.  Exhibit 5.

19  If you look under that observation, Judge, it's the bullet

20  point.

21           THE COURT:  Overruled.  You may testify.

22  Q.  Proceed, sir.

23  A.  Yes, sir.  Most significantly in reviewing this financial

24  statements is not the sales --

25           THE COURT:  No, that was clearly excluded.

GB7LGOH1                          Quintero - direct

1              THE WITNESS:  You're asking about the cost of goods

2     sold.

3              THE COURT:  Let's have the last question reread.

4              (Record read)

5              THE COURT:  By that I take it to mean what does this

6     line refer to.

7              MR. KEHOE:  Yes, your Honor.

8              THE COURT:  Not anything beyond that.

9              MR. KEHOE:  Yes, your Honor.

10    A.   The cost of goods sold is the cost of the pharmaceutical

11    products, in other words, the medications, and other products

12    that were sold by the specialty pharmacy.

13    Q.   Now, sir, now your next line is gross profit.  What is

14    that?

15    A.   The gross profit is the difference between the selling

16    price of the products and the cost associated with those

17    products.  So that is the net from the sales realized by the

18    pharmacy.

19             MR. KEHOE:  If I may, Judge, this is Government

20    Exhibit 1200.  May I approach, Judge?

21             THE COURT:  Yes.

22    Q.   Show you what's been received in evidence as Government

23    Exhibit 1200.  And is there a line there for operating costs?

24    A.   There are several lines that contain operating costs.

25    Q.   Okay.  And let us turn our attention back with to

1  Defendant's Exhibit 82 on the screen, operating costs.  What do

2  you mean by operating costs?

3  A.   These are the costs of running the pharmacy.  They include

4  salaries and wages, guaranteed payments to partners, rent, and

5  miscellaneous other expenses, such as utility costs, other

6  costs associated with running a retail establishment.

7  Q.   Now, let us go down to in the tax return that the

8  government introduced into evidence, which is Government

9  Exhibit 1200, is there a line there for ordinary business

10  income?

11  A.   Yes, sir, there is.

12  Q.   And let's go back to your chart, Defendant's Exhibit 82.

13  Is there a line for ordinary business income?

14  A.   Yes, sir, there is.

15  Q.   Now, there is a number of ordinary business income is

16  reflected in 2011 as 83,591.  The jurors can read it.  It goes

17  80,000; 104,000; 117,000; $446,779 for 2015; is that correct?

18  A.   Yes, sir, that is correct.

19  Q.   What do those numbers reflect, in your chart reflect?

20  A.   Those represent the taxable income and, again, that's going

21  to be charged to the members or the partners, owners, of the

22  company based on the sales that were generated by Afam over

23  this five-year period.

24  Q.   Now, this is ordinary business income that is reflected for

25  Afam Pharmacy?

GB7LGOH1                          Quintero - direct

1   A.   That is correct, on a pretax basis.

2   Q.   Do the Afam partnership tax returns reflect more than one

3   partner in this entity?

4   A.   Yes, they do.

5   Q.   And how many partners are there?

6   A.   Three partners.

7   Q.   And can you give us a percentage breakdown based on those

8   tax returns that the government put into evidence?

9   A.   Yes, sir.  Mr. Gohari was a 65 percent member or partner.

10  And there were two other individuals who owned a 25 percent

11  membership interest and a 10 percent membership interest,

12  aggregating 35 percent.

13  Q.   Now let us continue on with the next line in your chart,

14  the percentage of net sales, and you have a line that says net

15  sales, cost of goods sold, gross profit.  What is that?

16  A.   The -- this, these three lines show as a percentage of

17  total sales what each of these line items amount to.  So the

18  cost of goods sold says that over the five-year period,

19  approximately 92 and a half cents out of every dollar of sales

20  went to buying the applicable products that were sold.  And

21  gross profit of seven and a half percent said that essentially

22  every dollar of sales that is generated, about seven and a half

23  cents is the profit or the difference between the selling price

24  and the cost of the applicable products and that seven and a

25  half percent is what's left over to operate the rest of the

1  pharmacy.

2  Q.  Now, that's a gross profit?

3  A.  That is correct.

4  Q.  Now if we move down again to the operating costs, take us

5  through that.

6  A.  Yes, sir.  The operating cost shows again as a percent of

7  sales or for every dollar of sales, if we look at the five-year

8  summary, 1.1 cents goes to salaries and wages, 1.5 cents to

9  guaranteed payments to partners, a half of a cent to paying

10  rent, and 1.7 cents to other operating expenses.  So in

11  aggregate, the costs to run the pharmacy are approximately 4.9

12  cents out of every dollar in sales.

13  Q.  Now let's take that down to the -- and we look at what the

14  gross profit was, line was, and then you came down to operating

15  costs.  Explain to us the line ordinary business income.

16  A.  Yes, sir.  If we take the difference between the seven and

17  a half cents from every dollar of sales that's the gross profit

18  and the 4.9 cents from every dollar in sales that is the cost

19  to operate the pharmacy, there is 2.6 cents left over.  That is

20  essentially the pretax income that the members or owners of the

21  pharmacy will be taxed personally on.

22  Q.  Now, so based on this adjustment, out of every dollar, it

23  is 2.6, excuse me, 2 cents, two and a half cents is what goes

24  to the partnership?

25  A.  On a pretax basis, that is correct.

GB7LGOH1                        Quintero - direct

1  Q.  And then, of course, when it's distributed, would it be

2  taxed for the individuals?

3  A.  It would be.

4  Q.  Now, the partnership itself pays a minimum amount of tax

5  too, does it not?

6  A.  A very minimal amount.

7  Q.  Now let's turn our attention to Defendant's Exhibit 83, if

8  we may, and, again, can you tell us what Defendant's Exhibit 83

9  is?

10  A.  Yes, sir.  This is the balance sheet information of Afam

11  for the five years ended December 31, 2015 based on information

12  that was reported in the company's tax returns, as well as

13  certain financial ratios during that five-year period.

14  Q.  Now, just take us through there, assets.  It says current

15  assets and then has a variety of items down from the assets?

16  A.  Yes, sir.

17  Q.  What is that?

18  A.  This shows cash, the amount of cash the company had as of

19  each of the five years ended reflected in this chart; accounts

20  receivable, money that was owed to the company by various payer

21  sources such as Medicaid; inventory, so those would be the

22  pharmaceutical products and other products the company had in

23  stock as of each of these dates; other current assets, not a

24  significant number during the time period; and fixed assets are

25  in a specialty pharmacy largely the fixtures.

1            MR. RICHMAN:  Objection, your Honor.  I could explain

2      at side bar.

3            THE COURT:  So the testimony after the words "current

4      assets" will be stricken.  The rest stands.

5            MR. KEHOE:  I'm sorry, Judge.  I asked the question

6      about what fixed assets were.

7            THE COURT:  And he gave a lengthy answer.  But if your

8      follow-up question is what are the fixed assets --

9            MR. KEHOE:  I apologize, Judge.  I will withdraw that

10     question.

11           THE COURT:  Okay.

12     Q.  Let's go down to the next part, liabilities and partners'

13     capital, what does that say?

14     A.  Liabilities are obligations that the company had as of each

15     of these date to third parties.  And partners' capital is

16     essentially the net worth of the company as of each of those

17     dates.

18     Q.  And mind you, this is information that you obtained from

19     tax returns that are the government put into evidence?

20     A.  That is correct.

21     Q.  And the financial ratios, what does that mean?

22     A.  These are certain ratios that are routinely looked at in

23     analyzing businesses and retail establishments.

24     Q.  Now let's just go into some of your items and I ask you to

25     take a look, did you examine the volume of sales of

1    prescriptions funded by Medicaid dispensed by Afam to the

2    alleged coconspirators during the relevant time frame?

3    A.  Yes, sir, I did.

4    Q.  Let's turn our attention to first Defendant's Exhibit 88.

5    Do you have that before you, sir?

6    A.  Yes, sir, I do.

7    Q.  And just explain to the jurors exactly -- let me withdraw

8    that question.

9           It notes at the top quarterly Afam sales to the

10   alleged coconspirators funded by Medicaid.  Can you just

11   explain, did you put that on there, is that right?

12   A.  Yes, I created this exhibit.

13   Q.  And what did you mean by that, sir?

14   A.  This exhibit shows for each of the quarters from the

15   beginning of 2012 through the fourth quarter of 2015 what was

16   both the number of prescriptions dispensed to all collectively

17   of the alleged coconspirators, as well as the dollar value in

18   total for all prescriptions dispensed on behalf of all of the

19   alleged conspirators.

20   Q.  So just use one as an example for us, let's say the third

21   quarter of 2014.

22   A.  Yes, sir.  So on that quarter, it says that 161

23   prescriptions were dispensed and the total dollar value paid by

24   Medicaid for those 161 prescriptions amounted to $27,251.

25   Q.  That was a quarter, a three-month period of time?

GB7LGOH1                         Quintero - direct

1   A.  Yes, sir, as divided among 19 people.

2   Q.  So when you do this, it's on a three-month basis for 19

3   people?

4   A.  That is correct.

5   Q.  Let's us look at the next exhibit which would be

6   Defendant's Exhibit 89.

7   A.  Yes, sir.

8   Q.  Now, how is that titled?

9   A.  This analysis breaks it down on to a personal basis.  So on

10  a per person basis, how many prescriptions were dispensed

11  during each of these quarters and what was the dollar value

12  reimbursed by Medicaid for the prescriptions on average for

13  each of the 19 people.

14  Q.  So, again, let's take I think we used quarter three for

15  2014, what is that?

16  A.  That indicates that on average, each of the 19 individuals

17  had eight and a half prescriptions that were filled over the

18  three-month period and the dollar value of reimbursement for

19  those eight and a half prescriptions on average was $1,434

20  total.

21  Q.  And that's for 19 people?

22  A.  That is correct.

23  Q.  Let us turn our attention to another item and I asked to,

24  excuse me, and if we could put on the screen Defendant's

25  Exhibit 86.  Now, tell us a little bit, what is Defendant's

GB7LGOH1                        Quintero - direct

1    Exhibit 86?

2    A.   This is a chart that I put together that shows for each of

3    the 20 people that were at one point identified as alleged

4    coconspirators, what were the number of prescriptions filled

5    from the beginning of 2012 through October 31, 2015, what were

6    the total dollars reimbursed by Medicaid during that period for

7    each of the individuals, what do those reimbursements

8    constitute as a percentage of the total that was funded by

9    Medicaid and as a percent of the total that was paid to Afam.

10        And so substantially all the money if we look at the

11   percentages was funded by Medicaid, but a little bit of it was

12   funded either by some combination of other third payer sources

13   or by the individuals personally.

14   Q.   So just juxtapose those two numbers.  You have the three --

15   you were talking about $384,426?

16   A.   Yes, sir, that is correct.

17   Q.   And that is the Medicaid, net sales from Medicaid?

18   A.   Yes, sir, that was funded by Medicaid.

19   Q.   And if we could go just one, two, three, four columns over

20   to the, excuse me, $452,854.33, that is for all sales?

21   A.   That's correct, including sales that were not funded by

22   Medicaid.

23   Q.   And what is the time frame for this?

24   A.   This is over a period of just less than four years.

25   Q.   So you have the chart January 1, 2012, to October 31, 2015?

GB7LGOH1                          Quintero - direct

1    A.  Yes, sir.

2    Q.  Let's go to, if I may, Defendant's Exhibit 84.  This notes

3    at the top, shares of Afam sales funded by Medicaid comprised

4    of sales to alleged coconspirators 2012-2015.  What does this

5    reflect?

6    A.  This chart compares the total sales that were funded by

7    Medicaid on behalf of parties other than the alleged

8    coconspirators, and that's the blue bar, as compared to, if you

9    can see it, the little red bar is the sales funded by Medicaid

10   associated with prescriptions filled on behalf of the alleged

11   coconspirators.

12   Q.  So let me back this up if I can.  The blue in for instance

13   2012 is 1,989,282.  Is that the -- reflect the Medicaid sales

14   for all of the other patients coming in the pharmacy other than

15   the coconspirators?

16   A.  That is correct.

17   Q.  And the coconspirators are the red line, the 103,176?

18   A.  That is correct.

19   Q.  And if we move to say to the right hand, it's 2015, we have

20   sales of all Medicaid sales for this three-year-plus period is

21   eight million, nine hundred and eighty-five thousand, six

22   thousand dollars, and the sales to the coconspirators reflect

23   139,839?

24   A.  Actually, that's not quite accurate, if I understood your

25   question correctly.

1    Q.  If I misspoke, correct me, please.

2    A.  The last bar 2015 shows total sales funded by Medicaid just

3    for that year for patients other than the alleged

4    coconspirators.

5    Q.  My apologies.  And that would reflect eight million, nine

6    hundred and eighty-five thousand, six thousand dollars for

7    patients other than the coconspirators?

8    A.  Yes, sir, that is correct.

9    Q.  While the coconspirators are only, excuse me, are

10   reflecting $139,839, right?

11   A.  Yes, sir.

12   Q.  Let's turn to Defendant's Exhibit 85 in evidence.  Now,

13   this notes at the top sales by Afam to the alleged

14   coconspirators billed to Medicaid in relation to total Afam

15   sales 2012-2015.  Does this reflect the same time period of

16   January 1, 2012 to October 31, 2015?

17   A.  This reflects all the way through December 31, 2015.

18   Q.  Stand corrected.  Can you explain this chart, this

19   demonstrative exhibit, please.

20   A.  Yes, sir.  The blue sliver represents the sales during that

21   four-year period to the alleged coconspirators that were funded

22   by Medicaid, so approximately $384,000 over the four-year

23   period, as compared to roughly 28.8 million in sales to other

24   patients during that time period.

25   Q.  So the 28.7 million reflects all of the sales to Medicaid

1   and this 384 represents the Medicaid sales just to the

2   coconspirators?

3   A.   No.   The 28.8 million represents all sales funded by all

4   payer sources, including Medicaid, excluding the 384,000 of

5   sales funded by Medicaid on behalf of the alleged

6   coconspirators.

7   Q.   So when comparing this $28,783,757 in sales compared to

8   sales to alleged coconspirators, can you give us a percentage

9   ratio as to how many, how much sales were, based on this chart,

10  were not to the coconspirators and how many were, what the

11  percentage was?

12  A.   Yes, sir.   98 percent, 98.7 percent of the sales were to

13  patients other than the alleged coconspirators, and only

14  1.3 percent pertained to sales to the alleged coconspirators

15  that were funded by Medicaid.

16  Q.   Now let us turn our attention to Exhibit 86 if you can,

17  Defendant's Exhibit 86.   Now, this is the document that we

18  reviewed just prior to the -- you mapping out the pie chart

19  that we just looked at, is it not?

20  A.   Yes, sir, it is.

21  Q.   Now let us look at Defendant's Exhibit 87.   Now, what is

22  this, sir?

23  A.   This exhibit shows the relationship between total sales

24  generated by Afam from 2012 to through 2015 that were funded by

25  sources other than Medicaid -- excuse me.   More precisely it

GB7LGOH1                        Quintero - direct

1  compares the total sales generated over that four-year period,

2  excluding the sales that were funded by all sources to on

3  behalf of the alleged coconspirators, as contrasted against the

4  sales that were funded by all sources, Medicaid and other

5  sources, on behalf of the alleged coconspirators.

6  Q.  Let's just look.  The chart at the top says total sales by

7  Afam to the alleged coconspirators funded by all payer sources

8  in relation to total Afam sales 2012-2015?

9  A.  Yes, sir.

10  Q.  Now, are we looking at all sales by Afam Pharmacy here?

11  A.  Yes, during that four-year period.

12  Q.  That comes out to what amount?

13  A.  Sales other than to the alleged coconspirators amounted to

14  $28,783,757, as compared to the alleged coconspirators from all

15  payer sources during that time period amounted to $452,854.

16  Q.  So if we look at the total sales to the alleged

17  coconspirators, it would amount to a percentage of 1.5 percent?

18  A.  Yes, sir.

19  Q.  Now let's turn your attention to Defendant's Exhibit 82 if

20  we may.  Again, Defendant's Exhibit 82 was a document that we

21  reviewed previously I do believe.  This is the document where

22  you were talking about the gross profit of 7.5 percent.  Do you

23  see that?

24  A.  Yes, sir.

25  Q.  Now, sir, based on using this document and the tax returns,

GB7LGOH1                          Quintero – direct

1    did you come up with or did you analyze exactly how much money

2    was earned as a result of this enterprise that is now before

3    the Court?

4    A.  Yes, sir, I did, approximately.

5                (Continued on next page)

1   Q.  Can you give us an idea of what that is.

2   A.  Yes, sir.  If we were to consider the entire roughly

3   $450,000 in sales that were funded by all payer sources,

4   primarily Medicare but also through other payer sources or

5   personally by the alleged co-conspirators, that 450,000 is

6   about 1½ percent of the 29,168,000 over the 4-year period.

7   However, what is significant in terms of calculation is simply

8   the gross profit.

9            MR. RICHMAN:  Objection, use of the word

10  "significant."

11           THE COURT:  Sustained.

12           MR. RICHMAN:  Thank you.

13  A.  The alleged benefit --

14           THE COURT:  The objection was sustained.  Put another

15  question.

16  Q.  Can you work us through these numbers, sir, and take us

17  into the tax consequences and financial remuneration earned as

18  a result of that.

19  A.  Yes, sir.  The sales that have been associated with the

20  alleged co-conspirators totaled $450,000 over this time period.

21  Based on the gross margin of 7½ percent of sales that is

22  reflected in Exhibit 82, that would say that from 450,000 in

23  sales, the gross profit would be 7½ percent of that.  If I were

24  to take $450,000, multiply it by 7½ percent, the gross profit

25  on that on a pretax basis would be rounded, and I don't have a

1   calculator in front of me, rounded would be, say, $40,000

2   pretax.

3           However, the other adjustments that need to be made

4   is, first of all, that's a pretax amount.  The partners would

5   have to personally or the owners would have to pay taxes on

6   that.  If the pretax profit is $40,000, round numbers, if we

7   were to use a 35 percent tax bracket -- which is probably low

8   for these individuals if we consider that this would be taxed

9   both at the corporate level, the New York State level, the New

10  York City level -- 40,000 pretax becomes, we'll round it up,

11  $30,000 after tax.

12          However, to further relate it to things that I

13  testified to before, Mr. Gohari is a 65 percent member or

14  owner.  His share of $30,000 after tax at 65 percent would be,

15  let's say, approximately $18,000 over 4 years.  So, if we were

16  to break that down on an annual basis, using those numbers,

17  16,000 over 4 years, it would be about $4,000 a year.

18          In fact, I have done more precise numbers as opposed

19  to thinking this out off the top of my head.  The more precise

20  numbers actually reduce it to just over a thousand dollars a

21  year.

22  Q.  Let me show you what has been marked as Defense Exhibit

23  144, if we can put that on the screen, but not show it to the

24  jurors as it hasn't been admitted.  If we can put it on the

25  screen.  Mr. Quintero, I think you have that in your stack.

1             MR. KEHOE:  May I approach, Judge?

2             THE COURT:  Yes, I do.

3    Q.  If you can, tell us about Defense Exhibit 144.  What does

4    that say?

5    A.  With what I understand to be Defense Exhibit 144, it

6    reveals, based on information that I directly got from a tax

7    return, the distributions that were specifically made to Mr.

8    Gohari.  I estimate the taxes that he would have been liable

9    for as a 65 percent member, and recognize, as I previously

10   testified, that about 1½ percent of sales were associated with

11   sales to the alleged co-conspirators, 1½ percent of the after-

12   tax income would be the alleged benefit from the matter before

13   the court.

14            MR. RICHMAN:  Objection, your Honor.  I think the

15   witness is at this point reading from a document that is not in

16   evidence.

17            THE COURT:  I don't know because defense counsel has

18   not favored the Court with a copy of this exhibit nor put it on

19   the screen for the Court.

20            MR. KEHOE:  It was supposed to go on the screen,

21   Judge.

22            THE COURT:  But it did not.

23            MR. KEHOE:  I didn't know that.  My apologies.  I can

24   hand up a copy.

25            THE COURT:  That would be very useful.

1          Sustained.

2     Q.  Sir, did you actually put this document together?

3     A.  Yes, sir, I did.

4     Q.  You culled this information from the tax returns?

5     A.  Yes, sir.

6     Q.  Is this a summary chart from the tax returns and the other

7     information that you had?

8     A.  With one exception, that being I used an assumed tax rate,

9     which is probably low, which means that the alleged benefit

10    would be even less than shown here.  I used an assumed tax rate

11    of 35 percent.

12          MR. KEHOE:  Your Honor, at this time we offer into

13    evidence Defense Exhibit 144.

14          MR. RICHMAN:  Objection.

15          THE COURT:  Ground?

16          MR. RICHMAN:  The witness has just stated that there

17    is an assumption baked into Defense Exhibit 144 that is not

18    based on the tax returns: more pointedly, the taxes on net

19    income number that he used, the percentage.

20          THE COURT:  You can cross-examine on that.  Overruled.

21    Received.

22          (Defendant's Exhibit 144 received in evidence)

23          MR. KEHOE:  Thank you, your Honor.

24          Can we put Defense Exhibit 144 on the screen.  Can we

25    blow it up a little bit.

1    Q.  You were talking about this document.  Again let's go

2    through this line by line.  This reflects monetary benefit to

3    Mr. Gohari of sales to alleged co-conspirators.  Is that your

4    heading, sir?

5    A.  Yes, sir.

6    Q.  The distributions, what are those?

7    A.  Those are the distributions that Mr. Gohari received over

8    the 4-year period from the company as reported on the company's

9    tax returns.

10   Q.  You assumed a 35 percent income tax rate?

11   A.  Yes, sir.

12   Q.  Did you then deduct that from that number?

13   A.  Yes, sir.

14   Q.  The total after-tax cash flow, what is that?

15   A.  This would say that net of taxes he would have benefited

16   over the 4-year period from the entire pharmacy, not just the

17   portion that may be attributed to sales to the alleged

18   co-conspirators but from running this entire operation, on an

19   after-tax basis his benefit would have been $282,198 over 4

20   years.

21   Q.  Taking these items, the 24,389 in 2012, the 23,379 in 2013,

22   50,110 in 2014, and 184,319, that's the after-tax money to Mr.

23   Gohari for everything that sold in the pharmacy, is that

24   correct?

25   A.  That's right.

1   Q.  The final number, the 282,000, from 2012 to 2015 is all of

2   the money coming to Mr. Gohari for those years?

3   A.  Yes, sir.

4   Q.  Take us down to the 1.5 percent.  What is that?

5   A.  Given that the sales associated with the alleged

6   co-conspirators were approximately 1½ percent of the sales of

7   the pharmacy over the 4-year period, the benefit that can be

8   related to these sales would be 1½ percent of $282,198, over a

9   4-year period $4,233.

10  Q.  To assist the jury, before we go on, you have starred

11  Defense Exhibit 87.  If we can put Defense Exhibit 87 back on

12  the screen.  Is this the document or exhibit that you are

13  cross-referencing to come up with the 1.5 percent?

14  A.  Yes, sir, it is.

15  Q.  Let's look back to Defense Exhibit 144.  We can blow up

16  that top part.  Sir, going back to using that number percentage

17  of sales to the alleged co-conspirators, you took all the money

18  and multiplied it by 1.5 percent, and for this from 2012

19  through 2015 it amounts to cash of $4,233 for Mr. Gohari?

20  A.  Yes, sir, over the 4-year period.

21  Q.  The next line says number of years annual monetary benefit.

22  Can you explain that.

23  A.  Yes, sir.  I divided the total over 4 years by the 4-year

24  period, and it amounts to $1,058 per year.

25  Q.  So profit to Mr. Gohari individually for all sales coming

Gb7rgoh2                    Quintero - cross

1   to these co-conspirators over this 4-year period 2012-2015

2   amounts to $1,058 per year?

3   A.  Based on the best information available, that is correct.

4           MR. KEHOE:  Thank you, Mr. Quintero.  I have no

5   further questions.  May I check with my co-counsel briefly?

6           THE COURT:  Yes.

7           MR. KEHOE:  Thank you, your Honor.  Mr. Quintero,

8   thank you very much.  I have nothing further.

9           THE COURT:  Cross-examination.

10  CROSS-EXAMINATION

11  BY MR. RICHMAN:

12  Q.  Good morning, Mr. Quintero.

13  A.  Good morning.

14  Q.  Mr. Quintero, most of your analysis is based on the

15  returns, the tax returns, provided by the partnership and the

16  defendant, correct?

17  A.  Which analysis are you referring to?

18  Q.  The analysis you just testified to.

19  A.  That is one portion of the analysis.

20  Q.  Your analysis is only as good as the underlying numbers you

21  are working with, correct?  If you could answer yes or no, Mr.

22  Quintero.  Mr. Quintero, the analysis --

23          MR. KEHOE:  Excuse me, your Honor.  There is a

24  question on the floor before another question is asked, with

25  all due respect.  There are two questions.

Gb7rgoh2                        Quintero - cross

1                  THE COURT:  I didn't hear the answer yet.

2                  MR. RICHMAN:  I'll rephrase the question.

3     Q.  Mr. Quintero, your analysis is only as good as the

4     underlying numbers you work with, correct?

5     A.  That's true with any analysis.

6                  THE COURT:  I think the answer is yes, is that

7     correct?  Is that correct?

8                  THE WITNESS:  I'd not characterize it that way.  But

9     it if it has to be yes or no, it would have to be yes on a

10    qualified basis.

11                 THE COURT:  Thank you.

12    Q.  Your analysis relies on the validity of the numbers you

13    work with, correct?

14    A.  On a qualified basis, yes.

15                 THE COURT:  What is your qualification?

16                 THE WITNESS:  That's the case with any analysis, but

17    there are many pieces of data that go into analysis.

18                 THE COURT:  What he is getting at is, for example,

19    some of your analysis is based on the income tax returns of the

20    company and the defendant, yes?

21                 THE WITNESS:  That is correct.

22                 THE COURT:  You don't know whether those tax returns

23    are accurate or inaccurate, you just take that as an assumption

24    to make your analysis, right?

25                 THE WITNESS:  Yes, sir.

Gb7rgoh2                    Quintero - cross

1    THE COURT:  I think that was the point that was being

2    suggested.  Go on, counsel.

3    Q.  In this case both the 2015 returns are actually in draft

4    form, correct?

5    A.  Yes, sir.

6    Q.  They haven't even been submitted to the IRS, correct?

7    A.  I'm not aware of them having been submitted thus far.

8        MR. RICHMAN:  Ms. Bostillo, if you could please pull

9    up Government Exhibit 1205.

10   Q.  Mr. Quintero, these are the individual income tax returns

11   for the defendant from 2011?

12       MR. RICHMAN:  If we could zoom in, please, on line 37.

13   Q.  This shows that in 2011 the adjusted gross income for the

14   defendant was $54,040, correct?

15   A.  Yes, sir.

16       MR. RICHMAN:  Ms. Bostillo, if we could move ahead to

17   Government Exhibit 1209.

18   Q.  Mr. Quintero, these are the draft 2015 individual tax

19   returns for the defendant.  If we could zoom in again.  In this

20   case, in 2015, the defendant has reported an adjusted gross

21   income of $486,584, correct?

22   A.  Yes.

23   Q.  Roughly from 2011 to the draft report for 2015, that's an

24   increase of about a little bit less than ninefold, correct?

25   A.  I believe that's approximately correct.

1   Q.  Approximately.  Thank you.  You testified earlier about

2   your experience with tax returns, correct?

3   A.  I don't recall testifying specifically about my experience

4   with tax returns.

5   Q.  Your experience as a CFA -- which involved working with tax

6   returns, correct?

7   A.  As a CFA, CPA, and many --

8   Q.  Right, all of your licenses.  Have you ever done tax

9   returns for a criminal enterprise?

10          MR. KEHOE:  Objection, Judge.

11          THE COURT:  Sustained.

12  Q.  Mr. Quintero, we'll move on.  I want to ask you a few

13  questions about some of the numbers that you used during your

14  analysis.

15          MR. RICHMAN:  If we could pull up Defense Exhibit 82,

16  please.

17  Q.  Mr. Quintero, you used a gross profit when you talked about

18  the total numbers for the 2012 to 2015 period of 7½ percent,

19  correct?

20  A.  Yes, sir.

21  Q.  That you arrived at by averaging or totaling those years,

22  correct?

23  A.  That is correct.

24  Q.  But the margin was different year to year, wasn't it?

25  A.  It was.

1   Q.  For example, if we look at what is in front of you, in 2013

2   the margin was over 25 percent, was it not?

3   A.  Yes, sir.

4   Q.  Using your analysis here, if you had cabined your analysis

5   to 2013, the profit margin would have been 25 percent on all

6   drugs that came in, correct, or all drugs that were sold,

7   correct?

8   A.  Looking just at that one year, that is correct.

9   Q.  That was my question.  Thank you.  Your analysis also

10  doesn't take into account different margins across different

11  products, correct?

12  A.  Correct.  It is an average.

13  Q.  If some of the medications that the defendant's pharmacy

14  dispensed had a much higher margin than others, that's not

15  accounted for in your analysis, correct?

16  A.  I would have no basis for knowing that.

17  Q.  That's not accounted for in your analysis, correct?

18  A.  That is correct.

19  Q.  If the defendant was charging for products and not actually

20  dispensing them, that's not accounted for here either, correct?

21          MR. KEHOE:  Objection, your Honor.

22          THE COURT:  Ground of the objection?

23          MR. KEHOE:  He is asking for an answer that is purely

24  speculative, Judge.  There is no basis, no foundation in these

25  questions prior to this for that.

Gb7rgoh2                    Quintero - cross

1          THE COURT:  There clearly is a basis for the previous

2     question.  I'm not sure that there is a basis for this

3     question.  Come to the side bar.

4               (At the side bar)

5          THE COURT:  What is the evidence in evidence that he

6     charged for any given item without actually dispensing it?

7          MR. RICHMAN:  Your Honor, Mr. Cabrera testified that

8     there would be times when prescriptions are billed but not

9     dispensed.

10          THE COURT:  All right.

11          MR. KEHOE:  It would still make it to the tax returns.

12     So what that has got to do with it?

13          THE COURT:  That's the question.  He is asking whether

14     it would make it to the tax return or not.  The witness may

15     agree with you or disagree.  I will permit the question.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

```
1          (In open court)

2          (Question read)

3   A.   That would be accounted for in the total numbers over the

4   5-year period.

5   Q.   Mr. Quintero, if the defendant was charging for an item and

6   not dispensing it, it would impact the profit margin, would it

7   not?

8   A.   It would not.

9   Q.   It would not.  If the defendant was charging a thousand

10  dollars for an item but had not actually paid for that item,

11  what would his profit margin be on that item if you can just

12  answer that question?

13  A.   I want to make sure I understand the question.  When you

14  say it would not be reflected in these numbers, you're

15  referring to the chart that is Defendant's Exhibit 282?

16  Q.   We are taking a step back, Mr. Quintero.  If the defendant

17  charged someone $1,000 for a medication but he wasn't paying

18  anything for that medication, what would his profit margin be

19  on that medication?

20  A.   On that individual sale --

21  Q.   That's my question.

22  A.   -- it would be 100 percent.

23  Q.   Okay.  If the defendant was doing that, Mr. Quintero, and

24  not reporting it in his tax returns, that would impact the

25  margins, correct?
```

1             MR. KEHOE:  Judge, pure speculation.  There is no

2    foundation for that at all.

3             THE COURT:  Overruled.

4    A.  It would have no impact on the tax return because the tax

5    return reflects sales that were reported and costs that were

6    reported.  Those costs are reflected in cost of goods sold.

7    Q.  If the defendant was selling an item for a thousand dollars

8    but not buying it and not reporting that transaction, that

9    would impact the margin, correct?

10   A.  No, sir, because the cost of goods sold reflects everything

11   that was purchased.

12   Q.  It reflects everything that was purchased if the defendant

13   chooses to report it, correct?

14   A.  No, sir.  That's not the way cost of goods sold is

15   calculated.

16   Q.  The cost of the items, Mr. Quintero, if the defendant

17   chose --

18             THE COURT:  I think the problem is the two of you

19   don't seem to be on the same wavelength.

20             The cost of goods sold are the reported cost of goods

21   sold, yes, correct?

22             THE WITNESS:  They are the reported cost of goods

23   sold, but it's based on all purchases.

24             THE COURT:  Excuse me.  Could you answer my question.

25   The cost of goods sold that you are relying on are the reported

1   cost of goods sold.  Isn't that a yes-or-no question?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  What is the answer?

4            THE WITNESS:  That is correct.

5            THE COURT:  Thank you.  Go ahead.

6   BY MR. RICHMAN:

7   Q.  Mr. Quintero, you are familiar with a guarantee in

8   partnership tax, correct?

9   A.  A guarantee in partnership tax?

10  Q.  Something called a guarantee for a partnership, correct?

11  A.  There are many types of guarantees for partnerships.

12  Q.  One type of guarantee for a partnership is a payment that's

13  made to the partners in addition to the split of partnership

14  income, correct?

15  A.  That could be.  It depends upon the agreement.

16  Q.  It depends on the agreement.  Have you seen the partnership

17  agreement in this case?

18  A.  I don't believe I have.

19  Q.  It's usually paid on top of the split of partnership

20  profits, correct?

21            MR. KEHOE:  I would object, Judge.  There is no

22  foundation for this.

23            THE COURT:  Sustained.

24  Q.  Mr. Quintero, in this case, when you discussed the profit

25  the defendant supposedly made, you didn't include anything

1  about a guarantee in your analysis, did you?

2  A.  Yes, sir, because the profit was net of guarantee payments

3  to partners.

4  Q.  Specific to what the defendant made, there was nothing in

5  that testimony about the guarantee, the money that the

6  defendant himself received, was there?

7             MR. KEHOE:  Asked and answered.

8             THE COURT:  I'll allow it.

9  A.  I didn't precisely reflect on this analysis, that is

10  correct.

11  Q.  We will take a look at some of that together.

12             MR. RICHMAN:  Your Honor, permission to publish

13  Government Exhibit 1200.

14             THE COURT:  Go ahead.

15             MR. RICHMAN:  Ms. Bostillo, if we could highlight line

16  10, please.

17  Q.  Mr. Quintero, if you can read that, it says that there is a

18  guarantee payment reported in 2011 of $82,873 to the partners,

19  correct?

20  A.  Yes, sir.

21  Q.  The defendant's portion of this didn't factor into any of

22  the testimony you gave on direct examination, correct?

23  A.  That is correct.

24             MR. RICHMAN:  Your Honor, permission to publish

25  Government Exhibit 1201, please.

1          THE COURT:  Okay.

2          MR. RICHMAN:  Ms. Bostillo, if you could please

3   highlight line 10 again.

4   Q.  Mr. Quintero, this shows a reported guarantee payment of

5   $104,761, correct?

6   A.  Yes, sir.

7          MR. RICHMAN:  Ms. Bostillo, if we could please turn to

8   page 11 of this document.

9   Q.  Mr. Quintero, this is the schedule K-1 for the defendant

10  from tax year 2012.

11         MR. RICHMAN:  Ms. Bostillo, if you could highlight box

12  4, please, up at the top right.

13  Q.  Mr. Quintero, if you look at box 4, that shows a guaranteed

14  payment to the defendant of $94,380, correct?

15  A.  Yes, sir.

16  Q.  Once again, Mr. Quintero, on direct examination you didn't

17  testify to that number, correct?

18  A.  That is correct.

19         MR. RICHMAN:  Your Honor, permission to publish

20  Government Exhibit 1202, please.

21         THE COURT:  Yes.

22         MR. RICHMAN:  Ms. Bostillo, if you could please again

23  highlight line 10.

24  Q.  Mr. Quintero, line 10 says that the guaranteed payments to

25  partners reported for tax year 2013 is $118,600, correct?

Gb7rgoh2                    Quintero - cross

1   A.  Yes, sir.

2           MR. RICHMAN:  Ms. Bostillo, if we could please turn to

3   page 14 of this document.

4   Q.  Mr. Quintero, this is the K-1 for the defendant from tax

5   year 2013, and it lists his share of the guarantee of $104,600,

6   does it not?

7   A.  Yes, sir.

8   Q.  Once again, Mr. Quintero, your testimony on direct

9   examination didn't include this number, correct?

10  A.  It did not.

11          MR. RICHMAN:  Your Honor, permission to publish

12  Government Exhibit 1203, please.

13          THE COURT:  Yes.

14          MR. RICHMAN:  Ms. Bostillo, if you could please again

15  highlight line 10.

16  Q.  Mr. Quintero, this shows a guarantee payment to partners

17  for tax year 2014 of $51,765, correct?

18  A.  Yes, sir.

19          MR. RICHMAN:  Ms. Bostillo, if you could please turn

20  to page 8.  And if you could highlight box 4, please.

21  Q.  Mr. Quintero, again, this is the K-1 for the tax year 2014,

22  correct?

23  A.  Yes, sir.

24  Q.  It lists the guarantee for the defendant as $51,765,

25  correct?

Gb7rgoh2                    Quintero - cross

1    A.  Yes, sir.

2    Q.  That's the same amount as the full guarantee that we just

3    reviewed for the partnership, correct?

4    A.  That is correct.

5            MR. RICHMAN:  Your Honor, permission to publish

6    Government Exhibit 1204, please.

7            THE COURT:  Yes.

8    Q.  Mr. Quintero, this is the draft tax return for tax year

9    2015, correct?

10   A.  Yes, sir.

11   Q.  Again we'll look at line 10, which shows a guaranteed

12   payment to partners of $175,000, correct?

13   A.  Yes, sir.

14           MR. RICHMAN:  Ms. Bostillo, if we could please turn to

15   page 8.

16   Q.  Mr. Quintero, this is the K-1 for the defendant from last

17   tax year, the draft K-1.  This lists his share of the guarantee

18   as $175,000, correct?

19   A.  Yes, sir.

20   Q.  That's the full guarantee for tax year 2015, correct?

21   A.  That is correct.

22   Q.  Once again, Mr. Quintero, this number was not relied upon

23   during your direct examination, correct?

24   A.  Well, it was relied upon in my income summary, not with

25   respect to the personal benefit realized by Mr. Gohari.

1    Q.  Exactly.  Thank you, sir.

2              MR. RICHMAN:  May I have one moment, your Honor?

3              THE COURT:  Yes.

4              MR. RICHMAN:  Your Honor, no further questions at this

5    time.

6              THE COURT:  Redirect.

7    REDIRECT EXAMINATION

8    BY MR. KEHOE:

9    Q.  Let's go through some of the questions raised by my learned

10   friend, Mr. Quintero.  Let's turn our attention first to I

11   think it was 1209, Government Exhibit 1209.  If we can go down

12   to the bottom of that page, this is the draft tax return for

13   2015, is that right, sir?

14   A.  Yes, sir.

15   Q.  This is the document that counsel just talked to you about,

16   right?

17   A.  That is correct.

18   Q.  If you go down to the bottom of the page, if we could blow

19   that up, the bottom, I think he raised the fact that there was

20   an adjusted gross income of $486,584, is that right?

21   A.  Yes, sir.

22   Q.  What does adjusted gross income reflect?

23   A.  This is Mr. Gohari's income tax return.  That would be the

24   adjusted gross income prior to deductions that would be a basis

25   for his federal income taxes.

Gb7rgoh2                    Quintero - redirect

1    Q.  Let us turn our attention with this number back to Defense

2    Exhibit 84.  This is again a document that we looked at on

3    direct examination.  I don't believe my learned friend showed

4    you this document on cross, did he?

5    A.  He didn't.

6              MR. RICHMAN:  Objection, your Honor.  This is beyond

7    the scope.

8              THE COURT:  Sustained.

9              MR. KEHOE:  If I may, Judge --

10             THE COURT:  No, no.  I'm sustaining the objection to

11   the form of the question.

12             MR. KEHOE:  Yes, your Honor.

13   Q.  If we could look at this document and compare 2014 to 2015,

14   and it reflects sales to individuals other than

15   co-conspirators, was there a growth in sales to individuals

16   other than the co-conspirators or a decline?

17   A.  A significant growth, increase.

18   Q.  Take us to the numbers between 2014 and 2015.  What are the

19   numbers for 2014 and 2015?

20   A.  2014, the sales to parties other than the alleged

21   co-conspirators amounted to $1,589,019.  In 2015 they increased

22   to $8,985,006.

23   Q.  So it would be fair to say that somewhere in the area of,

24   what, six times the amount of sales to other customers took

25   place in 2015 that didn't transpire in 2014?

Gb7rgoh2                    Quintero - redirect

1    A.  Yes, sir, that is correct.

2    Q.  When you make that additional money, here the $8,985,000,

3    that is then reflected in the tax return that my learned friend

4    talked about, 1209, any additional moneys, of course, have to

5    be reported and paid taxes on, right?

6    A.  That is correct.

7    Q.  Is there any indication from other than the draft or terms

8    that these other tax returns, both at a partnership level and

9    at an individual level have not been properly submitted to the

10   IRS?

11           MR. RICHMAN:  Objection, your Honor.

12           MR. KEHOE:  It was asked on cross-examination.

13           THE COURT:  No, no, that isn't quite what was asked.

14   Come to the side bar.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  The question that the Court has is does

3     either counsel have any information on whether these returns

4     were in fact submitted to the IRS?

5              MR. KEHOE:  I do, Judge.

6              THE COURT:  Yes?

7              MR. KEHOE:  They have been submitted.

8              THE COURT:  How do you know that?

9              MR. KEHOE:  Talking to the accountant, the Afam

10    accountant, Gohari's accountant.

11             MR. RICHMAN:  That's news to the government, your

12    Honor.  We don't have evidence to the contrary, but we didn't

13    know that.

14             THE COURT:  On that representation, I will allow the

15    question.

16             MR. RICHMAN:  Your Honor, the issue of the objection

17    was foundational.

18             THE COURT:  You basically raised the question, because

19    they are labeled "draft," did he know whether or not they had

20    been submitted, and he said no, he didn't know.  That was fair

21    game.  But since counsel has independent knowledge that they

22    were submitted, he's just trying to ask whether the witness has

23    any reason to believe that these were not submitted or words to

24    that effect.  I think that is fair game too.

25             (Continued on next page)

Gb7rgoh2                          Quintero - redirect

1            MR. KEHOE:  If I may, Judge.  I was talking about

2     2012, 2013, 2014.  2015, to my understanding, is still in draft

3     form, has not been filed.

4            THE COURT:  Then you need to confine that.

5            MR. KEHOE:  I did.

6            (Continued on next page)

1              (In open court)

2      BY MR. KEHOE:

3      Q.  Mr. Quintero, with regard to the tax returns, not the draft

4      tax return for 2015, do you have any indication that the tax

5      returns for the years 2012, 2013, and 2014 were not submitted

6      to the IRS?

7      A.  No, sir.  I believe they were.

8              THE COURT:  Just so I'm clear and the jury is clear,

9      you don't know whether or not 2015 was submitted, do I

10     understand that correctly?

11             THE WITNESS:  That is correct.

12             THE COURT:  Looking at Defense Exhibit 84, the figures

13     there that are significantly different for 2015 are drawn from

14     the income tax return, do I have that right?

15             THE WITNESS:  Yes, your Honor.

16             THE COURT:  Very good.

17     BY MR. KEHOE:

18     Q.  Let's go to Government Exhibit 1200.  We talked about the

19     lines.  Could we put the first line up on the screen.  I

20     believe it was a guarantee payment.  Is that line 10?  Counsel

21     asked you about guarantee payments to partners.  Do you recall

22     those questions?

23     A.  Yes, sir.

24     Q.  What is a guarantee payment of a partner?

25     A.  My only knowledge is from what appears in the tax return.

1   Q.  Just what you know from the tax return, not outside.  What

2   does that mean?

3   A.  That means that the amount indicated on line 10 of the 2011

4   tax return is the amount that would have been made to the

5   partners of Afam.

6   Q.  Is that one partner, two partners, three partners?  How

7   many is that?

8   A.  Three partners.

9   Q.  So you have a guarantee payment of partners that is then

10  split up between the 65 and the other percentage, what is it,

11  35, right?

12  A.  Yes, sir.

13  Q.  Now I think we can go through this.  I think counsel asked

14  you questions that you didn't talk about during your direct

15  examination.  Do you remember those questions?

16  A.  Yes, sir.

17  Q.  There are guarantee payments to partners in all of these

18  years, aren't there?

19  A.  There are.

20  Q.  When you get your percentage guarantee, what happens with

21  that money from there?

22  A.  It reduces the taxable income of the company.

23  Q.  When that money flows down to the individual partners, be

24  it Mr. Gohari or the others, what happens then?

25  A.  They get taxed personally on that amount.

1    Q.  And pay taxes personally on that amount?

2    A.  That is correct.

3    Q.  Going back to the guarantee payment to partners, what

4    impact does that have on the percentage of profit generated by

5    sales to the co-conspirators?

6    A.  It has no direct relationship.

7    Q.  Let's use one document as an example.  Let's put Defense

8    Exhibit 85 on the screen.  This is sales by Afam to

9    co-conspirators, billed to Medicaid.  You said that there are

10   28 million-plus to Medicaid from the entire business and 1.3 to

11   co-conspirators, right?

12   A.  1.3 percent, that is correct.

13   Q.  What does the guarantee payment to the partners have

14   anything to do about the $28,783,757 figure on this chart?

15            MR. RICHMAN:  Objection to form, your Honor.

16            THE COURT:  I'll allow it.

17   A.  It would have no impact on any number on this chart.

18   Q.  Let me turn our attention to Defense Exhibit 87.  This is

19   the total sales to alleged co-conspirators funded by all

20   payers?

21   A.  Yes, sir.

22   Q.  This is 87:  28,783,757, and it says 98 percent.  This is

23   sales from all pay sources, correct?

24   A.  That is correct.

25   Q.  With sales to the co-conspirators of 1.5 percent?

Gb7rgoh2

1    A.  Yes, sir.

2    Q.  What do the guarantee payments to partners on the tax

3    returns have to do with this $28.7 million figure of all sales

4    to conspirators from all payer sources?  What does that have to

5    do with it?

6    A.  Nothing at all.

7              MR. KEHOE:  Thank you, your Honor.  No further

8    questions.

9              THE COURT:  Any recross?

10             MR. RICHMAN:  One moment, please, your Honor.

11             No questions, your Honor.  Thank you.

12             THE COURT:  Thank you very much.  You may step down.

13             (Witness excused)

14             THE COURT:  Ladies and gentlemen, we will give you

15   your mid-morning break at this point.  There are a couple of

16   legal matters I have to take up with counsel, so it will

17   probably about a 20-minute break.  I'll see you in 20 minutes.

18             (Continued on next page)

19

20

21

22

23

24

25

Gb7rgoh2

1          (Jury not present)

2          THE COURT:  I was just furnished by my law clerk with

3     a two-page single-spaced letter sent by email yesterday by the

4     government.  The Court's individual rules, in their very first

5     sentence, prohibit counsel from submitting any letter or other

6     correspondence without prior permission of the Court.  I of

7     course, as you would expect, was here yesterday in chambers

8     through most of the day, specifically, from at least 10:00 to

9     5:00, and no call was received.  What accounts for the

10    government having sent this in violation of my rules?

11         MS. ESTES:  Your Honor, our apologies.  We thought

12    since it was the weekend, that that was the appropriate course.

13    I misunderstood --

14         THE COURT:  There is no exception in my rules.  The

15    reason for the rules, and this is a good example, is had you

16    called and asked permission to send this, then I would have

17    ordered the defense to put in their response yesterday, and I

18    could have, instead of taking the jury's time now, dealt with

19    it.  But let's deal with it now.

20         Has defense counsel seen this?

21         MR. KEHOE:  Yes, your Honor.  I saw it last night.

22         THE COURT:  Tell me what these witnesses are going to

23    testify to.

24         MR. KEHOE:  We have several different witnesses,

25    Judge.  I will take them in order.  I have several witnesses

Gb7rgoh2

1    and Mr. Bachner has a witness.  These witnesses are going to

2    address specific issues raised by the prosecution.

3           Ms. Michelle Harewood was a long-term patient from Mr.

4    Gohari.  She had been going there initially because her doctor

5    was next door.  Her doctor moved, and then she continued to go

6    very large distances to Mr. Gohari's pharmacy because she was

7    more comfortable there and that's where she wanted to do her

8    business and consistently dealt with that pharmacy.

9           THE COURT:  Is that all for her?

10          MR. KEHOE:  No, your Honor.

11          THE COURT:  Keep going.

12          MR. KEHOE:  One of the other issues brought up by the

13   defense was the fact that Mr. Cabrera had Mr. Gohari's cell

14   phone.  Ms. Harewood had Mr. Gohari's cell phone number as a

15   long-term patient.

16          There has been an issue raised by the government about

17   third parties picking up prescriptions.  Ms. Harewood picked up

18   prescriptions for not only herself, her father, and her

19   children, but also from her landlord.  Mr. Gohari never asked

20   for any idea, etc.

21          The last issue concerning Ms. Harewood is the

22   suggestion by Mr. Gohari that she should get other

23   prescriptions, how is that relevant.  It's relevant to rebut

24   the suggestion advanced by the United States that when Gohari

25   was telling Cabrera that these people should get other

1    prescriptions, this was an issue focused simply on Cabrera so

2    they would go out and generate some high-amount, high-priced

3    prescriptions, when in truth and in fact as a pharmacist, here

4    is a woman to whom he said go get a different medication and

5    suggested a medication to her.

6             Lastly --

7             THE COURT:  Whoa.  Just so I'm clear on this point you

8    were just discussing, a prescription for a cheaper medication?

9             MR. KEHOE:  Yes.  Generally speaking, it was for a

10   lower copay.

11            THE COURT:  How does that respond to the point?  I see

12   how the other parts respond, but how does that respond to the

13   situation from what Mr. Cabrera was supposedly doing?

14            MR. KEHOE:  It responds to it because Mr. Gohari as a

15   pharmacist was talking to a patient to suggest to that

16   patient -- whether or not the patient did it is another

17   issue -- that that patient should go get a different medication

18   from his or her doctor.  The suggestion coming from Mr. Cabrera

19   was that every time Mr. Gohari did that or made that

20   suggestion, it was for some alternative purpose, i.e., to

21   generate more income for the pharmacy.

22            THE COURT:  I see.  I'm not sure that is what the

23   testimony was, but if that were the testimony, I could see your

24   argument.  Go ahead.  What is the last one?

25            MR. KEHOE:  The last point with Ms. Harewood was that

Gb7rgoh2

```
1    she had been a patient there, waived the copay.  The suggestion
2    coming from waiving the copay from Mr. Cabrera was they waived
3    the copay because this was all part of the deal, when in truth
4    and in fact Mr. Gohari on occasion had a customer, a patient,
5    that was there for a significant period of time and waived the
6    copay.  I know your Honor has gathered that this is a
7    neighborhood that, frankly, is of a low socioeconomic level.
8               THE COURT:  Let's stop with Ms. Harewood.  I guess
9    it's "hare-wood,", H-A-R-E-W-O-O-D?
10              MR. KEHOE:  Yes.
11              THE COURT:  Let me ask the government why isn't at
12   least some and maybe all of what counsel just said relevant?
13              MS. ESTES:  Your Honor, we submit that some of those
14   things are relevant.  Our concern that much of the 3500 talk
15   about how the defendant was such a pharmacist, helpful things
16   he would do with filling the prescriptions.  We think evidence
17   in that regard is entirely irrelevant.
18              THE COURT:  I agree with that, but that's not what
19   counsel says he is offering it for.  He says basically it's
20   being offered to rebut various specific arguments made by the
21   government as to ways in which the defendant was acting in
22   either a suspicious manner or failing to act under allegedly
23   specific circumstances.
24              What this shows, defense counsel would argue, is that
25   the kinds of the circumstances that the government referred to
```

1    can come up in perfectly innocent situations and therefore the

2    argument would be that Mr. Gohari had no reason to be

3    suspicious when it came up in the Cabrera type of situations

4    because it was something that came up in perfectly innocent

5    situations.  I take it that is the gist of the argument.

6              MR. KEHOE:  That is the gist of the argument, yes,

7    sir.

8              THE COURT:  That seems perfectly relevant to me.  But

9    I agree, I'm sure counsel knows that any testimony from these

10   witnesses about what a wonderful guy Mr. Gohari was or we just

11   had total satisfaction with his pharmacy and his personal

12   practices, that would be of course irrelevant and forbidden.

13   You understand that, of course?

14             MR. KEHOE:  Yes, your Honor.

15             THE COURT:  Anything else?

16             MS. ESTES:  That's fine.  Thank you, your Honor.

17             MR. BACHNER:  Thank you, your Honor.  I have two

18   witnesses.  One witness is a Ms. Eunice Cozens, your Honor.

19   Ms. Cozens will testify that she is suffering from COPD, that

20   she had been frequenting the defendant's pharmacy actually when

21   he worked at a different location, then continued to frequent

22   his location when he moved further.

23             The reason for that, even though she had a pharmacy

24   right across the street from her, was because Mr. Gohari ran an

25   efficient pharmacy where he saw her when she needed, he cared

Gb7rgoh2

1    for her when she walked through the door, and he understood the

2    significance --

3             THE COURT:  I think the first part is relevant, the

4    second is not.  She can certainly say that I continued with Mr.

5    Gohari when he moved further away.  She can describe the

6    distance and that it was not in the same neighborhood.  But

7    that's it.

8             MR. BACHNER:  Judge, if I might just complete?  I

9    understand your Honor's ruling.

10            THE COURT:  Yes.

11            MR. BACHNER:  It would seem to us, your Honor, that

12   that rebuts the government's portion that the reason people go

13   farther away would have to be for nefarious reasons when there

14   actually are completely legitimate reasons that I think the

15   jury should be entitled to know.

16            THE COURT:  The trouble is it's a 403 problem.  When

17   you start getting into stuff like, well, I regarded Mr. Gohari

18   as Mr. Wonderful, then the probative value is substantially

19   outweighed by the prejudice.  If the government is stupid

20   enough to on cross-examination say wasn't it for some bad

21   reason that you did this, then of course the door will be open

22   to what you have just said, but not on direct.

23            MR. BACHNER:  There are two other things she will say,

24   your Honor.  One is that there was a point in time she needed a

25   prednisone prescription filled because she had gotten so sick

1   that she had used it up too quickly.  She understood that Mr.

2   Gohari was not permitted to give her another prescription

3   because the time had run out.  She went to see him, and she had

4   a conversation with him, which she understands she cannot

5   reiterate to the Court.

6          But I would say, did you ask Mr. Gohari to fill that

7   prescription?  Yes.  Did you have an understanding as to

8   whether he could?  She knew from her own personal experience

9   that a pharmacist couldn't do that, and she said yes.  And did

10  Mr. Gohari do that?  He refused.  Did there come a point in

11  time when you had another conversation and he did?  Yes, he

12  gave me two sample pills to hold me over, and I went to the

13  hospital.

14         THE COURT:  These are in fact prior good acts, so

15  those are not admissible.

16         MR. BACHNER:  I would think it just rebutted the

17  government's case that he was just giving out scripts before

18  they ran out in time willy-nilly when in fact just with

19  prednisone pills --

20         THE COURT:  Again, it is much too colored.  In effect

21  what you are saying is suggesting to the jury from the facts of

22  the case that there she was -- I'm going to exaggerate -- on

23  death's door begging him to fill a prescription that he knew

24  the law prevented him from doing.  I'm not going to allow that.

25         MR. BACHNER:  Actually, not exaggerating.  She would

1    say --

2              THE COURT:  Then you make my case.

3              MR. BACHNER:  Finally, your Honor, regarding the issue

4    about the pharmacist being compassionate and caring, I

5    understand your Honor's ruling.  I just want to fill the

6    record.  Underlying the government's case is the fact that a

7    pharmacist would be doing what Mr. Gohari did lacks total

8    compassion, lacks total caring for his patients.

9              THE COURT:  I have not heard one word from the

10   government on that.

11             MR. BACHNER:  Isn't it implicit, your Honor?

12             THE COURT:  No, it is not implicit.  I don't assume it

13   and I have no reason to believe the jury assumes it.  I was

14   under the naive impression that pharmacists, like lawyers, are

15   professionals and they act out of professional motives.  No one

16   has ever accused lawyers as being the soul of compassion, but

17   their glory is when they act as professionals.

18             MR. BACHNER:  Your Honor, finally there is one other

19   witness that we are going to be calling subject to your Honor's

20   ruling on this.  The defendant's uncle, Mr. Said, the last name

21   is hard to say, A-S-K-A-R-I-N-A-M, he, your Honor, would

22   testify that he's been to the defendant's pharmacy many times,

23   it's a very busy location, he's been there, he is one of his

24   clients, etc.

25             However, also, your Honor, as background we would seek

Gb7rgoh2

1    to elicit that he was affirmatively instrumental in negotiating

2    and bringing Mr. Gohari and family members from Iran to the

3    United States, that he actually got the lawyers involved, was

4    involved in the various agencies.

5          THE COURT:  What is the relevance of that?

6          MR. BACHNER:  The reference, your Honor, is to give

7    the jury a fuller picture of the situation and also to deal

8    with one of the issues your Honor had raised at side bar at an

9    earlier time.  We are trying to complete that picture for the

10   jury as far as the background of how he came to the country.  I

11   think it shows an understanding of who the defendant is and his

12   coming into the country.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

GB7LGOH3

1      THE COURT:  In fact it seems to be totally

2    objectionable.  It seems first to be an attempt to get into

3    evidence something that the Court already indicated was

4    inadmissible hearsay.  And, second of all, it's irrelevant to

5    the issues in this case and clearly prejudicial.

6      MR. BACHNER:  Your Honor, I understand your Honor's

7    ruling.  We wouldn't do it through hearsay, but I understand

8    your Honor's ruling otherwise on that issue.

9      Your Honor, I did speak with the government about this

10   before I brought it to your Honor's attention.  I felt I had to

11   make a record for the Court.  The government has agreed that

12   they're not going to address the remarks on opening about the

13   Iranian situation for lack of proving it, and we're not going

14   to raise it again as well.  So I wanted to bring that to your

15   Honor's attention.

16      THE COURT:  Okay.  Very good.

17      All right.  Anything else?  Yes.

18      MR. KEHOE:  Yes, your Honor.  We had other witnesses

19   other than these.

20      THE COURT:  I think the ground rules are hopefully

21   pretty clear now.  So if there's any specific witness who

22   raises a specific issue that you have a question about, just

23   approach the side bar.

24      MR. KEHOE:  Yes, your Honor.

25      THE COURT:  All right.  We'll take a five-minute break

GB7LGOH3

1   and then we'll resume.

2           MR. BACHNER:  Thank you your Honor.

3           (Recess)

4           THE DEPUTY CLERK:  Shall I bring in the jury?

5           THE COURT:  Yes.  Let's get the next witness on the

6   stand.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.  Go ahead.

3     SAEED ASKARINAM,

4          called as a witness by the Defendant,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MR. BACHNER:

8     Q.  Good morning, Mr. Askarinam.

9     A.  Good morning.

10    Q.  Sir, do you know someone named Danny Gohari?

11    A.  Yes, I do.

12    Q.  How do you know him?

13    A.  I'm Danny's uncle.

14    Q.  And do you see Danny seated in the courtroom today?

15    A.  Yes, I do.

16          MR. BACHNER:  Stipulate into the record?

17          MS. ESTES:  Yes.

18    Q.  Mr. Askarinam, just tell us a little bit about yourself.

19    Were you born here in the United States?

20    A.  No.  I was born in Shiraz, Iran.

21          THE COURT:  I will allow a limited amount, very

22    limited.  So go ahead.

23          MR. BACHNER:  Limited background.

24    Q.  When did you come to the U.S.?

25    A.  I came to United States in December of 1971.

1    Q.  Sir, could you tell the jury just what you do for a living?

2    A.  I'm in the real estate business.

3    Q.  And, sir, do you have hold any degrees?

4    A.  Yes.  I have my undergraduate degree, electrical engineer,

5    and my graduate degree in business administration, master of

6    business administration.

7    Q.  And, sir, just generally where do you work presently?

8    A.  I have my own company.  I have an office in Brooklyn, New

9    York.

10   Q.  Sir, do you know a pharmacy called Afam Pharmacy?

11   A.  Yes, I do.

12   Q.  How do you know that pharmacy?

13   A.  I went there to fill out my prescription.  Also, Danny

14   being my nephew, I frequently visit him.

15   Q.  And you understand that Danny works at Afam?

16   A.  He did work there, yes.

17   Q.  And, sir, how often would you go to that pharmacy?

18   A.  At least two, three times a month.

19   Q.  And at the time you went to the pharmacy was it always to

20   fill prescriptions?

21   A.  Not always.  I would go, being my nephew, sometimes I will

22   go there to see how he's doing.  So I was always in the

23   neighborhood.

24   Q.  And did you have an occasion, sir, to see how large --

25   could you describe for the jury how large the pharmacy it was?

GB7LGOH3                        Cousins - direct

1   A.   It's a very small pharmacy.  I would say about two, 300

2   square foot, small waiting area at the beginning, and Danny was

3   in the back of the store filling out prescription.

4   Q.   Would you describe the store as -- how would you describe

5   the store as far as the level of how busy it was?

6   A.   It's very active.  Quite often people will come and fill

7   out prescription and Danny was constantly on the phone filling

8   out prescription and, you know, counting pills.

9   Q.   And were there other pharmacists working in that pharmacy?

10  A.   On occasion I would see one other pharmacist there.

11  Q.   And do you know that person by name?

12  A.   Something Bobby.

13              MR. BACHNER:  One second.

14              Thank you, sir.  No other questions, sir.  Pass the

15  witness.

16              THE COURT:  Cross-examination.

17              MS. ESTES:  We don't have any cross-examination, your

18  Honor.

19              THE COURT:  Thank you very much.  You may step down.

20              (Witness excused)

21              THE COURT:  Please call your next witness.

22              MR. KEHOE:  The defense calls Michelle Harewood.

23              Your Honor, there's one patient that I think needs to

24  go.

25              THE COURT:  Go ahead.

GB7LGOH3                    Cousins - direct

 1            MR. KEHOE:  Mr. Bachner told me about that.

 2            THE DEPUTY CLERK:  Please take the witness stand.

 3    ENIS COUSINS,

 4         called as a witness by the Defendant,

 5         having been duly sworn, testified as follows:

 6            MR. BACHNER:  Thank you, your Honor.

 7    DIRECT EXAMINATION

 8    BY MR. BACHNER:

 9    Q.  Good morning, Ms. Cousins.  Ms. Cousins, what borough to

10    you live in?

11    A.  Kings County, Brooklyn.

12    Q.  Are you presently working?

13    A.  No.

14    Q.  Are you disabled?

15    A.  Yes.

16    Q.  What conditions do you suffer from?

17    A.  Severe COPD.

18    Q.  Ma'am, do you have children?

19    A.  Yes, I do.

20    Q.  Just in a line or two, what do your children do?

21    A.  My first one is a minister.  The second one is a Harvard

22    law school graduate.  He works in Chicago with HP.  And my last

23    one, 17-year-old, just got a full scholarship to Princeton.

24    Q.  Congratulations.

25    A.  Thanks.

GB7LGOH3                        Cousins - direct

1        THE COURT:  Wait a minute.  The first one is a

2   minister; that's good.  The last one.  Did I hear that the

3   middle one is a lawyer?

4        THE WITNESS:  Yes, corporate lawyer.

5        THE COURT:  My condolences.

6        THE WITNESS:  Your condolences.

7        THE COURT:  Okay, counsel.

8        MR. BACHNER:  Thank you, Judge.

9   Q.  Ms. Cousins, do you know Danny Gohari?

10  A.  Oh, yes, I do.

11  Q.  Do you see Danny here in the courtroom today?

12  A.  Yes, I saw him.

13  Q.  Could you point him out?

14  A.  He's right there.

15       THE COURT:  All right.

16  Q.  Thank you.  Ms. Cousins, when did you first meet Danny

17  Gohari, if you can recall?

18  A.  Well, it was maybe about 12 years ago because my primary

19  care doctors and my pulmonologist, cardiologist were right at

20  the facility where his pharmacy was right there next-door,

21  attached to building.

22  Q.  And what location was that pharmacy?

23  A.  That's Utica Avenue, 5025 Church Avenue.

24  Q.  Did there come a time, Ms. Cousins, when that pharmacy

25  changed locations?

1   A.  Not too long ago, yes.

2   Q.  And after the pharmacy changed locations, did you continue

3   to frequent the pharmacy where Danny was working at?

4   A.  I sure do.

5   Q.  And approximately how far is that pharmacy from where you

6   presently reside or where you resided at that time?  I

7   apologize.

8   A.  My residency has been there for 19 years.  And on a good

9   day I would say it's walking distance, but it's approximately

10  like a five-minute drive.

11  Q.  And is there a pharmacy closer than Afam Pharmacy to your

12  present home?

13  A.  Oh, sure, there's half a block from me, but I don't go

14  there.

15  Q.  And at the time that you went to Afam Pharmacy, you filled

16  a -- did you fill a variety of prescriptions there?

17  A.  Oh, yes, I do.

18  Q.  And as far as the pharmacy is concerned, when you came into

19  the pharmacy, who did you deal with?

20  A.  I dealt with Danny on much of the occasions and sometimes

21  other workers.

22  Q.  And when you went into the pharmacy, did you have to wait

23  to have your prescriptions filled?

24  A.  I do have to wait, but not very long in comparison to the

25  other pharmacies I've been to.

1  Q.  Now, ma'am, can you describe for the jury how busy the

2  pharmacy was?

3  A.  It's very busy.

4  Q.  And can you describe what you would see Danny doing on an

5  average day when you were there?

6  A.  Well, he's in between phone calls, filling prescriptions,

7  you know, telling other workers what to do, what not to do and

8  stuff like that.  He's always busy.

9  Q.  And are you -- without getting -- withdrawn.

10          MR. BACHNER:  Thank you very much, Ms. Cousins.

11          Pass the witness, your Honor.

12          THE COURT:  Any cross-examination?

13          MS. ESTES:  No, your Honor.

14          THE COURT:  Thank you very much.  You may step down.

15          (Witness excused)

16          MR. KEHOE:  The defense calls Michelle Harewood.

17          THE DEPUTY CLERK:  Please take the witness stand.

18   MICHELLE HAREWOOD,

19       called as a witness by the Defendant,

20       having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. KEHOE:

23  Q.  Good morning, Ms. Harewood.

24  A.  Good morning.

25  Q.  Ms. Harewood, where do you live?

1   A.  937 Saratoga Avenue, Brooklyn, New York.

2   Q.  What neighborhood is that generally in Brooklyn?

3   A.  Brownsville.

4   Q.  How long have you resided there?

5   A.  About six years.

6   Q.  Ms. Harewood, are you currently suffering from some

7   physical ailments?

8   A.  Yes.  I have sinus and back injuries.

9   Q.  And you're not currently employed?

10  A.  No, I'm not.

11  Q.  Now, do you know -- for some of your issues have you gone

12  to a doctor, a Dr. Tipu?

13  A.  Yes.

14  Q.  And when you were going to Dr. Tipu, did you begin to get

15  your prescriptions filled at Afam Pharmacy?

16  A.  Yes.

17  Q.  And where was that in relation to Dr. Tipu?

18  A.  Its location?

19  Q.  Well, previously what was the location?

20  A.  On Church Avenue.

21  Q.  And was it right next-door to Afam Pharmacy?

22  A.  Yes.

23  Q.  And did you deal with Danny Gohari at the time?

24  A.  Yes.

25          MS. ESTES:  Objection, leading.

GB7LGOH3                            Harewood – direct

1        THE COURT:  Yes.  I'll allow the last question.  But

2   after this, no more leading.

3        MR. KEHOE:  Yes, your Honor.

4   Q.  And do you see Danny Gohari here in the courtroom?

5   A.  Yes.

6   Q.  And, Danny, stand up.  The gentleman standing up here?

7   A.  Yes.

8        THE COURT:  Identification is duly noted.

9        MR. KEHOE:  Thank you, your Honor.

10  Q.  How long did you deal with Mr. Gohari?

11  A.  For about seven years, eight years, approximately.

12  Q.  Ms. Harewood, did there come a time when Mr. Tipu moved his

13  office away from Church Avenue?

14  A.  Yes.

15  Q.  And did you base, even after Dr. Tipu left, did you

16  continue to go to Danny Gohari's pharmacy to fill your

17  prescriptions?

18       MS. ESTES:  Objection, leading.

19       THE COURT:  Well, it clearly is leading, but I will

20  allow it to move things along.  But I caution counsel again not

21  to lead.  But I'll allow this question.

22       Is the answer yes?

23       THE WITNESS:  Yes.

24  Q.  And why did you do that?

25  A.  Because I was comfortable with the pharmacy, with the

1   people there.

2   Q.  And how long did it take you to get by bus from your house

3   to Mr. Gohari's pharmacy?

4   A.  Not sure by bus because I normally drive.

5   Q.  And how long of a drive is it?

6   A.  About ten minutes.

7   Q.  Now, during the course of your years with Mr. Gohari, did

8   you get his cell phone number?

9   A.  Lately, yes, I did lately.

10           THE COURT:  Excuse me.  When you say lately,

11  approximately when?

12           THE WITNESS:  About eight or nine months ago.

13  Q.  Now, Ms. Harewood, the prescriptions at Afam Pharmacy, did

14  you pick prescriptions up for other people?

15  A.  Yes, I did.

16  Q.  And who did you pick them up for?

17  A.  I picked up for my dad, my kids, and one friend of mine

18  who's my landlord.  He's elderly.

19  Q.  What's his name?

20  A.  Patrick Connell.

21  Q.  You picked up because he was elderly?

22  A.  Yes.  And he doesn't see well, he doesn't hear well, so I

23  assist him sometimes.

24  Q.  Did Mr. Gohari ever ask you for any identification when you

25  were picking up for these people?

1    A.  No.

2    Q.  Now, did your father also get his prescriptions filled?

3    A.  Yes.

4    Q.  Did Mr. Gohari ever advise you concerning getting a low

5    copay?

6              THE COURT:  He's a landlord who doesn't see well or

7    hear well?

8              THE WITNESS:  Yes.

9              THE COURT:  How does that distinguish him from any

10   other landlord?

11             MR. KEHOE:  Judge, I don't want to take that one on.

12             THE COURT:  Go ahead, counsel.

13             No, not a serious question.

14             THE WITNESS:  Okay.

15             THE COURT:  Go ahead, counsel.

16             MR. KEHOE:  No real estate lawyers in here, Judge.

17   Q.  Going back to that, your father was also going to the

18   pharmacy?

19   A.  My dad doesn't really go to the pharmacy as such.  I'm the

20   one that normally go.  He probably went there twice, you know.

21   Q.  Now, was there a discussion with Mr. Gohari about getting a

22   lower copay?

23             MS. ESTES:  Objection, leading and hearsay.

24             THE COURT:  Well, I think that question I'll allow and

25   it may have to be leading here to avoid the problem we

GB7LGOH3                         Harewood - cross

1    discussed outside the presence of the jury.

2              So is the answer to that yes or no?

3              Do you want the question reread?

4              THE WITNESS:  Yes, please.

5              (Record read)

6              THE COURT:  Just answer that yes or no.  Was there

7    such a discussion?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.

10   Q.  Did he -- this is just for the fact it was said -- did he

11   tell you to do something to get the lower copay?

12   A.  Well, it depends on the medication.  Sometimes it would

13   require him to call the doctor to change it, you know.

14   Sometime medication is just over the counter that he can handle

15   it himself.

16   Q.  On occasion when you were dealing with Mr. Gohari, did he

17   waive the copay?

18   A.  It depends on the cost.

19             THE COURT:  Sustained.  Sustained.

20             MR. KEHOE:  Your Honor, thank you.  I have no further

21   questions.

22             THE COURT:  Counsel.

23   CROSS-EXAMINATION

24   BY MS. ESTES:

25   Q.  Good morning.

GB7LGOH3                    Harewood - cross

1    A.  Good morning.

2    Q.  So, Ms. Harewood, you picked up medications for your

3    father, right?

4    A.  Yes.

5    Q.  And he has the same last name as you?

6    A.  Yes.

7    Q.  So that's Hollister Harewood?

8    A.  Yes.

9    Q.  And he's received oxycodone before, right?

10   A.  Yes.

11   Q.  Why did he need oxycodone?

12   A.  He had a surgery done and that's what the hospital gave

13   him, Methodist Hospital.

14   Q.  And he only received it a couple of times, right?

15   A.  One time only.

16   Q.  One time only?

17   A.  I think it's one time, yeah.

18   Q.  And it was only a five-day supply?

19   A.  I can't remember exactly how many days it was, but he

20   did -- I did pick up that for him, oxycodone, yes.

21   Q.  And you testified that you've picked up for relatives,

22   right?

23   A.  My dad and my kids.  Those are my relatives.

24   Q.  How old are your kids?

25   A.  Fifteen, ten, 12.

1   Q.  And none of your kids were getting oxycodone, right?

2   A.  No.

3   Q.  And do they have your same last name?

4   A.  No, only one.

5   Q.  One has your last name?

6   A.  Yeah.

7   Q.  And you testified that you picked up for your landlord as

8   well, right?

9   A.  Yes.

10  Q.  And does he have your same address?

11  A.  Yes, he does.

12  Q.  And he wasn't getting oxycodone, right?

13  A.  No.

14          MS. ESTES:  No further questions.

15          THE COURT:  Anything else?

16          MR. KEHOE:  No, thank you.

17          Thank you very much, Ms. Harewood.

18          THE COURT:  Thank you.  You may step down.

19          (Witness excused)

20          THE COURT:  Please call your next witness.

21          MR. KEHOE:  The defense calls Cheryl Mayers,

22  M-A-Y-E-R-S.

23   CHERYL MAYERS,

24      called as a witness by the Defendant,

25      having been duly sworn, testified as follows:

1    DIRECT EXAMINATION

2    BY MR. KEHOE:

3    Q.  I'm not sure if it's morning or afternoon, Ms. Mayers, but

4    whatever it is, good morning or good afternoon.

5    A.  Good morning.

6    Q.  Ms. Mayers, where do you live?

7    A.  In Brooklyn.

8    Q.  What general area in Brooklyn?

9    A.  Canarsie area.

10   Q.  How long have you lived in the Canarsie area?

11   A.  About 20 years.

12   Q.  I understand you're not employed right now, but what did

13   you do previously?

14   A.  Previously I was working in banking, Immigrant Savings

15   Bank, about 22 years.  I got let go back in 2008.  And then I

16   was working for Direct Buy, that's about two and a half years,

17   and that went under.  And then I decided to do home care.

18   Q.  And is that what you're doing now?

19   A.  Yes.

20   Q.  During the last several years have you had some physical

21   issues?

22   A.  Yes, I did.

23   Q.  And can you explain to the Court and jury what those were?

24   A.  I had just recently, also, just had a surgery in January.

25   I had one in May and one in August.  In the past also I had

1   several different surgeries.  I went to there's a clinic on

2   Church Avenue that I used to go to, but that's now formally

3   closed.

4   Q.  Would that be Dr. Tipu's pharmacy, excuse me, clinic?

5   A.  Yes.

6   Q.  And what did you go to Dr. Tipu's clinic?

7   A.  I'm also diabetic, so I also went to the diabetic doctor

8   there.  I used to go to the GYN, as well, and the foot doctor,

9   as well.

10  Q.  And after going to that doctor did you get some

11  prescriptions that you needed filled?

12  A.  Yes.  And I used to go right next-door to the pharmacy

13  because it was convenient for me and it was right adjoined to

14  each other.

15  Q.  And was the gentleman working there, was that Mr. Gohari?

16  A.  Yes.

17  Q.  And, obviously, do you see him in the courtroom here?

18  A.  Yes.  Yes.

19          THE COURT:  Duly noted.

20  Q.  Now, did there come a time, Ms. Mayers, when Dr. Tipu moved

21  his offices?

22  A.  Yes.

23  Q.  And did you continue to go to Dr. Tipu?

24  A.  Yes.

25  Q.  And after he moved his office, when you got your

1    prescriptions, did you continue to go to Mr. Gohari's pharmacy?

2    A.  Yes, because it was convenient for me.

3    Q.  And going to his pharmacy?

4    A.  Yes.

5    Q.  And so you didn't go near Dr. Tipu, you went back to his?

6    A.  I went back to the pharmacy right on Church Avenue.

7    Q.  Now, was there ever an occasion when you didn't have enough

8    money to pay for a prescription?

9    A.  Yes.

10   Q.  And what in fact transpired when you didn't have any money

11   to pay for the prescription?

12            MS. ESTES:  Objection.

13            THE COURT:  I'm sorry, forgive me.  When there's an

14   objection I have to rule.

15            I'm going to sustain the objection unless counsel

16   wants a side bar.

17            MR. KEHOE:  If I could rephrase the question.

18   Q.  When you didn't have enough money, did you have a

19   conversation, without telling us what was said, did you have a

20   conversation with Mr. Gohari about it?

21   A.  Yeah --

22            THE COURT:  No.  I'm still -- the answer is yes, but

23   put another question.

24   Q.  And after you had that conversation, did you absolutely,

25   positively have to pay him that day for your prescription?

1            THE COURT:  Sustained.

2   Q.  Did you get your prescription?

3   A.  Yes.

4   Q.  Thereafter, next day, sometime down the line, did you then

5   return to the pharmacy with the money?

6   A.  Yes.

7   Q.  Now, during your period of time when you were with

8   Mr. Gohari, did you have any conversations with Mr. Gohari --

9            MR. KEHOE:  And most respectfully, Judge, if I could

10  have a little leeway on the leading so I can get through this

11  without triggering, your Honor, some of your Honor's orders.

12  Q.  -- did you have a conversation with Mr. Gohari about

13  getting cheaper medication for you?

14           THE COURT:  Just answer that yes or no.

15  A.  Yes.

16  Q.  And did he suggest that you talk to your doctor about a

17  cheaper medication?

18  A.  Yes.

19  Q.  And did you do that?

20  A.  Yes.

21  Q.  And was the medication cheaper?

22  A.  Yes.

23  Q.  Now, in picking up your medication -- again, your Honor,

24  just a tad bit of leeway here -- when you would ask for a

25  prescription, was there ever a time when the entire

831

1   prescription was not filled and you had to come back?

2   A.   Yes.

3               MS. ESTES:   Objection.

4               THE COURT:   Ground?

5               MS. ESTES:   Your Honor's prior ruling on specific good

6   acts.

7               THE COURT:   I don't think this one came up, but if the

8   question is what's the relevance, I'll hear counsel at the side

9   bar.

10              (Continued on next page)

1           (At the side bar)

2           THE COURT:  So what is she going to say?

3           MR. KEHOE:  What she's going to say is that she

4    returned back.  Obviously, I have to wend my way through the

5    hearsay aspect of it, but she didn't get the full and then she

6    came back.  She got a phone call and based on what she was

7    told, she came back.  One of the issues --

8           THE COURT:  What's the relevance?

9           MR. KEHOE:  The issue is it goes to Cabrera's comment

10   that when he didn't get the full prescription that Gohari

11   pocketed the difference.  That was the suggestion brought up by

12   counsel on direct examination of Mr. Cabrera.  And here is a

13   perfectly innocent explanation as to what in fact transpired in

14   her personal experience.  It rebuts that issue.

15          MS. ESTES:  Your Honor, what happened with her has no

16   relevance to what happened with Mr. Cabrera.

17          THE COURT:  I don't remember what Mr. Cabrera said in

18   that regard, so you have to fill in.

19          MS. ESTES:  Mr. Cabrera said with respect to some of

20   his patients, they didn't always get the medication, but we've

21   never said this was the case with every person.

22          THE COURT:  Didn't get medication at all?

23          MS. ESTES:  He said there were a couple that they

24   didn't get medication at all and a couple where the pills were

25   short.

GB7LGOH3                          Mayers - direct

1          THE COURT:  And the pills were short meaning that

2     they -- he just didn't put in enough without telling the

3     patient or that the patient was told it's less than the full

4     amount?

5          MS. ESTES:  I don't think the testimony made clear.

6          THE COURT:  Okay.

7          MS. ESTES:  Just that patients were missing

8     medication.

9          THE COURT:  So assuming he did tell them, so I take it

10     what counsel is saying, what defense counsel is saying is there

11     are circumstances where one might have to come back to get the

12     full prescription filled so that what Mr. Cabrera had described

13     in part might have appeared innocent rather than guilty.

14          MR. KEHOE:  Correct.  That's right, Judge.

15          MS. ESTES:  Your Honor, there was follow-up testimony

16     from Mr. Cabrera that he went back to the defendant and the

17     defendant said, essentially, this is what you get.

18          MR. KEHOE:  That comes from Mr. Cabrera, hardly the

19     bastion of credibility.

20          THE COURT:  That's a different question.  What he's

21     describing then is not rebutted by this circumstance.  So,

22     sustained.

23          MR. KEHOE:  Judge, if I may, Judge, this is an

24     instance that happened once.  He said, he maintained that on

25     several occasions, he said he complained once.  And he

1    testified on direct examination that on many occasions that it

2    was short.  The issue here is directly relevant to say if

3    you're short, you just go back and get the rest because they

4    don't have it.  It's directly pertinent to what they tried to

5    bring out with this guy and I guarantee you, Judge, in final

6    argument, counsel is going to argue this stuff.

7            There's an innocent explanation.  If he doesn't have

8    enough, he calls him.  He just goes back.  He gets a phone

9    call.  Don't tell us the phone call.  Did you go back and get

10   the rest of your prescription?  Yes.  It's highly pertinent,

11   especially if they argue what counsel just said they're going

12   to argue.

13           THE COURT:  If Mr. Gohari says to Mr. Cabrera this is

14   all you get, that, of course, is probative of that they have a

15   conspiratorial relationship because an honest pharmacist would

16   not have done that.  But what you're saying is that on some

17   other occasion with a non-coconspirator, a situation arose in

18   which he filled part of a prescription and then filled part

19   another part of it later.

20           MR. KEHOE:  Yes.

21           THE COURT:  I don't see how that rebuts.  This is only

22   really being offered, as far as I can tell, for impeachment of

23   Cabrera.

24           MR. KEHOE:  Judge, it's also a rebuttal of the entire

25   scenario laid out by counsel that if you get less than the full

1   script, Danny Gohari is taking that money and keeping it.

2              THE COURT:  I disagree.  When you have things like

3   that were testified by the government's pharmacy expert on

4   things that a reasonable pharmacist would not have done, then

5   of course you have the right to rebut it, as most of the last

6   few witnesses have done.  But this was not something raised by

7   their expert.  This was something only raised and in ways that

8   are really quite distinguishable from your situation with this

9   witness by Mr. Cabrera.  It's extrinsic evidence offered to

10  impeach a prior witness and that's within the discretion of the

11  Court.  The Court thinks it's not materially relevant and I'm

12  going to exclude it.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. KEHOE:  Ms. Mayers, thank you very much and have a

3    good afternoon.  No further questions.

4              THE COURT:  Was there anything else for this witness?

5              MR. KEHOE:  No, your Honor.

6              MS. ESTES:  Yes, your Honor, just briefly.

7    CROSS-EXAMINATION

8    BY MS. ESTES:

9    Q.  Ms. Mayers, good morning.

10   A.  Good morning.

11   Q.  So you testified earlier that --

12             THE COURT:  Well, that's an assumption that's not

13   supported by the facts in evidence.

14             MS. ESTES:  My apologies, your Honor.

15   Q.  Ms. Mayers, you testified earlier that you were in home

16   care; is that right?

17   A.  That's correct.

18   Q.  How long have you been in home care?

19   A.  About two years.

20   Q.  And how did you get involved in home care?

21   A.  After I had got let go from my job and Direct Buy, I

22   decided to go do the certificate and I started home care.

23   Q.  So you have a certificate in home care?

24   A.  Yes.

25   Q.  Are you licensed?

1   A.  Yes.

2   Q.  And you're registered as a home healthcare aide?

3   A.  That's correct.

4   Q.  And that registration is available online; is that right?

5   A.  I believe so.

6   Q.  So you can be looked up in an online registry?

7   A.  Yes.

8   Q.  And your number is 417778; is that right?

9   A.  What number is that?

10  Q.  Your registration number.

11  A.  I don't know the number.

12  Q.  But did you attend a training program?

13  A.  I did.  Americare in Brooklyn.

14  Q.  And information about your training as a home health aide

15  is available online, as well, right?

16  A.  I believe.  I did it with Americare, so I believe they

17  probably have online.

18  Q.  So a potential employer could look up online that you're in

19  home care, right?

20  A.  Yes.

21  Q.  And a pharmacist could look up online that you're in home

22  care, right?

23  A.  I don't know.

24          MS. ESTES:  One moment, your Honor.

25          No further questions.

1           THE WITNESS:  Thank you.

2   REDIRECT EXAMINATION

3   BY MR. KEHOE:

4   Q.  Ms. Mayers, it's a fact that a lot of people in Brooklyn

5   where you are that are helping out who are invalid or sheltered

6   or can't get out themselves, can't they?

7   A.  Yes.

8           MS. ESTES:  Objection.

9           THE COURT:  Sustained.

10  Q.  You were just asked questions about home healthcare.  Are

11  there not a lot of people in and around Brooklyn helping people

12  who can't get out?

13  A.  Yes.

14          MS. ESTES:  Objection.

15          MR. KEHOE:  No further questions.

16          THE COURT:  I'll allow it.

17          You may step down.  Thank you very much.

18          THE WITNESS:  Thank you.

19          (Witness excused)

20          THE COURT:  Call your next witness.

21          MR. KEHOE:  Yes, your Honor.  Michelle Rodgers.

22   MICHELLE RODGERS,

23      called as a witness by the Defendant,

24      having been duly sworn, testified as follows:

25  DIRECT EXAMINATION

1    BY MR. KEHOE:

2    Q.  Ms. Rodgers, where do you live, ma'am?

3    A.  Brooklyn.

4    Q.  And whereabouts?  You don't have to give the address.

5    A.  On Eastern Parkway, Crown Heights.

6    Q.  How long have you lived there?

7    A.  Say over 15 years.

8    Q.  And what do you do for a living?

9    A.  Home health aide.

10   Q.  What is a home health aide, what does that mean?

11   A.  Home health aide do a lot of stuff -- picking up

12   medications, cooking, doing shopping, administer medications,

13   you know, setting out your patient pills, helping them take a

14   bath or whatever you have to do.

15   Q.  You noted that you pick up medications for your patients,

16   your clients?

17   A.  Yes.

18   Q.  And have you done that on occasion?

19   A.  Yes.

20   Q.  And -- withdrawn.

21          It was for your particular patients; is that right?

22   A.  Yeah, yeah.

23   Q.  Now, did there come a time when you were getting -- you

24   individually, did you have some issues where you had to get

25   prescriptions filled?

1   A.   Yeah.  I had to get my prescription filled for my daughter;

2   she was having ear problem.  And I sent it in to Danny and the

3   prescription was like too strong because of her age and Danny

4   called me and said the prescription was a little bit strong.

5              MS. ESTES:  Objection.

6              THE COURT:  No.

7              MR. KEHOE:  If I may, Judge?

8              THE COURT:  Yes.

9   Q.   Without telling us about the conversation, did you have a

10  conversation with Mr. Gohari about the prescription?

11  A.   Yes.

12  Q.   And thereafter did you change the prescription?

13  A.   Yes.

14  Q.   And did it work?

15  A.   Yes.

16  Q.   Now, you were initially going to a -- which doctor were you

17  originally going to, was it near Mr. Gohari?

18  A.   Yes, there was a doctor near him.  And then after that, I

19  went to a different doctor, but I still send my prescription to

20  him.

21  Q.   Okay.  So you went to a different doctor but you still went

22  back to --

23  A.   Yes.

24  Q.   Was that a greater distance?

25  A.   Yeah, it was greater.

1   Q.  Now, you mentioned that you pick up for your patients

2   prescriptions.  Do you also pick up for friends and neighbors?

3   A.  Yeah, I pick up, yeah.

4   Q.  Is that yes?

5   A.  Yes.

6           MR. KEHOE:  May I have one moment, your Honor?

7           THE COURT:  Yes.

8           MR. KEHOE:  Your Honor, I have no further questions

9   for Ms. Rodgers.  Thank you very much.

10          THE COURT:  Cross-examination.

11  CROSS-EXAMINATION

12  BY MS. ESTES:

13  Q.  Ms. Rodgers, as a home health aide, how many people you do

14  typically care for at a time?

15  A.  One.

16  Q.  Just one?

17  A.  Mm-hmm.

18          MS. ESTES:  No further questions.

19          THE COURT:  Thank you very much.

20          MR. KEHOE:  If I could have redirect on that?

21          THE COURT:  Yeah.

22  REDIRECT EXAMINATION

23  BY MR. KEHOE:

24  Q.  The type of home health care you do, you're actually in the

25  apartment full time with the patient, aren't you?

GB7LGOH3

1    A.  Yes, full time, five days a week with the patient.

2    Q.  Full time?

3    A.  Full time.

4         MR. KEHOE:  Thank you very much.  I have no further

5    questions.

6         THE COURT:  Thank you very much.  You may step down.

7         (Witness excused)

8         THE COURT:  Call your next witness.

9         MR. KEHOE:  Your Honor, the defense rests.

10        THE COURT:  Okay.  Counsel come to the side bar.

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB7LGOH3

1              (At the side bar)

2              THE COURT:  How long does the government want for

3      summations, for its two summations combined?

4              MR. RICHMAN:  An hour for initial summation, your

5      Honor.

6              MS. ESTES:  Twenty, 25 minutes.

7              MR. RICHMAN:  An hour 25 minutes combined.

8              THE COURT:  How long does defense counsel want?

9              MR. KEHOE:  The same amount of time, Judge.

10             THE COURT:  So I'll give you the choice.  We could

11     either have summations right after lunch today, or we could

12     have them first thing tomorrow.

13             MR. KEHOE:  I vote for the morning, Judge.

14             MS. ESTES:  That's fine.

15             MR. RICHMAN:  Fine with the government, your Honor.

16             THE COURT:  So I will excuse the jury.  I'm going to

17     get you over lunch or at the end of lunch a proposed charge and

18     we'll have a charging conference say around 2:30 or so to give

19     you some time to look over my charge.

20             MR. KEHOE:  Yes, your Honor.

21             THE COURT:  And we'll take up right now after I excuse

22     the jury any further motions that anyone has.

23             Okay.  Very good.

24             MR. BACHNER:  Judge, we're going to get that hard

25     copy, the charge?

844

1     THE COURT:  Yeah.  Why don't you all come back to the

2  courtroom at 2 o'clock and I will get everyone hard copies then

3  of the charge and then we'll have the charge conference at 2:30

4  and I'll give you a chance.

5     MR. BACHNER:  Thank you, Judge.

6     (In open court)

7     THE COURT:  So, ladies and gentlemen, that concludes

8  the evidence in this case.  The next thing we do is counsel

9  gives closing arguments and then I give you my instructions of

10  law and then the case is yours to deliberate.  Counsel have

11  requested and I think it's reasonable that they have until

12  tomorrow to prepare their closing arguments.  So we're going to

13  excuse you for today.

14     Now, tomorrow, I understand from rumor and hearsay

15  that there's an election tomorrow.  So in order to make sure

16  that you have a chance to vote before you come here, I think

17  we'll start at 10 o'clock.  Does that work for everyone?  So

18  the courthouse will be sort of closed.  Actually, a whole bunch

19  of judges, including myself, will be continuing on with

20  matters, but we've told security that you'll be here tomorrow.

21  If you run in, if you see any sign, courtroom closed, just

22  ignore it, but go through the normal security.  But you may

23  want to allow an extra five minutes or so just because we won't

24  have the full courthouse staff tomorrow.

25     So the schedule is this.  We will reconvene at

10 o'clock tomorrow.  We will have closing arguments which will

take us down to about 1 o'clock.  You'll then have your normal

lunch.  You'll then have my instructions of law, which take

about half-hour, from two to 2:30, and then you'll start your

deliberations.  We'll only sit tomorrow until four.  So if you

don't complete your deliberations, you'll come back at

9 o'clock on Wednesday.

I mention all that so you can plan ahead, but also,

alternate juror No. 2, I think that obviates the problem that

you had.  I'll get back to you if there's any problem, but I

don't think there will be.

So it's actually cold, but it's a lovely day.  You can

go home.  If I were you, I'd wander around the neighborhood,

you know, buy some nice Chinese food, whatever you want.  Have

a very good day.  Have a very good evening.  We'll see you at

10 o'clock tomorrow.

(Jury not present)

THE COURT:  All right.  Please be seated.

At the last break we got the following note.  I'll

just read it.  But as you'll see in a minute, it's mooted by

the schedule.

This is from alternate juror No. 2.  Your Honor, next

Monday, November 14, I have my son's parent/teacher conference,

first grade.  I've arranged for the conference to happen in the

earliest possible slot, 8:30 a.m., and it will be concluded no

GB7LGOH3

later than 9 a.m.  The school is in Brooklyn Heights and if I

can attend, I can be back for jury service no later than

9:30 a.m.  It is the only parent/teacher conference of the

semester and the primary opportunity for us to get feedback

from my son's teacher.  If it would be possible to be at trial

at 9:30 a.m. so that I can attend my son's conference, I would

be greatly appreciative.  Thank you for your time and

consideration.  Avi Luft, alternate juror No. 2.

So as you know, we will excuse the alternates subject

to recall.  But we will excuse the alternates when the jury

begins its deliberations tomorrow, so this is obviously moot,

but I wanted to place it on the record.  I'll give it to my

courtroom deputy so it's duly marked.

Okay.  Any motions that defense counsel?

MR. KEHOE:  We're renewing our Rule 29 motion, your

Honor, with all the previous arguments given at the close of

the defense case on the sufficiency of the evidence for a

conviction.

THE COURT:  You would have been negligent not to have

made that motion and I would have been equally negligent not to

deny it.  Very good.

Counsel needs to be back in the courtroom at two.  The

defendant is welcome to come to the charging conference but

he's not required.  It's totally his option after consultation

with counsel.  But we'll have the charging conference beginning

GB7LGOH3

1   at 2:30.

2              MS. ESTES:  Thank you, your Honor.

3              (Luncheon recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GB7LGOH3

1                         AFTERNOON SESSION

2                            2:50 p.m.

3           THE COURT:  The record will reflect that counsel

4    received the proposed charge at 2:15, so I have given them

5    until now, which is almost 2:50, to look it over.

6           Beginning with the general instructions 1 through 9,

7    any objections, suggestions, or additions to 1 through 9?

8    First from the government.

9           MS. ESTES:  No, your Honor.

10          THE COURT:  From the defense?

11          MR. KEHOE:  No, your Honor.

12          THE COURT:  Turning to 10 and 11, the summary and then

13   the first of the two counts, any objections, suggestions, or

14   additions with respect to 10 and 11?  First from the

15   government.

16          MS. ESTES:  Yes, your Honor.  On page 24 we noticed

17   what we think might be a typo.

18          THE COURT:  A typo?  My gosh.  It must be my law

19   clerk.  Where is that?

20          MS. ESTES:  It's in the first paragraph, the sentence

21   that starts "For example, if you find that the defendant was

22   aware of the high probability that the defendant knew."

23          THE COURT:  Yes.  Thank you very much.  Strike "that

24   the defendant knew."

25          MS. ESTES:  Yes, your Honor.  Thank you.

GB7LGOH3

1          THE COURT:  Thank you.  Anything else on those two

2     charges?

3          MS. ESTES:  Not from the government, your Honor.

4          THE COURT:  Anything from the defense?

5          MR. KEHOE:  Yes, your Honor.  This is the conscious

6     avoidance instruction.  But the government didn't try this as a

7     conscious avoidance case.  Their case from the very outset has

8     been one of direct knowledge by the defendant.

9          THE COURT:  I considered that, but I think they

10    actually argued both.  They argued that Mr. Cabrera is saying

11    it's a direct case, but then they also argued that there were

12    all these red flags flying, although they didn't use that term.

13         MR. KEHOE:  If I may, Judge?

14         THE COURT:  Yes.

15         MR. KEHOE:  If your Honor harkens back to a week ago

16    today to counsel's opening statement, it had always been that

17    Mr. Gohari knew what Cabrera was doing and the conspiracy was a

18    direct conspiracy.  There has never been any inkling that this

19    was a conscious avoidance type of issue.  The way that counsel

20    lead this information from Mr. Winsley was that there was other

21    evidence of the improper conduct of this defendant.  But it has

22    always been a direct knowledge case.

23         THE COURT:  I'll hear from the government in a minute.

24    Mr. Winsley's testimony was at the time we had the Daubert

25    hearing and I think consistently both that it corroborates

GB7LGOH3

1    Cabrera because it shows the defendant acting or failing to act

2    in circumstances where a good faith pharmacist would act but

3    also was independently a conscious avoidance claim.

4           My law clerk has the opening statements.  I don't know

5    of any requirement that they put that in their opening

6    statements.  The question is whether they fairly apprised the

7    defense that that would be one of their theories.

8           MR. KEHOE:  Clearly, Judge, you have pinpointed what

9    Winsley's testimony was, to be corroborative of the testimony

10   of Cabrera.  It was not an independent basis, most

11   respectfully, of conscious avoidance to warrant a charge.  The

12   government has never, ever --

13          THE COURT:  Forgive me.  Conscious avoidance in a

14   conspiracy context is a little bit different.  In other words,

15   they are not charging your client with any substantive crime.

16          MR. KEHOE:  Yes.

17          THE COURT:  They are claiming that he entered into an

18   agreement with one or more co-conspirators.  The conscious

19   avoidance comes up in this context of his knowledge of the

20   specific object, and that is the way I have charged it.

21          For example, if I entered with you into a conspiracy

22   in which we agreed that I would ignore or overlook, in return

23   for your giving me high-end prescriptions, allow you to fill

24   prescriptions that otherwise would have been something I would

25   have looked at but I didn't know whether what you had in mind

GB7LGOH3

1    was a prescription for oxycodone or a prescription for some

2    other controlled substance, then the government would be

3    entitled to a charge which is essentially what the conscious

4    avoidance charge is here: that he would still be guilty of

5    conspiring to distribute oxycodone as opposed to some other

6    controlled substance because he purposely turned away from

7    learning what the specific drug was.  I think that is all that

8    is charged here.

9            MR. KEHOE:  If I may, Judge, that, with all due

10   respect, has not been the presentation of evidence in front of

11   this Court.  There has never been advancement by the government

12   of the theory that there was a conspiracy to do some type of

13   drugs and that Mr. Gohari just looked the other way while Mr.

14   Cabrera completed the other steps in the conspiracy.  This has

15   always been a firm agreement by Mr. Cabrera with Mr. Gohari,

16   that we had an agreement to do X, and that in support of that

17   Mr. Winsley comes in and says you see all these things that he

18   didn't do and that he should have done, that shows that what

19   Cabrera is saying is true.

20           THE COURT:  Let's hear what the government has to say.

21   I'm open to persuasion on this particular matter.

22           MS. ESTES:  Your Honor, we specifically elicited

23   testimony from Mr. Winsley and also from Mr. Cabrera that the

24   defendant was looking the other way.  For instance, there was a

25   line of questioning where we asked Mr. Cabrera if the defendant

asked about any of the patients' pain.  For every one of those

patients he said no.  There has also been a lot of evidence

about whether the defendant met the patients.  The testimony

was no, he did not meet the patients.  That is all consistent

with a conscious avoidance instruction and it is consistent

with Winsley's testimony, which is intended to show that a

reasonable pharmacist would have known that something was going

on here.

MR. KEHOE:  If I may, Judge?

THE COURT:  Yes.

MR. KEHOE:  With all due respect, that is absolutely

not consistent with a conscious avoidance theory.  Their theory

has always been and continued to be throughout all his direct

examination that Gohari was in cahoots with Cabrera, and as

evidence of that, case point one Mr. Winsley: all of these

cautionary steps --

THE COURT:  Let me interrupt for a second because I

think the government maybe did not fully understand the thrust

of defense counsel's position.  Defense counsel is not arguing

that you can't put in evidence of the defendant turning away or

acting in an improper manner and all like that because that is

circumstantially consistent with the theory that he had an

agreement with Cabrera to distribute illegal drugs.  You don't

need a charge for that.  It's just another form of

circumstantial evidence?  If you want, when I discuss

GB7LGOH3

circumstantial evidence, we can put in a sentence to that effect.

　　　　But the charge you have asked for is a charge that presupposes that there was not a fully formed, explicit agreement between Cabrera and the defendant with respect to what the object of the conspiracy was, and a conscious disregard supplies that knowledge.  I'm thinking that the defendant may be right, that that was never argued at any point.

　　　　MS. ESTES:  Your Honor, may I have one minute?

　　　　THE COURT:  Yes.

　　　　MS. ESTES:  Your Honor, the government is permitted to argue in the alternative that the evidence has established that there has always been a relationship between the defendant and Mr. Cabrera.  Both sides have elicited testimony regarding that relationship.

　　　　One theory would be that there was this relationship but that the defendant maybe doesn't know where Mr. Cabrera is distributing the oxycodone or the specifics of why it is medically unnecessary, but that is because he is turning a blind eye because he is getting these high-priced medications as part of their arrangement.  That was the entire point of Mr. Winsley offering the testimony about all these red flags that a reasonable pharmacist should have seen, also the testimony of Sharon Auyeung that she told the defendant that she herself saw

GB7LGOH3

1    these red flags and that nonetheless he kept dispensing.

2              MR. KEHOE:  Still, your Honor, with all due respect,

3    that is not indicative of a conscious avoidance issue.  This

4    has been advanced by the United States in order to be

5    corroborative of this deal, this explicit deal that allegedly

6    took place we know Cabrera and Gohari.

7              There has never been any indication in any of the

8    questioning or anything presented by the United States that

9    there is a conscious avoidance or that Mr. Gohari turned a

10   blind eye to any of this.  To the contrary, their position has

11   been that he was in it as a co-conspirator and part and parcel

12   of this agreement.

13             That's why Winsley's information was coming in,

14   because it is corroborative of this deal.  There is nothing

15   advanced concerning a conscious avoidance defense or conscious

16   avoidance theory by the United States.

17             THE COURT:  I'm going to think about this.  I want to

18   go back and look at the record.  I will let you know by

19   sometime early this evening at the very latest.  In fact, I'll

20   send the final charge to both sides by email sometime early

21   this evening, and you will see my ruling on this issue.

22             MR. KEHOE:  Your Honor, for the sake of time, the same

23   issue comes up on page 30.

24             THE COURT:  In the next count?

25             MR. KEHOE:  Yes, in the next count.

GB7LGOH3

1              THE COURT:  Okay.

2              MR. KEHOE:  Same argument.  I can make the same

3    argument again if you want to hear it.

4              THE COURT:  I would cherish that, but I will pass that

5    up.

6              MR. KEHOE:  You will forgo the pleasure?

7              THE COURT:  That's right.  Any other objections to 10

8    or 11 from the defense?

9              MR. KEHOE:  No, your Honor.  That was my objection.

10             THE COURT:  Any objections other than the one that has

11   just been made to 12, the other count?

12             MR. KEHOE:  Other than what I just made, Judge, no.

13             MS. ESTES:  Your Honor, we did have one brief comment

14   on page 30.

15             THE COURT:  Yes.

16             MS. ESTES:  In the first full paragraph it says, "For

17   example, if you find that the defendant was aware of the high

18   probability that Gilberto Cabrera was submitting requests to

19   Medicaid."

20             THE COURT:  Yes.

21             MS. ESTES:  The defendant would be the one submitting

22   requests to Medicaid, the pharmacy.

23             THE COURT:  I see what you are pointing out.  If I

24   keep it at all, I will reword it because it is clearly wrong in

25   referring to Cabrera.

1          MS. ESTES:  Thank you, your Honor.

2          THE COURT:  I only put in the venue charge because the

3     defense is entitled to it and this case is I suppose a little

4     bit different from many in that everything focused on Brooklyn,

5     which for some fluke of history is not part of the Southern

6     District of New York.  On the other hand, I don't know if there

7     is really an issue on venue.  If the defense wants it in, I'll

8     keep it in.

9          MR. KEHOE:  We want it in, Judge.

10         THE COURT:  Okay.  Any objections to the concluding

11    instructions 14 and 15?

12         MS. ESTES:  No, your Honor.

13         MR. KEHOE:  Your Honor, my only question, and I didn't

14    know if I saw it or if I missed it, is with regard to the tapes

15    as opposed to the transcripts.  I know your Honor gave the

16    instruction before that the tapes themselves are the evidence

17    and the transcripts are just an aid to the jury.  I don't know

18    if your Honor lets this go based on your prior instructions to

19    the jury.

20         THE COURT:  Do you want something in there?  They knew

21    that from the instruction I gave them before, but it is not

22    something I want to artificially exclude if you really want it

23    in there.

24         MR. KEHOE:  It would be helpful, I believe, if you

25    would put it in there.

GB7LGOH3

1          THE COURT:  All right, I will put it in someplace in

2     the final instructions, something about that.

3          MS. ESTES:  Your Honor, if you would like, the

4     government could point to specific parts of the record where we

5     believe the evidence supports a conscious avoidance

6     instruction.  We are happy to provide a letter to the court

7     noting that.

8          THE COURT:  That's fine as long as you do it by no

9     later than 4:30.  And if the defense wants to respond to that

10    letter, they would need to do so by 5:30.

11         MS. ESTES:  Yes, your Honor.

12         THE COURT:  I'll hold off to then to make the

13    decision.  Anything else about any aspect of the charge

14    whatsoever?

15         MR. KEHOE:  Just one thing for the record, Judge.

16         THE COURT:  Yes.

17         MR. KEHOE:  I trust that your Honor reviewed our

18    copious jury instructions.

19         THE COURT:  I did.  To the extent they are not here,

20    they are deemed to have been denied in whole or in part.  You

21    have that for the purpose of any appeal.

22         MR. KEHOE:  Yes, your Honor.

23         THE COURT:  The same goes for the government.  Any

24    problems with the verdict form?

25         MS. ESTES:  No, your Honor.

GB7LGOH3

1        MR. KEHOE:  No, your Honor.

2        THE COURT:  Anything else we need to discuss?

3        MS. ESTES:  No, your Honor.

4        MR. KEHOE:  I don't believe so, Judge.

5        THE COURT:  Remind me.  I know you told me at the side

6   bar.  How is the government dividing its two summations?

7        MS. ESTES:  I believe about an hour for one and about

8   20 minutes for the other.

9        THE COURT:  All right.  Did we say at the side bar an

10   hour and 20 for each side or an hour and 25?

11        MR. KEHOE:  I said an hour and a half, Judge, and I

12   thought they were getting an hour and a half too.

13        THE COURT:  An hour and a half is fine.  What that

14   means is that we will go without a break because we are

15   starting at 10:00 and they need to have lunch at 1 o'clock.

16        I think that's everything.  To confirm:  If the

17   government wishes, it will send me a letter, which you can send

18   by email, no later than 4:30; if the defense wishes, they will

19   send me a response by email no later than 5:30; and I will send

20   to you the final charge by no later, say, than 8 o'clock.

21   Thanks very much.

22        (Adjourned to 10:00 a.m., November 8, 2016)

23

24

25

INDEX OF EXAMINATION

Examination of:                                  Page

AMBAR ARANAGA

Direct By Ms. Estes . . . . . . . . . . . . . 739

Cross By Mr. Kehoe . . . . . . . . . . . . . 743

RONALD GARY QUINTERO

Direct By Mr. Kehoe . . . . . . . . . . . . 747

Cross By Mr. Richman . . . . . . . . . . . . 780

Redirect By Mr. Kehoe . . . . . . . . . . . 793

SAEED ASKARINAM

Direct By Mr. Bachner . . . . . . . . . . . 813

ENIS COUSINS

Direct By Mr. Bachner . . . . . . . . . . . 816

MICHELLE HAREWOOD

Direct By Mr. Kehoe . . . . . . . . . . . . 819

Cross By Ms. Estes . . . . . . . . . . . . . 824

CHERYL MAYERS

Direct By Mr. Kehoe . . . . . . . . . . . . 827

Cross By Ms. Estes . . . . . . . . . . . . . 836

Redirect By Mr. Kehoe . . . . . . . . . . . 838

MICHELLE RODGERS

Direct By Mr. Kehoe . . . . . . . . . . . . 839

Cross By Ms. Estes . . . . . . . . . . . . . 841

Redirect By Mr. Kehoe . . . . . . . . . . . 841

```
                         GOVERNMENT EXHIBITS

Exhibit No.                                      Received

 919   . . . . . . . . . . . . . . . .740

 921   . . . . . . . . . . . . . . . .742

                         DEFENDANT EXHIBITS

Exhibit No.                                      Received

 81, 82, 83, 84, 85, 86, 87, 88, 89, 91, . . . 755

           and 92

 144   . . . . . . . . . . . . . . . .777
```