Gb8rgoh1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4              v.                        16 CR     246 (JSR)

5   KIAN GOHARI,
                                         Jury Trial
6                  Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         November 8, 2016
9                                        10:00 a.m.

10  Before:

11         HON. JED S. RAKOFF

12                                       District Judge

13

14

15

16

17         APPEARANCES

18

19  PREET BHARARA
         United States Attorney for the
         Southern District of New York
20  JORDAN L. ESTES
    JASON A. RICHMAN
21  EDWARD B. DISKANT
         Assistant United States Attorneys

22

23  GREGORY W. KEHOE
    ILANA HARAMATI
24  MICHAEL BACHNER
         Attorneys for Defendant

25

1              (Trial resumed; jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  Juror

3    No. 11 is wearing her 500th new outfit.  Very impressive.  I

4    also look at Juror No. 2, that bright shirt.  This is so

5    impressive.

6              Ladies and gentlemen, we are about to hear closing

7    arguments of counsel.  I want to remind you that nothing that

8    counsel says is itself evidence.  The evidence, which is now

9    fully before you, came from the witnesses, the exhibits, and

10   the stipulations.  But before you begin your deliberations, you

11   may find it useful to hear what counsel for each side believes

12   the evidence shows or fails to show, as the case may be.

13             Because the government bears the burden of proving its

14   case beyond a reasonable doubt, it gets both an opening

15   statement and a rebuttal statement, and in between we will hear

16   from defense counsel.  Each side is allotted a total of an hour

17   and a half.  We will begin with the first of the government's

18   two statements.

19             Counsel.

20             MR. RICHMAN:  Thank you, your Honor.

21             When we stood before you last week, we told you this

22   is a case about drug dealing, about this defendant abusing his

23   license and choosing to pedal in an elicit trade, a case about

24   an agreement between the defendant and Gilberto Cabrera,

25   expensive prescriptions for oxycodone, an illegal business

Gb8rgoh1                     Summation - Mr. Richman

1    deal.

2              Now you know that is exactly what this case is about.

3    You have learned all about it.  You have learned how Cabrera

4    met the defendant, introduced to him by Pookie, about how they

5    entered into their agreement, about how the defendant said, I

6    can get you oxycodone, bring me expensive prescriptions.  You

7    have learned about how that agreement progressed, about how

8    they talked to each other, about how the defendant was

9    Cabrera's man at the pharmacy.

10             You have learned that they would use hushed tones when

11   they would speak in front of others to hide what they were

12   doing.  You have learned about how Cabrera would call the

13   defendant, leave him angry voicemails, curse at his employees

14   if they didn't have the drugs he was promised.  You have

15   learned about how the defendant would request specific

16   prescriptions in return, specific expensive prescriptions, not

17   because he cared about the supposed patients or their

18   well-being, but because that was his end of the deal.

19             And you have learned about how it all unraveled,

20   October of last year, about how the pharmacy got inspected by

21   the state and the defendant got scared.  But not so scared as

22   to shun Gilberto Cabrera forever.  Just scared enough, just

23   scared enough to tell him to let's wait three to six months,

24   let's see what happens, let's see if we can start up again.

25             Ladies and gentlemen, they never got that chance, and

the fruitful relationship, the deal that they had, came to a

close for good.  But not before years of success, years of each

side fulfilling his end of the bargain, years of their criminal

dealings in Afam Pharmacy, years of transactions that benefited

them both, years of drug dealing.

Ladies and gentlemen, there is a lot that I submit is

no longer in dispute in this case.  I'm going to start there.

There is no real dispute that there was an oxycodone

distribution ring.  It involved Gilberto Cabrera, it involved

Sheri Bowen, it involved Robert Hespeth, it involved others.

There is no dispute that the defendant's pharmacy

provided the oxycodone sold by this ring, that the defendant's

pharmacy filled over 270 oxycodone 30 milligram tablets for

this ring.  There is no dispute that the oxycodone that the

defendant provided was medically unnecessary.  And there is no

dispute that the defendant filled other expensive prescriptions

brought to him by Cabrera, prescriptions for those same members

of the conspiracy.

So, what remains?  What is arguably in dispute?  The

only dispute appears to be and the primary dispute for you to

resolve is whether the defendant, Cabrera's man at the

pharmacy, intended to engage in a crime, intended to join in a

conspiracy with Gilberto Cabrera.

Today we are going to review the evidence that proves

that on this one essential point there is also no longer any

1    real dispute.  After this trial you know that the defendant was

2    an active participant in this conspiracy.  This is our

3    opportunity to talk through the evidence together.

4            The defendant is charged in two Counts.  Very briefly,

5    Count One involves a conspiracy to distribute oxycodone and

6    Count Two involves a conspiracy to commit health care fraud.

7    Judge Rakoff will instruct you on the law, and you should of

8    course listen carefully as he does and follow his instructions.

9            With respect to Count One, I expect that Judge Rakoff

10   will instruct you that a pharmacist who acts outside the usual

11   course of professional practice and knowingly dispenses

12   oxycodone for no legitimate medical purpose may be found guilty

13   of unlawful distribution.  On the other hand, a pharmacist who

14   in good faith fills prescriptions for oxycodone in the regular

15   course of a legitimate professional practice does not violate

16   the law.  After this trial you know that the defendant wasn't

17   dispensing oxycodone to Gilberto Cabrera for any legitimate

18   medical purpose or acting in good faith in filling those

19   hundreds of oxycodone prescriptions.

20           Count Two charges the defendant with defrauding

21   Medicaid.  Very briefly, you know that substantially all of

22   these oxycodone prescriptions were billed to Medicaid.

23   Medicaid was paying for oxycodone prescriptions that the

24   defendant was filling so Cabrera would sell the pills on the

25   street.  That's what makes the defendant guilty on Count Two.

1         The conspiracy begins with Gilberto Cabrera.  He

2    started the scheme to make money.  He would find people,

3    recruit them to obtain oxycodone prescriptions, fill these

4    prescriptions, and then resell sell the pills on the street.

5    You now know that oxycodone is a highly addictive drug with an

6    active secondary market.  Bill Winsley told you about this.  He

7    told you that oxycodone 30 milligram tabs are at the most

8    potential for abuse because they are dispensed in a dosage that

9    can be abused in a variety of ways.

10         Gilberto Cabrera told you the hardest part of his

11   scheme was to obtain the oxycodone.  It was hard to find a

12   pharmacist just from anywhere.  You know why this is case.

13   Sharon Auyeung told you why.  It was suspicious.  What he did

14   was suspicious.  Bill Winsley told you why.  All of those

15   prescription over prescription after prescription, it was

16   suspicious.  A pharmacist who wasn't involved, a pharmacist who

17   did his job as he was licensed to do wouldn't distribute

18   oxycodone to Gilberto Cabrera in the manner that the defendant

19   did for as long as the defendant did it.

20         Finding a pharmacist, this was a huge problem for

21   Cabrera.

22         What happened?  Cabrera learned about the defendant,

23   learned about a pharmacist to solve all of his problems, to

24   provide oxycodone.  Cabrera told you all about his relationship

25   with the defendant from the very beginning through the very

Gb8rgoh1                    Summation - Mr. Richman

1    end.

2            Cabrera learned about the defendant from this man,

3    from Pookie, from Eugene Seaman, a drug dealer he knew from the

4    neighborhood.  Seaman sold Cabrera that the defendant will

5    prescribe what he wants so long as he gets back the

6    prescriptions that he requires without no problem, exactly the

7    kind of pharmacist Cabrera was looking for.

8            You know Cabrera was telling you the truth about this

9    initial introduction not just from his testimony but also from

10   the records you have seen in this case.  We'll take a quick

11   look.

12           Pookie went to the defendant's pharmacy just as

13   Cabrera told you he did.  This is Government Exhibit 211, his

14   prescription record.  This record covers the prescription

15   period starting with January 1 of 2012.  This first

16   prescription January 2012, long before Cabrera and his crew

17   began working with the defendant.  This prescription prescribed

18   by Dr. Ahmad, just as Cabrera told you.  This prescription was

19   filed by KDG, Kian Danny Gohari, defendant.

20           Cabrera told you it was Pookie and a few others who

21   brought him into the defendant's pharmacy to first introduce

22   him.  He told you he needed the introduction because what they

23   were doing was illegal.  If it wasn't, he wouldn't have needed

24   to be introduced to a pharmacist.

25           Pookie vouches for the defendant.  Pookie vouches for

Gb8rgoh1                    Summation - Mr. Richman

1    Cabrera.  Cabrera wanted his presence to be known.  He wanted

2    the defendant to know he was going to approach him about doing

3    the same thing, about also getting oxycodone.

4        Cabrera and the defendant didn't talk that day when he

5    came in with Pookie.  But shortly after, Cabrera saw the

6    defendant again, saw him outside Dr. Ahmad's office handing out

7    his business cards.  Cabrera told you about Dr. Ahmad's office,

8    and his testimony aligned well with Sheri Bowen's.  He told you

9    that this is a doctor who was giving out HIV prescriptions.

10       Sheri Bowen told you that she would get there at 5

11   o'clock in the morning.  You wanted to be the first on line.

12   About 9 o'clock it would open, you would go in, you would sit

13   down, and at about 2:00 or 3:00 Dr. Naveed would come.  She

14   told you that then she would just walk in.  She had a piece of

15   paper with prescriptions written on it and she would ask for

16   them, and she would get them.

17       We know that the defendant knew Dr. Ahmad.  This is

18   Government Exhibit 500.  It shows that a huge percent of his

19   business came from Dr. Ahmad in 2011 and 2012.

20       Back to the scene of this first conversation, back to

21   Cabrera, the defendant, and Dr. Ahmad's office.  Cabrera

22   approaches the defendant, asks him if he would fill oxycodone,

23   and tells him he has lots of high-end prescriptions to give him

24   in return.  Later on Cabrera goes to the pharmacy and the

25   defendant tells him -- they reach an agreement -- sure, if you

1    have other medications, I can do something.

2              Cabrera knew exactly what this meant.  He had his

3    pharmacists lined up.  This was his guy.  He had his source of

4    oxycodone ready to tap.  All he needs to do is bring the

5    defendant other prescriptions and he's in luck, he's in

6    business, he's ready to go.

7              And tap this source he does.  As Cabrera told you, he

8    starts bringing prescription after prescription after

9    prescription to the defendant.  The records back this up: HIV

10   medications, expensive pain pills, cancer medications, and of

11   course oxycodone.

12             Who did Cabrera tell you were the first patients he

13   brought in?  He told you it was Perry Luther and Michelle

14   Middleton.  Look at Government Exhibits 214 and 215.  These are

15   the prescription records for those two patients.  He brings

16   them both in in July 2012, just as the conspiracy is beginning,

17   just as Cabrera told him.  This is back in 2012, when this all

18   begins.  Oxycodone prescriptions, expensive other

19   prescriptions, all to the defendant, all part of the deal.

20             This is how the scheme continued from the very

21   beginning through the final days in October 2015.  Stacks and

22   stacks of prescriptions from Cabrera, Sharon Auyeung told you

23   they would stack up on the counter.  Oxycodone from the

24   defendant, tit-for-tat.

25             Cabrera testified about a number of aspects of their

Gb8rgoh1                    Summation - Mr. Richman

1    agreement.  We are going to talk about them now.  First, ladies

2    and gentlemen, the contours of the agreement itself, how the

3    agreement would work.

4         Cabrera told you over and over again it was oxycodone

5    for a bulk of expensive prescriptions.  But you don't just have

6    Cabrera's testimony on this.  First, you have the wire calls.

7    This is Government Exhibit 403-T.  403, this is a jury aid,

8    which is Government Exhibit 403-T.  It's a September 4, 2015

9    call between Cabrera and the defendant.

10        What happens here?  Cabrera tells the defendant, "I

11   got like 8, 8 scripts too, so -- but let me -- I'll be back in

12   two minutes."  Ladies and gentlemen, this is Cabrera fulfilling

13   his end of the bargain.  This is Cabrera calling the defendant

14   and saying I have your scripts.

15        Also on this call the defendant fulfills his end of

16   the bargain.  Cabrera says, "And, um, I got, uh, Tonya Freeman,

17   okay?"  Defendant says, "For when"?  Cabrera says, "Today."

18   This is Cabrera telling the defendant I have Tonya Freeman's

19   oxycodone.

20        How do you know that this was what was going on?

21   Cabrera told you.  But you also have records, and we'll get to

22   them in a moment.  Before we get to those, what happens as soon

23   as Cabrera and the defendant get off the phone?  Cabrera calls

24   his nephew, calls Robert Hespeth.  He says, go to the pharmacy,

25   get there by 3:00 or 4:00, that's when they are closing.

1    That's exactly what the defendant had just told him to do.

2          Let's take a look back.  Let's look at Tonya Freeman's

3    prescription records.  This is who Cabrera just talked about on

4    that call.  What do we see?  September 4, 2015, oxycodone to

5    Tonya Freeman.  This is the plan in action.  This is the

6    defendant fulfilling his end of the bargain.  This is the

7    oxycodone he promised to Cabrera in exchange for the

8    prescriptions Cabrera promised to him.

9          About those prescriptions, this is Government Exhibit

10   917.  This is a list, a summary, of the prescriptions from

11   September of that year.  Looking more closely at a few, this is

12   from that day, from the day we were just talking about.  What

13   do we see?

14         This is a prescription for Sheri Bowen, $883.25.  This

15   is a list of prescriptions for Darin Benn.  One of them is over

16   a thousand dollars, September 4, 2015.  This is Tonya Freeman,

17   Flovent, $195.  This is Jorge Tirado, a number of drugs, some

18   of them same as Sheri Bowen's, some of them very expensive.

19         This is the plan in action.  This is just what Cabrera

20   told you they would do.  This Cabrera fulfilling his side of

21   the bargain.

22         Continuing on this same week, ladies and gentlemen,

23   this is Government Exhibit 406.  This is Cabrera calling the

24   defendant on September 8th saying, "Sheri Bowen is tomorrow,

25   okay?"  Defendant responds, "No problem."  This is again

1    Cabrera asking the defendant to fill his side of the bargain.

2    This is Cabrera giving the defendant a heads-up, hey, Sheri

3    Bowen's oxy, coming tomorrow, just like we talked about.  Then

4    look what happens.  Government Exhibit 210, back to Sheri

5    Bowen's records.  The next day, the day after that call, Sheri

6    Bowen gets oxycodone 30 milligram tabs.  This is the

7    defendant's side of the bargain.

8         You have also heard some testimony in addition to

9    these calls, in addition to these records, in addition to Mr.

10   Cabrera.  You have heard other testimony.  You heard from Sheri

11   Bowen.  Sheri Bowen told you that Cabrera told her that Danny

12   would call, that the defendant would call and let them know

13   different prescriptions to get, exactly what he wanted, so that

14   Cabrera would fulfill his side of the bargain.

15        She told you about how they would get the oxy

16   prescriptions that they would also bring to the defendant so he

17   could fulfill his side of the bargain.  Doctor to doctor.  She

18   told you about one doctor where they watched videos.

19        Sharon Auyeung also testified about this.  She told

20   you how she heard the defendant ask Cabrera do you have any

21   others that he would bring in a single prescription.  You know

22   exactly why he asked that.  It's not because he cared about the

23   patients.  It's not because he wanted to make sure they got

24   their medications.  It's because he cared about getting paid,

25   because he cared about Cabrera fulfilling his side of the

1   bargain.

2          I want to talk about the prescriptions for one more

3   patient, for Benn Darin.  This is a classic example of the

4   defendant's request.  There is a lot of testimony about Benn

5   Darin, that he had HIV.  Cabrera brought his prescriptions to

6   the defendant; I don't think anyone would deny that.  Here is

7   the record, Government Exhibit 203.

8          One thing to note is that oxycodone 30 milligram tabs

9   aren't there, because he didn't get it.  He gets oxycodone for

10  two smaller doses over the course of all these years, but it

11  wasn't for 30 milligram pills, which was the type that Cabrera

12  wanted to resell.  But Benn Darin was still an essential part

13  of this agreement.  Now you know why: because he got the

14  expensive prescriptions that the defendant craved.  His

15  prescriptions helped Cabrera fill his end of the bargain.

16         Remember, ladies and gentlemen, Cabrera told you he

17  paid Benn Darin.  He wasn't getting paid by Benn Darin to bring

18  his prescription to the pharmacy, no.  He paid Benn Darin.  Why

19  did he do that?  Because Benn Darin was helping him fill his

20  end of the bargain.  Benn Darin had lots of expensive

21  prescriptions, over $87,000 in prescriptions filled at the

22  defendant's pharmacy.

23         Let's look at a few of those prescriptions.  There's a

24  $996 prescription.  There is a $1,275 prescription.  There is a

25  prescription for just under $4200.  Think about the profit on a

Gb8rgoh1                    Summation - Mr. Richman

1    $4,000 drug.  These were prescriptions brought to the defendant

2    at his request, brought by Cabrera to fulfill his end of the

3    bargain.  This is essential point one, this is the crux of the

4    agreement: oxycodone for expensive prescriptions, tit-for-tat,

5    corroborated by the calls, corroborated by the testimony,

6    confirmed by the records.

7            Before we leave this point, let's take a look at two

8    or three more examples.  First, we have Alberto Nazario and

9    Robert Hespeth.  For Nazario -- these prescription records are

10   from August of 2012 -- what do we see?  What's on top?

11   Oxycodone.

12           What are the next two?  Expensive drugs from Dr. Ahmad

13   filled by the defendant on the same day.  This is the

14   agreement.  This is it.  You see it right here.  What's on the

15   bottom?  Robert Hespeth.  Again oxycodone right, above it

16   Abilify.  You heard a lot about Abilify, over a thousand

17   dollars.  This is the agreement.

18           Two more examples.  We have Stefone Holliman on the

19   top and Willie Johnson on the bottom.  Stefone Holliman on the

20   top, March 2015, Abilify.  Same month, oxycodone.  On the

21   bottom, Willie Johnson -- all of these are July 2014: Abilify,

22   Saphris, oxycodone, all in the same month, all part of the

23   deal.  This happened over and over and over again.

24           Ladies and gentlemen, while we are talking about the

25   patient profiles and the prescriptions that were filled, one

Gb8rgoh1                    Summation - Mr. Richman

1   small but important point.  One of the things you will be

2   instructed is that you have to find that venue is appropriate

3   in this district.  As you will see here and you can see in the

4   record, some of these doctor's appointments took place in New

5   York.  Gilberto Cabrera testified about certain acts that he

6   took in Manhattan.  He told he drove through Manhattan on his

7   way to the pharmacy.  He told you he sold oxycodone in

8   Manhattan.  That's enough to establish venue.  It is a small

9   point but an important point.

10          Back to Cabrera point two.  Cabrera told you a lot

11  about how he and the defendant would interact, how they would

12  behave with each other, how they would treat each other.  Here

13  is an example.  Gilberto you that when they would talk, they

14  would speak in low tones, hushed voices.  He told you the

15  defendant never wanted to meet with patients but only with him.

16  He told you he would call the defendant when he needed oxy, how

17  he would call the defendant because that is the person he had

18  the agreement with.

19          We have also heard about this from other witnesses and

20  we have seen other evidence concerning how they treated each

21  other.  We heard about this from Sharon Auyeung.  What did she

22  tell you?  She told you that she saw them whisper just as

23  Cabrera had told you.  She told you in all of her time working

24  at the pharmacy she never observed the defendant whispering

25  with anyone else but one person, with the person he had a

1    criminal agreement with.

2         You have also heard from Sheri Bowen about this.  She

3    told you there was a young woman at the pharmacy, and when she

4    was there, Cabrera couldn't stand it.  You know why: because he

5    and the defendant couldn't openly discuss their criminal deal.

6    In Bowen's words, he and the defendant couldn't discuss "what

7    Danny needs to do for us."

8         You have heard calls and recordings about this.  You

9    have heard how they talked to each other.  We are going to look

10   at some of that now and how they talked about each other.

11        This is Government Exhibit 400.  This is a call

12   between Cabrera and Willie Johnson.  Willie Johnson says, "You

13   better call your man at the pharmacy."  Who is his man at the

14   pharmacy?  The defendant.  We are going to listen to a call

15   now.  This is Government Exhibit 424.

16        (Audio played)

17        He doesn't know what to do with this.  This is another

18   employee at the pharmacy.  He doesn't know about the account.

19   He tells him to call back when Danny's there, when Danny is

20   back.  You know why that is: because the defendant and Cabrera

21   had an agreement.  Cabrera didn't have this agreement with this

22   unidentified employee at the pharmacy.  Listen to this call.

23   Listen to the employee's voice.  Listen to the trepidation in

24   his voice.  He doesn't know about this account.  The defendant

25   does.

1          Government Exhibit 409, we'll listen to this one too.

2          (Audio played)

3          Ladies and gentlemen, this is a call between Cabrera

4     and someone known as Super.  Super tells Cabrera he's at

5     Danny's pharmacy because his people "is trying to get some

6     stuff."  He used more colorful language.  Cabrera tells Super

7     that Danny isn't there, and Cabrera confirms that he doesn't

8     mess with nobody but the defendant.  Why not?  Because the

9     defendant and Cabrera have a deal, not Cabrera and anyone else,

10    the defendant.

11         We are going to listen to a voicemail now which

12    Cabrera left for the defendant on October 10th of last year.

13         (Audio played)

14         First, ladies and gentlemen, this is clearly not a

15    home health aide calling his pharmacist.  This isn't a patient

16    calling his pharmacist.  Look at the language he uses.  Look

17    how he talks to the defendant.  "Some other sideway stuff.  I

18    don't know what the F is with these people's attitude."  He's

19    talking about the defendant's employees.  This isn't a home

20    health aide, ladies and gentlemen.  That's the way

21    co-conspirators would talk to another one.

22         Listen to the context of the call.  Cabrera tells the

23    defendant, "I'm go about what you told me to do."  What did he

24    mean?  He told you exactly what he meant.  "We had an

25    agreement.  I always kept my part of the agreement: bulk

1    prescriptions.  I did what he told me to do, and for some

2    reason there's not going to be a problem.  For some reason that

3    lady was giving us an issue that day, so I was kind of upset."

4    He was doing what the defendant had told him to do, what his

5    partner in crime had told him to do.

6            Cabrera complained.  He called his man at the

7    pharmacy.  He called the person he had agreement with.  And he

8    was upset.  You heard this for yourselves.  This is Government

9    Exhibit 401.  We won't play this one.  There is just a few

10   snippets up.  This is from August 27tht last year.

11           What does Cabrera say to the defendant?  He tells him,

12   "I left it there yesterday, like you said.  It was for Duane

13   Harrison, like you told me to do.  Like I told you before,

14   that's why I didn't come like you said."

15           Let's take a look.  Let's see what he was referring to

16   here.  This is Government Exhibit 209.  These are the records

17   for Duane Harrison.  This is for the day before.  This is for

18   August 26, 2015, oxycodone 30 milligrams.  Look back at the

19   call.  Cabrera is telling the defendant he followed his

20   instructions.  He had left the oxy like the defendant told him

21   to do, like Cabrera testified about, exactly how their

22   conspiracy was designed to work.

23           Again, ladies and gentlemen, this is powerful

24   evidence, and it's substantially corroborated by the other

25   evidence and witnesses in this case.  This shows you exactly

1    what was going on here, a nefarious deal between two drug

2    dealers.  This is certainly not the behavior of a normal

3    pharmacist and his patient: conversations outside the earshot

4    of other employees, angry phonecalls, cursing phonecalls and

5    messages.  This is the behavior of two people in an illicit

6    deal.

7              Next, ladies and gentlemen, Cabrera told you that he

8    and the defendant had an explicit discussion about Cabrera

9    reselling the oxycodone.  The defendant said to Cabrera, you

10   must be making good money off the pills.  He said this two or

11   three times.  You know why he said this: because Cabrera was

12   going through a lot, was bringing him a lot of prescriptions to

13   get this oxy.  Of course he knew what Cabrera was doing and he

14   knew that it was lucrative.  They talked about it.

15             Sheri Bowen told you about this too.  She told you

16   that she would get the oxy prescription, she would give them to

17   G, give them to Cabrera, he would fill them at Danny's

18   pharmacy, and then he would go sell them, just as Cabrera told

19   you he would do, just as Cabrera told you the defendant asked

20   him about.

21             Cabrera also told you a lot about specific drugs that

22   the defendant requested.  One in particular he remembered was

23   diclofenac.  Here is some of his testimony about diclofenac.

24   He told you the defendant actually wrote on a piece of paper

25   that he wanted diclofenac.  He said it was a pain pill.  He

1    said the defendant wrote it for him and this was something the

2    defendant wanted.

3           Sheri Bowen told you about this also.  She was asked,

4    Danny wanted you to get pain pills?  She said yes.  You got the

5    pain pill, right?  When I first got the pain pill, I had no

6    pain, it was medically unnecessary.

7           Once again let's look at the records that corroborate

8    this testimony about diclofenac.  Sheri Bowen, November 2014,

9    diclofenac $867.  Jorge Tirado, October 2014, diclofenac $866.

10   Gilberto Cabrera himself, December 2013, diclofenac $866.

11          Another particular medication you heard about were HIV

12   medications.  Cabrera told you that the defendant wanted HIV

13   medicine.  Look through any number of records in evidence:

14   Sheri Bowen, Phil Ingram, others.  They got HIV medicines.  We

15   will go through one example.  These are the records relating to

16   Philip Ingram, page 2.

17          November 2012.  What happens in 2012?  November 15th

18   he gets an expensive HIV medication prescribed by Dr. Ahmad.

19   Value $1,812.  Four days later: oxycodone, Dr. White.  This

20   happens over and over and over.  This is the deal.

21          Another drug that Cabrera told you about were psych

22   medications.  Wilfredo Stretz, Sheri Bowen, Robert Hespeth,

23   they all got psych meds.  Indeed, Cabrera testified that Stretz

24   gets good medications, good psychiatric medications.  That's

25   Stretz's prescription record, Exhibit 213: all sorts of

1    expensive psych meds.

2            What does the defendant mean by good psych meds?

3    Certainly not that he was happy that Mr. Stretz was getting his

4    medications.  Certainly not that he hoped that Mr. Stretz got

5    better.  You know he never called Mr. Stretz.  We know he

6    didn't care.  No, he meant that he got expensive medications,

7    that he helped Cabrera fill his end of the bargain.

8            Cabrera also told you similarly that the defendant

9    really liked Willie Johnson as a patient.  Now you know why.

10   Look at his patient profile: over $50,000 in total

11   prescriptions, 64 pages.  That's why the defendant liked him.

12           These are just a few examples, ladies and gentlemen,

13   and there are others.

14           Another very important point from Cabrera's testimony:

15   the defendant not only entered into this deal with him, not

16   only knew he was reselling oxycodone, not only extracted his

17   price for it, but he extracted a particular price.  He told

18   Cabrera, this is what you should get, and Cabrera got it.  The

19   records back that up.

20           These are some of the most essential points in

21   Cabrera's testimony, some of the ways in which you know he's

22   guilty.  Let's talk about some others.

23           Let's take a single day as an example of how this

24   conspiracy behaved, October 5th, 2015.  Cabrera told you he was

25   supposed to go see the defendant that day, to go pick up Sheri

Bowen's oxy.  What does he do?  He calls the pharmacy.  Here's
the call.  He calls, he's told Danny's not in.  He told you
exactly why he called: to see if Danny was there because he had
an oxy prescription.

          What else did he do that day?  What else does he do
when he is supposed to get oxy?  He texts the defendant, twice.
Texts him at first and says Sheri Bowen is being sent
electronically by 11:00 a.m.  Once he is upset, later on, 1:27
in the afternoon, texts his back: "I drove three hours.  You
never told me not to come today.  I told you it was Sheri Bowen
day."

          First, this three-hour drive, defendant is certainly
on notice at this point, if not before.  That's suspicious, as
Bill Winsley told you, to come that far for a prescription.
That's not a five-minute bus ride in Brooklyn, that's a
three-hour drive.  Do you know where Sheri Bowen lives?  She
told you.  She lives in Brooklyn.  How could Cabrera be a home
health aide for her?  He wasn't.

          Back to this day.  Cabrera gets upset.  He texts the
defendant.  He told you why he texted him: he was upset.  He
literally drove three hours.  He had told the defendant that
that was Sheri Bowen day.

          What happens next?  This is all October 5th.  What
happens next?  Let's look at Sheri Bowen's records.  October
7th, the defendant fills her oxy prescription, just as Cabrera

1  told you he required him to do, just as you heard in those

2  calls, just as you saw on those texts.  Why?  That was their

3  deal.

4          Ladies and gentlemen, you should carefully evaluate

5  Cabrera's testimony on these essential points and others.  You

6  saw him testify.  You heard him testify about the risks

7  associated with buying.  You saw his demeanor and responses to

8  counsel both for the government and for the defense.  He was on

9  the stand for a long time.

10          Remember how he testified.  Remember how he didn't

11  hesitate.  Remember how consistently he details his agreement

12  and told you when he couldn't remember details or wasn't sure.

13  Remember all the ways he was corroborated that we have just

14  discussed and that we are about to.

15          We will continue with Sharon Auyeung.  She told you

16  that she filled prescriptions for Cabrera during two time

17  periods.  In one series she realized something was wrong.  She

18  stopped.  The defendant convinced her to start again and showed

19  her a slip of paper.  And she did, she did it briefly.  Then

20  again she knew something was wrong, she stopped.  Something was

21  up.

22          Let's talk about the records on this point, ladies and

23  gentlemen.  This is derived from the patient profiles, and they

24  are in evidence.  She stopped dispensing in March 2014 and then

25  dispensed twice more in June 2014, just like she told you.

Gb8rgoh1                    Summation - Mr. Richman

1              It is important who she dispensed for in June 2014.

2       One of them is for Duane Harrison.  Here is his patient

3       profile.  What do you know about Duane Harrison?  You know what

4       Gilberto Cabrera told you.  He was one of the patients that

5       Cabrera had signed that fake document, the same fake document

6       that the defendant showed Ms. Auyeung to convince her to start

7       filling the prescriptions again.  That's not a coincidence,

8       ladies and gentlemen.

9              There are some other points of Sharon Auyeung's

10      testimony that are worth discussing.  She told you a lot about

11      her interactions with Cabrera and about her observations of

12      Cabrera and the defendant; about how she didn't feel

13      comfortable that he was bringing prescriptions for other

14      people; about how she didn't feel comfortable that he paid in

15      cash even though he had Medicaid; about how he would bring

16      oxycodone to the pharmacy for a number of people and it just

17      seemed weird - she is just out of pharmacy school, but it just

18      seemed weird; and about how Cabrera would react if they didn't

19      have the drugs he wanted - "He would actually throw a fit and

20      he would curse at me and he would demand that I call Danny."

21             Think about that, ladies and gentlemen.  He would

22      throw a fit and curse at an employee in a pharmacy.  Certainly

23      not a home health aide, certainly not a normal patient.  And he

24      would demand that she call Danny.  Why?  Because that's who

25      Cabrera had the agreement with.  If Ms. Auyeung wouldn't fill

Gb8rgoh1                    Summation - Mr. Richman

1     his prescriptions, he was going to his business partner, he was

2     going to his co-conspirator, he was going to the defendant.

3          Those reasons were all why Ms. Auyeung herself didn't

4     feel comfortable with Cabrera, about how a pharmacist at Afam,

5     at the scene of the crime, new something was wrong.

6          On top of that, you had testimony from Bill Winsley,

7     who told you about all the signs that a reasonable pharmacist

8     in the defendant's position shouldn't have missed but which

9     were ignored here.  Winsley told you that 30 milligram

10    oxycodone is only appropriate for patients in severe, severe

11    pain.  He told you that these pills are most susceptible to

12    abuse and diversion.  He told you about indicators pharmacists

13    need to be aware of: distance from the patient and provider,

14    patients bringing in prescriptions for the same drug that they

15    just received, patients bringing in prescriptions for the same

16    drug from two or more different doctors, cookbook therapy,

17    cookbook prescribing, and someone who brings in multiple

18    patient prescriptions when a pharmacist only sees that one

19    individual and not the patients – exactly what was going on

20    here.  On that point, he called it a major concern.

21         He also noted that a patient paying cash for

22    controlled substances, cash for drugs like oxycodone but who

23    also had Medicaid or insurance, that's another concern.  That

24    also happened here.

25         Winsley then took a look at some of the records in

1    evidence in this case that you have also seen, and he applied

2    the general concerns he outlined to the facts and evidence at

3    issue here.  He told you over and over and over again how a

4    reasonable pharmacist who had been in the defendant's shoes

5    should have been concerned.  Of course, you know why the

6    defendant wasn't concerned: because he wasn't acting as a

7    reasonable pharmacist, he was acting as a drug dealer, he was

8    acting in concert with Gilberto Cabrera.

9         First, Winsley looked at this page of Government

10   Exhibit 219, the prescription records for Gilberto Cabrera.  He

11   told you there were multiple issues here: two oxycodone

12   prescriptions, identical in strength and quantity, filled

13   within five days, written by different doctors.  Indeed, he

14   said there is very little that could explain this.  This is in

15   isolation, looking at this one example.

16        Second, he told you about Dr. White and his suspicious

17   prescription drugs, about how White wrote 89 prescriptions for

18   oxy 30s for 17 or 19 patients.  You know that other doctors

19   from this case just like Dr. White.  But just looking at this

20   doctor, Winsley told you it was unreasonable for him to do so.

21        Winsley told you about Dr. Una.  This is a textbook

22   example of cookbook prescribing.  She gave the identical

23   prescription to a large number of people.  And not just any

24   prescription: oxycodone.

25        We know how much research.  He told you that you

1    should have done research into your patient at this point.  We

2    know how much research the defendant did.

3           Winsley also showed you Government Exhibit 915.  This

4    is summary of prescriptions picked up at Afam Pharmacy, at

5    Ekwunife Pharmacy, for one day, February 23, 2015.  Let's take

6    a look.  When asked for his opinion about one individual

7    picking up these prescriptions, he said it would be exceedingly

8    questionable.  Again, this is one day for the conspiracy out of

9    countless others, in isolation.  He told you it would be

10   exceedingly questionable.

11          Think about all of these examples in the aggregate.

12   Think about all of this combined together.  A reasonable

13   pharmacist would never have filled these prescriptions.  But

14   the defendant wasn't acting as a reasonable pharmacist.  He was

15   acting as a drug dealer.

16          Finally, let's talk about October 27th and 28th.

17   October 27th you will remember from Karen Thomas.  That is the

18   day that the state inspected the pharmacy, found some minor

19   violations, took a bunch of prescriptions.  Those are in

20   evidence.  More important than the minor violations is the

21   reaction that the defendant had, the reaction showing that he

22   knew the gig was up, that they had to lay low, that the

23   authorities were watching.

24          At about 4:30 that day Cabrera and the defendant have

25   a call.  Let's listen.

1          (Audio played)

2          First, ladies and gentlemen, this is the defendant

3     refusing to give Benn Darin any of his medication.  Second,

4     let's look closely at a few portions of this call.  First,

5     notice how the defendant doesn't want to talk about it on the

6     phone.  "All right, when you come in, um . . ."  Of course he

7     doesn't want to talk about it.  He was nervous about their oxy

8     scheme thinks it's been uncovered.

9          Look at how Cabrera responds.  "Ah, he, he, he don't

10    get that."  Ladies and gentlemen, this is a reference to

11    oxycodone.  Cabrera thinks that the defendant's nervous because

12    they are talking about Benn Darin, and he's confused because

13    Benn Darin doesn't get oxycodone.  That's what the Cabrera is

14    telling the defendant here.  He doesn't have to say he don't

15    get oxycodone.  The defendant knows what he's talking about He

16    don't get that.  Cabrera is trying to calm him down and say if

17    you don't have oxy, you don't get it, it's fine.

18         What does Cabrera to next?  He calls his nephew,

19    Robert Hespeth.  This is Government Exhibit 414.  Tells him to

20    go see what the F he's talking about.  Hespeth goes.  We've

21    seen him go see the defendant.  Here's part of the pole camera

22    footage.  Special Agent Cahill testified about that.  It looks

23    likes Hespeth is inside talking to the defendant and eventually

24    he walks out.

25         What does he do as soon as he walks out?  He calls

 1    Cabrera.  Here's a snippet of that call.  He tells Cabrera,

 2    "Oxycodones, he said oxycodones, we should just wait for three

 3    like to six months."  Look at what Robert Hespeth conveys to

 4    his uncle.  Let's take a breather, the defendant told him,

 5    let's take a pause.  The authorities were in here yesterday,

 6    I'm nervous, let's stop three to six months maybe can start up

 7    again with the oxy.  Make sure the government isn't still after

 8    us.  The defendant was scared, but he didn't want to give up

 9    his lucrative deal, so he wanted to take a pause, wait till

10    things calm down, start up again.

11            What happens next?  The defendant goes to see the

12    defendant himself.  We have seen more pole camera footage from

13    that day.  We won't watch the whole thing but here is a

14    snippet.  There is Cabrera in front of the pharmacy.  He goes

15    in, comes out, he loiters in front for a while.

16            Then we had a second clip that we played from that day

17    where Cabrera eventually does go in and talks to the defendant.

18    Ladies and gentlemen, what did he tell you about that

19    conversation?  First, the defendant told him that the official

20    that came in took all the oxy prescriptions they had.  You know

21    that's true because that is exactly what Karen Thomas told you.

22    That's in evidence.  That's what she did.  Cabrera couldn't

23    have made that up.

24            What else?  Just like Hespeth had told Cabrera on the

25    call the defendant told him three to six months, let's pump the

brakes, I don't want to come to a full stop, but let's pause,

let's see what happens.  Not, oh, my God, you're a drug dealer,

get out of my pharmacy.  No.  Let's wait three to six months,

let's see what happens, maybe we can start up again.

          How do you know this is true?  Because of the call you

heard, the call from Hespeth to his uncle which occurred over a

year ago, when nobody knew they were being recorded.

          Then their conversation continued.  Again Cabrera was

asked, well, what is your understanding of why he didn't want

you there?  It's because some officials confiscated the

prescriptions and he didn't want to get in trouble.  That's

what Karen Thomas told you.

          After that day and after that conversation, they never

got a chance to rekindle their relationship, to restart their

lucrative agreement.  After several years and tens of thousands

of oxy pills, it was over.

          Ladies and gentlemen, I want to take a few minutes to

address some arguments made by defense counsel.  The burden

rests with the government.  The defendant has no obligation to

say anything; but if he does, you are free to scrutinize it.

Here the defense arguments, such as they are, don't withstand

scrutiny.  I you want to talk about two.

          First, the defendant's supposed lack of profit from

the scheme.  The defense witness, Mr. Quintero, testified

yesterday.  He went through lots and lots of hoops and

Gb8rgoh1                      Summation - Mr. Richman

1    calculations and equations to get to the bottom line he wanted

2    to get to, to a supposed profit.

3            Now, you know there were lots of problems with his

4    analysis.  First, he told you that he applied a profit margin

5    across the board, entirely leaving unaccounted for the fact

6    that the defendant's items had different margins and that he

7    wasn't even dispensing some of these items, as Gilberto Cabrera

8    told you.  He recognized that the margin actually varied year

9    to year, but he just applied the average rate.  In 2013, for

10   example, the profit margin was over 25 percent, but he applied

11   a 7½ percent, which is the average across all the years.

12           Let's think about even using that 7½ percent.  Let's

13   think about the $4,000 medication we talked about.  What is the

14   profit on that?  7½ percent of 4,000 is $300.  It's obvious why

15   the defendant wanted drugs like these.  It's a lot easier to

16   make that much money on one expensive drug than on dozens of

17   less expensive drugs.  And if the profit margin on that $4,000

18   drug had been 25 percent in 2013?  $750.

19           Second, he told you that his analysis would have been

20   skewed had the defendant not provided particular medications

21   that he was charging for.  He even told you that the profit

22   margin on such an event could be 100 percent.  And you know

23   from Gilberto Cabrera that there were times when the defendant

24   wouldn't dispense what he charged for.

25           This is one example.  Back to diclofenac.  He told you

about this.  It cost $867.65.  He testified about it.  He

looked up records.  Cabrera never received it.  Ladies and

gentlemen, 100 percent profit on expensive drugs adds up very,

very quickly.

          Third, he told you he ignored the guarantee that the

defendant received in calculating the defendant's bottom line.

Lots of testimony on direct examination about the money the

defendant ultimately made, completely ignored these guarantees.

These numbers are on the screen.  Take a look.  $94,000 in

2012, over 100,000 in 2013, over 50,000 in 2014, and over

175,000 listed on the draft report for 2015.

          Fourth, he told you his entire testimony basically was

based on the tax returns, and he admitted that those are only

as good as the numbers underlying them.

          MR. KEHOE:  Objection.  There is no challenge to these

tax returns.

          THE COURT:  Overruled.

          MS. ESTES:  Further, ladies and gentlemen, even

working with the numbers in the tax returns, those are large

numbers, over $450,000 in revenue.  This is Defense Exhibit 87,

the pie chart.  This isn't a number that the government runs

from.  This shows that one customer, Gilberto Cabrera, provided

the defendant with over $450,000 in revenue during the relevant

time period.  This is Government Exhibit 921.  These are the

patient totals.  Come to about the same number, 451,000.

1           Mr. Quintero testified in some detail based on the

2      Medicaid numbers.  Defense Exhibit 84.  He went year-by-year.

3      In one year, in the first year, 2012, Cabrera provided the

4      defendant with over 5 percent of his business.  That's one

5      customer, this busy pharmacy you heard so much about, 5 percent

6      of his business.  In 2013, $46,000 from Cabrera, under

7      $1 million total.  That's about 4.7 percent, one customer, this

8      busy pharmacy.  2014, $95,000 out of just under $1.6 million

9      total, almost 6 percent.  These are big numbers.

10          Second, I want to talk to you about this man, about

11     Gilberto Cabrera, as a home health aide.  Throughout this trial

12     there has been allusion or argument that the defendant, the

13     supervising pharmacist, thought Cabrera was a home health aide.

14     This might be the biggest distraction of all because there

15     isn't an ounce of evidence in the record to support it and

16     everything that you know contradicts it.

17          First, Sharon Auyeung.  She told you that the

18     defendant told her that the white guy works at a nursing home

19     as an aide.  She told you she didn't believe it partly because

20     of how he dressed.  Cabrera was asked about it too.  You might

21     remember his testimony.  He answered, do we look like health

22     aides to you?  Does he look like a health aide to you?

23          Sheri Bowen was asked about it, she told you Cabrera

24     wasn't a health aide, told you she never heard him anyone tell

25     him that he was, and that she didn't believe he was presenting

Gb8rgoh1                    Summation - Mr. Richman

1   himself as one.  When asked why not, she listed reasons: he

2   wore shorts and flip-flops every day, he looked dirty, and he

3   was not someone anyone would hire to take care of a family

4   member.

5             Ladies and gentlemen, use your common sense.  You saw

6   Cabrera.  You heard him testify.  Is he a home health aide?

7   You saw a couple of actual home health aides testify.  Just

8   like Cabrera told you, this man, Government Exhibit 702, he

9   wasn't a home health aide.

10            Ladies and gentlemen, when you begin your

11  deliberations later today, ask yourselves: does it make sense

12  that the defendant wasn't involved? does it make sense that he

13  didn't know the oxy he distributed was being misused? does it

14  make sense that Gilberto Cabrera brought him all of these other

15  prescriptions for any other reason? does it make sense that he

16  thought Gilberto Cabrera was a home health aide?

17            You have heard testimony about signs that a reasonable

18  pharmacist shouldn't ignore, about signs that Sharon Auyeung

19  didn't ignore regarding oxycodone diversion.  Bill Winsley told

20  you about all the signs present here: the number of

21  prescriptions, the number of patients, the doctor shopping, the

22  distance, and so on.

23            The defendant saw all the signs that oxycodone was

24  being diverted, and he didn't ignore them.  You know why he

25  didn't ignore them: because he didn't have to, because he knew

1    full well what was going on.  He was a participant.  He

2    embraced it.  He extracted his price for it.

3              The defendant was Cabrera's man at the pharmacy.  He

4    provided oxy to Gilberto Cabrera knowing full well that it was

5    being resold on a secondary market, knowing full well that this

6    addictive drug was not being used as intended but instead being

7    sold for a profit.  And he did it for a simple reason: so that

8    Cabrera would bring him expensive prescriptions to fill,

9    prescriptions he could bill Medicaid for, prescriptions that he

10   could profit from.  That's all this was, a business deal.

11             Ladies and gentlemen, the defendant wasn't selling

12   oxycodone on the street corner.  But without him, Gilberto

13   Cabrera wasn't either.  That's why he's guilty.

14             THE COURT:  Very good.  We will hear now from defense

15   counsel.

16             (At the side bar)

17             MR. KEHOE:  May I go to the restroom very quickly,

18   Judge, while we are getting set up here?

19             THE COURT:  I'll give the jury a 5-minute break.  But

20   we really have to keep it to 5 minutes.

21             (In open court)

22             THE COURT:  We are going to give you a five-minute

23   break, but we really need to hold it to five minutes.  Go on

24   into the jury room, and we'll call you right back.

25             (Recess)

GB8LGOH2                    Summation – Mr. Kehoe

1      (Recess)

2            THE COURT:  Now we'll hear from defense counsel.

3            MR. KEHOE:  Thank you, your Honor.

4            Good morning, ladies and gentlemen.  On behalf of my

5      client, Mr. Gohari, Ms. Haramati, Mr. Bachner, and I, everybody

6      at defense table, we'd like to thank you for your time.  I know

7      coming here is an imposition.  We need you to fulfill these

8      tasks and the court system thanks you.

9            I'm sure you noticed a bit that the final argument

10     presented by my learned friend that the argument by the

11     government has shifted.  When we had opening statement a little

12     more than a week ago, it seems like longer than that, the

13     government stood before you and noted for you that this was a

14     case about greed.  The problem is that the government never

15     factored in to what the most important portion of greed is.

16     How much is somebody making from a particular transaction?  Why

17     is somebody doing this?  Why is somebody going into this

18     endeavor?  Certainly because they're making boatloads of money

19     as a result of it.

20           During the defense case, through the examination of

21     Mr. Quintero and his charts, you folks saw that was just wrong.

22     Let us look at Defendant's Exhibit 84.  And if I can remind you

23     of Defendant's Exhibit 84, ladies and gentlemen, these are the

24     shares of the pharmacy sales funded by Medicare comprised of

25     sales to the coconspirators for a four-year period, 2012, 2014,

1    2014, 2015.  Look at these years.  Let us go back to the

2    operative year that the government has their wiretap up.  Just

3    in Medicaid, just in Medicaid, the Afam Pharmacy was selling

4    almost $9 million in prescriptions just in Medicaid.  Whereas

5    the coconspirators were accounted for just shy of 140,000 of

6    that, 9 million to 140.

7         Now, what do we know from this chart?  We know

8    something very important, that this is a busy pharmacy, a very

9    busy pharmacy because this is just the Medicaid payments.  And

10   a small, small, small sliver of that involves these

11   coconspirators.

12        Let's turn our attention to Defendant's Exhibit 85

13   that Mr. Quintero was talking about.  This is the all of the

14   Medicaid, excuse me, all of the sales.  Note at the top, sales

15   by Afam to the alleged coconspirators billed to Medicaid in

16   relation to the total sales.  From 2012 to 2015, $27.7 million,

17   excuse me, $28.7 million in sales to Medicaid are taking place

18   and look at what the amount is for the coconspirators.

19        Let's go to the next chart, which is 87, I believe.

20   This is again all the sales, all of the sales by this pharmacy

21   from 2012 to 2015, 28.7 million.  And what do the sales for the

22   coconspirators account for?  1.5 million.

23        Now, the government came before you and presented you

24   summary charts and they presented you oxycodone being

25   dispensed, page after page in their exhibits.  I'm sure you

recall that.  They never presented one shred of evidence on the

$28.7 million of other prescriptions going through this

pharmacy.  Why do you think they did that?  Why do you think

they made that decision not to run these numbers through and

look to see, oh, my heavens.  If we take everything that these

coconspirators did over four years, it's a minuscule portion of

the sales going through this pharmacy.  And would any

reasonable person, Mr. Gohari or anybody else, jeopardize their

entire future for what is a minuscule portion of their

prescriptions coming in the door?  That's what the government

is asking you to believe.  And the reason why you never saw

these numbers during the government's case is because they just

didn't want to see it.

Sometimes, ladies and gentlemen, you blink.  They have

these numbers.  These are all the Medicaid numbers.  These are

numbers that came from the United States government.  Those are

numbers produced by the United States government, as

Mr. Quintero noted.  Sometimes you just don't want to see it.

Sometimes you blink at something like this, we've all done it.

You blink once, you blink twice.  Then all of a sudden you just

don't see anymore because you're so fixated at what you want --

you think is going on here that you don't see the total

picture.

Remember I told you at the opening of this case that

there is a way that you look at something and people continue

GB8LGOH2                    Summation - Mr. Kehoe

1    to look at it and it's a street and then overnight it snows and

2    the street looks different.  Look at this pharmacy.

3    $28.7 million in sales.  The government presented you a

4    minuscule portion of those sales and does nothing to account

5    for the rest.

6            Certainly there's a profit motive.  There's a profit

7    motive that they're talking about, the greed that counsel

8    talked about in the opening statement, certainly, certainly

9    this case has got to be about something more than 1.5 percent

10   of the sales of this pharmacy.  Excuse me.

11           Let's turn to Defendant's Exhibit 144.  This is

12   Defendant's Exhibit 144.  And at the top of this you recall

13   this is just the sales, the sales and the benefit to

14   Mr. Gohari.  Sales over the four years, $282.  1.5 percent of

15   that business you just saw from Defendant's Exhibit 87,

16   1.5 percent of the business, what does that come down to?

17   $4,233.  $1,058 a year, if you want to take that further, is

18   $88.16 a month.

19           Now, we went through this routine and we'll get to

20   this later on in the final argument.  We went through this

21   routine and counsel talked about these guaranteed payments to

22   partners and there was no accounting for the guaranteed payment

23   to partners, do you recall that?  I'm sure you recall that in

24   cross-examination and they're standing by this.  Assume for the

25   sake of this argument that counsel is right and then assume

GB8LGOH2                    Summation - Mr. Kehoe

1    that every guaranteed distribution from partners in 2012 to

2    2015 went to Mr. Gohari and nobody else, assume that.  And I'll

3    go through these numbers with you at the end.  That takes that

4    number, $1,058, and increases it to $1,953 a year, or putting

5    them all together, $162.75 a month.  That is the government's

6    case.  That is the government's case.

7         And any inkling that was just raised either during

8    cross-examination or by counsel that these tax returns weren't

9    properly filed with the IRS, trust me, you would have heard

10   about it.  You would have heard about them many times over from

11   the United States.  The evidence before you is that these were

12   the tax returns filed by Mr. Gohari and the partnership except

13   for 2015, which is still in the draft form.

14        But take it down to its least common denominator,

15   ladies and gentlemen, they said at the opening this is about

16   greed, this case is about greed, and these are the numbers.

17   And the best possible scenario that the government has

18   presented to you, this is less than $2,000 a year.

19        Let's look at this.  Let's look at Mr. Gohari's

20   pharmacy.  You heard a lot about this pharmacy.  You heard a

21   lot about it from a lot of different folks.  This is a

22   neighborhood pharmacy.  It's not Walgreens.  It's not Rite Aid.

23   It's not Duane Reade.  It's not CVS.  They do things for

24   people.  Mr. Gohari waives the copay.  He suggests a lower cost

25   if they can get a generic.  If you can't pay right away, come

1    back and pay.

2            This is a busy pharmacy.  There's a lot going on.  If

3    there's any question about whether or not how busy it is, just

4    in covering Medicaid, put Exhibit 84 on.  Just look at in 2015

5    how much Medicaid is going on here.  And these are sick people.

6    These are not people that come into this pharmacy like we had

7    Mr. Winsley that works in a hospital or even Sharon Auyeung

8    that works in a hospital.  These are sick people.  They're

9    poor.  They don't have a lot of money and they're coming in for

10   assistance and there's a lot of them.  Even the agent for the

11   FBI noted how busy this pharmacy is.

12           And did Mr. Gohari run this pharmacy perfectly?  No.

13   Busy people coming in and out, people have needs.  You're

14   supposed to get the copay, you're not supposed to waive the

15   copay, all those things.  Did he do everything as perfectly as

16   he could have?  No.  But he was there to assist his patients.

17   He was there to help his patients.

18           And in the midst of this neighborhood pharmacy, which

19   by the way is a very, very small pharmacy, if you recall the

20   testimony even of Sharon Auyeung it was an extremely small

21   pharmacy.  It's interesting to note that the government never

22   went into the pharmacy, but we'll get to that.  In this

23   extremely small pharmacy, in walks Gilberto Cabrera, a man with

24   a plan.

25           I want to say at the very outset Mr. Cabrera notes

that Mr. Gohari met Mr. Cabrera at Dr. Naveed's office.  Do you

recall that?  What the government never brought out and didn't

come out until cross-examination in some of their witnesses is

that Dr. Naveed's office was around the corner.  Much was made

during the course of Mr. Winsley's testimony about patients

coming from far away, about it's suspicious they're coming from

far away.  You didn't hear word one in the examination of any

of the government witnesses by the government that Dr. Naveed's

pharmacy was around the corner.  Of course they would come to a

pharmacy that's right around the corner.  That's exactly what

they were saying they should be doing, absent the loyalty or

wanting to stay with someone, etc.

        But in comes Gilberto Cabrera.  Now, the government

doesn't want to focus on this, but, ladies and gentlemen, let's

be perfectly frank.  The government's case rises and falls on

Gilberto Cabrera, not Sheri Bowen.  Everything Sheri Bowen

knows they know from Gilberto Cabrera.  And who is Gilberto

Cabrera?  Let's put aside his criminal convictions, his violent

past, his drug dealing.  Let's put all that aside and let's get

the best assessment from Gilberto Cabrera from his friend,

Sheri Bowen.  Sheri Bowen noted that Gilberto Cabrera was this

friend.  What did she say about him?  She said he preys on

people.  This is the government's central witness, preys on

people, preys on the downtrodden, preys on the poor, takes

people from soup kitchens, takes people who are on food stamps.

1    That's who this guy is.

2            And, frankly, he lies to everybody.  He lies to his

3    patients about how much he can pay them.  He lied to Sheri

4    Bowen.  Remember, Sheri Bowen came in and said I went to

5    Cabrera and asked him asked him for more money because I

6    thought I could get more money for my oxycodone, do you

7    remember that testimony?  We didn't hear about that in final

8    argument.  What did Cabrera say on the stand?  Sheri Bowen says

9    I can't give you more money because I'm paying Danny Gohari.

10   What does Sheri Bowen -- what did Cabrera say?  I never paid

11   Danny Gohari a dime.  It's the same guy.  This is his friend.

12           He lied about how much money he made.  He came in here

13   and he said, well, you know, I made, six, seven, $8 a pill.  I

14   pressed him on it a little bit.  Isn't it true you were selling

15   to Shorts for 90 pills for $1,400, which is about $15 a pill?

16   Isn't it true that you had this woman up in Connecticut that

17   you were paying -- you were selling them to her for about $30 a

18   pill?  Do you remember his response to that?  Well, it depends.

19   It depends what the price is.

20           Whatever the situation is, he's going to end up on top

21   and he will lie to fit the circumstances.  And we will go into

22   some of those lies in a moment because his testimony is replete

23   with them, both on the stand and out of the courtroom.  But

24   keep this in mind with a man like Gilberto Cabrera and I harken

25   to a letter written by Thomas Jefferson to a man named Peter

1    Carr, a good friend of his.

2              MR. RICHMAN:  Objection, your Honor.

3              THE COURT:  Ground?

4              MR. RICHMAN:  Not in evidence, your Honor.

5              THE COURT:  This is, I assume, a rhetorical flourish.

6              MR. KEHOE:  Yes, your Honor.

7              THE COURT:  Overruled.

8              MR. KEHOE:  Jefferson wrote this in 1785.  He who

9    permits himself to tell a lie once finds it much easier to do

10   it a second and a third time, till at length, it becomes

11   habitual.  He tells lies without attending to it and truths

12   without the world believing.  The falsehood of the tongue leads

13   to that of the heart and in time deprives all of its

14   dispositions.

15             That's who this guy is that the government has hitched

16   their wagon to, that has come in here with a deal to reduce his

17   sentence for which he wants to walk out the door to hand up

18   Mr. Gohari.  The same person came up with the master plan for

19   all of this.  And his first aspect of this, and you didn't hear

20   anything about this in final argument, was his need to create

21   the need.  He preyed, using Sheri Bowen's description, he

22   preyed on people to create the need.  He found these people at

23   soup kitchens, poor people going in there for a meal, on food

24   stamps, taking drugs, poor people.  And he paid these people as

25   little as possible while he's living on his estate in

GB8LGOH2                      Summation - Mr. Kehoe

1   Pennsylvania.

2            And he took advantage of their drug problems,

3   sometimes paying them in money, sometimes paying them in drugs.

4   But he developed a need with these people to not only give them

5   their prescriptions, to ensure they got to the doctor, to deal

6   with the hospitals, etc., he was creating a need.  Was this guy

7   a licensed caregiver?  No.  Was he a licensed person?  No.

8   He's out there helping these people out by his own ambition and

9   we'll get into that.  But the first key step to this is to get

10  these people to rely on him, which is what he did.

11           When Ben Darin needed his insulin, who did he call?

12  He called Gilberto Cabrera.  When people needed to go to the

13  hospital, who they did call?  They called Gilberto Cabrera.

14  And his master plan when he was doing all this was one and one

15  thing only, that while he was getting in there assisting these

16  people with all of these steps medically along the way, he was

17  taking sick people and ensuring that they were going to get

18  oxycodone for him to sell.  And we'll get into that in a little

19  bit.

20           Let's talk a little bit about this web of deceit that

21  was brought about by Mr. Cabrera.  The web of deceit was not

22  just a one event.  It was a multi-area event, a multi-scene

23  event, starting with doctors and leading to the pharmacists.

24  His web of deceit started as far as individual treating

25  facilities.  He had to convince these doctors that he was

GB8LGOH2                    Summation - Mr. Kehoe

1    providing care for them.  So you recall the examination.  When

2    I talked to him, do you recall phone calls from a cardiology

3    center about Jorge Tirado?  By the way, these are sick people.

4    When we look at this -- I'm sorry, counsel.

5          When we look at all of these medications going after

6    psychiatric medicine, these people needed these.  These people

7    had health problems.  George Tirado was going to a

8    cardiologist.  Gilberto Cabrera is fielding phone calls about

9    George Tirado's cardiology center.  He's fielding phone calls

10   about Stefone Holliman's radiology department in a hospital.

11   He took calls from Interfaith Hospital about Ben Darin's

12   Medicaid regime.  He took calls from Brookdale Hospital about

13   how George Tirado is going to get home and what kind of support

14   he has at home.

15         Those are just four.  These are phone calls, these are

16   just phone calls that came up in the wiretap.  All these

17   medical facilities -- cardiology, radiology, Brookdale

18   Hospital, Interfaith Hospital -- all of these phone calls are

19   coming into Gilberto Cabrera.  And what is he doing?  Is he

20   saying to these people I have nothing to do with this, why

21   don't you call this guy yourself.  Why don't you call him.  I

22   have nothing to do with it.  No, he's taking the information,

23   he's using the information and he's using it to assist these

24   people.  Call him what you want, he is helping these people in

25   various capacities.  Of course he has his own need.

1              Putting Danny Gohari aside, he is presenting himself

2       to the outside world as just that, something -- somebody that

3       is there that is the contact point for all of these people.

4       That's the only reason why he's going through this.  What does

5       Gilberto Cabrera say about it?

6              When I asked him about getting this information and

7       what he's doing with these people, I asked him, and this is the

8       transcript, 453, line 16 to 19, did you come to learn -- and

9       we're talking about George Tirado -- did you come to learn that

10      this -- that he got this prescription after it was prescribed?

11             I guess so.

12             And you took it to Gohari's pharmacy, didn't you?

13             Yeah, because he told me to bring all the

14      prescriptions I can get to him.

15             We'll get to that one.  That's his deal thing where

16      everything is there, but we'll talk about that and we'll talk

17      about in reference to Mr. Winsley.

18             And you gave it to George Tirado because that's what

19      he needed, didn't you?

20             Whether he took it or not I don't know.

21             Talking about you.

22             I didn't dispense medicines to them like that.  I

23      wasn't feeding them, so I wouldn't know if he was taking it or

24      not.

25             You went and got it and you brought it to him, didn't

1    you?

2              Yeah, I brought them their medications.

3              Why is he doing that?  Why does he do that?  Why is

4    there any question that this guy is out there helping these

5    patients?  Because he was, but he's doing it for his own ends.

6              Now, why does he want to be the person that's in the

7    middle of this?  And that takes us to the next step.  He's

8    presenting himself to the outside world as this person that's

9    helping these patients, that's picking up these prescriptions,

10   because he wants to control the situation.  Remember what Sheri

11   Bowen said.  Sheri Bowen said in response to a question why do

12   you and why does Cabrera and Mr. Hespeth take all these people

13   to the doctors?  Because he doesn't want them to run away with

14   the oxycodone prescriptions.  Do you recall that?  That's why

15   he does it.

16             So the plan, this web, is he takes in these people.

17   He assists them with hospitals.  He takes them to the doctor.

18   And these are sick people.  And then he takes his next step.

19   He becomes the go-to guy in all of this.  He's the guy that has

20   all the information.  He's the guy that has the information on

21   the time of the appointments.  He's the guy that sets up the

22   appointments and the physicians.  And he becomes the middleman

23   in everything.

24             Again, Cabrera is the person who is setting this up.

25   And there's no evidence whatsoever, ladies and gentlemen, that

1   Mr. Gohari has any participation or knowledge of all of this

2   web of deceit that Mr. Cabrera is involved in.  You know, he

3   becomes -- he maintains that he is the person, that nobody can

4   go to Mr. Gohari except through him.  But where does that

5   information come from?  Who does it come from?  I asked Sheri

6   Bowen that question.  The person it comes from is Gilberto

7   Cabrera, not from Danny Gohari.

8         There's no tape evidence that the government has --

9   and we have 2,000 phone calls -- there is no taped evidence

10  where Mr. Gohari says don't let your patients come here.

11  There's no evidence where Mr. Gohari is saying the only person

12  I want to deal with is you.  The only person saying that is

13  Gilberto Cabrera.  And he is telling the other coconspirators

14  that for the sole reason that he wants to remain in control.

15  That is the only reason.

16        If what Cabrera says is true that Gohari didn't want

17  anybody else to contact the coconspirators except Cabrera, how

18  is it that Mr. Gohari calls Sheri Bowen?  How is it that the

19  pharmacy leaves messages with Sheri Bowen?  How is it that

20  happens?  If this is such a tight conspiracy where everybody

21  knows what's going on, how do you explain the fact that

22  Mr. Gohari and his pharmacy are calling one of the major

23  participants in this conspiracy?  How do you juxtapose those

24  two facts and reconcile them?

25        You know, there's an old adage, it happens to come

from a 14th century monk, called Occam's razor.  What it comes
down to is when you look at the facts and what appears to be
the most logical explanation, that's the explanation.  That's
the explanation.  How is it that Mr. Gohari himself and his
pharmacy are calling Sheri Bowen on the phone if in fact Gohari
has told Cabrera that I don't want to deal anybody else but
you?  There's only one simple explanation to that.  That my
good friend, our good friend, Mr. Cabrera, is not telling the
truth.  And he is doing this for his own selfish purposes.
He's doing with the patients, he doesn't want the patients
close to Mr. Gohari because he doesn't want to have them
getting this oxycodone.  He wants to pay them exactly what he
wants.  And if they complain about the amount, the amount
they're getting, from Sheri Bowen, he lies to them and says
he's paying Mr. Gohari.

          Let us move on.  So we take this entire web of deceit.
We have Gilberto Cabrera involved with this very, very busy
pharmacy.  He comes up with this scheme.  He talks about these
folks that he's taking care of -- and we'll get into that in a
little bit as to what he's talking about because I know you
heard the testimony that he is talking about, oh, I'm out with
George Tirado getting his psych evaluation.  I'm out with Ben
Darin getting his -- I'm at his dialysis.  We're going to get
into that.  Remember those tapes, and we'll play those for you.
And that's conversations that are going into the pharmacy,

1    again, continuing to lead the pharmacy to believe that

2    necessary fact this person that is providing and helping these

3    people out.

4             But all the while his web of deceit proceeds and he

5    comes up with the plan for the dirty urines.  He comes up with

6    the urine, with putting oxycodone in the urine.  First they

7    started shaving the oxycodone in the urine and then when they

8    got caught, they changed and Cabrera himself provided oxycodone

9    in the urine.

10            By the way, they talk a lot about Dr. White.  You

11   heard Cabrera say that Dr. White threw some of his patients out

12   of his office.  I wonder why.  But think about the

13   sophistication of the plan.  They go from the shavings in the

14   urine and they go to using the actual urine so the doctors

15   don't figure out that these people are in fact not the people

16   that are taking this oxycodone when it's Cabrera.

17            And there's no indication that any of this, that

18   Mr. Gohari has any participation in this at all.  This whole

19   plan that he came in with to put the MRI together, that they

20   would compromise somebody in a doctor's office to get an MRI so

21   somebody would look injured -- there's no indication that

22   Mr. Gohari knew anything about this either.  This entire web of

23   deceit that all of these people are participating in rests with

24   one person, the government's main witness here, Mr. Cabrera.

25            So, how does he fool the pharmacy?  How does he

GB8LGOH2                        Summation – Mr. Kehoe

1    continue to get the pharmacy to believe that he's actually

2    doing things for these people?  And I ask you to take a quick

3    listen to a couple of phone calls.  If we go to Government

4    Exhibit 401.  This is the phone call where Cabrera tells

5    Mr. Gohari directly and through Mr. Hespeth that he is at a

6    psych evaluation for George Tirado when in truth and in fact

7    he's in Pennsylvania.

8              (Audio recording played)

9              MR. KEHOE:  What does he actually say?  He says to

10   them, I'm at George Tirado's psych evaluation.  Why does he do

11   that?  Why is telling them when he's in Pennsylvania that he's

12   at a psych evaluation?  His explanation on the stand was, oh, I

13   want to make sure Danny knows I'm continuing to get out there

14   and continuing to get him scripts.  Really?  Really?  Occam's

15   razor.  This is supposed to be a conspiracy that's already

16   going on for three years.  Three years and he still has to

17   continue to convince Mr. Gohari that he's actually doing

18   something for George Tirado so he knows he's out there giving

19   him scripts?  All he has to say is I'll bring George Tirado's

20   scripts in tomorrow.  Instead he lies to him twice -- one, that

21   he's not at a psych evaluation for George Tirado, and, two,

22   that he's -- because George Tirado's psych evaluation is in

23   Brooklyn, he's in Pennsylvania.

24             But that's not the only one.  Let's go to 402.  This

25   is Government Exhibit 402.

1          (Audio recording played)

2          MR. KEHOE:  Again, I'm at a psych evaluation for

3    George Tirado.  Those calls, that call is on August 27, 2015.

4    About a week later, let's go to Government Exhibit 404.

5    Government Exhibit 403.  He's calling Gohari in this call about

6    Ben Darin, the man who's got a diabetes problem.  What does he

7    say?  If we can play this, please.

8          (Audio recording played)

9          MR. KEHOE:  Listen to that call.  Is that a call

10   between somebody or two people that had been in some vast

11   conspiracy for a long period of time, or is that a call from

12   somebody who is obviously trying to get pen insulins?  But he's

13   not at with Ben Darin getting the pen insulin, getting the

14   treatments.  He's in Pennsylvania.  Why does he insist on

15   convincing Mr. Gohari that he is actually out there at the

16   location helping Ben Darin?

17         It doesn't end on that.  He does it again in

18   Exhibit 405.  If we can play that, please, same day later on.

19         (Audio recording played)

20         MR. KEHOE:  I'm still at the doctor with Ben Darin.

21   Why?  Why?  And this reason is that, again, that he says that

22   the reason I'm doing that is because I have to convince him I'm

23   out there getting scripts?  Is there any indication that

24   Mr. Gohari has not been filling these prescriptions?  None, not

25   even from the government.  So why doesn't he just say I'll

1    bring the stuff tomorrow.  I'm out of town, I'm in

2    Pennsylvania.  I'll do this, no.  He has to tell them he's at a

3    doctor's office taking care of people because this is his cover

4    story.  The cover story has to remain the same.  And he has to

5    convince and continue to convince people that this is what he's

6    doing.  He has to continue to say to these people that I am

7    providing this type of assistance to these people because he

8    has to keep his cover up.  He can't tell people what he's

9    actually doing or else there's no other need for this.

10           Keep in mind that the government's position is that

11   this has been an ongoing conspiracy for over three years.  And

12   Cabrera still has to go through and convince and talk to the

13   folks in the pharmacy, including Mr. Gohari, that he's some

14   type of caregiver.

15           And, by the way, this is such a tight conspiracy, this

16   is such a selfish conspiracy what people are calling together,

17   operating together, how is it that when the phone calls that

18   the government has, how is it that so many times phone calls

19   went in and Danny Gohari wasn't even there?  Remember the phone

20   call, hey, I called Monday.  Call back Wednesday.  Danny is not

21   here right now.  The call that in fact did come in from

22   Mr. Cabrera, he calls and says, well, okay, you can bring the

23   scripts in, but make sure you're here by 4 o'clock.  I'm not

24   keeping this place open for you.  What does that tell you?

25   He's not there.  He doesn't know when this guy is going to

GB8LGOH2                    Summation - Mr. Kehoe

1    call.  He calls looking for him, and these people are supposed

2    to be in some type of conspiracy?

3            One step further.  We alluded to this before and I

4    alluded to it in our opening statement -- 2,000, 2,000 phone

5    calls and taped communications that the government, that the

6    United States government taped.  Now, every, every conspiracy

7    has people talking on their cell phones together, right?

8    Wouldn't you expect that?  You'd expect a conspiracy over a

9    period of time, certainly in 2,000 phone calls, I'll get a

10   couple of calls coming from Mr. Gohari to Mr. Cabrera making

11   sure everything is okay, right?  Not one.  Not one.

12           How about the texts, well, you got to have texts.

13   Remember that angry phone call?  First we had an angry phone

14   call that the government just played in final argument.  Is

15   this the call that would go into a pharmacy for a

16   non-coconspirator?  Certainly, certainly the coconspirator,

17   Mr. Gohari, jumps back on the line and says, oh, you got this

18   all wrong, right?  No.  Zip.  Nothing.  There's no response.

19   He follows it up with a text message, two, as a matter of fact,

20   no response.  This is their conspiracy.

21           And you know why there's no response?  In part, go to

22   Exhibit 84, Defendant's Exhibit 84.  Look at the right hand

23   column.  He's busy.  You have these phone calls coming back and

24   forth.  I'm coming in with something?  Okay, yeah, bang.  I'm

25   coming in with something, okay, bang.  He is busy.  Look at the

GB8LGOH2                          Summation - Mr. Kehoe

growth in this business while all this is going on.  So you
have this tremendous growth in business, small part of this,
this conspiracy.  Cabrera is calling back up.  Gohari is not
calling back.  Some conspiracy.  This is the reason why he's
ignoring Cabrera, because it's a meaningless portion of his
business.

          And the government could have shored this up.  They
had 2,000 phone calls.  Certainly one would have come across
that put Mr. Gohari in the mix coming from his cell phone.  No.
The government could have gone into this pharmacy.  It was a
tiny little pharmacy.  It's a busy street.  There are slews of
people going in there.  They could have gone in to see this
pharmacy to see what the pharmacy was like.  Did they do that?
No.  They had a pole camera.  Remember the pole camera?  They
had this pole camera that was up day after day after day.  Did
they go through any of that pole camera and see whether or not
any of these other patients went in there?  No.  They never
even followed Mr. Gohari home on surveillance.  Wouldn't it
have been significant for your consideration if they had?  They
did nothing.  There is no conspiratorial meetings outside this
pharmacy between Mr. Cabrera and Mr. Gohari.

          Counsel made some reference to hushed tones in there,
according to Ms. Auyeung.  Wouldn't this conspiracy have been
other places at other times?  It is nowhere.  No phone calls,
no texts, no meetings, no nothing.  What we have is this guy

GB8LGOH2                    Summation - Mr. Kehoe

1   calling this pharmacy, and this is just the 60-day period we

2   have, telling people and lying to people as to in fact what

3   he's doing.

4          So let's go through Mr. Cabrera's scheme.  He's got

5   prescriptions from doctors that are giving them after seeing

6   these patients with a physician/patient relationship.  These

7   are sick people.  Cabrera has their ID card.  He's got

8   permission slips for some of them.  And some of the patients

9   are, even according to the FBI agent, are outside in the car.

10  Why are they outside in the car?  Putting aside Sheri Bowen

11  who's having sex with Mr. Cabrera.  He's take -- clearly taking

12  advantage of her as well.  They're outside in the car in case

13  the pharmacist needs them.  If that were not the case, if this

14  were just this deep conspiracy, why go through all these

15  formalities?  Why go through getting scripts?  Why go through

16  getting their IDs?  Why getting signed permission slips and why

17  bother bringing the patients to the facility?  I mean Cabrera

18  is delivering the medications to a lot of these people at home.

19         You know, if you have a conspiracy and this is going

20  on, this is, this wouldn't happen because you wouldn't need

21  these people there.  But Cabrera is saying no, no, no.  Danny

22  Gohari, he told me to bring all of my scripts.  This was the

23  deal.  He would fill my scripts if I brought him everything.

24  I'm sure you remember that.

25         Do you recall what happened when I cross-examined

1      Mr. Winsley?  This was not something, again, that was brought

2      out on direct examination.  It came out on cross.  And what did

3      Mr. Winsley say?  He said that the pharmacists are supposed to

4      have all these prescriptions.  You can't force them to do it,

5      but you want someone to give all of your prescriptions to the

6      pharmacy so there's not contraindicative medications going all

7      over the place.  This is what he said.

8              This is trial transcript page 554, lines 14 to 17:

9      Pharmacists should always encourage, they can't force, but they

10     can encourage that all the scripts come to -- prescriptions

11     come to the pharmacy so that they can do their job adequately.

12             This is page 554, line 24:

13     "Q.  As a good pharmacist, Mr. Winsley, you would, as an

14     inspector, you would instruct your pharmacist to be a good

15     pharmacist and try and encourage your patients to bring all of

16     their scripts to one pharmacy, wouldn't you?

17     "A.  We always encourage that all the way through pharmacy

18     school, all the way up."

19             MR. KEHOE:  Now, I wonder why the government didn't

20     ask Mr. Winsley that.  The only person that tells us about this

21     deal is Mr. Cabrera.  And Mr. Cabrera said to us, among other

22     things, I had this deal with Danny and he was the only one I

23     had this deal with and that after Sharon Auyeung stopped

24     filling my scripts, Danny was the guy.  Do you remember that?

25             Let's look at Exhibit 219, Government Exhibit 219, if

GB8LGOH2                    Summation - Mr. Kehoe

1   we can.  And now if I can highlight, if you will, page 20.

2   Now, this is February 11, 2015, after Sharon Auyeung is gone by

3   her own admission.  Let's look at who's filling these scripts.

4   The first one, initials BR for oxycodone.  Let's go four down.

5   The fourth one, EC.  Let's go to the bottom of the page.  ECL.

6   Let's go to the next page, page 21.  Again, July 3, 2015, EC.

7   Go two down, another oxycodone.  October 28, 2015, BR.

8           I think we can all agree those initials are not the

9   initials of Mr. Gohari.  What did he say when he came here?  He

10  came here before you and said the only person I had that deal

11  with was Danny Gohari.  And even Sharon Auyeung, Sharon Auyeung

12  says she continued to fill his prescriptions.  She didn't want

13  to do the oxycodone, but she continued to fill the

14  prescriptions.  My learned friend, Mr. Bachner, asked her, why

15  did you continue to do that?  She said I thought he was

16  entitled to do that.  I thought he was entitled to pick them

17  up.  So even if she didn't want to do oxycodone, she continued

18  to fill all these other scripts because she thought he was

19  entitled to do that.

20          When we went through the argument with Mr. Cabrera

21  about there not being other people filling these scripts after

22  Sharon Auyeung, you didn't hear about this from the government.

23  This isn't the first time.  If you recall Mr. Winsley

24  testifying about the contraindicative prescriptions and how

25  prescriptions shouldn't have been given together and it was a

GB8LGOH2                    Summation - Mr. Kehoe

 1    terrible thing and any reasonable pharmacist wouldn't have done
 2    this, blah, blah, blah, and then they were shown Mr. Seaman,
 3    Mr. Winsley was shown Mr. Seaman's sheet, his exhibit involving
 4    his medication in Exhibit 211.  If we go to the second page of
 5    Exhibit 211 for Eugene Seaman.  The government pointed out,
 6    211, page 2, these are the two that were highlighted by the
 7    government.  They weren't even prescribed by Mr. Gohari.
 8    Mr. Gohari prescribed others.  But these are the ones that were
 9    highlighted by the government.  They highlighted some more on
10    the next page, page 3, the third one, fourth one, fifth one.
11    They highlighted all those.  Again, not prescribed by
12    Mr. Gohari.

13            See a pattern here?  You see a pattern of blinking and
14    closing your eyes?  You see something that you think is
15    suspicious and then you don't take that next step.  You don't
16    take that further step.  It's a lot easier to sit here and say,
17    you know, Mr. Gohari is here and I don't really have to find
18    out who in fact did this.  It's a lot easier to just let it go.
19    Until, of course, the evidence and the documents reveal
20    otherwise.

21            Let's go back to the money because the only reason why
22    anybody does this is because of the money.  If we go back just
23    briefly to Defendant's Exhibit 85, again, this is the sales to
24    the coconspirators that were billed to Medicaid and Government
25    Exhibit -- what is that -- 86, excuse me, 87, my apologies,

1    this is the 1.5 number figure.

2              Now, a lot was made during cross-examination and again

3    we heard about it for these guaranteed payments.  And if we

4    could go to Defendant's Exhibit 82.  What Mr. Quintero's

5    testimony was that the percentages that he had on this pie

6    chart were percentages of sales and had nothing to do with the

7    guaranteed payments.  So let's go to the guaranteed payments

8    line.  If we can just blow up these first up at the top.  See

9    operating cost at the top.  Blow that up.  Yes.  Just the top

10   portion of that, Jose, please.  That's it.

11             This is the line that you can see, this is the net

12   sales, gross profit, operating costs, and there are guaranteed

13   payments to partners.  And counsel for the government said that

14   wasn't taken into account.  Well, it was taken into account.

15   But what he said was that when you look at profits going to an

16   individual, that wasn't taken into account.  Well, first of

17   all, let me say to you if you can look at this, you'd see it

18   has no bearing on sales.  If you look at, for instance, year

19   2013, you can see that they have an increase of -- a sales

20   of -- net profit of 386 and a guaranteed payment of 104, where

21   the next year you have significantly more and it's only 118.

22             If you look at the I guess it's the year 2014, you

23   have a net profit of $412, yet only a guaranteed payment of

24   $51,000.  So in one year you have a guaranteed payment of

25   $118,000 with $457,000 in sales, and the next year it goes down

1   dramatically to 51,000 with gross profit of $412,870.

2          You can look at this, ladies and gentlemen.  But what

3   it clearly demonstrates is that guaranteed payments to partners

4   have nothing to do with sales.  It's a decision that is made

5   for partners, guaranteed payments to partners that doesn't

6   reflect the numbers of sales.

7          But let's do this.  Let's take this number and let's

8   take out what the government had to say.  And can we just blow

9   that up again.  So let's look over at the right-hand column

10  because this is what the government was looking at.  450,000.

11  Can you see this, counsel?  Let me pull it back.

12          450,126.  That's from '11, '12, '13, '14, and '15.  If

13  you look at the left-hand column on guaranteed sales, you see

14  82,873.  That's for 2011.  And we'll back that out.  Why?

15  Because in the document that we looked at before that

16  Mr. Quintero was saying he was accounting for the profit for

17  '12, '13, '14, '15, the time frame of the conspiracy.  So what

18  number do we have here?  This number comes out to $367,253 in

19  guaranteed payments to partners for 2012, 2014, and 2015.

20          Now stay with me, ladies and gentlemen.  Let's assume

21  based on what the argument that the government has presented

22  both yesterday and this morning that Mr. Gohari got all of

23  that, okay, that the other partners didn't get a dime, that

24  Mr. Gohari got all of that, got the $367,253.  Mind you, this

25  is a drug conspiracy.  They're maintaining this was about money

1    over a four-year period of time.

2              Now, we looked at Government Exhibit 87.  Can we just

3    flip to that a second.  What we know from the numbers -- and

4    the numbers are the numbers -- we know from the numbers that

5    the total sales to the conspirators are 1.5 percent.  So we're

6    looking to see what the benefit to Mr. Gohari is, assuming he

7    got all this.  You multiply the 1.5 times $367,253.  What does

8    that come out to?  For four years, for four years, it comes out

9    to $5,508.80 for four years.

10             Now, we all know -- excuse me -- you have to pay

11   taxes, so you take this down.  You wouldn't have taken home all

12   of this money so you take it down.  Let's say the working

13   capital is at 35 percent tax rate.  So you have this money,

14   assume he got all of it, at 35 percent tax rate.  How much

15   money in the four years is he taking home on these guaranteed

16   payments?  This is what it is.  And you can go back in the jury

17   room and do this math and just take these numbers and do the

18   math yourself.  3,000 -- it's $3,580 for four years, guaranteed

19   payments, assuming he got everything, based on the 1.5, the

20   four years would be $3,580.  And divide it by four, how much do

21   you think that is?  I can tell what you it is because I did it

22   before I came in here.  $895 a year.

23             So, let's go back to Defendant's Exhibit 144.

24   Defendant's Exhibit 144 is the percentage of sales that

25   Mr. Gohari was talking about, excuse me, that Mr. Quintero was

GB8LGOH2                       Summation - Mr. Kehoe

1    talking about yesterday.  And what did he tell you?  He told

2    you over the four years the percentage of sales was $4,233.  On

3    a yearly basis that is $1,058.

4              So you take the $1,058.  And mind you, this is, this

5    is what Mr. Gohari is putting in his pocket as a result of the

6    sales to these coconspirators.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          We take the $1058 from Defense Exhibit 144, add it to

2     the 895, and what do you come up with?  19 -- is it 53?  Yes.

3     1953.

4          I'm going through this exercise because the government

5     raised this both during Mr. Quintero's testimony and again this

6     morning.  We take the amount of money, the profit on the sales

7     being $1,000, and assuming he got every penny of the guarantee

8     payments to the partners, he would have gotten 895.  So we have

9     1953.  1953, one-nine-five-three.  Mr. Gohari jeopardized his

10    entire career, his business, and his life, in the best case

11    scenario -- and the government includes this -- for $1953.

12         Oh, by the way, we always pay our bills monthly,

13    right?  You pay your electric bill monthly, you pay your water

14    bill monthly, we pay our mortgages monthly.  What is this

15    divided by 12?  It's $162.75 a month.  The government wants you

16    to believe that this man, threw his entire business that he was

17    building away for $162.75 a month.

18         Occam's Razor.  Occam's Razor.  You're looking for

19    reasonable explanations.  The simplest explanation is usually

20    the one.  Who in heaven's name, ladies and gentlemen, would

21    throw away their business and their lives for $162.75 a month?

22    That is what the government is asking you to believe.

23         The numbers are the numbers.  When you go back in the

24    jury room, I invite you to go through them.  If you think it is

25    implausible that anybody would make this decision, I submit to

1   you, ladies and gentlemen, you are correct.

2         There is a reason why the government didn't go through

3   this exercise with these numbers.  I think you know what that

4   reason is: because it shatters the theory of the case.  It

5   shatters the theory of the case that anybody would jeopardize

6   their entire life for this miniscule portion of money when, by

7   the government's own admission, this pharmacy is making a lot

8   of money.  But that's what they would have you believe.

9         The person that they brought before you that sat on

10  this witness stand, that wants you to buy into this implausible

11  scenario is Gilberto Cabrera.

12        Ladies and gentlemen, this is the last time I'm going

13  to get a chance to talk to you.  I don't get to say anything

14  after I sit down.  The government gets back up and they get to

15  talk to you again in rebuttal because they have the burden of

16  proof, but I don't have a chance to respond to that.

17        I ask you this.  When they say to you, oh, we don't

18  pick our witnesses, the witnesses are just there, and we have

19  to use these people, and we wish we had ministers, nuns, and

20  priests — no.  They had a decision to make.  They could have

21  run through these numbers, but they didn't do it.  What they

22  elected to do was pick a guy who is lying to everybody.  They

23  decided to get the message from a guy who simply cannot tell

24  the truth.

25        There is an old saying, ladies and gentlemen: if you

1    can't trust the messenger, you can't trust the message.  I ask

2    you, ladies and gentlemen, when you go back into that jury room

3    and his Honor has given you these instructions, ask yourself

4    with Gilberto Cabrera, has the government proved this beyond a

5    reasonable doubt?

6           What is that?  I'm reading from the judge's

7    instruction which he will read to you.  "Proof beyond a

8    reasonable doubt must therefore be proof of a convincing

9    character that a reasonable person would not hesitate to rely

10   on in making an important decision."

11          These are the numbers.  The government has decided to

12   put Gilberto Cabrera before you.  Would you hesitate in relying

13   on Gilberto Cabrera when you are making an important decision

14   in your life?  Think about that.  Close your eyes for a second

15   and think about it.  Would this be a man that you would allow

16   in your house to water your plants?  The answer unquestionably

17   is no.

18          The government made a decision.  They wanted to see

19   what they wanted to see.  They didn't want to see what the

20   reality was.  They wanted to see what they wanted to see.  They

21   selected Mr. Cabrera as the vehicle to bring before you, a man

22   at the end of the day, ladies and gentlemen, for all his

23   cocaine trafficking, his heroin trafficking, his oxycodone

24   trafficking, is looking for time served.

25          Think about this ladies and gentlemen.  If you

1    hesitate, if you doubt, if you wouldn't rely on what he had to

2    say in the most important decisions of your own affairs,

3    there's only one conclusion before you.

4            Mr. Cabrera is not a trustworthy individual.  He may

5    say to you that Mr. Gohari was involved in any number of

6    aspects.  He may say to you, oh, he told me to come after

7    the --

8            By the way, by the way, there is this whole argument

9    that Mr. Gohari somehow was acting improperly when an agent

10   comes in and takes all of these scripts from him concerning

11   oxycodone and he doesn't want to deal with them anymore, that

12   that is suspicious.  That argument from the government itself

13   is alarming.  But be that as it may.

14           The government has asked you to conclude that this

15   person, this person, is a trustworthy person whose statement

16   has been corroborated, this person who, by his own admission,

17   has been involved in any number of crimes.  The bottom line

18   here is that this person is willing to say and do anything that

19   is necessary to get him where he wants to go.  And the person,

20   the entity, that relied on him and took him at his word was the

21   United States government.  Again, if you can't trust the

22   messenger, you can't trust the message.

23           The government has stood before you and presented you

24   with a case and an argument concerning a lot of different facts

25   and that Cabrera and others were involved in this illegal

distribution ring.  The person at the center of it, as we said

over and over, is Mr. Cabrera.  He is the one that puts Mr.

Gohari into this.  I ask you quite simply to reject that, to

reject that.  They have not come before you with evidence of

such a conclusive nature to convict Mr. Gohari in any way,

shape, or form.

         I am going to ask you to go back into that jury room,

ladies and gentlemen, and make a decision, a difficult

decision, to find Mr. Gohari not guilty.  For some it may be

hard.  The government has come in with this case.  You have a

lot of people here, a lot of evidence here.  Some of you may

think it is difficult under all of these circumstances to find

this man not guilty.

         Let me leave you with these parting words.  They were

given by a gentleman right up the street here at Cooper Union,

February 21, 1860.  His name was Abraham Lincoln.  He said

these words.  "Let us have faith.  Let us have faith that right

makes might, and in that faith let us dare to the end do our

duty as we understand it."

         Ladies and gentlemen, I ask you to consider all of

this evidence, all of these facts and circumstances, all of

this matter that's been put before you and render a verdict of

not guilty.  I ask you to render a verdict of not guilty and

reject this case before you and send this man back to his

family.

1          Again, this is the last time I'm going to be able to

2     get to talk to you.  I want to thank you for your time, effort,

3     and attention.  On behalf of Mr. Gohari and the defense team,

4     we appreciate it.  Thank you.

5          THE COURT:  Ladies and gentlemen, we'll take another

6     very quick five-minute break at this time, and then we will

7     hear the rebuttal summation from the government.

8          (Recess)

9          THE COURT:  We will hear now the government's rebuttal

10    summation.

11         MS. ESTES:  Ladies and gentlemen, let's start by

12    talking about the money.  Defense counsel suggested in closing

13    that the defendant wouldn't do this because it wasn't enough

14    money, the $452,000 in revenue to its pharmacy was not enough,

15    he simply wouldn't do it.  But let's think about the numbers

16    here.

17         That is $452,000 from one customer, one person, a

18    pharmacy that has hundreds of customers.  One person is coming

19    in the door with $452,000.  That's almost half a million

20    dollars of business for this pharmacy.  And this is a volume

21    business.  That's what you heard from Mr. Cabrera, that the

22    defendant wanted a bulk of medications.  Those bulk of

23    medications, that $452,000 in revenue, that was very important

24    for the defendant's business.

25         Now, when Cabrera is bringing in these expensive

1   prescriptions, the defendant is not doing what Mr. Kehoe did

2   here.  He doesn't have a chart up there.  He is not doing math.

3   He's not COMING up with what his after-tax income is going to

4   be on all of this revenue.  He is looking AT the numbers on the

5   prescriptions: the $1600 Atripla, that $866 for diclofenac, the

6   thousand dollars for Abilify.  That's what he is looking at:

7   the revenue, the volume coming into the pharmacy.  He's not

8   doing the math that Mr. Kehoe did there.

9        Let's take a look at that math for a moment.  In Mr.

10  Kehoe's opening he said defendant did this all for $40,000.

11  Somehow by the time he got to closing he's down to $1,000.  The

12  defendant is not doing the math when he sees these big numbers

13  come to the pharmacy.  This is a lot of revenue.

14       Putting aside the revenue here, the defendant really

15  needed these sales.  You have seen the Medicaid at that time.

16  In 2011 he got $2.6 million from Dr. Ahmad.  Ms. Bostillo, if

17  you could please put up Government Exhibit 500.  It goes down

18  in 2012 to $1.6 million.  You can see in Government Exhibit 319

19  that it goes down even further.  It drops off in 2013.

20       So the pharmacy, they really needed volume.  They

21  needed any sales.  In 2013, when all the pricey HIV

22  prescriptions from Dr. Ahmad went away, he needed Cabrera, he

23  needed the diclofenac, he needed the Abilify.  He needed these

24  sales.

25       In 2014 Cabrera's crew made up over 5 percent of his

1    business.  That's one person, one customer, 5 percent of the

2    business of a pharmacy that supposedly has hundreds of

3    customers coming in.  That's a big deal.  That's a really

4    important customer.

5           Ladies and gentlemen, defense's whole argument assumes

6    the rest of the defendant's business is legitimate.  But you

7    have heard the testimony.

8           MR. KEHOE:  Objection, Judge.  There is no evidence of

9    that.

10          THE COURT:  We don't know that yet because you

11   interrupted before she indicated what testimony she was going

12   to cite.  When she cites that testimony, if you still have an

13   objection, you may make it then.

14          MR. KEHOE:  Thank you, your Honor.

15          MS. ESTES:  You heard testimony from Cabrera about

16   other drug dealers bringing prescriptions to the defendant's

17   pharmacy.  He said there was a ring of drug dealers coming to

18   the pharmacy.  He had heard about the defendant --

19          MR. KEHOE:  I'm going to object, Judge, based on that.

20   That is not in evidence.

21          THE COURT:  I'll let the government finish this

22   portion.  Tell me when you are finished.  Then I'll rule.

23          MS. ESTES:  He heard from the defendant from numerous

24   people, from Pookie, Eugene Seaman, from Tina, he said from

25   others.

1        THE COURT:  I think I'm going to sustain the

2   objection.  Even though there is some testimony of that sort,

3   it was not sufficiently developed to be of particular relevance

4   to the issue at hand.  Sustained.

5        MS. ESTES:  Let's talk about the Dr. Ahmad patients.

6   You heard about Dr. Ahmad, how people were going in there to

7   get HIV prescriptions when they didn't have HIV.  And you saw

8   all the figures there that were coming from Dr. Ahmad.

9        This business, parts of this business, which we are

10  not asking you to look at here, but parts of this business are

11  not legitimate.  What we are asking you to focus on here,

12  though, is the 1½ percent that defense counsel showed you in

13  that big pie chart, 1½ percent from 2012 to 2015.  We submit

14  that 100 percent of that 1½ percent is dirty, a hundred percent

15  of that 1½ percent comes from his illicit agreement with

16  Cabrera.  We are asking you to focus on that.

17        Why would he do this?  Ladies and gentlemen, when he

18  did this, he didn't think he was going to get caught.  He

19  thought as long as he did this, getting paid through Medicaid

20  rather than pocketing wads of cash, he was in the clear.  He

21  thought he was safe.  Does it seem like a bad decision sitting

22  here today?  Of course it does.  But at the time he thought he

23  could get away with it.

24        Now I want to talk about Mr. Cabrera.  Mr. Kehoe would

25  have you believe he is a liar, you can't believe a word he

1   says.  To be clear, why is he making this argument?  It's

2   obvious.  If you believe Cabrera, the defendant is guilty.  If

3   you believe Cabrera, his client is completely sunk.  So he has

4   to get up and argue that Cabrera committed perjury on the

5   stand.  If you believe Cabrera, the defendant was not

6   dispensing these in good faith, he is guilty, he was dispensing

7   medically unnecessary prescriptions for the money.

8           First, let's think about everything that Cabrera says

9   that is not really in dispute.  He says he's a drug dealer,

10  that he took oxycodone prescriptions from many other people,

11  over 12 other people, to the pharmacy, even more people who

12  weren't identified.  He also took other prescriptions to the

13  pharmacy, expensive drugs.

14          You have seen those records: the Abilify, the

15  diclofenac, the HIV medications.  That's not in dispute.  The

16  defendant's pharmacy billed these prescriptions, over 3,000

17  total prescriptions from Cabrera's crew totaling over $450,000

18  in revenue.  Defendant filled the majority of the oxycodone

19  prescriptions himself.

20          You also heard all of those wire calls.  Those calls

21  happened; that's not in dispute.  Cabrera called the defendant,

22  asked for him at the pharmacy, and he called the defendant when

23  he had oxycodone prescriptions to make sure the defendant was

24  there to fill them.

25          What about these lies Mr. Kehoe is talking about?  Mr.

1    Kehoe says Cabrera is a liar unless it's something Mr. Kehoe

2    likes.  For instance, he likes that Cabrera brought urine to

3    the doctors, so he would have you believe Mr. Cabrera then.

4    But when Mr. Cabrera says as to the defendant, I had an

5    agreement with him, Mr. Kehoe says no, you can't believe him

6    then, only when he says something I like, like when he is

7    bringing urine to the doctors.

8           When Cabrera says he brought medications to some of

9    the people, like Wilfredo Stretz and Benn Darin, Mr. Kehoe

10   likes that, so he asks you to believe him.  But when Cabrera

11   says he brought those medications to the pharmacy as part of

12   the arrangement, that you shouldn't believe.  Mr. Kehoe wants

13   to have it both ways.

14          He has gone on and on about how Cabrera lied to

15   everybody, how that shows he is lying now.  He is a drug

16   dealer.  Drug dealers lie to each other.  He lied to doctors.

17   He lied to the defendant about the psych appointments to keep

18   him happy.  But ladies and gentlemen, ask yourself: if he was

19   lying on the stand, wouldn't he have told better lies?

20          For instance, he didn't say, yeah, I had this

21   agreement with the defendant, I would go in, he would dispense

22   me oxycodone, and I'd give him envelopes of cash.  Wouldn't

23   that have been simpler, rather than this convoluted agreement

24   about oxycodone in exchange for expensive HIV medications?  If

25   he was really lying to get a deal, to save himself, wouldn't he

1   have told a better story?

2          The bottom line is he didn't overstate what happened

3   because it doesn't matter to him whether the defendant is

4   convicted.  You heard from him about his cooperation agreement,

5   and you have the cooperation agreement.  It's in evidence.

6   Think about his incentives here to tell the truth.  If he tells

7   the truth, maybe he get out from under that 10-year mandatory

8   minimum sentence.  But it doesn't matter whether the defendant

9   is convicted.  What matters to him, his incentive, is to tell

10  the truth.

11         Defense counsel has focused on inconsistency he claims

12  that Mr. Cabrera had, that sometimes he didn't remember

13  specific transactions at the pharmacy, that sometimes he didn't

14  remember the price of oxycodone pills.  Ladies and gentlemen,

15  use your common sense.  He went to the pharmacy hundreds of

16  times.  He sold those pills hundreds of times.

17         It's not surprising that he doesn't remember the

18  details of which pharmacist at which time was giving out the

19  oxy, of what the particular price of the oxycodone pills was.

20  Think about your own life.  You don't remember details like

21  that.  You remember the big things, the big things, like a

22  criminal agreement.  He remembered his criminal agreement with

23  the defendant.

24         One important thing to keep in mind.  Mr. Kehoe called

25  Mr. Cabrera a lot of names and said the government struck this

1    deal with him.  But keep in mind it's the defendant who chose

2    Mr. Cabrera.  It would be much easier for the government if the

3    defendant had chosen to dispense medically unnecessary

4    prescriptions to somebody with a spotless criminal record, to

5    somebody who never lied in his life.  That would be much easier

6    for us.  But he didn't do that.  He dispensed tens of thousands

7    of oxycodone pills to Gilberto Cabrera in exchange for other

8    expensive medications.  The government didn't choose Cabrera,

9    the defendant did.

10           The entire defense argument is that Cabrera is lying,

11   that he is a criminal mastermind, and that this is his master

12   plan to frame the defendant.  He was pulling the wool over the

13   defendant's eyes during the conspiracy and decided to frame him

14   afterwards.  Mr. Kehoe says that is the most logical

15   explanation, this web of deceit.  Let's think this through.

16   Let's consider this defense theory.

17           What about Sheri Bowen?  Sheri Bowen became a

18   cooperating witness.  She testified about the defendant's

19   agreement with Cabrera.  It's pretty unlucky for the defendant

20   that the supposed lies Cabrera had during the course of the

21   conspiracy now line up with his effort to frame him.  She's

22   become a cooperating witness.  It's really remarkable.  I mean

23   it's really unlucky for the defendant that Mr. Cabrera was

24   lying to her then and that those lies now are consistent with

25   this criminal agreement.

1          And it's unfortunate, too, that she overheard

2     conversations between Cabrera and the defendant that are also

3     consistent with the criminal agreement.  Maybe the defendant

4     was just really unlucky there that she heard these

5     conversations and thought they had a criminal agreement.

6          Let's keep going.  It's not just Sheri Bowen who says

7     incriminating things about the defendant.  Remember those wire

8     calls?  Remember Super, the one who said when you go to the

9     pharmacy you don't fuck with anybody but the defendant?  How

10    does the defense explain that?

11         Either Cabrera during the course of the conspiracy has

12    some sort of elaborate plan to frame the defendant in case he

13    is one day arrested and so somehow gets Super to say something

14    incriminating on a wire call or the defendant is just really

15    unlucky, that call was taken out of context, gosh, that would

16    be another instance of really bad luck for the defendant.

17         What else?  What about all of those other wire calls,

18    the calls where Cabrera says I've got 8, 8 scripts for you,

19    where he says Tonya Freeman goes tomorrow or it's Sheri Bowen

20    day, all of those calls that are consistent with the criminal

21    agreement he has talked about on the stand?  What about those

22    calls?  Cabrera wasn't trying to frame the defendant before he

23    was arrested, so maybe the defendant is just really unlucky?

24    Maybe all of those calls too, we are taking them all out of

25    context.  That's pretty remarkable bad luck there that all of

1    those calls are now consistent with Mr. Cabrera's testimony.

2              What about Dr. Ahmad?  The defendant also had the bad

3    luck of dealing with Dr. Ahmad, a doctor who gave out HIV

4    prescriptions to people who didn't have HIV.  The defendant was

5    handing out business cards at a pharmacy.  That sure looks

6    suspicious.

7              MR. KEHOE:  Objection.

8              THE COURT:  Ground?

9              MR. KEHOE:  I withdraw the objection.

10             THE COURT:  Okay.  Go ahead.

11             MS. ESTES:  And getting millions in business from him.

12   This is just another coincidence.

13             What about Sharon Auyeung, the other pharmacist?  How

14   do you explain her testimony: how she heard Cabrera and the

15   defendant talking and whispering in the pharmacy, how she heard

16   the defendant ask Cabrera about other prescriptions?  Maybe

17   this is all just bad luck, really bad luck, that all of this

18   testimony from her is consistent with this agreement that

19   Cabrera is making up.

20             Ladies and gentlemen, that's some really bad luck

21   there.  Cabrera decides to frame the defendant, and then there

22   are all of these other things perfectly consistent with the

23   agreement: the wire calls, the testimony of Sheri Bowen, the

24   testimony of Sharon Auyeung, all the Dr. Ahmad evidence.

25             MR. KEHOE:  Judge, I'm going to object.  If I can go

1    to the side bar on this?

2              THE COURT:  No.  What is the ground?

3              MR. KEHOE:  The arguing of the conspiracy, the names

4    in the conspiracy, what counsel is now arguing about the named

5    conspirators.

6              THE COURT:  No, I don't think that is a ground for

7    objection.  Overruled.

8              MS. ESTES:  Ladies and gentlemen, let's think about

9    that evidence again: the wire calls, Sharon Auyeung, Dr. Ahmad,

10   Sheri Bowen, all of that evidence.  Is the defendant really

11   just that unlucky?  If that's the case, he would have to be the

12   unluckiest man in the entire history of the world.

13             Mr. Kehoe said you could consider the most logical

14   explanation, Occam's Razor.  We submit there is a very logical

15   explanation here.  Cabrera talked about what the defendant did

16   about their agreement because that's what happened.  And you

17   know that from all of the other evidence: from the prescription

18   data, from Sharon Auyeung, from Sheri Bowen, and from the wire

19   calls.

20             Defense counsel has emphasized that other pharmacists

21   filled prescriptions for Cabrera.  He likes to point to those

22   initials on the screen.  We told you that from the beginning.

23   Sharon Auyeung got on the stand and said she filled

24   prescriptions for Cabrera.  That's true.  The other pharmacists

25   aren't on trial here, though.  There has been no testimony that

1    they had an agreement with Cabrera.  In fact, the testimony has

2    been that Sharon Auyeung stopped.

3         Ladies and gentlemen, I would encourage you to look

4    through Government Exhibits 201 through 219, the prescription

5    records for the co-conspirators.  Please spend some time with

6    the records.  When you do that, when you look at the oxycodone

7    30 milligram prescriptions, you will see that the defendant

8    filled over 24 of them.  You will see the initials DG or KDG,

9    Danny Gohari, Kian Danny Gohari.  That is over quadruple what

10   any other pharmacist did.

11        Ladies and gentlemen, you heard the wire calls.  When

12   Cabrera calls the pharmacy, he asks for the defendant.  When he

13   texts, he texts the defendant's personal phone.  You heard the

14   call with the pharmacy worker about Willie Johnson's

15   prescriptions.  The person said, that's Danny's account, you

16   should talk to him.

17        You heard from Sharon young about how Cabrera would

18   come into the pharmacy and curse at her and ask for Danny.

19   That's because he had the agreement with Danny.  That's the

20   agreement.  The efforts to focus on other pharmacists are all a

21   distraction.

22        What is the defense asking you to believe here?  That

23   somehow the defendant was tricked, that he thought Cabrera was

24   a caregiver.  Ladies and gentlemen, this is where your common

25   sense comes in.  You have seen pole camera footage and

1    surveillance photo of Mr. Cabrera.  You have seen him on the

2    stand and you have heard how he talks on wire calls, and you

3    heard that he would yell at the defendant if the defendant

4    wasn't there to supply the oxycodone.  You heard that from

5    Sharon Auyeung, that he would yell at her.  She didn't think he

6    was a caregiver because of the way he dressed.  Same with Sheri

7    Bowen.

8         The defendant was not presenting himself as a

9    caregiver.  It's ridiculous.  It's laughable.  That's why every

10   time defense counsel asked Mr. Cabrera about it, he laughed.

11        Now let's talk through some of the government records.

12   Defense counsel suggested we are hiding a lot of things, we are

13   hiding all of these calls, we are not showing you all the

14   records.  So let's walk through some of these transactions and

15   take a look at them.  Mr. Richman as already walked through a

16   lot with you, but I'd like to look at some more.

17        Let's start with Government Exhibit 209, the

18   prescription records for Duane Harrison.  Let's look at page 8,

19   the third transaction from the bottom.  This is oxycodone 30

20   milligrams filled by DG, Danny Gohari.  This is April 3, 2014.

21        Let's go to the next day, April 4th, Government

22   Exhibit 201.  These are the records for Alberto Nazario.  Let's

23   go to page 24, the last transaction.  Oxycodone 30 milligrams

24   filled by DG.

25        Let's stick with this same day and go to Government

1    Exhibit 210, the records for Sheri Bowen, page 20, second row.

2    Oxycodone 30 milligrams filled by DG.

3         Let's step back a moment.  We have April 3rd, one

4    patient with 30 milligrams oxycodone, April 4th two patients

5    with 30 milligrams oxycodone.  Let's look at another day around

6    this time frame, four days later.  Let's go to Government

7    Exhibit 219, the records for Mr. Cabrera, and let's go to page

8    18, the fifth transaction: oxycodone 30 milligrams, 110 pills,

9    filled by KDG.

10        Here, this is not a patient.  This is not somebody

11   Cabrera is supposedly giving care to.  This is just for the

12   caregiver himself.  He is getting 110 pain pills.  That is a

13   little unusual when he is taking care of so many other people.

14   He is getting these pain pails which Mr. Winsley said are only

15   for the most serious forms of pain, but he is supposedly a

16   caregiver for other people.

17        Let's try two days after that, Government Exhibit 207,

18   Willie Johnson, page 27, second transaction.  Again this is

19   oxycodone 30 milligrams filled by KDG.  Let's go to the same

20   day, Government Exhibit 218, the records for Jorge Tirado, page

21   16, fourth transaction: oxycodone 30 milligrams filled by KDG.

22        Let's keep tabs on where we are here.  One filled on

23   April 3rd, two filled on April 4th, his own filled on April

24   8th, two more filled on April 10th.  That's six patients within

25   a week.  This one person comes in with six prescriptions for

1     the high-strength immediate release oxycodone on the market.

2              Not to belabor it, but let's go to one more,

3     Government Exhibit 208, page 3.  Last transaction, eight days

4     later, yet another patient gets 30 milligrams oxycodone,

5     Michael Harper.  That's seven patients within the span of two

6     weeks.

7              Cabrera is a caregiver?  He's a very busy one.  He has

8     seven patients getting the strongest form of immediate release

9     oxycodone on the market.  What a coincidence.  And he himself

10    is getting it too.  And KDG, Danny Gohari, he is the one who

11    filled all these prescriptions.

12             Ladies and gentlemen, ask yourself, does this make any

13    sense?  Pharmacists or layperson, you know something is wrong

14    here with one person bringing in all these narcotic

15    prescriptions for other people.  He's not a caregiver.  That's

16    crazy.  Of course the defendant knew that.

17             Defense has spent some time telling you that this

18    pharmacy was a neighborhood pharmacy, that the defendant gave

19    out his phone number to customers because that is what you do

20    in a neighborhood pharmacy.  Ladies and gentlemen, that is a

21    distraction.  The fact that it isn't Duane Reade doesn't change

22    the standard and it doesn't change the defendant's obligations.

23             If anything, it means maybe he should have been more

24    in tune to his patients.  You knew that he was wasn't.  You

25    heard he wasn't asking Cabrera about the patient's pain.  He

1   didn't ask Sheri Bowen about her pain even though she got

2   oxycodone from the pharmacy for over two years.  He didn't ask

3   her about it because he didn't care because he knew she wasn't

4   taking the oxycodone.

5         Defense counsel suggested that maybe it's okay for a

6   pharmacist to request that patients bring in all of their

7   prescriptions to one pharmacy.  They say it makes sense, it's

8   good for the patient because the pharmacist can see all the

9   drug-drug interactions.  And Winsley said that, it's true, it's

10  ideal to have a patient bring all their prescriptions to one

11  pharmacy.  Maybe under this theory Cabrera takes Duane

12  Harrison's oxycodone prescriptions to the pharmacy and the

13  defendant says we'll bring all these other prescriptions in.

14  So maybe there is an innocent explanation.

15        But, ladies and gentlemen, you have to ask yourself,

16  what about Benn Darin?  You have heard about Benn Darin.  He

17  wasn't getting oxycodone.  No oxycodone.  As Mr. Kehoe says,

18  Mr. Cabrera's out for himself.  He says he preys on people.

19        Ask yourself ladies and gentlemen, why in the world

20  would Cabrera be bringing in Benn Darin's prescriptions to the

21  pharmacy if he doesn't get oxycodone?  What is the explanation

22  for that?  There is no explanation.  Cabrera doesn't care about

23  Benn Darin.  He's paying Benn Darin.  He needs to take Benn

24  Darin's prescriptions there, those very expensive prescriptions

25  that Mr. Richman showed you, because that is part of the deal.

1    That is the only explanation for why he is bringing Benn

2    Darin's prescriptions to the pharmacy.  Same with Wilfredo

3    Stretz.  He's not doing this out of the goodness of his heart.

4    He's doing it to keep up his end of the bargain.

5          The defense has also suggested that Cabrera was

6    tricking Danny, pulling the wool over his eyes.  But if he's

7    tricking Danny, why Benn Darin?  Couldn't he just get lots of

8    prescriptions for another patient?  Why would he bring in Benn

9    Darin to trick the defendant when Benn Darin wasn't getting

10   oxycodone?  To trick the defendant, he would just need

11   oxycodone prescriptions and other prescriptions for one

12   patient.  The Benn Darin stuff doesn't make sense.  The only

13   way it makes sense is if that is the payment for the defendant.

14         Ask yourself, too, if he wanted to trick the

15   defendant, why all the expensive medications?  Couldn't you

16   trick the defendant just by bringing in a lot of prescriptions

17   for small amounts of medications, for like $30 medications?

18   Why the diclofenac, the $860 pain gel, why the Abilify, why the

19   Atripla?  He is bringing in the expensive medications because

20   he needs to pay the defendant.

21         The defense has said there were no conspiratorial

22   meetings.  You have heard to the contrary.  You heard Mr.

23   Cabrera.  He talked about a very important meeting, the meeting

24   the day of the inspection on October 2015.  The day after that

25   call with Robert Hespeth, Cabrera goes to the pharmacy.  He

1    meets with the defendant inside the pharmacy to talk about the

2    inspection, what happened.

3            But that's not enough.  That was too serious.  They

4    couldn't talk about it in whispers that Sharon Auyeung talked

5    about earlier.  They had to go outside to talk about what to

6    do.  They are afraid they are going to get caught.  That's when

7    the defendant says lay low for now but come back in three to

8    six months.

9            Mr. Kehoe made a lot of arguments to you about what

10   the defendant didn't know, about how Cabrera was fooling the

11   defendant.  But you know that's not true.  Mr. Richman went

12   through all of the reasons with you.  I'm not going to cover

13   them all again, but I expect Judge Rakoff will instruct you

14   that you may consider whether the defendant took deliberate

15   steps to avoid learning some things about these prescriptions,

16   to avoid learning that the prescriptions were medically

17   unnecessary.

18           You know from the evidence that he didn't find out

19   about those prescriptions.  You heard Cabrera testify he did

20   not ask about the patient's pain.  Ms. Bowen said the same

21   thing: he never called to ask about her pain, to ask her why

22   over the course of two years she is getting the highest

23   strength oxycodone on the market.

24           Winsley said a reasonable pharmacist would ask

25   questions, would follow up.  The defendant didn't do that here.

1    At the very least, he willfully blinded himself because he

2    knew, he knew, those prescriptions were dirty.

3         Ladies and gentlemen, at the end the defense talked

4    about the standard of proof here, the reasonable doubt

5    standard.  That is the standard, of course.  We embrace it.

6    The defense has no burden here.  It's the government's burden,

7    and we embrace that.  The reasonable doubt standard is the

8    standard that has been used in every criminal case in the

9    history of this country.  We submit that we have met it here.

10        It's a doubt based in reason.  It's not a magical

11   standard.  It's guided by common sense.  Your common sense

12   tells you that based on all the evidence you have heard --

13   Cabrera, the wire calls, Sharon Auyeung, Sheri Bowen, Bill

14   Winsley -- you know the defendant was involved in a conspiracy

15   to distribute oxycodone and in billing that fraudulent

16   oxycodone to Medicaid.

17        Very shortly, I expect Judge Rakoff will instruct you

18   that what I say is not evidence, that what Mr. Richman said is

19   not evidence, and that what Mr. Kehoe said is not evidence.

20   You, the jury are entrusted with finding the facts in this

21   case, to look past the distractions that Mr. Kehoe has told you

22   about and look at the evidence, look at why you know the

23   defendant was involved in this conspiracy, from Cabrera, Sheri

24   Bowen, those wire calls, the prescription data, Sharon Auyeung.

25        Let me end with this.  Think back to the calls on the

day of the inspection, to the call where Robert Hespeth tells

Cabrera about his discussion with the defendant after the

inspection, when the defendant says to stay away for now but

come back for oxycodone in three to six months.  Ladies and

gentlemen, that call says it all.  The defendant knew what he

was doing was wrong so he said they had to stay away for now.

But he couldn't help himself because he was making too much

money, so they lay low for now, come back in three to six

months.

          The defendant agreed with others to distribute

oxycodone and commit health care fraud.  He is guilty as

charged.

          THE COURT:  Ladies and gentlemen, we are going to

excuse you for lunch now.  Even now you should still not

discuss this case among yourselves because you have not yet

heard my instructions of law.  I know you are very excited to

hear them.  We will reconvene at 2 o'clock, I will give you my

instructions of law at that time, and then you will commence

your deliberations.  So have a good lunch.

          (Jury not present)

          THE COURT:  A couple of housekeeping items.  First, I

received last night from counsel their letter submissions on

the issue of whether I should charge conscious disregard.  I

chose to charge it.  While the defense raised a number of

objections, their main objection seemed to be that they didn't

Gb8rgoh3

1    feel the government has given them fair notice of this.  I

2    disagree.  For example, the Daubert hearing on the government's

3    expert was filled with classic conscious disregard language,

4    such as all the reference to red flags flying.

5          In addition, the government several days before trial

6    submitted the conscious disregard charge.  If there was any

7    doubt that that was going to be pursued, their submission of

8    the charge placed defense counsel on notice.

9          The defense had other objections, but I don't want to

10   hear any more.  I got a full briefing on this as well as oral

11   argument yesterday.  The defense objection is preserved for

12   appeal, but the Court will charge conscious disregard.

13         Second, the reason I sustained defense counsel's

14   objection to the statements about the testimony about possible

15   other bad acts by the defendant is, among other things, this

16   would have raised had I not sustained the objection, 404(b)

17   issues.  I don't even know if the government gave proper notice

18   of that other conduct under 404(b), but certainly it was not

19   something as to which a proposed charge was submitted by the

20   government.  That's the reason I sustained that particular

21   objection.

22         Is there anything new that counsel wishes to raise?

23         MR. KEHOE:  Yes, Judge.  We move for a mistrial based

24   on my last objection that government counsel on rebuttal was

25   basically arguing that Naveed Ahmad was a co-conspirator.

Gb8rgoh3

1          THE COURT:  I understood that was your objection.

2          MR. KEHOE:  That was my objection, and I stand by that

3     objection and move for a mistrial accordingly.

4          THE COURT:  That is denied.  I didn't need a side bar

5     because I knew that was your objection.  You made it clear from

6     your remarks.

7          As I have said innumerable times, the evidence

8     regarding Dr. Naveed, also known as Dr. Ahmad, is highly

9     relevant on a whole bunch of issues in this case, and the

10    government is free to argue all of that.  That doesn't make him

11    a co-conspirator, and it doesn't follow from the fact that he

12    is not a co-conspirator that that evidence is irrelevant.  I am

13    not going to go through the various analogies I used in the

14    very lengthy discussion we had about this.  The objection by

15    defense counsel is once again overruled.

16         We will see you all at 2 o'clock.

17         (Luncheon recess)

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             2:06 p.m.

3            (Jury not present)

4            THE COURT:  So I forgot to mention that as soon as I

5       finish my charge and the jury retires to begin their

6       deliberations, counsel need to gather all the exhibits other

7       than the recordings from both sides, show them to each other to

8       make sure there's no disagreement, and then give them to my

9       courtroom deputy who will bring them into the jury room.  That

10      should be done immediately.

11           MS. ESTES:  Yes, your Honor.  Just a few questions

12      about aside from the recordings, there are some other exhibits

13      that would be on discs.  For instance, there were Excel

14      spreadsheets, pole camera footage.  We just wanted to know what

15      your Honor would like to do with those.

16           THE COURT:  Well, they're not going to have any

17      equipment inside the jury room, but do we have hard copies of

18      this?  I didn't realize they were not on hard copies.

19           MS. ESTES:  The Excel I think we could print out.  It

20      would be voluminous and a little confusing, but we could.

21           THE COURT:  But that's all -- both sides referred to

22      that.  You're talking about the --

23           MS. ESTES:  The Bureau of Narcotics Enforcement

24      records that --

25           THE COURT:  What about the pages showing the specific

GB8LGOH4

1    charges made on specific days?

2              MS. ESTES:  Those are all printed in hard copy.

3              THE COURT:  That's all I care about.

4          So I can tell the jury in addition to the recordings,

5    what are the things that are -- because we won't to send them

6    in because they won't have the equipment.

7              MS. ESTES:  Government Exhibit 101 and 102 are Excel

8    spreadsheets of Bureau of Narcotics Enforcement data for the

9    pharmacy.

10             THE COURT:  Used for what?

11             MS. ESTES:  To -- they show the controlled substance

12   prescriptions from the pharmacy.

13             THE COURT:  Oh, okay.  What's the other?

14             MS. ESTES:  And then the pole camera footage.

15             THE COURT:  Okay.  Anything else?

16             MR. BACHNER:  Your Honor, how are you, Judge.  I just

17   noticed you have a copy, what appear to be a copy of the charge

18   for the jurors.  Do you have a preference for deliberations as

19   far as the charge is concerned whether they get a copy?

20             THE COURT:  Of course they get a copy.  Only

21   antediluvian judges don't send copies of the charge to the jury

22   anymore.

23             MR. BACHNER:  No comment, your Honor.

24             THE COURT:  I can never understand.  For example, not

25   to single out any judge in this exalted court, but in the

1    Northern District of Virginia, known as the rocket docket, not

2    only do they not send the charge to the jury in printed form,

3    but they do not allow the jury to ask for the reading back of

4    testimony.

5             MR. BACHNER:  I just had a trial in Philadelphia where

6    no read-backs were permitted.

7             THE COURT:  My view of that, for what it's worth, is

8    I'm not sure whether it's unconstitutional, but it's certainly

9    irrational.  Now you've got me in trouble with some of my

10   fellow judges.  Anyway, no.  I let jurors take notes.  I let

11   jurors -- every juror gets an individual copy of my charge.

12   And if at some point, for example, they ask for testimony, we

13   will initially send them one copy just so they can get going,

14   but then we'll send them in 11 additional copies so that

15   everyone will have a copy because what jurors are supposed to

16   do, and in my experience they do do unless they are prevented

17   from doing so, is exercise reason.  So, yes.

18            MS. ESTES:  Sorry, your Honor.  We just had one more

19   question.  As to the text messages, can those -- there were

20   sheets with the text messages listed.  Are those permitted to

21   go back?

22            THE COURT:  Were they in evidence?

23            MS. ESTES:  Yes.

24            THE COURT:  Why not.  The only thing I don't want to

25   go back is something they can't access, that we need equipment

 1   to access, and I want to inform them of that so that they can

 2   come out here if they want it and we'll access it for them.

 3           MS. ESTES:  Okay.  Then one other question just for

 4   clarification.  What about the transcripts of the calls?

 5           THE COURT:  The transcripts are going in.  I

 6   specifically refer them into my charge, to which I refer you.

 7           MS. ESTES:  Sorry, your Honor.

 8           THE COURT:  Which I tell them that, as defense counsel

 9   requested, that the transcripts are aids and if they have any

10   question of what actually was said on the call, they need to

11   notify us and we'll have them come out and play the call.

12           MS. ESTES:  Thank you, your Honor.

13           THE COURT:  Anything else?

14           MR. BACHNER:  No, your Honor.

15           MR. KEHOE:  No, your Honor.

16           THE COURT:  Okay.  Let's bring in the jury.

17           THE DEPUTY CLERK:  Marshal, please bring in the jury.

18           (Jury present)

19           THE COURT:  Please be seated.

20           All right, ladies and gentlemen.  Each of you now has

21   a copy of my instructions of law.  We're going to read them

22   together now, but then you'll also have them to take with you

23   into the jury room.

24           If you look at the table of contents on page 1, you'll

25   see that my instructions are divided into three parts:  First,

1    the general instructions.  These apply not just to this case

2    but really to all criminal cases.  Then there are the specific

3    instructions of the two charges in this case.  And, finally,

4    there are some concluding instructions about how you fill out

5    your verdict form and things like that.  So let's turn the page

6    and begin reading.

7            We are now approaching the most important part of this

8    case, your deliberations.  You have heard all of the evidence

9    in the case, as well as the final arguments of the lawyers for

10   the parties.  Before you retire to deliberate, it is my duty to

11   instruct you as to the law that will govern your deliberations.

12   As I told you at the start of the case, and as you agreed, it

13   is your duty to accept my instructions of law and apply them to

14   the facts as you determine them.

15           Regardless of any opinion that you may have as to what

16   the law may be or ought to be, it is your sworn duty to follow

17   the law as I give it to you.  Also, if any attorney or other

18   person has stated a legal principle different from any that I

19   state to you in my instructions, it is my instructions that you

20   must follow.

21           Because my instructions cover many points, I provide

22   each of you with a copy of them, not only so you can follow

23   them as I read them to you now, but also so that you can have

24   them with you for reference throughout your deliberations.  In

25   listening to them now and reviewing them later, you should not

single out any particular instruction as alone stating the law,

but you should instead consider my instructions as a whole.

Your duty is to decide the fact issues in the case and

arrive, if you can, at a verdict.  You, the members of the

jury, are the sole and exclusive judges of the facts.  You pass

upon the weight of the evidence; you determine the credibility

of the witnesses; you resolve such conflicts as there may be in

the testimony; and you draw whatever reasonable inferences you

decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own

recollection of the evidence.  To aid your recollection, we

will send you all the exhibits -- except the recordings and a

couple others that I'll mention in a minute -- at the start of

your deliberations, and if you need to review particular items

of testimony, we can also arrange to provide them to you in

transcript or read-back form.

Please remember that none of what the lawyers have

said in their opening statements, in their closing arguments,

in their objections, or in their questions, is evidence.  Nor

is anything I may have said evidence.  The evidence before you

consists of just three things:  the testimony given by the

witnesses that was received in evidence, the exhibits that were

received in evidence, and the stipulations of the parties that

were received in evidence.  In addition, there were certain

charts that were received as aids to you in summarizing certain

1    data from exhibits in evidence.  In other words, those charts

2    are not themselves evidence, but may in your discretion be

3    considered as summaries that may or may not be helpful.

4           Regarding testimony, keep into mind that testimony

5    consists of the answers that were given by the witnesses to the

6    questions that were permitted.  Please remember that questions,

7    although they may provide the context for answers, are not

8    themselves evidence; only answers are evidence, and you should

9    therefore disregard any question to which I sustained an

10   objection.  Also, you may not consider any answer that I

11   directed you to disregard or that I directed be stricken from

12   the record.  Likewise, you may not consider anything you heard

13   about the contents of any exhibit that was not received in

14   evidence.

15          Furthermore, you should be careful not to speculate

16   about matters not in evidence.  For example, there is no legal

17   requirement that the government prove its case through a

18   particular witness or by use of a particular law enforcement

19   technique.  Nor should you speculate about why one or another

20   person whose name may have figured in the evidence is not part

21   of this trial or what his or her situation may be.  Your focus

22   should be entirely on assessing the evidence that was presented

23   here for your consideration.

24          It is the duty of the attorney for each side of the

25   case to object when the other side offers testimony or other

1    evidence that the attorney believes is not properly admissible.

2    Counsel also have the right and duty to ask the Court to make

3    rulings of law and to request conferences at the side bar out

4    of the hearing of the jury.  All such questions of law must be

5    decided by me.  You should not show any prejudice against any

6    attorney or party because the attorney objected to the

7    admissibility of evidence, asked for a conference out of the

8    hearing of the jury, or asked me for a ruling on the law.

9            I also ask you to draw no inference from my rulings or

10   from the fact that on occasion I asked questions of certain

11   witnesses.  My rulings were no more than applications of the

12   law, and my questions were only intended for clarification or

13   to expedite matters.  You are expressly to understand that I

14   have no opinion as to the verdict you should render in this

15   case.

16           You are to perform your duty of finding the facts

17   without bias or prejudice as to any party.  You are to perform

18   your final duty in an attitude of complete fairness and

19   impartiality.  You are not to be swayed by rhetoric or

20   emotional appeals.

21           The fact that the prosecution is brought in the name

22   of the United States of America entitles the government to no

23   greater consideration than that accorded any other party.  By

24   the same token, it is entitled to no less consideration.  All

25   parties, whether the government or individuals, stand as equals

1    at the bar of justice.

2          Please also be aware that the question of possible

3    punishment is the province of the judge, not the jury, and it

4    therefore should not enter into or influence your deliberations

5    in any way.  Your duty is to weigh the evidence and not be

6    affected by extraneous considerations.

7          It must be clear to you that if you were to let bias

8    or prejudice or fear or sympathy or any other irrelevant

9    consideration interfere with your thinking, there would be a

10   risk that you would not arrive at a true and just verdict.  So

11   do not be guided by anything except clear thinking and calm

12   analysis of the evidence.

13         The defendant here, Kian Gohari, is charged with two

14   federal crimes about which I will instruct you shortly.  Please

15   bear in mind, however, that the charges, or "counts" as they

16   are called, are not themselves evidence of anything.

17         The defendant has pled not guilty to both charges.  To

18   prevail against the defendant on a given charge, the government

19   must prove each essential element of that charge beyond a

20   reasonable doubt.  This burden never shifts to the defendant,

21   for the simple reason that the law presumes the defendant to be

22   innocent and never imposes upon any defendant in a criminal

23   case the burden or duty of calling any witness or producing any

24   evidence.

25         In other words, as to each charge, the defendant

1   starts with a clean slate and is presumed innocent until such

2   time, if ever, that you as a jury are satisfied that the

3   government has proved that the defendant is guilty of that

4   charge beyond a reasonable doubt.

5          Since, in order to convict the defendant of a given

6   charge, the government is required to prove that charge against

7   the defendant beyond a reasonable doubt, the question then is:

8   What is a reasonable doubt?  The words almost define

9   themselves.  It is a doubt based upon reason.  It is a doubt

10  that a reasonable person has after carefully weighing all of

11  the evidence.  It is a doubt that would cause a reasonable

12  person to hesitate to act in a matter of importance in his or

13  her personal life.  Proof beyond a reasonable doubt must

14  therefore be proof of a convincing character that a reasonable

15  person would not hesitate to rely on in making an important

16  decision.

17         A reasonable doubt is not caprice or whim.  It is not

18  speculation or suspicion.  It is not an excuse to avoid the

19  performance of an unpleasant duty.  The law does not require

20  the government prove guilt beyond all possible doubt.  Proof

21  beyond a reasonable doubt is sufficient to convict.

22         If, after fair and impartial consideration of the

23  evidence, you have a reasonable doubt as to the defendant's

24  guilt with respect to a particular charge against him, you must

25  find that defendant not guilty of that charge.  On the other

1    hand, if after fair and impartial consideration of all the

2    evidence you are satisfied beyond a reasonable doubt of a

3    defendant's guilt with respect to a particular charge against

4    him, you should not hesitate to find the defendant guilty of

5    that charge.

6              In deciding whether the government has met its burden

7    of proof, you may consider both direct evidence and

8    circumstantial evidence.

9              Direct evidence is evidence that proves a fact

10   directly, for example, where a witness testifies to what he or

11   she saw, heard, or observed, that is called direct evidence.

12             Circumstantial evidence is evidence that tends to

13   prove a disputed fact by proof of other facts.  To give a

14   simple example, suppose that when you came into the courthouse

15   today the sun was shining and it was a nice day, but the

16   courthouse blinds were drawn and you could not look outside.

17   Later, as you were sitting here, someone walked in with a

18   dripping wet umbrella, and, soon after, someone else walked in

19   with a dripping wet raincoat.  Now, on our assumed facts, you

20   cannot look outside the courtroom and you cannot see whether it

21   is raining so you have no direct evidence of that fact.  But on

22   the combination of the facts about the umbrella and the

23   raincoat, it would be reasonable for you to infer that it had

24   begun raining.

25             That is all there is to circumstantial evidence.

1    Using your reason and experience, you infer from established

2    facts the existence or the nonexistence of some other fact.

3    Please note, however, that it is not a matter of speculation or

4    guess; it is a matter of logical inference.

5              The law makes no distinction between direct and

6    circumstantial evidence.  Circumstantial evidence is of no more

7    or less value than direct evidence and you may consider either

8    or both and may give them such weight as you conclude is

9    warranted.

10             It must be clear to you by now that counsel for the

11   government and counsel for the defendant are asking you to draw

12   very different conclusions about various factual issues in the

13   case.  Deciding these issues will involve making judgments

14   about the testimony of the witnesses you have listened to and

15   observed.  In making these judgments, you should carefully

16   scrutinize all of the testimony of each witness, the

17   circumstances under which each witness testified, and any other

18   matter in evidence that may help you decide the truth and the

19   importance of each witness's testimony.

20             Your decision to believe or not to believe a witness

21   may depend on how that witness impressed you.  How did the

22   witness appear?  Was the witness candid, frank, and forthright,

23   or did the witness seem to be evasive or suspect in some way?

24   How did the way the witness testified on direct examination

25   compare with how the witness testified on cross-examination?

1   Was the witness consistent or contradictory?  Did the witness

2   appear to know what he or she was talking about?  Did the

3   witness strike you as someone who was trying to report his or

4   her knowledge accurately?  These are examples of the kinds of

5   common sense questions you should ask yourselves in deciding

6   whether a witness is or is not truthful.

7          How much you choose to believe a witness may also be

8   influenced by the witness's bias.  Does the witness have as

9   relationship with the government or the defendant that may

10  affect how he or she testified?  Does the witness have some

11  incentive, loyalty, or motive that might cause him or her to

12  shade the truth?  Does the witness have some bias, prejudice,

13  or hostility that may cause the witness to give you something

14  other than a completely accurate account of the facts that he

15  or she testified to?

16         In this regard, you have heard testimony from Gilberto

17  Cabrera and Sheri Bowen, cooperating witnesses who testified

18  that they had pled guilty to activity related to the activity

19  about which the defendant is charged and have now entered into

20  agreements to cooperate with the government.  The law permits

21  the use of testimony from cooperating witnesses; indeed, such

22  testimony, if found truthful by you, may be sufficient in

23  itself to warrant conviction if it convinces you of the

24  defendant's guilt beyond a reasonable doubt.  However, the law

25  requires that the testimony and motives of a cooperating

witness be scrutinized with particular care and caution.  After

carefully scrutinizing the testimony of a cooperating witness

and taking account of it's special features, you may give it as

little or as much weight as you deem appropriate.

As to all witnesses, you should also consider whether

a witness had an opportunity to observe the facts he or she

testified about.  Also, as to all witnesses, you should

consider whether the witness's recollection of the facts stands

up in light of the other evidence in the case.

In other words, for all witnesses, what you must try

it do in deciding credibility is to size up a person just as

you would in any important matter where you're trying to decide

if a person is truthful, straightforward, and accurate in his

or her recollection.

The law permits parties to offer opinion evidence from

witnesses who were not involved in the underlying events of the

case but who by education or experience have expertise in a

specialized area of knowledge.  In this case, William T.

Winsley was offered by such a witness by the government, and

Ronald G. Quintero was offered as such a witness by the

defendant.  Specialized testimony is presented to you on the

theory that someone who is learned in the field may be able to

assist you in understanding specialized aspects of the

evidence.

However, your role in judging credibility and

assessing weight applies just as much to these witnesses as to

other witnesses.  When you consider the specialized opinions

and specialized information that were received in evidence in

this case, you may give them as much or as little weight as you

think they deserve.  For example, a specialized witness

necessarily bases his or her opinions or other information, in

part or in whole, on what that witness learned from others, and

you may conclude that the weight given the witness's opinions

may be affected by how accurate or inaccurate that underlying

information is.  More generally, if you find that the opinions

or information provide by a specialized witness were not based

on sufficient data, education, or experience, or if you should

conclude that the trustworthiness or credibility of such a

witness is questionable, or if the opinion of the witness is

outweighed, in your judgment, by other evidence in the case,

then you may, if you wish, disregard the opinions or other

specialized information provided by that witness, either

entirely or in part.

        On the other hand, if you find that a specialized

witness is credible and that the witness's opinions and other

specialized information are based on sufficient data,

education, and experience, and that the other evidence does not

give you a reason to doubt the witness's conclusions, you may,

if you wish, rely on the opinions or other specialized

information presented by that witness and give them whatever

1   weight you deem appropriate.

2           Defendant Kian Gohari did not testify in this case.

3   Under our Constitution, a defendant has no obligation to

4   testify or to present any evidence, because it is the

5   government's burden to prove a defendant guilty beyond a

6   reasonable doubt.  A defendant is never required to prove that

7   he or she is innocent.

8           Accordingly, you must not attach any significance to

9   the fact that Mr. Gohari did not testify.  No adverse inference

10  against Mr. Gohari may be drawn by you because he did not take

11  the witness stand, and you may not consider it against

12  Mr. Gohari in any way in your deliberations in the jury room.

13          With these preliminary instructions in mind, let us

14  turn to the specific charges against the defendant Kian Gohari.

15  This charges were originally set forth in what is called an

16  indictment, which is simply a charging instrument and is not

17  itself evidence, so it will not be presented to you.  The

18  indictment in this case contains a total of two counts, and

19  each count charges a different crime.  I will, for convenience,

20  refer to each charge or count by its number as it appears in

21  the indictment.  But there is no significance to the order of

22  these numbers.

23          Count One charges that the defendant conspired with

24  others to violate federal narcotics laws.  Count Two charges

25  that the defendant conspired with others to commit healthcare

1    fraud.

2              Let us turn first to Count One, which charges the

3    defendant with conspiracy to violate the narcotics laws, but

4    specifically conspiracy to distribute oxycodone.

5              In order for a defendant to be guilty of conspiracy,

6    the government must prove beyond a reasonable doubt:  first,

7    that the charged conspiracy existed; and, second, that at some

8    point the defendant knowingly and willfully joined the

9    conspiratorial agreement and thereby became a member of the

10   conspiracy.

11             Starting with the first essential element, what is a

12   conspiracy?  A conspiracy is an agreement, or an understanding,

13   of two or more persons to accomplish by concerted action one or

14   more unlawful purposes.

15             In this count, the unlawful purpose alleged to be the

16   object of the conspiracy is the unlawful distribution of

17   oxycodone.  As you have heard, oxycodone may be lawfully

18   dispensed for certain prescribed purposes, but, because of its

19   highly addictive qualities, it is otherwise prohibited from

20   being dispensed.  A pharmacist who acts outside the usual

21   course of professional practice and knowingly dispenses

22   oxycodone for no legitimate medical purpose may be found guilty

23   of unlawful distribution.  On the other hand, a pharmacist who

24   in good faith fills prescriptions for oxycodone in the regular

25   course of a legitimate professional practice does not violate

1   the laws.

2           Please bear in mind that conspiracy is an entirely

3   distinct and separate offense from a pharmacist actually

4   unlawfully distributing oxycodone.  The actual commission of

5   the object of the conspiracy is not an essential element of the

6   crime of conspiracy.  Rather, the government is required to

7   prove beyond a reasonable doubt only that two or more persons,

8   in some way or manner, explicitly or implicitly, came to an

9   understanding to accomplish the objective of unlawfully

10  distributing oxycodone.

11          Further, while it is charged that the alleged

12  conspiracy began in or about 2012 and continued through

13  October 2015, it is not essential that the government prove

14  that the conspiracy started and ended on those specific dates

15  or that it existed throughout that period.  Rather, it is

16  sufficient to satisfy the first element that you find that in

17  fact a conspiracy was formed and that it existed for any time

18  within the charged period.

19          If you conclude that the government has proved beyond

20  a reasonable doubt that the charged conspiracy existed, you

21  must then consider the second essential element, which is that

22  the defendant intentionally joined and participated in the

23  conspiracy.  To prove this element, the government must prove

24  beyond a reasonable doubt that the defendant entered into the

25  conspiracy to unlawfully distribute oxycodone and did so

1    knowingly and willfully.

2           To act "knowingly" means in this context to act

3    consciously and deliberately rather than mistakenly or

4    inadvertently; and to act "willfully" in this context means to

5    act voluntarily, purposely, and with an intent to further the

6    unlawful distribution of oxycodone.  Thus, a defendant enters

7    into a conspiracy knowingly and willfully if he joins the

8    conspiracy deliberately, purposefully, and with an intent to

9    further its unlawful object.  If you find beyond a reasonable

10   doubt that the defendant joined in the charged conspiracy and

11   did so knowingly and willfully, then the second element is

12   satisfied.

13          It is not necessary that the defendant be fully

14   informed of all the details of the conspiracy in order to

15   justify an inference of participation on his part.  Nor does a

16   given defendant need to know the full extent of the conspiracy

17   or all of its participants.  It is not necessary that a

18   defendant receive any monetary benefit from participating in

19   the conspiracy.  All that is necessary is proof beyond a

20   reasonable doubt that a defendant knowingly and willfully

21   joined in the conspiracy with the purpose of furthering its

22   unlawful object.

23          In this regard, in considering whether the defendant

24   knew that the object of the conspiracy was the unlawful

25   distribution of oxycodone, you may consider whether the

1    defendant took deliberate steps to avoid learning what

2    otherwise would have been obvious.  Please be clear that this

3    is not a matter of the defendant's mere negligence, foolishness

4    or mistake; rather, it requires a conscious purpose to avoid

5    learning the truth.

6         For example, if you find that the defendant was aware

7    of the high probability that the prescriptions for oxycodone

8    were issued outside of the course of professional practice and

9    not for a legitimate purpose, but that the defendant, in order

10   to remain ignorant of these circumstances (as opposed to

11   actually believing such circumstances do not exist),

12   deliberately choose not to inquire further, then you may find

13   that the defendant actually understood that the object of the

14   conspiracy was the unlawful distribution of oxycodone.

15        However, let me advise you that a defendant's good

16   faith is a complete defense to the charges in this case.  A

17   pharmacist who in good faith fills prescriptions for drugs in

18   the regular course of a legitimate professional practice is

19   protected from conviction.  A pharmacist acts in good faith

20   when he or she is engaged in the honest exercise of

21   professional judgment and acts with a reasonable belief as to

22   the proper medical practice.  The burden of establishing

23   criminal intent and lack of good faith rests upon the

24   government.  A defendant is under no burden to prove his or her

25   good faith; rather, the government must prove bad faith and an

1    intent to unlawfully distribute oxycodone.

2            Finally, the law does not require that each

3    conspirator have an equal role in the conspiracy.  Even a

4    single act may be sufficient to draw a defendant within the

5    ambit of the conspiracy if it meets the essential requirements

6    I have described.

7            However, keep in mind that the government charges that

8    the defendant reached the unlawful agreement between himself

9    and at least one of the following people:  Gilberto Cabrera,

10   Sheri Bowen, Robert Hespeth, Alberto Nazario, Willie Johnson,

11   Jorge Tirado, Duane Harrison, Michael Harper, Wilfredo Stretz,

12   Darin Benn, Luther Perry, Danny Joyner, Darnell Ford, Tonya

13   Freeman, Stefone Holliman, Eugene Seaman, Leslie Stewart,

14   Phillip Ingram, Michelle Middleton.

15           Thus, even if you were to find that there was a

16   conspiracy agreement between the defendant and any other person

17   whose name has arisen in evidence, such an agreement would not

18   satisfy the charge in Count One.

19           And I might pause there and say in particular

20   Dr. Naveed, sometimes called Dr. Ahmad, is not named as a

21   member of the charged conspiracies here.  There's evidence that

22   was admitted as to him, but if you find a conspiracy, it has to

23   be between the defendant and at least one of the people on this

24   list and not Dr. Ahmad, also known as Dr. Naveed.

25           A final caution:  the mere association by one person

1    with another person does not make that first person a member of

2    a conspiracy even when coupled with knowledge that the second

3    person is committing a crime.  Mere presence at the scene of a

4    crime, even coupled with the knowledge that a crime is taking

5    place, is not sufficient to support a conviction.  In other

6    words, knowledge without participation is not sufficient.  What

7    is necessary is that the defendant participated in the

8    conspiracy with knowledge of its unlawful purpose and with

9    intent to aid in the accomplishment of its unlawful purpose.

10            In short, in order to satisfy the second essential

11   element of the conspiracy charge, you must find beyond a

12   reasonable doubt that the defendant, with an understanding of

13   the unlawful character of the charged conspiracy, knowingly and

14   willfully joined and participated in the conspiracy for the

15   purpose of furthering its unlawful object.

16            Let us now turn to Count Two, which charges the

17   defendant with conspiracy to commit healthcare fraud.

18            You will recall that in order for a defendant to be

19   guilty of any conspiracy, the government must prove beyond a

20   reasonable doubt:  first, that the charged conspiracy existed;

21   and, second, that at some point the defendant knowingly and

22   willfully joined the conspiratorial agreement and thereby

23   became a member of the conspiracy.

24            The same instructions I gave you in Instruction No. 11

25   as to the nature and legal requirements of any conspiracy apply

1    just as much to Count Two as to Count One.  The difference is

2    that the object of the alleged Count Two conspiracy is the

3    crime of healthcare fraud.

4         The underlying crime of healthcare fraud requires:

5    first, that there existed a scheme to defraud or obtain money

6    or property by false or fraudulent pretensions,

7    representations, or promises in connection with the delivery of

8    or payment for healthcare benefits, items, or services; second,

9    that the defendant knowingly and willfully executed or

10   attempted to execute that scheme with the intent to defraud;

11   and, third, that the target of the scheme was a healthcare

12   benefit program such as Medicaid.  Accordingly, in Count Two,

13   the government charges that two or more persons, at least one

14   of which was one of the alleged coconspirators listed

15   previously, unlawfully agreed to submit to Medicaid false

16   requests for reimbursement for drugs that were not dispensed to

17   patients and to submit to Medicaid requests for reimbursement

18   based on fraudulently obtained prescriptions.

19        As with Count One, while -- by the way, where it says

20   there in the top sentence on 29, Accordingly, in Count Two the

21   government charges that two or more persons, at least one of

22   which was one of the alleged coconspirators listed previously,

23   unlawfully agreed to submit to Medicaid false requests for

24   reimbursement for drugs that were not dispensed to patients,

25   "or" rather than "and."  I'm just marking my copy and you may

1    want to in your copy, or to submit to Medicaid requests for

2    reimbursement based on fraudulently obtained prescriptions.

3    Either one would qualify.

4          As with Count One, while it is charged that the

5    alleged Count Two conspiracy began in or about 2012 and

6    continued through October 2015, it is not essential that the

7    government prove that the conspiracy started and ended on those

8    specific dates or that it existed throughout that period.

9    Rather, it is sufficient to satisfy the first element that you

10   find that in fact a conspiracy was formed and that it existed

11   for any time within the charged period.

12         If you conclude that the government has proved beyond

13   a reasonable doubt that the charged conspiracy existed, you

14   must then consider the second essential element, which is that

15   the defendant intentionally joined and participated in the

16   conspiracy.  To prove this element, the government must prove

17   beyond a reasonable doubt that the defendant entered into a

18   conspiracy to commit healthcare fraud and did so knowingly and

19   willfully and with knowledge of its object as I have defined

20   these terms previously.

21         In considering whether the defendant knew that the

22   object of the conspiracy was to commit healthcare fraud, you

23   may consider whether the defendant took deliberate steps to

24   avoid learning what otherwise would have been obvious.  Please

25   remember that this is not a matter of a defendant's mere

1    negligence, foolishness, or mistake; rather, it requires a

2    conscious purpose to avoid learning the truth.  For example, if

3    you find that the defendant was aware of a high probability

4    that his pharmacy's requests to Medicaid for reimbursement were

5    being submitted based on fraudulently obtained prescriptions,

6    but that the defendant, in order to remain ignorant of that

7    deception (as opposed to actually believing that such deception

8    did not exist), deliberately chose not to inquire further about

9    the prescriptions, then you may find that the defendant

10   actually understood that the object of the conspiracy was

11   healthcare fraud.

12          Also, once again, let me advise you that a defendant's

13   good faith is a complete defense to Count Two, just as it would

14   be to Count One.  A pharmacist acts in good faith when he or

15   she is engaged in the honest exercise of professional judgment

16   and acts with a reasonable belief as to proper medical

17   practice.  The burden of establishing criminal intent and lack

18   of good faith rests upon the government.  A defendant is under

19   no burden to prove his or her good faith; rather, the defendant

20   must prove bad faith and an intent to defraud beyond a

21   reasonable doubt.

22          One last requirement.  Before the defendant can be

23   convicted of any given charge, the government must also

24   establish what is called "venue," that is, some act in

25   furtherance of that charge occurred in the Southern District of

1    New York.  The Southern District of New York is the judicial

2    district that includes Manhattan, the Bronx, Westchester, and

3    several other counties not here relevant.  Venue is proper if

4    any act in furtherance of the crime you are considering

5    occurred in the Southern District of New York, regardless of

6    whether it was the act of the charged defendant or anyone else.

7    Furthermore, on the issue of venue -- and on this issue

8    alone -- the government can meet its burden by a preponderance

9    of the evidence, that is, by showing that it was more likely

10   than not that an act it further furtherance of a given crime

11   occurred in the Southern District of New York.

12           You will shortly retire to the jury room to begin your

13   deliberations.  As soon as you get to the jury room, please

14   select one of your number as the foreperson to preside over

15   your deliberations and to serve as your spokesperson if you

16   need to communicate with the Court.

17           You will be bring with you into the jury room a copy

18   of my instructions of law and a verdict form on which to record

19   your verdict.  Let me pause there and just show you, ladies and

20   gentlemen, the verdict form.  It's a very simple form.  It just

21   asks you two questions, whether on Count One the charge of

22   conspiracy to unlawfully distribute oxycodone you find the

23   defendant guilty or not guilty.  You'll just check the relevant

24   box.  And, similarly, on Count Two, the charge of conspiracy to

25   commit healthcare fraud, you'll check either guilty or not

1    guilty.

2              The foreperson will then sign the form, date it, fold

3    it up and seal it in this envelope very cleverly marked

4    "verdict" and that envelope in sealed form will be brought to

5    me and I will not open it until all 12 of you are back here in

6    the courtroom.  And then we will open it, read it to you, and

7    we'll ask each one of you whether that is in fact your verdict.

8    And the reason we go through all those formalities is to be

9    absolutely sure we have your verdict as you recite it.

10             Back to the instructions.  In addition, we will send

11   into the jury room all the exhibits except the recordings that

12   were admitted into evidence.  And also I understand there are

13   two other exhibits that are on disc, an Excel spreadsheets of

14   certain Bureau of Narcotics data and the full camera footage.

15   If you want to hear any of the recordings, if you want to see

16   any of the footage that's not in the parts that are in the jury

17   room, if you want to see that Excel sheet or any part of that,

18   just send us a note and we'll bring you back to the courtroom

19   and you can hear the recordings, etc.  You will, however, have

20   the transcripts of the recordings as an aid, but the ultimate

21   evidence is the recordings.  So if you have any question about

22   it, just ask to hear the recordings and we'll bring you back

23   for that purpose.

24             Back to the instructions.  If you want any of the

25   testimony provided to you, that can be done in either

1   transcript or read-back form.  But please remember that it is

2   not always easy to locate what you might want, so be as

3   specific as you possibly can be in requesting portions of the

4   testimony.

5          As to the recordings, you will have with you in the

6   jury room the transcripts of the recordings as an aid, but

7   please remember that these transcripts are only an aid to your

8   memory and that the recordings are the actual evidence of what

9   was said.  So if you want to hear the actual recordings, please

10  let us know and we will bring you back not courtroom for that

11  purpose.  As I mentioned, that also applies to the Excel sheet

12  and the full camera footage.

13         Any of your requests, in fact, any communication with

14  the Court, should be made to me in writing, signed by your

15  foreperson, and given to the marshal who will be available

16  outside the jury room throughout your deliberations.  After

17  consulting with counsel, I will respond to any question or

18  request you have as promptly as possible, either in writing or

19  by having you return to the courtroom so that I can speak with

20  you in person.

21         You should not, however, tell me or anyone else how

22  the jury stands on any issue until you have reached your

23  verdict and recorded it on your verdict form.  As I have

24  already explained, the government, to prevail on a particular

25  charge, must prove each essential element of that charge beyond

1    a reasonable doubt.  If the government carried this burden, you

2    should find the defendant guilty of that charge.  Otherwise,

3    you must find the defendant not guilty of that charge.

4            Each of you must decide the case for yourself, after

5    consideration with your fellow jurors of the evidence in the

6    case, and your verdict must be unanimous.  If deliberating,

7    bear in mind that while each juror is entitled to his or her

8    opinion, you should exchange views with your fellow jurors.

9    That is the very purpose of jury deliberation -- to discuss and

10   consider the evidence; to listen to the arguments of fellow

11   jurors; to present your individual views; to consult with one

12   another; and to reach a verdict based solely and wholly on the

13   evidence.  If after carefully considering all the evidence and

14   the arguments of your fellow jurors you entertain a

15   conscientious view that differs from the others, you are not to

16   yield your view simply because you are outnumbered.  On the

17   other hand, you should not hesitate to change an opinion that,

18   after discussion with your fellow jurors, now appears to you

19   erroneous.

20           In short, your verdict must reflect your individual

21   views and must also be unanimous.  This concludes my

22   instructions of law.

23           Now, before we swear in the marshal, all objections

24   and other preserved points relating to the jury instructions

25   are deemed to have been reargued at this point and the rulings

 1    of the Court stands.

 2            Is there any other reason why counsel needs to

 3    approach at side bar?

 4            MS. ESTES:  No, your Honor.

 5            MR. KEHOE:  No, your Honor.

 6            THE COURT:  Very good.  All right.  We will swear in

 7    the marshal.

 8            (Marshal sworn)

 9            THE COURT:  Now, before you follow my courtroom deputy

10    and the marshal into the jury room, a couple of time scheduling

11    items.  It's now about ten of three.  You should begin your

12    deliberations immediately once you select your foreperson.

13    Your deliberations can take as little or as long as you want.

14    I've had juries that have taken five minutes.  I've had juries

15    that have taken five days.  It's entirely up to you.  But if

16    you haven't reached a verdict by 4 o'clock today, you should

17    all go home, be sure not to discuss the case.  Come back

18    tomorrow.

19            I think because it's the day after the election, we'll

20    ask you to come back again at 10 o'clock rather than 9 o'clock

21    so to give you a little time to watch the results.  But come

22    back at 10 o'clock.  Whoever is your foreperson is in charge of

23    making sure that your deliberations do not resume until all 12

24    of you are back in the jury room.  And then, again, you

25    deliberate as long as you like and if it goes more than another

1   day, it will be again you would leave at 4 o'clock.

2          Now, at this point the one part of this process that I

3   don't like occurs and that is I have to excuse the three

4   alternate jurors.  However, you're not totally off the hook.

5   You should still not discuss this case in any way, shape, or

6   form with anyone because if, God forbid, one of our regular

7   jurors were to get sick or something happens and we have to

8   replace that juror, then we're going to call you back.  We'll

9   call in order one, two, and three.  So until the case is over,

10  you are still eligible to be called back, at which point the

11  deliberations would start all over again with you being

12  present.

13         We will let you know when the jury has reached a

14  verdict so you'll know that you're then released.  But I want

15  to thank all three of you for your excellent service and,

16  subject to being recalled, you can now go into the jury room

17  and take your stuff and then leave before I excuse the full

18  jury.  So thank you so much.

19         JUROR:  Thank you, your Honor.

20         (Alternate jurors excused)

21         THE COURT:  We'll take a few minutes for the lawyers

22  to gather the exhibits together, but we'll send them in in a

23  very few minutes.

24         (Pause)

25         THE COURT:  All right.  So please follow my courtroom

1   deputy and the marshal to the jury room.

2              (Jury retired to deliberate; time noted:  2:54 p.m.)

3              THE COURT:  All right.  Please be seated.

4              I have marked one copy of my charge as Court Exhibit 1

5   and I'll give it to my courtroom deputy to docket.  And, as

6   mentioned, we'll also docket the letters from yesterday.

7              Now, while the jury is deliberating, one

8   representative of each side must be on this floor at all times.

9   You can go outside into the hallway, but you cannot go outside

10  this floor, and that's so that we can respond promptly to any

11  note that's received.  The exception will be if they deliberate

12  into tomorrow between one and two, I'll tell them that counsel

13  is excused for lunch between one and two.

14             Anything else any counsel needs to raise with the

15  Court?

16             MR. KEHOE:  No, your Honor.

17             MS. ESTES:  No, your Honor.

18             THE COURT:  Very good.  Thanks very much.

19             (Recess pending verdict)

20             (Adjourned to November 9, 2016, at 10 a.m.)

21

22

23

24

25